

Deposition of:
## Ken Robertson

*July 2, 2020*

In the Matter of:

## Ray, Sylvia Vs. Gray, Bradley, The Estate Of, et al.

Veritext Legal Solutions
877.373.3660 | calendar-al@veritext.com | 800.808.4958

1      IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4   CIVIL ACTION: 2:19-00069-KD-MU

5

6   SYLVIA RAY, AS PERSONAL

7   REPRESENTATIVE OF THE

8   ESTATE OF PAIGE MITCHELL,

9   DECEASED, et al.,

10          Plaintiffs,

11   vs.

12   ESTATE OF BRADLEY ELLIOTT GRAY,

13   et al.,

14          Defendants.

15

16              DEPOSITION

17                 OF

18             KEN ROBERTSON

19             JULY 2, 2020

20

21   TAKEN BY: Maya Rose

22          Registered Professional Reporter

23          and Notary Public

1    S T I P U L A T I O N S
2       IT IS STIPULATED AND AGREED, by and
3    between the parties, through their respective
4    counsel, that the deposition of KEN ROBERTSON
5    may be taken before MAYA ROSE, Commissioner,
6    Court Reporter and Notary Public, State at
7    Large;
8       That the signature to and the reading of
9    the deposition by the witness is waived, the
10   deposition to have the same force and effect
11   as if full compliance had been had with all
12   laws and rules of Court relating to the taking
13   of depositions;
14      That it shall not be necessary for any
15   objections to be made by counsel to any
16   questions, except as to form or leading
17   questions, and that counsel for the parties
18   may make objections and assign grounds at the
19   time of trial, or at the time said deposition
20   is offered in evidence, or prior thereto;
21      That the notice of filing of the
22   deposition by the Commissioner is waived.
23

1       A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4       Mr. John E. McCulley
5       Attorney at Law
6       John E. McCulley, P.C.
7       601 Greensboro Avenue, Suite 200
8       Tuscaloosa, Alabama  35401
9
10      Mr. Michael S. Burroughs
11      Attorney at Law
12      Michaels S. Burroughs Law Office
13      601 Greensboro Avenue, Suite 200
14      Tuscaloosa, Alabama  35401
15
16   FOR KEN ROBERTSON:
17      Mr. Tom Gaillard
18      Attorney at Law
19      Helmsing, Leach, Herlong, Newman
20         & Rouse, P.C.
21      150 Government Street, Suite 2000
22      Mobile, Alabama  36602
23

1       A P P E A R A N C E S (continued)
2
3    FOR MOUNDVILLE:
4       Mr. Richard Warren Kinney, III
5       Attorney at Law
6       Porter Porter & Hassinger, P.C.
7       880 Montclair Road, Suite 175
8       Birmingham, Alabama  35213
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1       I N D E X
2
3                      PAGE
4    EXAMINATION BY MR. MCCULLEY:...............7
5
6       E X H I B I T S
7    PLAINTIFF'S NO.                PAGE
8    Exhibit 1 - documents (Ray v. Moundville -102
9       001 through 023)
10   Exhibit 2 - Rules and Regulations of the -102
11      Moundville Police Department
12
13
14
15
16
17
18
19
20
21
22
23

Veritext Legal Solutions
877-373-3660                                        800.808.4958

1        I, Maya Rose, a Registered
2 Professional Reporter of Birmingham, Alabama,
3 and a Notary Public for the State of Alabama
4 at Large, acting as Commissioner, certify that
5 on this date, pursuant to the Federal Rules of
6 Civil Procedure and the foregoing stipulations
7 of counsel, there came before me at 2005
8 University Boulevard, Tuscaloosa, Alabama, on
9 the 2nd day of July, 2020, commencing at 10:10
10 a.m. and concluding at 12:20 p.m., KEN
11 ROBERTSON, witness in the above cause, for
12 oral examination, whereupon the following
13 proceedings were had and done:
14
15        KEN ROBERTSON,
16 being first duly sworn, was examined and
17 testified as follows:
18
19        THE REPORTER:  Usual stipulations?
20        MR. MCCULLEY:  Yes.
21        MR. GAILLARD:  That's fine.
22        MR. KINNEY:  That's fine.
23

1 EXAMINATION BY MR. MCCULLEY:
2     Q.  Do you know who everybody is in
3 here?
4     A.  I don't.
5     Q.  Okay.  You know your lawyer.
6     A.  Yes, sir.
7     Q.  Okay.  Do you know Warren Kinney,
8 down on the end?
9     A.  I don't.  I know he represents
10 Moundville, but I'm not familiar with him.
11     Q.  Okay.  All right.  And this is
12 Mike Burroughs --
13     A.  Right.
14     Q.  -- along with me, we represent the
15 plaintiffs in this case --
16     A.  Yes, sir.
17     Q.  -- which is the personal
18 representative of the deceased folks.
19     A.  Yes, sir.
20     Q.  Okay.
21     A.  Yes, sir.
22     Q.  The court reporter is taking down
23 everything we say --

1     A.  Yes, sir.
2     Q.  -- and she cannot take down this
3 (indicating) or this (indicating).
4     A.  Oh, sure.  Yes.
5     Q.  Right.  So be sure to answer.
6     A.  Yes, sir.
7     Q.  Let me know if you need a break.
8     A.  Yes, sir.
9     Q.  It's probably going to be after
10 you answer the question.
11     A.  Oh, yeah.  Yeah.
12     Q.  All right.
13     A.  Understood.
14     Q.  And if you don't understand a
15 question, I'd like for you to let me know
16 before you answer it.
17     A.  Sure.
18     Q.  Okay.  If you need clarification,
19 or you're not sure exactly where I'm going,
20 then just let me know.  Have you ever given a
21 deposition?
22     A.  No, sir.
23     Q.  Okay.  You're aware that Brad

1 Gray's estate is a defendant in this case?
2     A.  Yes, sir.  I believe I read that,
3 yes, sir.
4     Q.  All right.  And you know we're
5 here to talk about the deaths of Paige
6 Mitchell and Kaci Mitchell this morning;
7 right?
8     A.  Yes, sir.
9     Q.  All right.  Let me start by
10 getting your full name.
11     A.  Kenneth Wade, W-a-d-e, Robertson,
12 R-o-b-e-r-t-s-o-n.
13     Q.  Are you known by any other name?
14     A.  Ken.
15     Q.  And what's your date of birth?
16     A.  1 -- well, January 5th, 1966.
17     Q.  And what's your current home
18 address right now?
19     A.  925 County Road 67, and that's
20 Moundville, 35474.
21     Q.  What sort of professional
22 organizations, if any, do you belong to like
23 FOP?

1    A.   None.
2    Q.   You don't belong to FOP?
3    A.   No, sir.
4    Q.   Are there any that you've ever
5 belonged to?
6    A.   No, sir.
7    Q.   Like International Association of
8 Chiefs of Police?
9    A.   Well, like I said, not the
10 International Association but I was a member
11 of the Alabama Chiefs of Police when I was --
12 when I was --
13    Q.   What's the name of that
14 organization?
15    A.   AACOP, Alabama Association of
16 Chiefs of Police.  It's -- AACOP is the
17 synonym [sic] for it.
18    Q.   All right.  I haven't heard of
19 that one.  Where do you go to church?
20    A.   We go to the Highlands.
21    Q.   Here in Tuscaloosa?
22    A.   Yes, sir.
23    Q.   What about any sort of fraternal

1 groups, clubs or anything like that?
2    A.   No, sir.
3    Q.   No yachting association, nothing
4 like that?
5    A.   No, sir.
6    Q.   Have you reviewed any documents to
7 prepare for this today?
8    A.   The only documents I looked at
9 were the Exhibit 1 through the -- just the
10 initial reports and then the regulations.
11 That's the only thing that I've looked at.
12        MR. GAILLARD:  The Bates labeled
13 documents.
14        MR. MCCULLEY:  Okay.  All right.
15 Can we get a copy of that, the rules and
16 regulations of the Moundville Police
17 Department?
18        MR. KINNEY:  Sure.  Yeah.  Has
19 that not been provided to you?
20        MR. BURROUGHS:  It's Bates stamped
21 but we've not seen this.
22        MR. KINNEY:  All right.  Yeah, of
23 course.

1    Q.   (BY MR. MCCULLEY:)  Okay.  Mr.
2 Robertson, you've just shown me that you
3 reviewed the rules and regulations of the
4 Moundville Police Department prior to your
5 deposition today?
6    A.   Yes, that document there, yes.
7    Q.   Right.  Were those in effect at
8 the time of the death of Paige Mitchell and
9 Kaci Roberts?
10    A.   Not all of them were.  There are
11 some in there that I wasn't aware of that
12 aren't -- that I didn't know anything about.
13    Q.   Fair enough.
14    A.   So it may be something that was
15 put in place after I left.
16    Q.   So what you looked at is what's
17 current today?
18    A.   I'm assuming, yes, sir.
19    Q.   Okay.
20    A.   Yes, sir.  I'm not sure when they
21 were put in place, but some of that wasn't
22 familiar to me when I was chief.
23    Q.   All right.  And the other document

1 you looked at, was that the court record --
2        MR. GAILLARD:  Yes.
3    Q.   -- from Bradley Gray's case file?
4    A.   I'm not sure what the title is.
5 It would just be these documents here, the
6 report, the arrest warrant for Brad Gray, the
7 deposition.  I think it's Ray versus
8 Moundville 001 to Ray versus Moundville 023.
9    Q.   Okay.  All right.  When did you
10 first become a police officer?
11    A.   1997.
12    Q.   And where was that?
13    A.   McKenzie, Alabama.
14    Q.   K-e-n-z-i-e?
15    A.   No.  M-c-K-e-n-z-i-e, yes.
16    Q.   Okay.  And how long did you work
17 there?
18    A.   I was there through the academy.
19 I was there probably six months.  I moved to
20 Moundville.
21    Q.   So you went to work in Moundville
22 in '97 or '98?
23    A.   Yes, sir, ninety -- I can't

1 remember exactly, but it was '97 or '98. I
2 worked there two years, and then I went to the
3 sheriff's office.
4    Q.  All right.  You mentioned the
5 academy.  McKenzie paid for you to go to it?
6    A.  They did.
7    Q.  Okay.
8    A.  Bay Minette.
9    Q.  So did you have any law
10 enforcement training at all before you went to
11 the academy?
12    A.  No, sir.
13    Q.  Okay.  And then after you got the
14 job at McKenzie and after you completed the
15 academy at Bay Minette, did you have any other
16 training?
17    A.  Oh, I've had -- I mean, that's
18 kind of -- I mean, I've had training, good
19 gracious, twenty-two years of it.  Yeah.  I
20 mean, we've had twelve hours of training per
21 year, as you know, but, you know, a lot.  I
22 could go over it and over it and over it, but
23 there's just files of it.  You know, over

1 twenty-two years -- you know, we're required
2 to have twelve CEUs a year, so -- and then I
3 was in the Chief of Police Conference, in
4 their classroom for ten years.  So I had
5 almost 480 hours of -- I mean, excuse me,
6 almost 260 hours of training.  I didn't
7 quite -- I think I was a few hours short of
8 that, but --
9    Q.  Do you have records of that?
10    A.  Sure.  Yes.  There are records of
11 that, yes, sir.
12    Q.  Do you have them?
13    A.  I -- I don't know.  I could
14 probably -- I don't know if I would have a
15 complete record of that, but maybe we could
16 get them.
17    Q.  Who would have them?
18    A.  Chief conference.  The Chief of
19 Police Conference, the leadership of them
20 should be able to --
21    Q.  What's that?
22    A.  It's the association for all the
23 chiefs of police in the state of Alabama.

1    Q.  Back to AACOP?
2    A.  Yes.
3    Q.  Okay.
4    A.  Yes.  And, you know, they -- of
5 course you're required to have different CEUs
6 when you're in management and leadership
7 called executive CEUs, so they provide those.
8 And they have a law enforcement executive
9 program that you're in when you're there.
10 Those classes are reaching you toward that,
11 so --
12    Q.  Well, while I'm not surprised, I
13 just have to tell you that when I was in law
14 enforcement a hundred years ago --
15    A.  Yes, sir.
16    Q.  -- there was no academy.
17    A.  Wow, that's been a long time ago.
18    Q.  I was grandfathered in.
19    A.  Yes, sir.  Yes, sir.
20    Q.  And so the last thing on their
21 mind is continuing education.  They just
22 wanted to get us some training.
23    A.  Yes.  Yeah, it's all CEU based

1 now.  Everything has got to have it.
2    Q.  During that period of time, can
3 you remember whether you ever got any training
4 on securing evidence pretrial?
5    A.  I'm sure at some point, I can't
6 remember exactly a date, but I'm sure at some
7 point we certainly would have covered that at
8 some point.  There should be a record of that.
9 But I can't -- I can't sit here and say, yes,
10 on this date I did.
11    Q.  I can't remember either.  During
12 that period of time, did you ever have any
13 training on the disposition of articles being
14 held for evidence at the conclusion of a
15 trial?
16    A.  I can't recall if I had anything
17 like that or not.
18    Q.  Okay.  Did you ever have any
19 training specific to firearms as evidence?
20    A.  I mean, that's kind of a broad
21 question.  I don't know.  Do you mean a
22 description of firearms or --
23    Q.  Yeah.

1    A.  I mean, throughout the
2 twenty-something years, yeah, we've had --
3 I've had some sort of training in firearms,
4 you know, either by description or, you
5 know --
6    Q.  Identification?
7    A.  Right.  Yeah, how to handle them
8 through the ATF and that kind of thing.
9    Q.  Okay.  Have you ever had any
10 training specific to returning handguns to the
11 owner after the case is concluded in some way
12 or another?
13    A.  I don't recall any training of
14 that nature that specifically said how to
15 return it.
16    Q.  Okay.  All right.  You said that
17 you went to Moundville for a couple of years
18 in --
19    A.  Yes, sir.
20    Q.  All right.
21    A.  I worked for Moundville for
22 approximately two years, and then I went to
23 Hale County Sheriff's Office.

1    Q.  And that would have been?
2    A.  What, '99, 2000.  I was there
3 until 2006 before I went back to Moundville as
4 the police chief.
5    Q.  And you're sure that's 2006?
6    A.  Yes, sir, because that was an
7 election year, 2006 to 2016.
8    Q.  All right.  And then you stayed
9 with Moundville until when?
10    A.  2016.
11    Q.  Were you not there in January of
12 2017?
13    A.  No, sir.  I left there in
14 September of 2016.
15    Q.  So you weren't there when the
16 Mitchells were killed?
17    A.  No, sir.
18    Q.  In 2016 did you go back to the
19 sheriff's office?
20    A.  Yes, sir, I did.  I think that was
21 October.
22    Q.  And you're still there?
23    A.  Yes, sir, I'm still employed by

1 the sheriff's office.
2    Q.  Before 1997 when you went to work
3 in law enforcement for the first time, what
4 did you do?
5    A.  I worked for a trucking company.
6 I did mechanic work, that kind of thing.  I
7 worked on a farm.  Actually the mayor that
8 hired me --
9    Q.  Right.
10    A.  -- he kind of got me in it, so --
11    Q.  What was the mayor's name?
12    A.  Calvin Wright.  He's deceased,
13 but --
14    Q.  And he was mayor where?
15    A.  McKenzie.  He was also the owner
16 of the trucking company that I worked for.
17    Q.  But you didn't drive for the
18 trucking company?
19    A.  Huh-uh.
20    Q.  How long did you work for him?
21    A.  Man, you're getting back there
22 now.  Two, three years.
23    Q.  Do you remember the name of the

1 company?
2    A.  Wright -- that I worked at?
3 Wright & Son Trucking.
4    Q.  And that was in McKenzie?
5    A.  No, that was in Tuscaloosa.
6    Q.  Oh.
7    A.  Uh-huh.
8    Q.  Okay.  And before that?
9    A.  Horton's Auto Parts, I believe.
10 Man, that's way back there.  I don't know what
11 year that was.
12    Q.  That's here in town, too?
13    A.  Yeah, it was out on 215 out there.
14 It's gone now, but -- it was a junkyard at one
15 time.
16    Q.  Yeah.  And before that?
17    A.  That's just too -- I don't -- I
18 don't remember.
19    Q.  How long were you at Horton's?
20    A.  Not very long.  Maybe a year,
21 something like that.
22    Q.  All right.
23    A.  Man, I can't remember.  I can't

1 remember.
2    Q. All right. Your employment at
3 Moundville ended twice; correct?
4    A. Yes.
5    Q. All right. And when you went from
6 Moundville to the sheriff's office in 2000 --
7    A. Uh-huh.
8    Q. -- why?
9    A. Just a change of job. I mean, I
10 don't remember. You know, I had some friends
11 that worked there, you know, and just kind of
12 be over the -- worked through the County
13 instead of through the City, you know, kind of
14 opened up and to be able to...
15    Q. Who was the sheriff then?
16    A. Larry Johnson.
17    Q. All right. And then you went back
18 to the City --
19    A. Yes, sir.
20    Q. -- in 2006?
21    A. Yes.
22    Q. Why?
23    A. I ran for sheriff in '06

1 against -- it was myself and the chief that
2 was in Moundville is the sheriff now. Him and
3 I ran against each other, the one -- the guy I
4 work for now. And so when that -- when he
5 won, I just kind of went up there and applied
6 for his job and got -- you know, took his job.
7    Q. All right. He had been chief at
8 Moundville?
9    A. He had.
10    Q. What's his name?
11    A. Kenneth Ellis.
12    Q. He's still sheriff; right?
13    A. Yes, sir, he is.
14    Q. And then you went to work for him
15 in '16?
16    A. Yes, sir, I think it was October
17 of '16, yes, sir.
18    Q. All right. Why?
19    A. Because I was fired from
20 Moundville Police Department.
21    Q. Why were you fired?
22    A. Well, that's a good question.
23 There was many accusations, but I don't know

1 the exact reason. I guess just they didn't
2 need me anymore. They were headed in a
3 different direction. I really -- they never
4 really offered me an explanation at the end.
5    Q. Who was the mayor?
6    A. Tony Lester.
7    Q. Is he still there?
8    A. Yes, sir. Yes, sir, he is.
9    Q. He never told you directly why?
10    A. In the beginning -- in the
11 beginning he made some accusations of some
12 things. And then he -- but at the end when we
13 actually had the due diligence for them to
14 have the two-thirds vote, there was nothing
15 offered. It was just kind of, you know, my
16 attorney said -- had some things to say. They
17 didn't have anything to say. Then they took a
18 vote and that was it.
19      So I don't really -- in answer to
20 your question -- to fairly answer your
21 question, I have no -- I don't know why. I
22 know there were some accusations, but I don't
23 know why in the end --

1    Q. What have you heard? And I
2 sympathize with what you're saying because
3 when a girl breaks up with you, you don't know
4 why. You just know it's over.
5    A. Yes, sir.
6    Q. What did you hear?
7    A. What I can offer you is originally
8 when I was called into the mayor's office, he
9 stated I had forged a document. And when I
10 rebutted that, then I was sent home on leave.
11 And then, you know, all -- everything else
12 took place and they had a -- they had an audit
13 at the office by some sheriff out of Kentucky.
14 And I mean, you know, it was just a whole
15 big -- I want to use the proper word, but it
16 was just a whole messy thing.
17      And then, you know, they set the
18 due diligence here, what I call it, the
19 hearing to go before the mayor and the
20 Council. And of course I was there and
21 present. They didn't mention any -- any
22 reason. They didn't say this is why or
23 anything like that. We just had -- you know,

1 we had our say and I was basically there
2 anyway to clear my name because I knew my job
3 was futile. It was futile at the first four
4 years. I wasn't trying to do that. I was
5 just trying to clear my name from things that
6 had been said, so -- but nothing was said and
7 they took a vote and they decided to go in
8 another direction, and so here I am.
9     Q.  What was the document?
10     A.  It was a -- it was a reserve -- a
11 test, so to speak, that the reserves took to
12 say they could be reserves. It's -- I don't
13 even know how -- it's just like a two or three
14 little page test that they tested. And the
15 document that he had, which I only looked at
16 it for this long, I mean, I was never afforded
17 the opportunity to look at it. Well, you
18 forged it and, you know, blah, blah, blah.
19 But I do know that it was a -- it was a test
20 for the reserves, some kind of aptitude test
21 or -- you know, I didn't handle the reserves.
22 The assistant chief handled the reserves, so
23 it was an aptitude type, you know, test can

1 you do good as a reserve type thing. That's
2 what that was.
3     Q.  What was the allegation, that --
4     A.  The allegation was --
5     Q.  -- you signed somebody's name --
6     A.  Yes, the --
7     Q.  -- or took the test.
8     A.  The allegation was that I had
9 forged the document. And I know that sounds
10 crazy, but beyond that, I don't know.
11     Q.  Okay.
12     A.  I didn't see it again other than
13 that first day when I was suspended. I didn't
14 get to see the document again. They didn't
15 show it to me in the hearing or the due
16 diligence hearing or anything, so I don't
17 know. I mean, I did get -- I did have it in
18 my hand in that office and looked at it, but,
19 you know, I don't know what he was insinuating
20 I forged or whatever. But that was the case.
21     Q.  Was it discussed in the hearing?
22     A.  No.
23     Q.  How many police officers were

1 there when you were chief?
2     A.  At maximum, we had -- at one time
3 we had eight, I had eight maximum.
4     Q.  You say you left in October of
5 '16.
6     A.  September.
7     Q.  Okay. September of '16.
8     A.  Yes, sir.
9     Q.  And you went to work for the --
10     A.  Sheriff's office.
11     Q.  -- sheriff's office in October?
12     A.  That's correct.
13     Q.  After October, did you learn about
14 personnel changes at Moundville?
15     A.  Like the new chief and that kind
16 of thing?
17     Q.  Anything.
18     A.  Oh, yeah. Yeah. I mean, it's a
19 little, small county. Yeah, of course we
20 knew. They got a new chief, new assistant
21 chief, new officers.
22     Q.  All right. Tell me, if you can,
23 who worked in the Moundville Police Department

1 in January of 2017 when the Mitchells were
2 killed.
3     A.  That I know for a fact --
4     Q.  Right.
5     A.  -- you know, I'm not going to
6 guess. I know they hired a new Chief Banks.
7 No, scratch that because I don't -- I can't
8 remember if he was there yet or not. Keith
9 Burch.
10     Q.  Spell that for me.
11     A.  B-u-r-c-h. K-e-i-t-h, B-u-r-c-h.
12 He was the assistant chief. He was the acting
13 chief, but I cannot remember when they hired
14 the chief so I don't want to say that without
15 being very sure.
16     Q.  Was he your assistant chief?
17     A.  He was, yes, sir.
18     Q.  Okay.
19     A.  Timothy Dillard.
20     Q.  All right.
21     A.  Lamarcus Mayes.
22     Q.  Is that M-a-y-s?
23     A.  M-a-y-e-s. Daniel Pence.

1 Q. P-e-n-c-e?
2 A. Correct. And Tommy Muckenfuss.
3 Q. Help me out.
4 A. M-u-c-k-e-n-f-u-s-s.
5 Q. So you're sure of these five?
6 A. I'm sure of those five, yes, sir.
7 But I'm not sure -- because, you know, I
8 didn't -- there's a lot of animosity there, so
9 I didn't really -- I wasn't on the inner
10 circle --
11 Q. Sure.
12 A. -- of what was going on. It's
13 just everything I heard on the outside was --
14 but I'm sure they were there because they were
15 there when I was there and I know they were
16 still there, so -- now, they were employed
17 there. I don't know if they had anything to
18 do with any part of what you asked me. They
19 were employed with Moundville at the time.
20 Q. Did any of these other four hold
21 any rank?
22 MR. GAILLARD: Are you asking at
23 the time of January 2017 or --

1 A. Yeah.
2 Q. (BY MR. MCCULLEY:) Yes.
3 A. Other than Burch, I don't think
4 anybody held any rank other than Chief Burch.
5 Q. Were these guys all there when you
6 were there?
7 A. Yes. Timothy Dillard was there a
8 very short time after I arrived. Yeah, they
9 were all there when I was there.
10 Q. Did they hold any rank while you
11 were there?
12 A. No, other than Chief Burch.
13 Q. Okay. And you said the maximum
14 size while you were there was eight?
15 A. Yeah. I think at one point
16 between 2006 and '16, I had had eight
17 employees at some point but I can't remember
18 when and I don't -- you know, things were so
19 fluid and changed.
20 Q. Were some of them part time?
21 A. We cut out part time in probably
22 2011, so I don't think after that we ever had
23 any part time. And I'm sure I'm forgetting

1 someone who worked there, but I can't -- my
2 mind is -- you know, it's so hard to --
3 Q. Sure. Who was the -- while you
4 were chief --
5 A. Yes, sir.
6 Q. -- who was the custodian of
7 evidence for your department?
8 A. That would have been myself. That
9 would have been the chief.
10 Q. Okay. Did you have a safe or a
11 lockbox or something?
12 A. We had a -- at one time Moundville
13 had a jail. And when that jail closed, we
14 took that jail. So there was three
15 independent cells and we took that and used
16 that for evidence.
17 Q. Sure.
18 A. So it had a big metal door on it
19 and cell doors. And then inside each one had
20 a little locker for each officer. So that's
21 how that was -- and if they needed something,
22 you know, I had the key. We got the evidence
23 out and --

1 Q. You had the only key?
2 A. I did have the only key, yes, sir.
3 Q. Okay. But they had separate areas
4 inside?
5 A. They did.
6 Q. Okay.
7 A. They did.
8 Q. But in order to preserve the chain
9 for evidentiary purposes, you kept the only
10 keys?
11 A. Yes, sir.
12 Q. Okay. Describe for me the
13 physical facilities of the police department,
14 and the question I have written down to ask
15 you is, did you have an office? But I'd
16 really like a little more than that.
17 A. Okay. We had the old library, so
18 the physical -- it was in the corner of the
19 city hall, attached to the city hall, a part
20 of the city hall. When you came into our
21 department, to the right was my office. Then
22 there was a small clerk's office, Ms. Sparks.
23 Q. Is that a police clerk?

1    A.   That is a police clerk, yes, Ms.
2  Sparks.  There's a records room behind her or
3  a file room, let me say that.  And then to the
4  left were officers' little cubicles.  Then I
5  had an assistant chief's office and a
6  sergeant's office.
7    Q.   Okay.  Who was the sergeant?
8    A.   Well, I had a couple.  At one time
9  Landry Donaldson was a sergeant.  And before
10 that Jason Hughen I believe was the sergeant.
11   Q.   Spell his last name for me.
12   A.   H-u-g-h-e-n.
13   Q.   Okay.  This policy and procedure
14 manual that you read before you came today, is
15 that the only manual that you had at the
16 police department?
17   A.   Well, that -- like I said, some of
18 that, yes.  That is the basic layout and type
19 of manual that we had and we run off
20 directives, you know, where we may -- I may
21 put out a directive that would count as
22 overridden or -- you know, we -- that's how we
23 ran the department is by directive --

1    Q.   Okay.
2    A.   -- so --
3    Q.   Because they were more responsive?
4    A.   Well, sometimes things you have to
5  do now.  You know --
6    Q.   Right.
7    A.   -- sometimes -- or sometimes
8  things have to fluidly change because
9  something might not be -- something might have
10 changed legally or whatever, so you have --
11   Q.   Right.
12   A.   -- to make sure that's known.
13   Q.   Who drafted this?
14   A.   I'm not sure.  I don't know who
15 drafted that.  I'm not really sure.
16   Q.   Do you know if it was drafted by a
17 police department employee?
18   A.   I don't.
19   Q.   Do you know whether it was drafted
20 by a member of the city council?
21   A.   I don't.  I can't say.  I didn't
22 draft it so -- I mean, I didn't physically
23 write that -- write that manual for the police

1  department.
2    Q.   Who's responsible for changes to
3  it?
4    A.   Well, you know, at the time if
5  there was any changes in the police
6  department -- let me say this, if there was
7  any changes in the police department, it
8  should have been my responsibility to do that.
9    Q.   So if there were changes, you
10 would have made them?
11   A.   Not necessarily.
12   Q.   Who would have made them?
13   A.   Well, I mean, the mayor could have
14 made a change.  I mean, he has the authority
15 to make a change.
16   Q.   Right.
17   A.   I'm assuming attorneys could have
18 made changes in it, but --
19   Q.   But if they do that, you'd know,
20 as chief?
21   A.   I'm suppose to, yes, sir.
22   Q.   All right.
23   A.   That should be something that I'm

1  supposed to know.
2    Q.   Is there a police commissioner on
3  the city council?
4    A.   I don't think there's any -- I
5  don't know how they officially handled that.
6  At one time there was a police committee and
7  it had like a couple of council members on it.
8  They changed -- it changed from time to time,
9  but I don't know what the official -- I don't
10 know if they officially had a police
11 commissioner or a police just for that.
12        They had one for the fire
13 department and one for the street -- a couple
14 for the street department that handled, I
15 guess, you know, things that needed to be
16 handled if you had to go to somebody.
17   Q.   With whom on the council did you
18 have the most direct contact?
19   A.   I had contact -- at one time I
20 probably had contact with all of them.  I
21 don't think I directly had just one council
22 member that I went to.  You know, there were
23 several of them.  Just depending on the

1 problem or what the situation was may have
2 been the one I approached. I don't -- you
3 know, I --
4     Q.  Did you interact more with Mayor
5 Lester?
6     A.  Yeah. Yes. Yes, sir. Of course,
7 you know, I answered to him directly. He was
8 over day-to-day operations. You know, if
9 you're -- yes, I had -- I -- when I had
10 something going on or something was going to
11 be put to me or put to change or whatever,
12 yes, I would go through the mayor.
13     Q.  Right. And was he mayor when you
14 left?
15     A.  He was, yes, sir.
16     Q.  Tell me again why you left.
17     A.  I was fired in September of 2016.
18     Q.  And who's chief there now?
19     A.  Toby Banks.
20     Q.  Does he use some version of this
21 manual now, to the best of your knowledge?
22     A.  I assume he does, yes, sir.
23     Q.  Okay.

1     A.  I can't say that for sure because
2 I don't have any part of the inner workings,
3 but I'm sure he does.
4     Q.  What do you know about the
5 investigation into the Mitchell's murders?
6     A.  Zero. I've never had -- I don't
7 know any -- I've never had any kind of
8 dealings with the investigation whatsoever. I
9 didn't -- I don't -- you know, I don't have --
10 I don't know any of the official stuff. I've
11 never seen any of the official stuff other
12 than these documents that we're discussing
13 now. I don't know who did what other than
14 maybe seeing them on TV or just knowing that,
15 you know, he took the pictures or what because
16 I didn't know that, but --
17     Q.  Did you go to the scene?
18     A.  No, sir.
19     Q.  Do you know who ran the
20 investigation?
21     A.  I -- see, that's the -- I can't
22 remember if -- let me say this. If Chief
23 Banks was there at the time, then he would

1 have ran the investigation. But I cannot for
2 the life of me remember if he was there in --
3 I don't want to put him there if he wasn't
4 there and I can't remember when they hired
5 him. Because it was -- you know, a couple of
6 months they went through the process, so I
7 can't remember but I'm believing he was. I
8 believe he was there, Chief Banks.
9     Q.  Okay. And I understand you don't
10 know who ran the investigation.
11     A.  No, sir, I do not know who ran the
12 investigation for sure.
13     Q.  But you believe that Moundville --
14     A.  Well, I would believe that because
15 it was in their jurisdiction and, you know,
16 that would be --
17     Q.  Okay. And if not Toby Banks, then
18 we would guess Keith Burch; right?
19     A.  Yes, that would be -- yes, that
20 would be a good assumption because he was
21 acting chief or whatever. I don't know if
22 they actually officially made him acting
23 chief, but he was doing that capacity.

1     Q.  So in Hale County, the sheriff
2 allows a city police department to
3 investigate?
4     A.  Well, now with that being said,
5 the sheriff's department had some part in
6 that, but I don't know. You asked me
7 infinitive, definite, but I don't know. I
8 know that the sheriff's investigator was
9 there. I know that. But to what extent that
10 he had -- you know, and I can't say that the
11 sheriff's department led the investigation
12 because I don't know that.
13     Q.  Sure.
14     A.  I've never seen anything to do
15 with that.
16     Q.  Well, I'm just going on my
17 experience.
18     A.  Right. Right. You know, our
19 sheriff -- our sheriff allows -- he doesn't
20 step on toes. He offers his assistance as
21 help, whatever we can do. But he's never
22 going to go in and say, hey, that's mine.
23 He's not going to do that especially if those

1 people are capable. I mean, he's just not
2 going to do that, you know.
3    Q.  Okay.
4    A.  You know --
5    Q.  That would have been Sheriff
6 Ellis?
7    A.  Yes, sir.
8    Q.  And who was the investigator, if
9 you know?
10    A.  Lieutenant Jeames.
11    Q.  Spell that.
12    A.  Or at the time -- it may have been
13 Sergeant Jeames at the time. I don't
14 remember. Jeames, J-e-a-m-e-s.
15    Q.  Is he still with the sheriff's
16 department?
17    A.  He is. He's a lieutenant with the
18 sheriff's office, yes.
19    Q.  Based on what you've told me --
20    A.  Yes, sir.
21    Q.  -- some of my next questions
22 aren't going to make any logical sense.
23    A.  Yes, sir.

1    Q.  But I'm going to ask them
2 anyway --
3    A.  Sure.
4    Q.  -- because we're taking testimony.
5    A.  Yes, sir.
6    Q.  Do you agree that Brad Gray shot
7 and killed Paige and Kaci Mitchell?
8       MR. GAILLARD: Object to the form
9 of the question. You can answer.
10    A.  Yes.
11    Q.  (BY MR. MCCULLEY:) Do you agree
12 that Gray killed Paige and Kaci Mitchell using
13 a pistol that the Moundville Police Department
14 had confiscated and later returned to him?
15       MR. GAILLARD: Same objection.
16    A.  No, sir, I don't agree, they
17 didn't confiscate it. But I do agree that the
18 pistol was used, to my knowledge. I don't
19 know that for a fact, but I don't -- I don't
20 believe it was ever confiscated. That term --
21 I'm not saying --
22    Q.  Okay.
23    A.  -- we -- I'm not saying they

1 didn't have it in their possession. But it
2 wasn't confiscated. That's kind of an
3 official term, whereas we filled -- I mean --
4    Q.  Tell me about that distinction
5 that you're making in your mind.
6    A.  The distinction I'm making in my
7 mind is that when -- if an arrest is made and
8 the weapon is not used as evidence, the weapon
9 is not being condemned or confiscated, it's
10 not on the person of the person being
11 arrested, you know, if it's taken from a house
12 or something like that via warrant, then we
13 can -- then that's what I consider to be
14 confiscated.
15    Q.  All right.
16    A.  The distinction is if we just take
17 the weapon for safekeeping because we arrested
18 someone, we either don't want the weapon to
19 get stolen or we don't want -- you know, we
20 don't want a rifle sitting outside if we
21 arrest somebody that's hunting. So that
22 weapon is taken into custody but it's not
23 necessarily confiscated or moved upon legally

1 in the court to keep it.
2    Q.  Okay. All right. Do you know
3 whether the pistol that Gray used to kill
4 Paige and Kaci Mitchell was ever in the
5 custody of the Moundville Police Department?
6    A.  That's an -- let me say this. How
7 can I put this? I'm not sure -- yes, there
8 was a pistol taken from Brad Gray that was in
9 custody of the Moundville Police Department at
10 one time, but I'm not sure if we're talking
11 about the same pistol, so it's hard for me to
12 distinguish whether the pistol you're
13 referring to killed her was the same pistol
14 that we had in custody.
15       Yes, we did have a -- there was a
16 pistol of some kind that was in custody from
17 an arrest they made with Brad, yes. That -- I
18 agree with that, but I don't know if it's the
19 same pistol. I want to clarify that because I
20 never -- nobody has ever showed -- I don't
21 know. I wasn't privy to the investigation.
22 All I have is just what I've read and what
23 someone said, you know, what, you know,

1 someone said about it.
2    Q.  Okay.  Then you would agree that
3 at some point in time a pistol was taken from
4 Brad Gray into custody?
5    A.  I would -- I would agree that a
6 pistol was taken from Brad Gray's property and
7 placed in custody of the Moundville Police
8 Department, yes, sir.
9    Q.  And you would agree that it was
10 returned to him?
11    A.  I would agree with that, yes,
12 sir --
13    Q.  Okay.
14    A.  -- it was.
15    Q.  All right.  Do you know when it
16 was taken from him?
17    A.  It was taken -- to the best of my
18 knowledge, the time of arrest --
19    Q.  Is it in there (pointing)?
20    A.  -- would have been I believe July
21 of 2015.
22    Q.  All right.
23    A.  Let me make sure.  (Reviewing

1 document.)  Yeah, it looks like July of 2015.
2    Q.  Okay.  And can you tell from any
3 of these documents or do you know when it was
4 returned to him?
5    A.  I do.  It was returned probably
6 the second week of August of 2015.  That's a
7 rough guesstimate, but, yeah, it's right in
8 there within a few days.
9    Q.  So it's your testimony that it was
10 returned to him prior to his conviction?
11    A.  Yes, sir.
12    Q.  Who returned it to him?
13    A.  That was me.  I did.
14    Q.  Who arrested him?
15    A.  It looks like Lamarcus Mayes,
16 Officer Mayes.  He got the warrant.  He did
17 the deposition, so it looks like he arrested
18 him.  He also did the initial incident/offense
19 report, it appears.
20    Q.  You didn't arrest him?
21    A.  No, sir.
22    Q.  Okay.  When did you learn that he
23 had been arrested?

1    A.  I don't remember an exact date,
2 but what -- as far as the arrest.  But I was
3 in the store when I came back from conference,
4 a day or two after I had come back from
5 conference and he was in there and he was very
6 boisterous and loud.  He was very angry that
7 they had taken a pistol from him out of his
8 house.  He was arrested outside.  They went in
9 his house and got the pistol.  He was very
10 angry that they done that, said they didn't
11 have the right to do that and, you know, I'm
12 going to sue you and blah, blah, blah.  And,
13 you know, I had to calm him down, told him,
14 look, let me check into it, let me see what's
15 going on and we will rectify the situation,
16 whatever that may be.  So that's how it
17 started.  That's how...
18    Q.  And how long was that after his
19 arrest?
20    A.  That date was -- the reason I
21 remember is because I had just come back from
22 conference in August, and I had come into the
23 store to get -- this is going to sound stupid,

1 but I missed the coffee.  The coffee down on
2 the beach is all terrible.  So that's how I
3 remember that.  He came in -- I can even tell
4 you, it was probably around nine o'clock in
5 the morning because he worked for a company
6 that came in that store every morning.  All
7 those guys come in about 9:00 in the morning
8 on break.  And so there was a line of those
9 guys there and that's when he went to, you
10 know, raising Cain with me.
11         So that's when I kind of started
12 looking at what happened because I wasn't
13 aware of every arrest that was made.
14    Q.  Sure.
15    A.  But that's when I kind of started
16 looking into what it was and what happened and
17 how -- you know, how it went down.
18    Q.  Can you tell me about how long
19 after the arrest that was?
20    A.  After the arrest?
21    Q.  Right.
22    A.  He was arrested in July and this
23 was August.  I don't know, a month?

1    Q.  Okay.
2    A.  Maybe.  You know, something close,
3 but I can't give you an exact date.
4    Q.  So he was still hot about it a
5 month later?
6    A.  Oh, yeah.  Yeah.  And, you know,
7 he was hot before that.  He just didn't get to
8 me, you know.
9    Q.  In that investigation Paige
10 Mitchell made a statement.  Did you go through
11 that file at some point?
12    A.  I'm sure I did.  I can't sit here
13 and say, yeah, I remember, but I'm sure I did.
14 When I was looking into, you know, what the
15 situation was, this would have been the way I
16 would have found out.
17    Q.  And you wouldn't have had the
18 court records, but you would have had the
19 police department --
20    A.  Right.
21    Q.  -- records --
22    A.  Right.
23    Q.  -- right?

1    A.  Just the police report and, you
2 know, talked to the assistant chief or talked
3 to whoever it was that I might have talked to
4 and just kind of get the story, find out
5 what's going on.
6    Q.  And that would have been in
7 August, early August?
8    A.  Yes.  Well, middle of August.
9 Yes, sir.  Yes, sir, that would have been.
10    Q.  To the best of your knowledge, was
11 Lamarcus Mayes there by himself?
12    A.  To the best of my knowledge, Mayes
13 was there by himself, according to the
14 paperwork.  Now, Landry Donaldson ended up
15 with the pistol because I actually got it back
16 from him.  Now, how that --
17    Q.  You got it back from Landry
18 Donaldson?
19    A.  He -- I went to him, yes.  Let me
20 tell you how -- let me explain this.
21    Q.  Okay.  Do, please.
22    A.  When I looked at this, I had some
23 real concerns about the way we took the

1 pistol.  All right.  The pistol was in the
2 house.  We went in the house.  It's basic
3 police stuff, no search warrant.  You can't --
4 you know, we already had situations going on
5 prior to that with lawsuits, so I disagreed
6 with the way they took the pistol.  So, in
7 other words, we didn't have any legal reason
8 to keep the pistol.  There was zero legal
9 reason to keep it.  It wasn't taken off of
10 him.  It wasn't used as evidence.  It wasn't
11 being confiscated.  So they didn't have a
12 legal reason to keep it.
13        So that's -- when I say I got it
14 back from Landry, that's how it was returned.
15 It had to come from him.  And he was --
16    Q.  Where did he have it?
17    A.  I don't know.  He just -- he just
18 brought it and gave it back to me.
19    Q.  To your knowledge, it wasn't in
20 the lockup?
21    A.  No.  To my knowledge, it was not
22 in the lockup.
23    Q.  At that point in time, was your

1 department permitting officers to patrol solo?
2    A.  I'm sorry.  Do what?
3    Q.  Were they permitted to patrol solo
4 or their shift solo without another officer?
5    A.  Yes.  Yes.
6    Q.  Okay.
7    A.  Yes.
8    Q.  But was it also common for two to
9 be on duty at the same time?
10    A.  It was.  It was sometimes more
11 than that.  You know --
12    Q.  Sure.
13    A.  -- it's a small place and
14 sometimes guys just worked over just so they
15 could work over, you know.
16    Q.  Sure.
17    A.  Yeah, it's common.  They're -- you
18 know, and I don't -- you know, I would sit
19 here and tell you, but I don't know for a fact
20 if Donaldson was on the scene or not at the
21 time of the arrest.  I don't know that.
22    Q.  Do you know who went in the house?
23    A.  According to this report right

1 here, it was Mayes.
2    Q.  I want to make sure I get this
3 point.  It's your testimony here today that
4 the pistol was not evidence in that
5 misdemeanor that --
6    A.  That's correct, that they never
7 used it as evidence.  They never used it as --
8 they never tried to confiscate it at all.  My
9 understanding was the pistol was taken because
10 it was laying there and they didn't want
11 nothing to happen to it.
12    Q.  And it's your testimony that it
13 wasn't in the City's lockup for evidence?
14    A.  No, that is not my testimony,
15 because I'm telling you, my testimony is I
16 don't know.
17    Q.  Well, if you had the only keys to
18 the evidence lockup, wouldn't you know if
19 that's where it came from?
20    A.  I would.
21    Q.  Okay.  Fair enough.
22    A.  My assumption is that the weapon
23 came out of Landry's office if you're looking

1 for where it was brought from.  I didn't see
2 him bring it from there, but I'm assuming
3 that's where it was.
4    Q.  Where does Landry Donaldson live?
5    A.  Where does he live?
6    Q.  Yes.
7    A.  In Moundville.
8    Q.  Okay.  Is he still on the police
9 department?
10    A.  He is.  He came back.  He went to
11 the sheriff's office for a while and then he
12 came back or went back.
13    Q.  Did you ask him to bring you the
14 gun?
15    A.  Yeah.  Yeah.  I mean, I don't know
16 my exact wording, but, yeah, I'm sure I did.
17 Because at the point when I decided that we
18 had not -- we didn't have any legal reason to
19 keep it and we had -- and, you know, that was
20 really a gray area whether we even took it
21 legally or not to start with.  That was really
22 a concern of mine because I -- you know, a
23 fellow that's trying to hold onto his job

1 anyway, I didn't need a lawsuit.
2         So after I looked at it, and as
3 the chief of police I made the determination,
4 hey, you know, we don't have any legal reason
5 to keep the gun, none.  So we returned it.
6    Q.  Do you know where the -- I think
7 Brad Gray was charged with harassment, DV?
8    A.  Yes, sir, third.
9    Q.  Do you know where that happened?
10    A.  Other than just reading the
11 report, I don't.  It looks like she was at Mr.
12 Gray's residence.  It happened at his home.
13    Q.  Was that about a car?
14    A.  Yes, went to residence to get her
15 vehicle and other belongings, yes, sir.
16    Q.  Do you recall whether he used the
17 pistol in the commission of that offense?
18    A.  I don't.
19    Q.  Is there anything in that --
20    A.  There is.  It states in here that
21 he was in possession of a pistol at the time
22 and had it in a holster and kept saying he was
23 going to harm her.

1    Q.  Okay.  And that's her statement;
2 right?
3    A.  That's her -- well, Officer Mayes
4 wrote it in the deposition.  So is it her
5 statement?  I think there's one -- see if that
6 says the same -- yes, she signed it, but
7 Officer Mayes wrote it.
8    Q.  So there was a pistol used?
9    A.  No, there was -- he was in
10 possession of a pistol.
11    Q.  Right.
12    A.  It doesn't say anything about him
13 using it to do anything.
14    Q.  It sounds like what happened was
15 that he was able to put it in the house before
16 the police got there.
17    A.  I'm not sure.
18    Q.  I mean, that would explain that,
19 wouldn't it?
20    A.  It's possible, yeah.  I mean, he
21 could have put his pistol in the house.
22    Q.  And Donaldson or Mayes may have
23 felt justified in going in and getting it?

1    A.  Yeah.  And I'm not saying that
2 they -- you know, I'm certainly not saying
3 that they didn't feel justified.  I'm saying
4 what's legal and what's not.
5    Q.  Right.
6    A.  And as a chief, you know, that's
7 all I can determine.  I don't have the luxury
8 of saying I don't think he ought to have it or
9 I think he ought to have it.
10    Q.  I'm right there with you.
11    A.  Once I find out about it, I have
12 to handle it.
13    Q.  I'm right there with you.  I'm
14 just wondering in my mind whether there may
15 have been -- and I don't know there's a
16 question here.  I'm just -- do you think it
17 could have been evidence?
18        MR. GAILLARD:  Object to the form.
19    Q.  (BY MR. MCCULLEY:)  Yeah.  Let me
20 just restate that.  Do you think the pistol
21 could possibly have been used as evidence?
22    A.  It was never --
23        MR. GAILLARD:  Same objection.  Go

1 ahead.  I'm sorry.
2    A.  It was never booked in though.
3    Q.  (BY MR. MCCULLEY:)  Okay.
4    A.  So my assumption would be no.
5    Q.  Did you have a list of evidence
6 that's booked in?
7    A.  Yeah.  They have a audit list they
8 kept per -- per officer.
9    Q.  If they had put it on the list and
10 put it in the lockup, would that have changed
11 your mind about whether it was evidence?
12    A.  Not necessarily, no, sir.  I mean,
13 based on the -- based on the information that
14 I had at the time and based on -- because the
15 whole situation was based on the way that they
16 got the pistol.  If we want to get evidence
17 inside somewhere, if we want to get evidence,
18 we get a search warrant.  We don't walk in and
19 get it.  That's just not -- we cannot do that.
20 And that draws a whole bunch of ire in the
21 police department when you start doing things
22 like that.
23        So, you know, that was my main

1 concern was with Brad fussing like he was, he
2 had a valid point that they had no reason to
3 go in his house and get his pistol.  He didn't
4 have it on him when they arrested him.  And
5 even though someone accuses you of something,
6 it's not a conviction.  So I have to weigh in
7 on all of that as well.  Just because someone
8 accuses you of doing something doesn't mean
9 you can't.  And it's not illegal for him to
10 have a pistol in a holster on his side on his
11 property.  So I had to take all of that into
12 question when I made my decision.
13    Q.  Now, I may have asked you this
14 before.
15    A.  Yes, sir.
16    Q.  I did.  You said that you're in
17 charge of evidence.
18    A.  Yes, sir.
19    Q.  Or were.
20    A.  Were.
21    Q.  If you'll look one more time --
22    A.  Sure.
23    Q.  -- at that court record --

1    A.  Sure.
2    Q.  -- when was he convicted of
3 domestic violence?
4    A.  Let me look.  Is that in here?
5 (Reviewing document.)  Is that what I'm
6 looking for?  8 September; is that right?
7        MR. GAILLARD:  2015.
8    A.  2015.
9    Q.  (BY MR. MCCULLEY:)  Were you in
10 court then?
11    A.  I was not.
12    Q.  When did you learn about this, his
13 conviction?
14    A.  I don't know that -- I don't know
15 that I did.  I don't know that I did learn of
16 his conviction.  You know, it happens a lot.
17 We don't -- I mean, I don't necessarily track
18 every case especially if it's not eventful.
19    Q.  Who would have been the police
20 officer that appeared to testify?  Would that
21 have been Mayes?
22    A.  Yes, it would have been.  He did
23 the affidavit -- I mean, the deposition.  He

1  did the --
2      Q.  Do you know whether he was in
3  court when Gray pled guilty?
4      A.  I don't know that for sure.  And
5  I'll tell you something, he was probably
6  there.
7      Q.  Why do you say that?
8      A.  Well, because I mean, we get a
9  subpoena if something is going on, so I'm just
10  saying he's probably there.
11      Q.  But you don't get --
12      A.  But he doesn't -- we don't
13  necessarily -- to be honest with you, we don't
14  necessarily have to agree with these plea
15  agreements.  You know, sometimes they're done.
16      Q.  Do Moundville police officers go
17  for every defendant's appearance whether it's
18  a trial or a first appearance or whatever?
19      A.  At the time that I was chief, we
20  only -- we only went to court when we were
21  subpoenaed or called by the ADA and said, hey,
22  you need to be there tomorrow.
23      Q.  Okay.

1      A.  Whether that happened in this
2  case, I can't say.
3      Q.  Right.  And you don't know whether
4  you found out about the conviction until you
5  got sued --
6      A.  Right.
7      Q.  -- right?
8      A.  I can't honestly say that I knew
9  even -- that he was even convicted at all of
10  that.
11      Q.  Do you know if the department,
12  when you were chief, had any policy or
13  procedure for tracking cases in the district
14  court after y'all made them?
15      A.  No, it was -- no, sir, there was
16  no policy.  It was -- it was understood by
17  meetings and that kind of thing that you
18  followed up on your cases.  You need to know
19  what happened because if you don't, you know,
20  I would always explain to the officers that it
21  will be gone in the by and by, you know, if
22  you don't keep up with your cases.
23          Tracking of the case as far as

1  physically tracking the case through court, we
2  did not.  It was each officer's responsibility
3  to follow up on their cases and know what
4  happened and what the disposition of the case
5  was.
6      Q.  Each officer?
7      A.  Yes, each officer that had a case
8  followed --
9      Q.  You think this is Mayes' case?
10      A.  Well, this particular -- this
11  particular incident as I'm looking at it here
12  is Mayes' case, absolutely.  It's a -- it's a
13  DV 3 harassment arrest.  That's kind of a
14  common thing nowadays, back then as well.
15  And, yeah, it appears to me that he made the
16  arrest, that he got the warrant and filled out
17  the deposition for the clerk.  It appears like
18  he did the initial IO, so this would be his
19  case.
20      Q.  But you knew in August of 2015
21  that Gray had been charged with domestic
22  violence?
23      A.  Yeah, I found out when he --

1      Q.  When you got back?
2      A.  Yeah, when he was fussing at me
3  about that gun.
4      Q.  And you knew at that time that the
5  case was pending?
6      A.  From that point on, yes --
7      Q.  Right.
8      A.  -- of course I did.
9      Q.  But you didn't follow up to see
10  whether he was convicted or turned loose or
11  whatever?
12      A.  I didn't because there was other
13  things that happened in between that time in
14  there, you know, just -- I just didn't follow
15  up with it.
16      Q.  What things?
17      A.  Just -- just, you know, police
18  life, things that went on and I just didn't
19  follow up on the case.
20      Q.  Unrelated to this?
21      A.  Unrelated to that.
22      Q.  Okay.
23      A.  Plus it was another officer's case

1 to follow up on. So if there would have been
2 any question, I would have just went to that
3 officer.
4     Q. Is that in this manual, that it's
5 his job to follow up with it, this police
6 procedure manual?
7     A. I don't know if it's in that
8 manual or not. But we didn't have anything to
9 my knowledge at the time, unless it was in
10 place before I came. And, you know, I just
11 have to be honest. There was nothing in there
12 that said we followed up on cases. It was by
13 directive or via meeting, you know, just, hey,
14 this is the way we need to do things.
15     Q. I guess y'all had your fair share
16 of domestic violence cases?
17     A. Yes, sir.
18     Q. Was anybody else involved in the
19 discussion about the return of the gun other
20 than you and Landry Johnson?
21     A. Donaldson.
22     Q. Donaldson.
23     A. Say that again. Was there anybody

1 else involved in the returning of it or --
2     Q. In the discussion about the
3 returning of the gun. I know that you were
4 involved and Landry Donaldson --
5     A. Well, I'm sure I discussed it with
6 probably the assistant chief. And I'm not
7 sure if I discussed it with Mayes or not
8 because it was not in his possession, but I'm
9 sure I did.
10     Q. What about the mayor?
11     A. No.
12     Q. No?
13     A. No. He wouldn't have had anything
14 to do -- I mean, you know, he wouldn't have
15 had anything to do with it.
16     Q. Did he ever talk to you about the
17 whole domestic violence arrest or any of that?
18     A. No.
19     Q. Okay. Did you ever consult him
20 about whether to return it?
21     A. No, sir.
22     Q. Have you ever asked anybody else
23 to return it?

1     A. No, sir.
2     Q. You know there are several state
3 statutes that apply to possession of handguns
4 by individuals convicted of domestic violence;
5 correct?
6     A. I'm aware of statutes, yes.
7     Q. Yes. Were you aware of them at
8 that time that you returned the handgun?
9     A. Specific statutes?
10     Q. Yeah.
11     A. At the time I returned the handgun
12 for that charge, there was no specific -- I
13 mean, there was no -- nothing in place that
14 said he couldn't get it back.
15     Q. There was no --
16     A. I mean, I don't know -- it's kind
17 of a broad question.
18     Q. Well, what we've agreed on
19 today --
20     A. Yes, sir.
21     Q. -- I think based on your --
22     A. Yes, sir.
23     Q. -- testimony is that you returned

1 it before he was convicted?
2     A. Yes, sir. Yes, sir.
3     Q. All right. And any state statute
4 would only apply to people who had
5 convictions; correct?
6     A. Yes, sir. I haven't refreshed
7 myself on that statute, but, yes, sir.
8     Q. Were you aware that there was a
9 scheme of state statutes that applied to
10 people who had been convicted of domestic
11 violence?
12         MR. GAILLARD: Object to the form.
13     A. At the time -- at the time that
14 we're discussing the pistol getting back, I
15 mean, of course from then on -- now I'm aware
16 of a lot now. But are we referring to the
17 time that the pistol was returned?
18     Q. Yes.
19     A. I was not aware of any statute
20 that would -- that would keep him from owning
21 a firearm. I don't -- I'm trying to answer it
22 right, but I don't --
23     Q. Okay. State or federal?

1   A.   State or federal.  If there was a
2 federal statute, I wasn't aware of it.
3   Q.   Okay.  And you didn't follow up on
4 the court case to see whether he was
5 convicted; correct?
6   A.   Correct.  Yes, sir.
7   Q.   And you don't know whether Mayes
8 or Donaldson followed up on the court case to
9 see whether he was convicted?
10   A.   I do not.
11   Q.   All right.  And the department --
12 I'm just trying to make sure I've got this
13 right.  The department has no policy itself to
14 follow up on the disposition of domestic
15 violence cases?
16   A.   At that time?
17   Q.   Yes.
18   A.   I wasn't aware of one.
19   Q.   Have you looked at the state
20 statutes since you got sued?
21   A.   I'm sure at some point I did.  I
22 can't recall the date, but I'm sure I did.
23 Well, I have to look at those statutes in the

1 course of my job all the time, so I'm sure I
2 have.
3   Q.   Right.  Do you contend that the
4 pistol that was returned to him is not covered
5 by the statute?
6      MR. GAILLARD:  Object to the form.
7   A.   Say that again.  I'm sorry.
8   Q.   (BY MR. MCCULLEY:)  The statute
9 talks about firearms.
10   A.   Right.
11   Q.   Do you contend that somehow the
12 pistol that was returned to him was outside
13 the statute?
14      MR. GAILLARD:  Object to the form
15 of the question.  If you understand it, you
16 can try to answer.
17   A.   At the time the pistol was given
18 back, that pistol nor Mr. Gray, the Moundville
19 Police Department nor myself had any legal
20 reason to keep it, if that's -- if that helps.
21 But there was no legal reason at the time the
22 pistol was returned to keep it.
23   Q.   Maybe I can narrow it down.  Do

1 you believe that pistol fits within the
2 definition of firearms contained in the
3 statute?
4      MR. GAILLARD:  Object to the form
5 of the question.  Which statute are we
6 referring to?
7      MR. MCCULLEY:  The state statutory
8 scheme.
9      MR. GAILLARD:  Okay.  And that's a
10 pretty broad statement.  Because even just the
11 criminal codes are full of a lot of statutes
12 or schemes.
13   Q.   (BY MR. MCCULLEY:)  Go ahead.
14      MR. GAILLARD:  So in fairness to
15 the witness, if we're asking --
16      MR. MCCULLEY:  Sure.
17      MR. GAILLARD:  -- about a specific
18 statute and how to define something --
19      MR. MCCULLEY:  Sure.
20      MR. GAILLARD:  -- you know, you
21 might want to let him look at it.
22   Q.   (BY MR. MCCULLEY:)  The state
23 statutory scheme that applies to individuals

1 that have been convicted of domestic violence
2 describes firearms and says they can't have
3 them.  Is there some reason you contend that
4 this pistol doesn't fit within that
5 definition?
6      MR. GAILLARD:  Object to the form
7 of the question.  Answer it if you can.
8   A.   I'm not sure that I understand the
9 question.  But I think what you're asking me
10 is that a firearm under the law -- under
11 that -- is that what you're asking me?
12   Q.   Exactly.
13   A.   Is that considered a firearm under
14 that domestic violence --
15   Q.   Yes.
16   A.   -- statute of a firearm?
17   Q.   Yes.
18   A.   Yes, that's a firearm, yes, sir.
19   Q.   All right.  Have you ever returned
20 any sort of weapon to someone who was arrested
21 and convicted?
22   A.   Have I ever -- have I ever
23 returned a weapon?

1    Q.  To someone who's been both
2  arrested and convicted?
3        MR. GAILLARD:  Object to the form
4  of the question.
5    A.  I mean, that's -- I can't answer
6  that.  I don't know what the -- have I ever
7  given a weapon back to someone that was a
8  convicted felon, convicted child molester?  I
9  mean, that's -- you know --
10    Q.  (BY MR. MCCULLEY:)  Yeah.
11    A.  -- any kind of conviction?
12    Q.  Yes, sir.
13    A.  Have I ever given a weapon back to
14  anybody --
15    Q.  Yes, sir.
16    A.  -- that had any kind of
17  conviction?  To my knowledge, no.  I mean, I
18  would have to say that because I don't recall
19  everybody that I've ever given --
20    Q.  All right.
21    A.  -- something back to.
22        MR. MCCULLEY:  Off the record.)
23        (Whereupon, a short break was

1        taken.)
2    Q.  (BY MR. MCCULLEY:)  Mr.
3  Robertson --
4    A.  Yes, sir.
5    Q.  -- we're curious whether the
6  change in the type font in this rules and
7  regulations manual from the police department,
8  page 1 through 45, are in some kind of Times
9  Font, Times New Roman --
10    A.  Uh-huh.
11    Q.  -- or something.
12    A.  Uh-huh.
13    Q.  And then this one is different.
14    A.  Yeah, I don't know what this is.
15    Q.  Do you think this was added?
16    A.  I -- yes.
17    Q.  Okay.
18        MR. GAILLARD:  When y'all say
19  "this", just for the record --
20        THE DEPONENT:  Yeah.
21        MR. GAILLARD:  -- we're referring
22  to the --
23        THE DEPONENT:  Yeah, we're

1  referring to the Moundville Police Department
2  Procedural General Order.
3    Q.  Page 46?
4    A.  Page 69, Ray versus Moundville 069
5  was the --
6    Q.  It's Bates stamped page 69.
7    A.  Yeah, Bates stamped.
8    Q.  Right.
9    A.  But from then on, it -- yes, it
10  does.
11    Q.  But you think the pages before
12  that were there when you were there?
13    A.  It's really hard to say just
14  without sitting down -- what this appears to
15  be is a -- is a copy -- this -- a lot of this
16  appears to be something that was never
17  enacted.  This appears to be something that
18  was -- we were working on over the years and
19  it was never -- the reason I say that is
20  because of the way it's laid out.  This was a
21  policy manual that we were -- that we were
22  working on.  I don't think it's ever been
23  voted on by the -- it may have been since I

1  left.  But at the time, I don't think so, but
2  that's what I'm going to say it was.
3    Q.  So you're saying you didn't use
4  this when you were chief?
5    A.  Right.  I mean, there may be some
6  things in here that are very similar to the
7  things that we used, but I can't say that I
8  used this (pointing).
9    Q.  But you still had policies --
10    A.  Yes, sir.
11    Q.  -- in your department?
12    A.  Yes, sir.
13    Q.  And you required your officers
14  to --
15    A.  Yes, sir.
16    Q.  -- follow them?
17    A.  There were policies, yes.
18    Q.  Okay.
19    A.  Pertaining to lots of different
20  things.
21    Q.  All right.  Well, the one I want
22  to ask you about is where you said that it was
23  each officer's job to follow up on their

1 cases.
2    A.  Right.
3    Q.  All right.  Did you follow up on
4 whether your officers were getting
5 convictions?
6    A.  (Witness shaking head negatively.)
7    Q.  Is that a no?
8    A.  That's a no.  Yeah, I'm sorry.
9 No.
10    Q.  Well, the reason I ask that again
11 it's based on my experience that supervisors
12 in law enforcement want to know if the patrol
13 officer's activity is productive.  In other
14 words, if you have an officer that's making a
15 hundred speeding arrests every week, you want
16 to know if he's getting convictions; right?
17         MR. GAILLARD:  Object to the form.
18    Not necessarily.
19    Q.  (BY MR. MCCULLEY:)  No?
20    A.  Not -- not necessarily.
21    Q.  Okay.  Before you returned the
22 weapon that had been taken from Brad Gray, did
23 you talk to the City attorney?

1    A.  Before --
2    Q.  Before you --
3    A.  I did not.
4    Q.  Okay.  Did you talk to the
5 district attorney?
6    A.  I did not.
7    Q.  But you did read the arrest report
8 before you returned it to him?
9    A.  I'm sure I did, yes, sir.
10    Q.  Okay.  In the course of your
11 investigation, did you ask Mr. Donaldson why
12 he went in the house and took it?
13    A.  I'm not sure if I asked Mr.
14 Donaldson.  That question was asked and it was
15 told to me that -- just for safekeeping, just
16 so nothing would happen to it.
17    Q.  Who said that?
18    A.  It would -- it was either
19 Donaldson or maybe Assistant Chief Burch told
20 me that.  It's been five years.  I don't --
21    Q.  Maybe Mayes?
22    A.  Could have been, yes, sir.
23    Q.  Okay.

1    A.  That's fair, yes, sir.
2    Q.  But you asked the question?
3    A.  Yes, sir.
4    Q.  Okay.
5    A.  I mean --
6    Q.  Did you also ask, why do you have
7 it and not have it logged in as evidence?
8    A.  Well, at the time that I found out
9 what was going on, that's when I started
10 asking those questions.
11    Q.  Sure.
12    A.  So, of course, you know, why do we
13 have the gun?  Well, it's for safekeeping.  So
14 that would explain to me why you didn't put it
15 into evidence.  That would, you know --
16    Q.  So you didn't ask him that
17 particular --
18    A.  I didn't.
19    Q.  Okay.  Tell me why you remember so
20 well that you returned it to him in August
21 while that case was pending.
22    A.  Because of the eventful situation
23 that happened at that store.  You know, and I

1 knew -- like I said, there was just several
2 things that happened at that particular time
3 is why I remember that, you know, because he
4 was raising Cain in front of a bunch of people
5 in the store, you know, workers and stuff.
6 And I had to call him off to the side.  And I
7 know what time -- I mean, when it was because
8 I know when I got back from conference and I
9 know why I was in the store.  I mean, it was
10 just an eventful situation.  You know, can I
11 remember before that?  Probably not.  Or after
12 that, I don't know.  But that particular time
13 that's why, if you're asking me, that's the
14 reasoning why I remember that.
15    Q.  Okay.
16    A.  Because it was just an eventful
17 deal.
18    Q.  Okay.  Back to the policy that the
19 arresting officers are supposed to follow up
20 on their own cases, how did they go about
21 doing that?
22    A.  Well, they just follow through the
23 courts.  Once they get -- you know, it begins

1 with the initial report, the investigation,
2 either they're arrested or not, getting the
3 warrant, producing themselves in court when
4 they're subpoenaed and then deposition in the
5 case.
6    Q.  All right.  And I guess I'm
7 struggling with why this follow-up is not
8 important to you as a chief.
9    MR. GAILLARD:  Object to the form.
10    Q.  (BY MR. MCCULLEY:)  That's not
11 really a question, is it?  When you gave the
12 gun back to Brad Gray, you know that he's got
13 a pending case for domestic violence; correct?
14    A.  When I gave him the gun back I
15 knew he had been arrested, yes.
16    Q.  All right.  Well, you checked to
17 see that it was still pending, that he hadn't
18 been convicted; right?
19    A.  Right.
20    Q.  Okay.  Isn't it true that if he's
21 convicted, he's unlawfully in possession of a
22 weapon?
23    MR. GAILLARD:  Object to the form.

1 Answer it if you can.
2    A.  Say it one more time.
3    Q.  (BY MR. MCCULLEY:)  Yeah.  If he's
4 convicted of domestic violence, he is
5 unlawfully in possession of a weapon; correct?
6    MR. GAILLARD:  Object to the form
7 of the question.
8    A.  If he has a weapon.
9    Q.  (BY MR. MCCULLEY:)  Right.
10    A.  Right.  Yeah, if he has one, yes,
11 sir.  He was caught with --
12    Q.  Well, you had given him one.
13    A.  No.  He -- no, sir.  When -- the
14 time that I gave him the weapon, there was no
15 legal reason to keep it.  He could legally own
16 a firearm.  He had no -- there was no legal
17 reason for the Moundville Police Department to
18 keep that weapon.
19    Q.  Well, I understand that part of
20 your testimony.  But if he's later convicted,
21 then he can't have one; right?
22    MR. GAILLARD:  Object to the form
23 of the question.

1    MR. KINNEY:  Same objection.
2    A.  I would agree with that, but I
3 can't say that he had a weapon at a later
4 date.  We don't have the authority to go and
5 start checking everybody that's been
6 convicted.  You know, we don't have that --
7 you know, that's something in the courts.
8    Q.  (BY MR. MCCULLEY:)  Okay.  Did you
9 ever discuss the Mitchell's deaths with
10 anybody at the sheriff's office?
11    A.  I mean, other than just telling
12 the sheriff that I had this deposition or
13 something like that, because I don't know
14 anything about the Mitchells deaths other than
15 it happened.
16    Q.  After the Mitchells died, did
17 Sheriff Ellis discuss that with you?
18    A.  No.
19    Q.  Okay.  Were you ever asked to stay
20 out of the investigation?
21    A.  I mean, I wasn't -- I mean, I
22 wasn't there to be in the investigation.
23    Q.  Okay.  So --

1    A.  No, no one ever asked me to stay
2 out of the investigation but I wasn't there to
3 be in it.
4    Q.  And who was the sheriff's
5 investigator at the time?
6    A.  Lieutenant Jeames.
7    Q.  All right.  And he didn't ask you
8 to stay out of it?
9    A.  I wasn't -- I wasn't there.  I
10 wasn't employed there.  I wasn't --
11    Q.  Well, you were at the sheriff's
12 office then; right?
13    A.  Yes.
14    Q.  Okay.
15    A.  But -- but I never -- never -- he
16 never asked me to stay out of it, but I never
17 had anything to do with it.
18    Q.  Right.  He never discussed it with
19 you?
20    A.  No.
21    Q.  Okay.  Did you ever let anybody
22 know that you had returned the pistol to Gray?
23    A.  The clerk would have known because

1 I went in there and had to get a form, the
2 property form to fill out. Of course, she
3 would have known. Of course, the officer
4 getting it back for me would have known. I'm
5 sure Chief Burch would have known. You know,
6 I can't say that I told them, but I mean, just
7 from the assumption of them knowing what's
8 going on.
9     Q.  Do you know if anyone told Paige
10 Mitchell or any her family members that the
11 gun had been returned?
12    A.  No, sir, I do not know that.
13    Q.  So you didn't let them know?
14    A.  I didn't, no.  No, sir.
15    Q.  And you didn't discuss with the
16 City attorney or anybody else whether
17 returning the pistol to Gray might violate the
18 law?
19    A.  I did not.
20    Q.  Do you know whether federal
21 authorities were involved in the investigation
22 into the Mitchells deaths?
23    A.  I -- no, I don't.

1     Q.  How long have you known or had you
2 known Brad Gray?
3     A.  Oh, I first went to work in
4 Moundville as a police officer in '97 or
5 whatever.  He was a young kid then.
6     Q.  How young?
7     A.  Oh, I don't know how old he was.
8 Fifteen, maybe.  I don't know.
9     Q.  Did you know his dad?
10    A.  I did not.  I never did -- I never
11 did, his mom either.  I don't really -- you
12 know, really the only person I know is him and
13 his brother.  That's pretty much it.  I knew
14 who his grandfather was.
15    Q.  What's his brother's name?
16    A.  Mike.  Mike.
17    Q.  So you never had any discussions
18 with his father about the gun?
19    A.  Oh, no.  No, sir.
20    Q.  Okay.
21    A.  I don't think I've ever had a
22 discussion with his father at all.
23    Q.  All right.  Had y'all arrested

1 Brad Gray a number of times before?  And let
2 me finish that question.  I really didn't
3 finish that.  And he's going to say, object to
4 the form, and justifiably so.  Had y'all
5 arrested Brad Gray a number of times before
6 this domestic violence arrest?
7     A.  I think we arrested -- I know of
8 at least one other time.
9     Q.  What was that for?
10    A.  I -- geez, I don't remember.  DUI,
11 maybe.
12    Q.  Okay.
13    A.  Or maybe a warrant.  Maybe a
14 warrant that was outstanding.  I just really
15 can't remember.
16    Q.  All right.
17    A.  I don't know if we wrote him a DUI
18 or it was an outstanding warrant.  But I think
19 I made the arrest.
20    Q.  Did he have an alcohol problem?
21        MR. GAILLARD:  Object to the form.
22    A.  He liked to drink, but I mean, I
23 don't know if he had an alcohol problem.

1     Q.  Okay.  You've run across him
2 several times?
3     A.  Mostly during the day, working,
4 uh-huh.
5     Q.  Yeah.  Do you know if -- or did
6 you or do you know if any of your officers
7 took him home instead of to jail when they'd
8 catch him drinking?
9     A.  Not to my knowledge, they didn't.
10    Q.  Okay.
11    A.  That would have been a no-no as
12 well.
13    Q.  Do you know of him ever being
14 violent, you personally know of him ever being
15 violent?
16    A.  No, sir.
17    Q.  Did he have a reputation for it?
18    A.  No, sir.  I mean --
19    Q.  Not that you know of?
20    A.  No, not that I know of.
21    Q.  Anybody besides Brad Gray ask for
22 that pistol to be returned to him?
23    A.  No, sir.

1    Q.  Did you know Paige Mitchell?
2    A.  I did know Paige.  I didn't know
3 her as well as I did Brad, so to speak.  I
4 mean, I didn't talk to her much or anything.
5    Q.  Did you know her dad?
6    A.  I met her dad one time -- one
7 time.
8    Q.  Yeah.
9    A.  I went over and spoke with him.
10    Q.  Did you know he's deceased?
11    A.  I did, yes, sir.  I did.
12    Q.  Had you ever met Sylvia Ray?
13    A.  No.  No, sir.
14    Q.  Okay.  Did you ever discuss with
15 Danny Ray or Sylvia Ray Brad Gray?
16    A.  (Witness shaking head negatively.)
17        MR. GAILLARD:  You've got to
18 answer out loud.
19    A.  Oh, no, sir.  I'm sorry.  I'm
20 sorry.
21    Q.  (BY MR. MCCULLEY:)  Did you ever
22 hear them saying anything about Brad Gray?
23    A.  No, sir, I don't really know them.

1 If I did, I wouldn't know it was them saying
2 it.
3    Q.  Do you know anything about what
4 Paige Mitchell's and Brad Gray's relationship
5 was like at the time of all of this?
6    A.  Just a little, you know.
7    Q.  Tell me about that.
8    A.  Just on again, off again type
9 thing.  They -- you know, pretty much on
10 again, off again.  They'd see each other for a
11 little while and then they wouldn't see each
12 other for a little while, then they'd see each
13 other for a little while, you know, that kind
14 of thing.
15    Q.  Do you know why?
16    A.  I don't.
17    Q.  Okay.  Never heard --
18    A.  I mean, I just wasn't friends with
19 them.  I wasn't social friends with them, so I
20 don't -- I can't tell you.
21    Q.  Don't know why?
22    A.  Don't know why.
23    Q.  Have you ever had a conversation

1 with Kaci Mitchell?
2    A.  No, sir.
3    Q.  Kayla Mitchell?
4    A.  I've talked to Kayla before but
5 not about this case or anything.
6    Q.  Okay.  What was that conversation
7 about?
8    A.  Something in the hardware store.
9 I mean, honestly I -- if I remember, it would
10 have been nothing.  It was just casual
11 conversation.  That would have been it.
12    Q.  Do you know of any statements made
13 by Paige Mitchell about Brad Gray?
14    A.  No, sir.
15    Q.  What about -- same question for
16 Kaci.  Did Kaci ever say anything about Brad
17 Gray?
18    A.  No, sir, not to me.
19    Q.  You've said that Brad Gray
20 maintained the police had no right to go in
21 his house to get that gun.
22    A.  Yeah, I think that's what he
23 said --

1    Q.  Right.
2    A.  -- yes, sir.  Yes, sir.  That was
3 his --
4    Q.  And that he wanted it back?
5    A.  Right.  He said they didn't have a
6 right to take it and could he get it back.
7    Q.  What else did he say about that
8 incident, if you remember anything?
9    A.  I don't ever remember talking to
10 him about it.
11    Q.  Okay.  Never talked to him about
12 it after the return of the weapon either?  He
13 never --
14    A.  No, sir, I don't think I talked to
15 him again.  If I did, I don't remember after
16 that at all.
17    Q.  You said y'all got sued, the
18 department got sued in a -- for --
19    A.  Well, there was a litigation with
20 an improper arrest or, you know --
21    Q.  Tell me about that.
22    A.  It was -- Officer Donaldson
23 responded to a call where the female -- let me

24 (Pages 90 - 93)

1 get that right, where the female made the
2 call, initial call for assistance. When he
3 got there, she tried to show him some
4 paperwork. He arrested her anyway or arrested
5 him. I -- geez, I'd have to go back and look.
6 But it's one or the other. And then -- so
7 that person sued him saying -- sued the
8 department saying that he didn't do due
9 diligence and follow-up in his reading of
10 his -- he had paperwork saying he could be
11 there and arrested him on his own property and
12 that type of thing. I'd have to read over the
13 lawsuit again. But that was the gist of it.
14 He made an arrest and they stated he shouldn't
15 have or they claimed that he shouldn't have.
16     Q.  How did that come out?
17     A.  I think -- as far as I remember,
18 it was dismissed, as far as I remember. As a
19 matter of fact, I know it was dismissed. I
20 just don't remember the whole -- the --
21 without reading about it.
22     Q.  Do you know whether there was a
23 settlement?

1     A.  I don't.
2     Q.  Okay.
3     A.  I can't recall. That's what I
4 mean by what I said.
5     Q.  You've told me that you're not
6 aware of any witnesses to the shooting;
7 correct?
8     A.  I am not.
9     Q.  Okay. And you've told me that
10 Landry Donaldson and Lamarcus Mayes were there
11 when they took the pistol away from -- no,
12 you --
13     A.  I'm not sure --
14     Q.  -- didn't tell me that.
15     A.  I'm not sure if Landry was there.
16 I know Mayes had to be there because he made
17 the initial.
18     Q.  And that's what Brad Gray said;
19 right?
20     A.  Yes.
21     Q.  Did he say who --
22     A.  Yes.
23     Q.  -- went in? Yeah.

1     A.  Yes. He didn't -- no, to my
2 knowledge he didn't tell me who got it. He
3 said they, y'all, you son of bitches or -- you
4 know, he was just really ranting and -- which
5 is why I remember. He was really ranting
6 inside that store. I had to call him out to
7 the side and say, hey, look, man, just give
8 me -- don't -- you know, don't raise Cain.
9 Let me figure out what's going on, so --
10     Q.  Do you know anybody else that was
11 there at the time?
12     A.  I probably knew everybody, but I
13 don't remember who. I mean, it's been five
14 years ago. I don't remember. It would have
15 been employees.
16     Q.  No, I mean at the scene.
17         MR. GAILLARD:  Of the shooting?
18     Q.  (BY MR. MCCULLEY:)  No.  When the
19 pistol was taken away from him.
20     A.  Oh, no, I don't know if anybody
21 else was there or not. I really --
22     Q.  Sorry.
23     A.  -- don't -- I really -- other than

1 just reading this (pointing), you know.
2     Q.  Okay. Was anybody with you
3 when -- or there, any other witnesses to you
4 taking the pistol back to him?
5     A.  I mean, I would have been in my
6 office. Nobody. It was just me and him and
7 then, like I said, the clerk.
8     Q.  So he came to get it? You didn't
9 take it?
10     A.  Yeah. Right. Right.
11     Q.  Okay.
12     A.  He came to get it. He came to the
13 police department. I mean, I can't -- I would
14 have never took it to him. I mean, I'm not --
15 yeah, he had to come in and sign for it just
16 like any other property. So the clerk, you
17 know, I would have went in there and got a
18 form and come in there. He would have been at
19 my desk.
20     Q.  What does the form say?
21     A.  You're receiving -- I'd have to --
22 I don't know. It would be something like --
23 it's just a general property return. This is

1 the property, this is what it looked -- this
2 is the description. You know, you're
3 receiving it on this date and blah, blah,
4 blah. And he would sign it.
5     Q. So he didn't sign a waiver or
6 anything to get it back?
7     A. No.
8     Q. All right.
9     A. No. Right. Not unless there's
10 some kind of paperwork where you would legally
11 have to sign a waiver.
12     Q. And you can't think of anybody
13 else who was involved in any discussion --
14 other than who you've told me, that was
15 involved in discussions about returning the
16 pistol to him?
17     A. No, sir, nobody but who I've told
18 you.
19     Q. Okay. Have you ever been
20 arrested?
21     A. No, sir.
22     Q. Have you ever had a complaint
23 filed against you?

1     A. I had one in Moundville.
2     Q. What was that for?
3     A. Well, I -- I take that back. I
4 don't know if it was lodged or not.
5     Q. You don't know if there was --
6     A. It was a female that said that I
7 grabbed -- cuffed her too hard.
8     Q. But you don't know if --
9     A. I can't remember.
10     Q. -- there was a formal complaint?
11     A. I don't think she filed a formal
12 complaint. I think she just went to the
13 mayor.
14     Q. Okay.
15     A. He said, hey, if she files a
16 formal complaint, we're going to have to do
17 something about it or whatever, and I think
18 that was it. In my career, no, never had a --
19 never even -- never even had a -- never
20 been -- other than the last four years of my
21 employment after Mayor Lester, I've never been
22 written up in my life for twenty years.
23 Exemplary record.

1     Q. Other than the last four years of
2 your employment?
3     A. At Moundville.
4     Q. Okay. What happened during that
5 last four years?
6     A. Well, I think -- I mean, it would
7 merely be conjecture and opinion. But I think
8 that the mayor ran on a platform of reforming
9 the police department and he set out to do
10 that and I was not a part of that. So some of
11 his constituents were not favorable towards
12 me, didn't like me because of actions I had
13 taken. But, anyway, so that's how that -- you
14 know, how -- I mean, it's small town politics.
15 So --
16     Q. What were you doing that was
17 disfavored?
18     A. Well, I mean, in my opinion, I
19 wasn't doing anything. In their opinion, I
20 was doing -- you know, I wasn't following
21 their rules or whatever. I mean, I don't know
22 how to describe it. I mean, there was --
23 there was one time when, you know, I said

1 some -- I called this father a bad name on the
2 phone, you know, and that kind of thing, so
3 just things like that. Just --
4     Q. Were you arresting the wrong
5 people?
6     A. No.
7     Q. Okay.
8     A. No, it was never anything about an
9 arrest or anything, nothing like that. It was
10 about duties, internal, internal duty.
11     Q. Have you ever returned a weapon to
12 anyone after they've been convicted, that you
13 know of?
14     A. No, sir.
15     Q. You may have answered this already
16 for me but my memory is not good. After the
17 Mitchells were killed, did anybody with the
18 sheriff's office come talk to you about it?
19     A. Huh-uh.
20     Q. All right.
21         MR. MCCULLEY: I think we're about
22 done. Give us just a minute, guys.
23         (Whereupon, a short break was

1     taken.)
2         MR. MCCULLEY: Unless I can think
3 of anything else while you're talking, I think
4 I'm done.
5         MR. GAILLARD: Warren, do you have
6 anything?
7         MR. KINNEY: I have no questions.
8         MR. GAILLARD: Yeah, I don't think
9 I have any either.
10         MR. MCCULLEY: Well, that didn't
11 give me much time.
12         MR. GAILLARD: I know. That's
13 what I was trying to accomplish.
14         MR. MCCULLEY: I guess we're done.
15         (Whereupon, Plaintiff's
16         Exhibits 1 and 2 were marked
17          for identification.)
18     FURTHER THE DEPONENT SAITH NOT
19
20
21
22
23

1         C E R T I F I C A T E
2
3 STATE OF ALABAMA)
4 COUNTY OF SHELBY)
5     I hereby certify that the above
6 proceedings were taken down by me and
7 transcribed by me using computer-aided
8 transcription and that the above is a true and
9 correct transcript of said proceedings taken
10 down by me and transcribed by me.
11     I further certify that I am neither of
12 kin nor of counsel to any of the parties nor
13 in anywise financially interested in the
14 outcome of this case.
15     I further certify that I am duly licensed
16 by the Alabama Board of Court Reporting as a
17 Certified Court Reporter as evidenced by the
18 ACCR number following my name found below.
19 *Maya Rose*
20 Maya Rose, ACCR#242
21 Expires 9/30/20
22 State of Alabama at Large
23 Commission Expires 2/23/21

27 (Pages 102 - 103)

| & |
| --- |
| **&** 3:20 4:6 21:3 |

| 0 |
| --- |
| **001** 5:9 13:8 |
| **023** 5:9 13:8 |
| **06** 22:23 |
| **069** 76:4 |

| 1 |
| --- |
| **1** 5:8 9:16 11:9 75:8 102:16 |
| **102** 5:8,10 |
| **12:20** 6:10 |
| **150** 3:21 |
| **16** 23:15,17 28:5,7 31:16 |
| **175** 4:7 |
| **18328** 103:19 |
| **1966** 9:16 |
| **1997** 13:11 20:2 |

| 2 |
| --- |
| **2** 1:19 5:10 102:16 |
| **2/23/21** 103:23 |
| **200** 3:7,13 |
| **2000** 3:21 19:2 22:6 |
| **2005** 6:7 |
| **2006** 19:3,5,7 22:20 31:16 |
| **2011** 31:22 |
| **2015** 46:21 47:1,6 61:7,8 64:20 |
| **2016** 19:7,10,14,18 38:17 |
| **2017** 19:12 29:1 30:23 |
| **2020** 1:19 6:9 |
| **215** 21:13 |
| **242** 103:20 |
| **260** 15:6 |
| **2:19-00069** 1:4 |

| 2nd 6:9 |
| --- |

| 3 |
| --- |
| **3** 64:13 |
| **35213** 4:8 |
| **35401** 3:8,14 |
| **35474** 9:20 |
| **36602** 3:22 |

| 4 |
| --- |
| **45** 75:8 |
| **46** 76:3 |
| **480** 15:5 |

| 5 |
| --- |
| **5th** 9:16 |

| 6 |
| --- |
| **601** 3:7,13 |
| **67** 9:19 |
| **69** 76:4,6 |

| 7 |
| --- |
| **7** 5:4 |

| 8 |
| --- |
| **8** 61:6 |
| **880** 4:7 |

| 9 |
| --- |
| **9/30/20** 103:21 |
| **925** 9:19 |
| **97** 13:22 14:1 87:4 |
| **98** 13:22 14:1 |
| **99** 19:2 |
| **9:00** 49:7 |

| a |
| --- |
| **a.m.** 6:10 |
| **aacop** 10:15,16 16:1 |
| **able** 15:20 22:14 57:15 |
| **absolutely** 64:12 |
| **academy** 13:18 14:5,11,15 16:16 |

**accomplish** 102:13
**accr** 103:18,20
**accusations** 23:23 24:11,22
**accuses** 60:5,8
**acting** 6:4 29:12 40:21,22
**action** 1:4
**actions** 100:12
**activity** 78:13
**ada** 62:21
**added** 75:15
**address** 9:18
**affidavit** 61:23
**afforded** 26:16
**ago** 16:14,17 96:14
**agree** 43:6,11,16,17 45:18 46:2,5,9,11 62:14 84:2
**agreed** 2:2 68:18
**agreements** 62:15
**ahead** 59:1 72:13
**aided** 103:7
**al** 1:9,13
**alabama** 1:2 3:8,14 3:22 4:8 6:2,3,8 10:11,15 13:13 15:23 103:3,16,22
**alcohol** 88:20,23
**allegation** 27:3,4,8
**allows** 41:2,19
**angry** 48:6,10
**animosity** 30:8
**answer** 8:5,10,16 24:19,20 43:9 69:21 71:16 73:7 74:5 83:1 90:18
**answered** 38:7 101:15
**anybody** 31:4 66:18,23 67:22

74:14 84:10 85:21 86:16 89:21 96:10 96:20 97:2 98:12 101:17
**anymore** 24:2
**anyway** 26:2 43:2 56:1 94:4 100:13
**anywise** 103:13
**appearance** 62:17 62:18
**appeared** 61:20
**appears** 47:19 64:15,17 76:14,16 76:17
**applied** 23:5 69:9
**applies** 72:23
**apply** 68:3 69:4
**approached** 38:2
**approximately** 18:22
**aptitude** 26:20,23
**area** 55:20
**areas** 33:3
**arrest** 13:6 44:7,21 45:17 46:18 47:20 48:2,19 49:13,19 49:20 53:21 64:13 64:16 67:17 79:7 88:6,19 93:20 94:14 101:9
**arrested** 44:11,17 47:14,17,23 48:8 49:22 60:4 73:20 74:2 82:2,15 87:23 88:5,7 94:4,4,11 98:20
**arresting** 81:19 101:4
**arrests** 78:15
**arrived** 31:8

**articles** 17:13
**asked** 30:18 41:6
  60:13 67:22 79:13
  79:14 80:2 84:19
  85:1,16
**asking** 30:22 72:15
  73:9,11 80:10
  81:13
**assign** 2:18
**assistance** 41:20
  94:2
**assistant** 26:22
  28:20 29:12,16
  34:5 51:2 67:6
  79:19
**association** 10:7,10
  10:15 11:3 15:22
**assume** 38:22
**assuming** 12:18
  36:17 55:2
**assumption** 40:20
  54:22 59:4 86:7
**atf** 18:8
**attached** 33:19
**attorney** 3:5,11,18
  4:5 24:16 78:23
  79:5 86:16
**attorneys** 36:17
**audit** 25:12 59:7
**august** 47:6 48:22
  49:23 51:7,7,8
  64:20 80:20
**authorities** 86:21
**authority** 36:14
  84:4
**auto** 21:9
**avenue** 3:7,13
**aware** 8:23 12:11
  49:13 68:6,7 69:8
  69:15,19 70:2,18
  95:6

**b**

**b** 5:6 9:12 29:11,11
**back** 16:1 19:3,18
  20:21 21:10 22:17
  48:3,4,21 51:15,17
  52:14,18 55:10,12
  55:12 64:14 65:1
  68:14 69:14 71:18
  74:7,13,21 81:8,18
  82:12,14 86:4 93:4
  93:6 94:5 97:4 98:6
  99:3
**bad** 101:1
**banks** 29:6 38:19
  39:23 40:8,17
**based** 16:23 42:19
  59:13,13,14,15
  68:21 78:11
**basic** 34:18 52:2
**basically** 26:1
**bates** 11:12,20 76:6
  76:7
**bay** 14:8,15
**beach** 49:2
**beginning** 24:10,11
**begins** 81:23
**believe** 9:2 21:9
  34:10 40:8,13,14
  43:20 46:20 72:1
**believing** 40:7
**belong** 9:22 10:2
**belonged** 10:5
**belongings** 56:15
**best** 38:21 46:17
  51:10,12
**beyond** 27:10
**big** 25:15 32:18
**birmingham** 4:8
  6:2
**birth** 9:15

**bitches** 96:3
**blah** 26:18,18,18
  48:12,12,12 98:3,3
  98:4
**board** 103:16
**boisterous** 48:6
**booked** 59:2,6
**boulevard** 6:8
**brad** 8:23 13:6 43:6
  45:8,17 46:4,6 56:7
  60:1 78:22 82:12
  87:2 88:1,5 89:21
  90:3,15,22 91:4
  92:13,16,19 95:18
**bradley** 1:12 13:3
**break** 8:7 49:8
  74:23 101:23
**breaks** 25:3
**bring** 55:2,13
**broad** 17:20 68:17
  72:10
**brother** 87:13
**brother's** 87:15
**brought** 52:18 55:1
**bunch** 59:20 81:4
**burch** 29:9 31:3,4
  31:12 40:18 79:19
  86:5
**burroughs** 3:10,12
  7:12 11:20

**c**

**c** 3:1 4:1 13:15
  29:11,11 30:1,4
  103:1,1
**cain** 49:10 81:4
  96:8
**call** 25:18 81:6
  93:23 94:2,2 96:6
**called** 16:7 25:8
  62:21 101:1

**calm** 48:13
**calvin** 20:12
**capable** 42:1
**capacity** 40:23
**car** 56:13
**career** 99:18
**case** 7:15 9:1 13:3
  18:11 27:20 61:18
  63:2,23 64:1,4,7,9
  64:12,19 65:5,19
  65:23 70:4,8 80:21
  82:5,13 92:5
  103:14
**cases** 63:13,18,22
  64:3 66:12,16
  70:15 78:1 81:20
**casual** 92:10
**catch** 89:8
**caught** 83:11
**cause** 6:11
**cell** 32:19
**cells** 32:15
**certainly** 17:7 58:2
**certified** 103:17
**certify** 6:4 103:5,11
  103:15
**ceu** 16:23
**ceus** 15:2 16:5,7
**chain** 33:8
**change** 22:9 35:8
  36:14,15 38:11
  75:6
**changed** 31:19
  35:10 37:8,8 59:10
**changes** 28:14 36:2
  36:5,7,9,18
**charge** 60:17 68:12
**charged** 56:7 64:21
**check** 48:14
**checked** 82:16

checking 84:5
chief 12:22 15:3,18
  15:18 19:4 23:1,7
  26:22 28:1,15,20
  28:21 29:6,12,13
  29:14,16 31:4,12
  32:4,9 36:20 38:18
  39:22 40:8,21,23
  51:2 56:3 58:6
  62:19 63:12 67:6
  77:4 79:19 82:8
  86:5
chief's 34:5
chiefs 10:8,11,16
  15:23
child 74:8
church 10:19
circle 30:10
city 22:13,18 33:19
  33:19,20 35:20
  37:3 41:2 78:23
  86:16
city's 54:13
civil 1:4 6:6
claimed 94:15
clarification 8:18
clarify 45:19
classes 16:10
classroom 15:4
clear 26:2,5
clerk 33:23 34:1
  64:17 85:23 97:7
  97:16
clerk's 33:22
close 50:2
closed 32:13
clubs 11:1
codes 72:11
coffee 49:1,1
come 48:4,21,22
  49:7 52:15 94:16

97:15,18 101:18
commencing 6:9
commission 56:17
  103:23
commissioner 2:5
  2:22 6:4 37:2,11
committee 37:6
common 53:8,17
  64:14
company 20:5,16
  20:18 21:1 49:5
complaint 98:22
  99:10,12,16
complete 15:15
completed 14:14
compliance 2:11
computer 103:7
concern 55:22 60:1
concerns 51:23
concluded 18:11
concluding 6:10
conclusion 17:14
condemned 44:9
conference 15:3,18
  15:19 48:3,5,22
  81:8
confiscate 43:17
  54:8
confiscated 43:14
  43:20 44:2,9,14,23
  52:11
conjecture 100:7
consider 44:13
considered 73:13
constituents 100:11
consult 67:19
contact 37:18,19,20
contained 72:2
contend 71:3,11
  73:3

continued 4:1
continuing 16:21
conversation 91:23
  92:6,11
convicted 61:2 63:9
  65:10 68:4 69:1,10
  70:5,9 73:1,21 74:2
  74:8,8 82:18,21
  83:4,20 84:6
  101:12
conviction 47:10
  60:6 61:13,16 63:4
  74:11,17
convictions 69:5
  78:5,16
copy 11:15 76:15
corner 33:18
correct 22:3 28:12
  30:2 54:6 68:5 69:5
  70:5,6 82:13 83:5
  95:7 103:9
council 25:20 35:20
  37:3,7,17,21
counsel 2:4,15,17
  6:7 103:12
count 34:21
county 9:19 18:23
  22:12 28:19 41:1
  103:4
couple 18:17 34:8
  37:7,13 40:5
course 11:23 16:5
  25:20 28:19 38:6
  65:8 69:15 71:1
  79:10 80:12 86:2,3
court 1:1 2:6,12
  7:22 13:1 45:1
  50:18 60:23 61:10
  62:3,20 63:14 64:1
  70:4,8 82:3 103:16
  103:17

courts 81:23 84:7
covered 17:7 71:4
crazy 27:10
criminal 72:11
cubicles 34:4
cuffed 99:7
curious 75:5
current 9:17 12:17
custodian 32:6
custody 44:22 45:5
  45:9,14,16 46:4,7
cut 31:21

d

d 5:1 9:11
dad 87:9 90:5,6
daniel 29:23
danny 90:15
date 6:5 9:15 17:6
  17:10 48:1,20 50:3
  70:22 84:4 98:3
day 6:9 27:13 38:8
  38:8 48:4 89:3
days 47:8
deal 81:17
dealings 39:8
death 12:8
deaths 9:5 84:9,14
  86:22
deceased 1:9 7:18
  20:12 90:10
decided 26:7 55:17
decision 60:12
defendant 9:1
defendant's 62:17
defendants 1:14
define 72:18
definite 41:7
definition 72:2
  73:5
department 5:11
  11:17 12:4 23:20

28:23 32:7 33:13
33:21 34:16,23
35:17 36:1,6,7
37:13,14 41:2,5,11
42:16 43:13 45:5,9
46:8 50:19 53:1
55:9 59:21 63:11
70:11,13 71:19
75:7 76:1 77:11
83:17 93:18 94:8
97:13 100:9
**depending** 37:23
**deponent** 75:20,23
102:18
**deposition** 1:16 2:4
2:9,10,19,22 8:21
12:5 13:7 47:17
57:4 61:23 64:17
82:4 84:12
**depositions** 2:13
**describe** 33:12
100:22
**describes** 73:2
**description** 17:22
18:4 98:2
**desk** 97:19
**determination** 56:3
**determine** 58:7
**died** 84:16
**different** 16:5 24:3
75:13 77:19
**diligence** 24:13
25:18 27:16 94:9
**dillard** 29:19 31:7
**direct** 37:18
**direction** 24:3 26:8
**directive** 34:21,23
66:13
**directives** 34:20
**directly** 24:9 37:21
38:7

**disagreed** 52:5
**discuss** 84:9,17
86:15 90:14
**discussed** 27:21
67:5,7 85:18
**discussing** 39:12
69:14
**discussion** 66:19
67:2 87:22 98:13
**discussions** 87:17
98:15
**disfavored** 100:17
**dismissed** 94:18,19
**disposition** 17:13
64:4 70:14
**distinction** 44:4,6
44:16
**distinguish** 45:12
**district** 1:1,2 63:13
79:5
**division** 1:3
**document** 12:6,23
25:9 26:9,15 27:9
27:14 47:1 61:5
**documents** 5:8 11:6
11:8,13 13:5 39:12
47:3
**doing** 40:23 59:21
60:8 81:21 100:16
100:19,20
**domestic** 61:3
64:21 66:16 67:17
68:4 69:10 70:14
73:1,14 82:13 83:4
88:6
**donaldson** 34:9
51:14,18 53:20
55:4 57:22 66:21
66:22 67:4 70:8
79:11,14,19 93:22
95:10

**door** 32:18
**doors** 32:19
**draft** 35:22
**drafted** 35:13,15
35:16,19
**draws** 59:20
**drink** 88:22
**drinking** 89:8
**drive** 20:17
**due** 24:13 25:18
27:15 94:8
**dui** 88:10,17
**duly** 6:16 103:15
**duties** 101:10
**duty** 53:9 101:10
**dv** 56:7 64:13

**e**

**e** 3:1,1,4,6 4:1,1 5:1
5:6 9:11,12 13:14
13:14,15,15 29:11
29:23 30:1,1,4
34:12 42:14,14
103:1,1
**early** 51:7
**education** 16:21
**effect** 2:10 12:7
**eight** 28:3,3 31:14
31:16
**either** 17:11 18:4
44:18 79:18 82:2
87:11 93:12 102:9
**election** 19:7
**elliott** 1:12
**ellis** 23:11 42:6
84:17
**employed** 19:23
30:16,19 85:10
**employee** 35:17
**employees** 31:17
96:15

**employment** 22:2
99:21 100:2
**enacted** 76:17
**ended** 22:3 51:14
**enforcement** 14:10
16:8,14 20:3 78:12
**especially** 41:23
61:18
**estate** 1:8,12 9:1
**et** 1:9,13
**eventful** 61:18
80:22 81:10,16
**everybody** 7:2
74:19 84:5 96:12
**evidence** 2:20 17:4
17:14,19 32:7,16
32:22 44:8 52:10
54:4,7,13,18 58:17
58:21 59:5,11,16
59:17 60:17 80:7
80:15
**evidenced** 103:17
**evidentiary** 33:9
**exact** 24:1 48:1
50:3 55:16
**exactly** 8:19 14:1
17:6 73:12
**examination** 5:4
6:12 7:1
**examined** 6:16
**excuse** 15:5
**executive** 16:7,8
**exemplary** 99:23
**exhibit** 5:8,10 11:9
**exhibits** 102:16
**experience** 41:17
78:11
**expires** 103:21,23
**explain** 51:20
57:18 63:20 80:14

explanation 24:4
extent 41:9

**f**

f 30:4 103:1
facilities 33:13
fact 29:3 43:19
  53:19 94:19
fair 12:13 54:21
  66:15 80:1
fairly 24:20
fairness 72:14
familiar 7:10 12:22
family 86:10
far 48:2 63:23
  94:17,18
farm 20:7
father 87:18,22
  101:1
favorable 100:11
federal 6:5 69:23
  70:1,2 86:20
feel 58:3
fellow 55:23
felon 74:8
felt 57:23
female 93:23 94:1
  99:6
fifteen 87:8
figure 96:9
file 13:3 34:3 50:11
filed 98:23 99:11
files 14:23 99:15
filing 2:21
fill 86:2
filled 44:3 64:16
financially 103:13
find 51:4 58:11
fine 6:21,22
finish 88:2,3
fire 37:12

firearm 69:21
  73:10,13,16,18
  83:16
firearms 17:19,22
  18:3 71:9 72:2 73:2
fired 23:19,21
  38:17
first 6:16 13:10
  20:3 26:3 27:13
  62:18 87:3
fit 73:4
fits 72:1
five 30:5,6 79:20
  96:13
fluid 31:19
fluidly 35:8
folks 7:18
follow 64:3 65:9,14
  65:19 66:1,5 70:3
  70:14 77:16,23
  78:3 81:19,22 82:7
  94:9
followed 63:18
  64:8 66:12 70:8
following 6:12
  100:20 103:18
follows 6:17
font 75:6,9
fop 9:23 10:2
force 2:10
foregoing 6:6
forged 25:9 26:18
  27:9,20
forgetting 31:23
form 2:16 43:8
  58:18 69:12 71:6
  71:14 72:4 73:6
  74:3 78:17 82:9,23
  83:6,22 86:1,2 88:4
  88:21 97:18,20

formal 99:10,11,16
found 50:16 63:4
  64:23 80:8 103:18
four 26:3 30:20
  99:20 100:1,5
fraternal 10:23
friends 22:10 91:18
  91:19
front 81:4
full 2:11 9:10 72:11
further 102:18
  103:11,15
fussing 60:1 65:2
futile 26:3,3

**g**

g 34:12
gaillard 3:17 6:21
  11:12 13:2 30:22
  43:8,15 58:18,23
  61:7 69:12 71:6,14
  72:4,9,14,17,20
  73:6 74:3 75:18,21
  78:17 82:9,23 83:6
  83:22 88:21 90:17
  96:17 102:5,8,12
geez 88:10 94:5
general 76:2 97:23
getting 9:10 20:21
  57:23 69:14 78:4
  78:16 82:2 86:4
girl 25:3
gist 94:13
give 50:3 96:7
  101:22 102:11
given 8:20 71:17
  74:7,13,19 83:12
go 10:19,20 14:5,22
  19:18 25:19 26:7
  37:16 38:12 39:17
  41:22 50:10 58:23
  60:3 62:16 72:13

81:20 84:4 92:20
  94:5
going 8:9,19 29:5
  30:12 38:10,10
  41:16,22,23 42:2
  42:22 43:1 48:12
  48:15,23 51:5 52:4
  56:23 57:23 62:9
  77:2 80:9 86:8 88:3
  96:9 99:16
good 14:18 23:22
  27:1 40:20 101:16
government 3:21
grabbed 99:7
gracious 14:19
grandfather 87:14
grandfathered
  16:18
gray 1:12 13:6 43:6
  43:12 45:3,8 46:4
  55:20 56:7 62:3
  64:21 71:18 78:22
  82:12 85:22 86:17
  87:2 88:1,5 89:21
  90:15,22 92:13,17
  92:19 95:18
gray's 9:1 13:3
  46:6 56:12 91:4
greensboro 3:7,13
grounds 2:18
groups 11:1
guess 24:1 29:6
  37:15 40:18 66:15
  82:6 102:14
guesstimate 47:7
guilty 62:3
gun 55:14 56:5
  65:3 66:19 67:3
  80:13 82:12,14
  86:11 87:18 92:21

**guy** 23:3
**guys** 31:5 49:7,9
  53:14 101:22

**h**

**h** 5:6 29:11,11,11
  34:12,12
**hale** 18:23 41:1
**hall** 33:19,19,20
**hand** 27:18
**handgun** 68:8,11
**handguns** 18:10
  68:3
**handle** 18:7 26:21
  58:12
**handled** 26:22 37:5
  37:14,16
**happen** 54:11
  79:16
**happened** 49:12,16
  56:9,12 57:14 63:1
  63:19 64:4 65:13
  80:23 81:2 84:15
  100:4
**happens** 61:16
**harassment** 56:7
  64:13
**hard** 32:2 45:11
  76:13 99:7
**hardware** 92:8
**harm** 56:23
**hassinger** 4:6
**head** 78:6 90:16
**headed** 24:2
**hear** 25:6 90:22
**heard** 10:18 25:1
  30:13 91:17
**hearing** 25:19
  27:15,16,21
**held** 17:14 31:4
**helmsing** 3:19

**help** 30:3 41:21
**helps** 71:20
**herlong** 3:19
**hey** 41:22 56:4
  62:21 66:13 96:7
  99:15
**highlands** 10:20
**hired** 20:8 29:6,13
  40:4
**hold** 30:20 31:10
  55:23
**holster** 56:22 60:10
**home** 9:17 25:10
  56:12 89:7
**honest** 62:13 66:11
**honestly** 63:8 92:9
**horton's** 21:9,19
**hot** 50:4,7
**hours** 14:20 15:5,6
  15:7
**house** 44:11 48:8,9
  52:2,2 53:22 57:15
  57:21 60:3 79:12
  92:21
**hughen** 34:10
**huh** 20:19 21:7
  22:7 75:10,12 89:4
  101:19
**hundred** 16:14
  78:15
**hunting** 44:21

**i**

**identification** 18:6
  102:17
**iii** 4:4
**illegal** 60:9
**important** 82:8
**improper** 93:20
**incident** 47:18
  64:11 93:8

**independent** 32:15
**indicating** 8:3,3
**individuals** 68:4
  72:23
**infinitive** 41:7
**information** 59:13
**initial** 11:10 47:18
  64:18 82:1 94:2
  95:17
**inner** 30:9 39:2
**inside** 32:19 33:4
  59:17 96:6
**insinuating** 27:19
**interact** 38:4
**interested** 103:13
**internal** 101:10,10
**international** 10:7
  10:10
**investigate** 41:3
**investigation** 39:5
  39:8,20 40:1,10,12
  41:11 45:21 50:9
  79:11 82:1 84:20
  84:22 85:2 86:21
**investigator** 41:8
  42:8 85:5
**involved** 66:18
  67:1,4 86:21 98:13
  98:15
**io** 64:18
**ire** 59:20

**j**

**j** 42:14
**jail** 32:13,13,14
  89:7
**january** 9:16 19:11
  29:1 30:23
**jason** 34:10
**jeames** 42:10,13,14
  85:6

**job** 14:14 22:9 23:6
  23:6 26:2 55:23
  66:5 71:1 77:23
**john** 3:4,6
**johnson** 22:16
  66:20
**july** 1:19 6:9 46:20
  47:1 49:22
**junkyard** 21:14
**jurisdiction** 40:15
**justifiably** 88:4
**justified** 57:23 58:3

**k**

**k** 13:14,15 29:11
  30:4
**kaci** 9:6 12:9 43:7
  43:12 45:4 92:1,16
  92:16
**kayla** 92:3,4
**kd** 1:4
**keep** 45:1 52:8,9,12
  55:19 56:5 63:22
  69:20 71:20,22
  83:15,18
**keith** 29:8 40:18
**ken** 1:18 2:4 3:16
  6:10,15 9:14
**kenneth** 9:11 23:11
**kentucky** 25:13
**kept** 33:9 56:22
  59:8
**key** 32:22 33:1,2
**keys** 33:10 54:17
**kid** 87:5
**kill** 45:3
**killed** 19:16 29:2
  43:7,12 45:13
  101:17
**kin** 103:12
**kind** 14:18 17:20
  18:8 20:6,10 22:11

22:13 23:5 24:15
26:20 28:15 39:7
44:2 45:16 49:11
49:15 51:4 63:17
64:13 68:16 74:11
74:16 75:8 91:13
98:10 101:2
**kinney** 4:4 6:22 7:7
11:18,22 84:1
102:7
**knew** 26:2 28:20
63:8 64:20 65:4
81:1 82:15 87:13
96:12
**know** 7:2,5,7,9 8:7
8:15,20 9:4 12:12
14:21,21,23 15:1
15:13,14 16:4
17:21 18:4,5 21:10
22:10,11,13 23:6
23:23 24:15,21,22
24:23 25:3,4,11,14
25:17,23 26:13,18
26:19,21,23 27:9
27:10,17,19,19
29:3,5,6 30:7,15,17
31:18 32:2,22
34:20,22 35:5,14
35:16,19 36:4,19
37:1,5,9,10,15,22
38:3,7,8 39:4,7,9
39:10,13,15,16,19
40:5,10,11,15,21
41:6,7,8,9,10,12,18
42:2,4,9 43:19
44:11,19 45:2,18
45:21,23,23 46:15
47:3 48:11,13
49:10,17,23 50:2,6
50:8,14 51:2 52:4
52:17 53:11,15,18

53:18,19,21,22
54:16,18 55:15,19
55:22 56:4,6,9 58:2
58:6,15 59:23
61:14,14,15,16
62:2,4,15 63:3,11
63:18,19,21 64:3
65:14,17 66:7,10
66:13 67:3,14 68:2
68:16 70:7 72:20
74:6,9 75:14 78:12
78:16 80:12,15,23
81:3,5,7,8,9,10,12
81:23 82:12 84:6,7
84:13 85:22 86:5,9
86:12,13,20 87:7,8
87:9,12,12 88:7,17
88:23 89:5,6,13,14
89:19,20 90:1,2,2,5
90:10,23 91:1,3,6,9
91:13,15,21,22
92:12 93:20 94:19
94:22 95:16 96:4,8
96:10,20 97:1,17
97:22 98:2 99:4,5,8
100:14,20,21,23
101:2,13 102:12
**knowing** 39:14
86:7
**knowledge** 38:21
43:18 46:18 51:10
51:12 52:19,21
66:9 74:17 89:9
96:2
**known** 9:13 35:12
85:23 86:3,4,5 87:1
87:2

**l**

**l** 2:1
**labeled** 11:12

**laid** 76:20
**lamarcus** 29:21
47:15 51:11 95:10
**landry** 34:9 51:14
51:17 52:14 55:4
66:20 67:4 95:10
95:15
**landry's** 54:23
**large** 2:7 6:4
103:22
**larry** 22:16
**law** 3:5,11,12,18
4:5 14:9 16:8,13
20:3 73:10 78:12
86:18
**laws** 2:12
**lawsuit** 56:1 94:13
**lawsuits** 52:5
**lawyer** 7:5
**laying** 54:10
**layout** 34:18
**leach** 3:19
**leadership** 15:19
16:6
**leading** 2:16
**learn** 28:13 47:22
61:12,15
**leave** 25:10
**led** 41:11
**left** 12:15 19:13
28:4 34:4 38:14,16
77:1
**legal** 52:7,8,12
55:18 56:4 58:4
71:19,21 83:15,16
**legally** 35:10 44:23
55:21 83:15 98:10
**lester** 24:6 38:5
99:21
**library** 33:17

**licensed** 103:15
**lieutenant** 42:10,17
85:6
**life** 40:2 65:18
99:22
**liked** 88:22
**line** 49:8
**list** 59:5,7,9
**litigation** 93:19
**little** 26:14 28:19
32:20 33:16 34:4
91:6,11,12,13
**live** 55:4,5
**lockbox** 32:11
**locker** 32:20
**lockup** 52:20,22
54:13,18 59:10
**lodged** 99:4
**logged** 80:7
**logical** 42:22
**long** 13:16 16:17
20:20 21:19,20
26:16 48:18 49:18
87:1
**look** 26:17 48:14
60:21 61:4 70:23
72:21 94:5 96:7
**looked** 11:8,11
12:16 13:1 26:15
27:18 51:22 56:2
70:19 98:1
**looking** 49:12,16
50:14 54:23 61:6
64:11
**looks** 47:1,15,17
56:11
**loose** 65:10
**lot** 14:21 30:8
61:16 69:16 72:11
76:15

**lots** 77:19
**loud** 48:6 90:18
**luxury** 58:7

**m**

**m** 13:15 29:22,23
30:4 42:14
**main** 59:23
**maintained** 92:20
**making** 44:5,6
78:14
**man** 20:21 21:10
21:23 96:7
**management** 16:6
**manual** 34:14,15
34:19 35:23 38:21
66:4,6,8 75:7 76:21
**marked** 102:16
**matter** 94:19
**maximum** 28:2,3
31:13
**maya** 1:21 2:5 6:1
103:20
**mayes** 29:21 47:15
47:16 51:11,12
54:1 57:3,7,22
61:21 64:9,12 67:7
70:7 79:21 95:10
95:16
**mayor** 20:7,14 24:5
25:19 36:13 38:4
38:12,13 67:10
99:13,21 100:8
**mayor's** 20:11 25:8
**mcculley** 3:4,6 5:4
6:20 7:1 11:14 12:1
31:2 43:11 58:19
59:3 61:9 71:8 72:7
72:13,16,19,22
74:10,22 75:2
78:19 82:10 83:3,9
84:8 90:21 96:18

101:21 102:2,10,14
**mckenzie** 13:13
14:5,14 20:15 21:4
**mean** 14:17,18,20
15:5 17:20,21 18:1
22:9 25:14 26:16
27:17 28:18 35:22
36:13,14 42:1 44:3
55:15 57:18,20
59:12 60:8 61:17
61:23 62:8 67:14
68:13,16 69:15
74:5,9,17 77:5 80:5
81:7,9 84:11,21,21
86:6 88:22 89:18
90:4 91:18 92:9
95:4 96:13,16 97:5
97:13,14 100:6,14
100:18,21,22
**mechanic** 20:6
**meeting** 66:13
**meetings** 63:17
**member** 10:10
35:20 37:22
**members** 37:7
86:10
**memory** 101:16
**mention** 25:21
**mentioned** 14:4
**merely** 100:7
**messy** 25:16
**met** 90:6,12
**metal** 32:18
**michael** 3:10
**michaels** 3:12
**middle** 51:8
**mike** 7:12 87:16,16
**mind** 16:21 32:2
44:5,7 58:14 59:11
**mine** 41:22 55:22

**minette** 14:8,15
**minute** 101:22
**misdemeanor** 54:5
**missed** 49:1
**mitchell** 1:8 9:6,6
12:8 43:7,12 45:4
50:10 86:10 90:1
92:1,3,13
**mitchell's** 39:5 84:9
91:4
**mitchells** 19:16
29:1 84:14,16
86:22 101:17
**mobile** 3:22
**molester** 74:8
**mom** 87:11
**montclair** 4:7
**month** 49:23 50:5
**months** 13:19 40:6
**morning** 9:6 49:5,6
49:7
**moundville** 4:3 5:8
5:11 7:10 9:20
11:16 12:4 13:8,8
13:20,21 18:17,21
19:3,9 22:3,6 23:2
23:8,20 28:14,23
30:19 32:12 40:13
43:13 45:5,9 46:7
55:7 62:16 71:18
76:1,4 83:17 87:4
99:1 100:3
**moved** 13:19 44:23
**mu** 1:4
**muckenfuss** 30:2
**murders** 39:5

**n**

**n** 2:1 3:1 4:1 5:1
9:12 13:14,15 30:1
30:4 34:12

**name** 9:10,13 10:13
20:11,23 23:10
26:2,5 27:5 34:11
87:15 101:1 103:18
**narrow** 71:23
**nature** 18:14
**necessarily** 36:11
44:23 59:12 61:17
62:13,14 78:18,20
**necessary** 2:14
**need** 8:7,18 24:2
56:1 62:22 63:18
66:14
**needed** 32:21 37:15
**negatively** 78:6
90:16
**neither** 103:11
**never** 24:3,9 26:16
39:6,7,11 41:14,21
45:20 54:6,7,8
58:22 59:2 76:16
76:19 85:15,15,16
85:16,18 87:10,10
87:17 91:17 93:11
93:13 97:14 99:18
99:19,19,19,21
101:8
**new** 28:15,20,20,21
29:6 75:9
**newman** 3:19
**nine** 49:4
**ninety** 13:23
**northern** 1:2,3
**notary** 1:23 2:6 6:3
**notice** 2:21
**nowadays** 64:14
**number** 88:1,5
103:18

**o**

**o** 2:1 9:12,12
**o'clock** 49:4
**object** 43:8 58:18
  69:12 71:6,14 72:4
  73:6 74:3 78:17
  82:9,23 83:6,22
  88:3,21
**objection** 43:15
  58:23 84:1
**objections** 2:15,18
**october** 19:21
  23:16 28:4,11,13
**offense** 47:18 56:17
**offer** 25:7
**offered** 2:20 24:4
  24:15
**offers** 41:20
**office** 3:12 14:3
  18:23 19:19 20:1
  22:6 25:8,13 27:18
  28:10,11 33:15,21
  33:22 34:5,6 42:18
  54:23 55:11 84:10
  85:12 97:6 101:18
**officer** 13:10 32:20
  47:16 53:4 57:3,7
  59:8 61:20 64:6,7
  66:3 78:14 86:3
  87:4 93:22
**officer's** 64:2 65:23
  77:23 78:13
**officers** 27:23
  28:21 34:4 53:1
  62:16 63:20 77:13
  78:4 81:19 89:6
**official** 37:9 39:10
  39:11 44:3
**officially** 37:5,10
  40:22

**oh** 8:4,11 14:17
  21:6 28:18 50:6
  87:3,7,19 90:19
  96:20
**okay** 7:5,7,11,20
  8:18,23 11:14 12:1
  12:19 13:9,16 14:7
  14:13 16:3 17:18
  18:9,16 21:8 27:11
  28:7 29:18 31:13
  32:10 33:3,6,12,17
  34:7,13 35:1 38:23
  40:9,17 42:3 43:22
  45:2 46:2,13 47:2
  47:22 50:1 51:21
  53:6 54:21 55:8
  57:1 59:3 62:23
  65:22 67:19 69:23
  70:3 72:9 75:17
  77:18 78:21 79:4
  79:10,23 80:4,19
  81:15,18 82:20
  84:8,19,23 85:14
  85:21 87:20 88:12
  89:1,10 90:14
  91:17 92:6 93:11
  95:2,9 97:2,11
  98:19 99:14 100:4
  101:7
**old** 33:17 87:7
**once** 58:11 81:23
**opened** 22:14
**operations** 38:8
**opinion** 100:7,18
  100:19
**opportunity** 26:17
**oral** 6:12
**order** 33:8 76:2
**organization** 10:14
**organizations** 9:22

**originally** 25:7
**ought** 58:8,9
**outcome** 103:14
**outside** 30:13 44:20
  48:8 71:12
**outstanding** 88:14
  88:18
**overridden** 34:22
**owner** 18:11 20:15
**owning** 69:20

**p**

**p** 2:1 3:1,1 4:1,1
  30:1
**p.c.** 3:6,20 4:6
**p.m.** 6:10
**page** 5:3,7 26:14
  75:8 76:3,4,6
**pages** 76:11
**paid** 14:5
**paige** 1:8 9:5 12:8
  43:7,12 45:4 50:9
  86:9 90:1,2 91:4
  92:13
**paperwork** 51:14
  94:4,10 98:10
**part** 30:18 31:20,21
  31:23 33:19 39:2
  41:5 83:19 100:10
**particular** 64:10,11
  80:17 81:2,12
**parties** 2:3,17
  103:12
**parts** 21:9
**patrol** 53:1,3 78:12
**pence** 29:23
**pending** 65:5 80:21
  82:13,17
**people** 42:1 69:4,10
  81:4 101:5
**period** 17:2,12

**permitted** 53:3
**permitting** 53:1
**person** 44:10,10
  87:12 94:7
**personal** 1:6 7:17
**personally** 89:14
**personnel** 28:14
**pertaining** 77:19
**phone** 101:2
**physical** 33:13,18
**physically** 35:22
  64:1
**pictures** 39:15
**pistol** 43:13,18 45:3
  45:8,11,12,13,16
  45:19 46:3,6 48:7,9
  51:15 52:1,1,6,8
  54:4,9 56:17,21
  57:8,10,21 58:20
  59:16 60:3,10
  69:14,17 71:4,12
  71:17,18,22 72:1
  73:4 85:22 86:17
  89:22 95:11 96:19
  97:4 98:16
**place** 12:15,21
  25:12 53:13 66:10
  68:13
**placed** 46:7
**plaintiff's** 5:7
  102:15
**plaintiffs** 1:10 3:3
  7:15
**platform** 100:8
**plea** 62:14
**please** 51:21
**pled** 62:3
**plus** 65:23
**point** 17:5,7,8
  31:15,17 46:3
  50:11 52:23 54:3

55:17 60:2 65:6
70:21
**pointing** 46:19 77:8
97:1
**police** 5:11 10:8,11
10:16 11:16 12:4
13:10 15:3,19,23
19:4 23:20 27:23
28:23 33:13,23
34:1,16 35:17,23
36:5,7 37:2,6,10,11
41:2 43:13 45:5,9
46:7 50:19 51:1
52:3 55:8 56:3
57:16 59:21 61:19
62:16 65:17 66:5
71:19 75:7 76:1
83:17 87:4 92:20
97:13 100:9
**policies** 77:9,17
**policy** 34:13 63:12
63:16 70:13 76:21
81:18
**politics** 100:14
**porter** 4:6,6
**possession** 44:1
56:21 57:10 67:8
68:3 82:21 83:5
**possible** 57:20
**possibly** 58:21
**prepare** 11:7
**present** 25:21
**preserve** 33:8
**pretrial** 17:4
**pretty** 72:10 87:13
91:9
**prior** 2:20 12:4
47:10 52:5
**privy** 45:21
**probably** 8:9 13:19
15:14 31:21 37:20

47:5 49:4 62:5,10
67:6 81:11 96:12
**problem** 38:1 88:20
88:23
**procedural** 76:2
**procedure** 6:6
34:13 63:13 66:6
**proceedings** 6:13
103:6,9
**process** 40:6
**producing** 82:3
**productive** 78:13
**professional** 1:22
6:2 9:21
**program** 16:9
**proper** 25:15
**property** 46:6
60:11 86:2 94:11
97:16,23 98:1
**provide** 16:7
**provided** 11:19
**public** 1:23 2:6 6:3
**purposes** 33:9
**pursuant** 6:5
**put** 12:15,21 34:21
38:11,11 40:3 45:7
57:15,21 59:9,10
80:14

**q**

**question** 8:10,15
17:21 23:22 24:20
24:21 33:14 43:9
58:16 60:12 66:2
68:17 71:15 72:5
73:7,9 74:4 79:14
80:2 82:11 83:7,23
88:2 92:15
**questions** 2:16,17
42:21 80:10 102:7
**quite** 15:7

**r**

**r** 3:1 4:1 9:12,12
29:11,11 103:1
**raise** 96:8
**raising** 49:10 81:4
**ran** 22:23 23:3
34:23 39:19 40:1
40:10,11 100:8
**rank** 30:21 31:4,10
**ranting** 96:4,5
**ray** 1:6 5:8 13:7,8
76:4 90:12,15,15
**reaching** 16:10
**read** 9:2 34:14
45:22 79:7 94:12
**reading** 2:8 56:10
94:9,21 97:1
**real** 51:23
**really** 24:3,4,19
30:9 33:16 35:15
55:20,21 76:13
82:11 87:11,12
88:2,14 90:23 96:4
96:5,21,23
**reason** 24:1 25:22
48:20 52:7,9,12
55:18 56:4 60:2
71:20,21 73:3
76:19 78:10 83:15
83:17
**reasoning** 81:14
**rebutted** 25:10
**recall** 17:16 18:13
56:16 70:22 74:18
95:3
**receiving** 97:21
98:3
**record** 13:1 15:15
17:8 60:23 74:22
75:19 99:23

**records** 15:9,10
34:2 50:18,21
**rectify** 48:15
**referring** 45:13
69:16 72:6 75:21
76:1
**reforming** 100:8
**refreshed** 69:6
**registered** 1:22 6:1
**regulations** 5:10
11:10,16 12:3 75:7
**relating** 2:12
**relationship** 91:4
**remember** 14:1
17:3,6,11 20:23
21:18,23 22:1,10
29:8,13 31:17
39:22 40:2,4,7
42:14 48:1,21 49:3
50:13 80:19 81:3
81:11,14 88:10,15
92:9 93:8,9,15
94:17,18,20 96:5
96:13,14 99:9
**report** 13:6 47:19
51:1 53:23 56:11
79:7 82:1
**reporter** 1:22 2:6
6:2,19 7:22 103:17
**reporting** 103:16
**reports** 11:10
**represent** 7:14
**representative** 1:7
7:18
**represents** 7:9
**reputation** 89:17
**required** 15:1 16:5
77:13
**reserve** 26:10 27:1
**reserves** 26:11,12
26:20,21,22

residence  56:12,14
respective  2:3
responded  93:23
responsibility  36:8
  64:2
responsible  36:2
responsive  35:3
restate  58:20
return  18:15 66:19
  67:20,23 93:12
  97:23
returned  43:14
  46:10 47:4,5,10,12
  52:14 56:5 68:8,11
  68:23 69:17 71:4
  71:12,22 73:19,23
  78:21 79:8 80:20
  85:22 86:11 89:22
  101:11
returning  18:10
  67:1,3 86:17 98:15
reviewed  11:6 12:3
reviewing  46:23
  61:5
richard  4:4
rifle  44:20
right  7:11,13 8:5
  8:12 9:4,7,9,18
  10:18 11:14,22
  12:7,23 13:9 14:4
  18:7,16,20 19:8
  20:9 21:22 22:2,5
  22:17 23:7,12,18
  28:22 29:4,20
  33:21 35:6,11
  36:16,22 38:13
  40:18 41:18,18
  44:15 45:2 46:15
  46:22 47:7 48:11
  49:21 50:20,22,23
  52:1 53:23 57:2,11

58:5,10,13 61:6
  63:3,6,7 65:7 69:3
  69:22 70:11,13
  71:3,10 73:19
  74:20 76:8 77:5,21
  78:2,3,16 82:6,16
  82:18,19 83:9,10
  83:21 85:7,12,18
  87:23 88:16 92:20
  93:1,5,6 94:1 95:19
  97:10,10 98:8,9
  101:20
road  4:7 9:19
roberts  12:9
robertson  1:18 2:4
  3:16 6:11,15 9:11
  12:2 75:3
roman  75:9
room  34:2,3
rose  1:21 2:5 6:1
  103:20
rough  47:7
rouse  3:20
rules  2:12 5:10 6:5
  11:15 12:3 75:6
  100:21
run  34:19 89:1

s

s  2:1,1 3:1,10,12
  4:1 5:6 9:12 29:22
  29:23 30:4,4 42:14
safe  32:10
safekeeping  44:17
  79:15 80:13
saith  102:18
saying  25:2 43:21
  43:23 56:22 58:1,2
  58:3,8 62:10 77:3
  90:22 91:1 94:7,8
  94:10

says  57:6 73:2
scene  39:17 53:20
  96:16
scheme  69:9 72:8
  72:23
schemes  72:12
scratch  29:7
search  52:3 59:18
second  47:6
securing  17:4
see  27:12,14 39:21
  48:14 55:1 57:5
  65:9 70:4,9 82:17
  91:10,11,12
seeing  39:14
seen  11:21 39:11
  41:14
sense  42:22
sent  25:10
separate  33:3
september  19:14
  28:6,7 38:17 61:6
sergeant  34:7,9,10
  42:13
sergeant's  34:6
set  25:17 100:9
settlement  94:23
shaking  78:6 90:16
share  66:15
shelby  103:4
sheriff  22:15,23
  23:2,12 25:13 41:1
  41:19,19 42:5
  84:12,17
sheriff's  14:3 18:23
  19:19 20:1 22:6
  28:10,11 41:5,8,11
  42:15,18 55:11
  84:10 85:4,11
  101:18

shift  53:4
shooting  95:6
  96:17
short  15:7 31:8
  74:23 101:23
shot  43:6
show  27:15 94:3
showed  45:20
shown  12:2
sic  10:17
side  60:10 81:6
  96:7
sign  97:15 98:4,5
  98:11
signature  2:8
  103:19
signed  27:5 57:6
similar  77:6
sir  7:6,16,19,21 8:1
  8:6,8,22 9:2,3,8
  10:3,6,22 11:2,5
  12:18,20 13:23
  14:12 15:11 16:15
  16:19,19 18:19
  19:6,13,17,20,23
  22:19 23:13,16,17
  24:8,8 25:5 28:8
  29:17 30:6 32:5
  33:2,11 36:21 38:6
  38:15,22 39:18
  40:11 42:7,20,23
  43:5,16 46:8,12
  47:11,21 51:9,9
  56:8,15 59:12
  60:15,18 63:15
  66:17 67:21 68:1
  68:20,22 69:2,2,6,7
  70:6 73:18 74:12
  74:15 75:4 77:10
  77:12,15 79:9,22
  80:1,3 83:11,13

86:12,14 87:19
89:16,18,23 90:11
90:13,19,23 92:2
92:14,18 93:2,2,14
98:17,21 101:14
**sit** 17:9 50:12 53:18
**sitting** 44:20 76:14
**situation** 38:1
48:15 50:15 59:15
80:22 81:10
**situations** 52:4
**six** 13:19
**size** 31:14
**small** 28:19 33:22
53:13 100:14
**social** 91:19
**solo** 53:1,3,4
**somebody** 37:16
44:21
**somebody's** 27:5
**son** 21:3 96:3
**sorry** 53:2 59:1
71:7 78:8 90:19,20
96:22
**sort** 9:21 10:23
18:3 73:20
**sound** 48:23
**sounds** 27:9 57:14
**sparks** 33:22 34:2
**speak** 26:11 90:3
**specific** 17:19
18:10 68:9,12
72:17
**specifically** 18:14
**speeding** 78:15
**spell** 29:10 34:11
42:11
**spoke** 90:9
**stamped** 11:20 76:6
76:7

**start** 9:9 55:21
59:21 84:5
**started** 48:17 49:11
49:15 80:9
**state** 2:6 6:3 15:23
68:2 69:3,9,23 70:1
70:19 72:7,22
103:3,22
**stated** 25:9 94:14
**statement** 50:10
57:1,5 72:10
**statements** 92:12
**states** 1:1 56:20
**statute** 69:3,7,19
70:2 71:5,8,13 72:3
72:5,18 73:16
**statutes** 68:3,6,9
69:9 70:20,23
72:11
**statutory** 72:7,23
**stay** 84:19 85:1,8
85:16
**stayed** 19:8
**step** 41:20
**stipulated** 2:2
**stipulations** 6:6,19
**stolen** 44:19
**store** 48:3,23 49:6
80:23 81:5,9 92:8
96:6
**story** 51:4
**street** 3:21 37:13
37:14
**struggling** 82:7
**stuff** 39:10,11 52:3
81:5
**stupid** 48:23
**subpoena** 62:9
**subpoenaed** 62:21
82:4

**sue** 48:12
**sued** 63:5 70:20
93:17,18 94:7,7
**suite** 3:7,13,21 4:7
**supervisors** 78:11
**suppose** 36:21
**supposed** 37:1
81:19
**sure** 8:4,5,17,19
11:18 12:20 13:4
15:10 17:5,6 19:5
29:15 30:5,6,7,11
30:14 31:23 32:3
32:17 35:12,14,15
39:1,3 40:12 41:13
43:3 45:7,10 46:23
49:14 50:12,13
53:12,16 54:2
55:16 57:17 60:22
61:1 62:4 67:5,7,9
70:12,21,22 71:1
72:16,19 73:8 79:9
79:13 80:11 86:5
95:13,15
**surprised** 16:12
**suspended** 27:13
**sworn** 6:16
**sylvia** 1:6 90:12,15
**sympathize** 25:2
**synonym** 10:17

**t**

**t** 2:1,1 5:6 9:12
29:11 103:1,1
**take** 8:2 44:16
60:11 93:6 97:9
99:3
**taken** 1:21 2:5
44:11,22 45:8 46:3
46:6,16,17 48:7
52:9 54:9 75:1
78:22 96:19 100:13

102:1 103:6,9
**talk** 9:5 67:16
78:23 79:4 90:4
101:18
**talked** 51:2,2,3
92:4 93:11,14
**talking** 45:10 93:9
102:3
**talks** 71:9
**tell** 16:13 28:22
38:16 44:4 47:2
49:3,18 51:20
53:19 62:5 80:19
91:7,20 93:21
95:14 96:2
**telling** 54:15 84:11
**ten** 15:4
**term** 43:20 44:3
**terrible** 49:2
**test** 26:11,14,19,20
26:23 27:7
**tested** 26:14
**testified** 6:17
**testify** 61:20
**testimony** 43:4
47:9 54:3,12,14,15
68:23 83:20
**thereto** 2:20
**thing** 11:11 16:20
18:8 20:6 25:16
27:1 28:16 63:17
64:14 91:9,14
94:12 101:2
**things** 24:12,16
26:5 31:18 35:4,8
37:15 59:21 65:13
65:16,18 66:14
77:6,7,20 81:2
101:3
**think** 13:7 15:7
19:20 23:16 31:3

31:15,22 37:4,21
56:6 57:5 58:8,9,16
58:20 64:9 68:21
73:9 75:15 76:11
76:22 77:1 87:21
88:7,18 92:22
93:14 94:17 98:12
99:11,12,17 100:6
100:7 101:21 102:2
102:3,8
**third** 56:8
**thirds** 24:14
**three** 20:22 26:13
32:14
**time** 2:19,19 12:8
16:17 17:2,12 20:3
21:15 28:2 30:19
30:23 31:8,20,21
31:23 32:12 34:8
36:4 37:6,8,8,19
39:23 42:12,13
45:10 46:3,18
52:23 53:9,21
56:21 59:14 60:21
62:19 65:4,13 66:9
68:8,11 69:13,13
69:17 70:16 71:1
71:17,21 77:1 80:8
81:2,7,12 83:2,14
85:5 88:8 90:6,7
91:5 96:11 100:23
102:11
**times** 75:8,9 88:1,5
89:2
**timothy** 29:19 31:7
**title** 13:4
**toby** 38:19 40:17
**today** 11:7 12:5,17
34:14 54:3 68:19
**toes** 41:20

**told** 24:9 42:19
48:13 79:15,19
86:6,9 95:5,9 98:14
98:17
**tom** 3:17
**tommy** 30:2
**tomorrow** 62:22
**tony** 24:6
**town** 21:12 100:14
**track** 61:17
**tracking** 63:13,23
64:1
**training** 14:10,16
14:18,20 15:6
16:22 17:3,13,19
18:3,10,13
**transcribed** 103:7
103:10
**transcript** 103:9
**transcription** 103:8
**trial** 2:19 17:15
62:18
**tried** 54:8 94:3
**trucking** 20:5,16
20:18 21:3
**true** 82:20 103:8
**try** 71:16
**trying** 26:4,5 55:23
69:21 70:12 102:13
**turned** 65:10
**tuscaloosa** 3:8,14
6:8 10:21 21:5
**tv** 39:14
**twelve** 14:20 15:2
**twenty** 14:19 15:1
18:2 99:22
**twice** 22:3
**two** 14:2,19 15:1
18:22 20:22 24:14
26:13 48:4 53:8

**type** 26:23 27:1
34:18 75:6 91:8
94:12

**u**

**u** 2:1 29:11,11 30:4
30:4 34:12
**uh** 20:19 21:7 22:7
75:10,12 89:4
101:19
**understand** 8:14
40:9 71:15 73:8
83:19
**understanding**
54:9
**understood** 8:13
63:16
**united** 1:1
**university** 6:8
**unlawfully** 82:21
83:5
**unrelated** 65:20,21
**use** 25:15 38:20
77:3
**usual** 6:19

**v**

**v** 5:8
**valid** 60:2
**vehicle** 56:15
**version** 38:20
**versus** 13:7,8 76:4
**violate** 86:17
**violence** 61:3 64:22
66:16 67:17 68:4
69:11 70:15 73:1
73:14 82:13 83:4
88:6
**violent** 89:14,15
**vote** 24:14,18 26:7
**voted** 76:23

**vs** 1:11

**w**

**w** 9:11
**wade** 9:11
**waived** 2:9,22
**waiver** 98:5,11
**walk** 59:18
**want** 25:15 29:14
40:3 44:18,19,20
45:19 54:2,10
59:16,17 72:1
77:21 78:12,15
**wanted** 16:22 93:4
**warrant** 13:6 44:12
47:16 52:3 59:18
64:16 82:3 88:13
88:14,18
**warren** 4:4 7:7
102:5
**way** 18:11 21:10
50:15 51:23 52:6
59:15 66:14 76:20
**we've** 11:21 14:20
18:2 68:18
**weapon** 44:8,8,17
44:18,22 54:22
73:20,23 74:7,13
78:22 82:22 83:5,8
83:14,18 84:3
93:12 101:11
**week** 47:6 78:15
**weigh** 60:6
**went** 13:21 14:2,10
18:17,22 19:3 20:2
22:5,17 23:5,14
28:9 37:22 40:6
48:8 49:9,17 51:19
52:2 53:22 55:10
55:12 56:14 62:20
65:18 66:2 79:12
86:1 87:3 90:9

95:23 97:17 99:12
**whatsoever** 39:8
**witness** 2:9 6:11
  72:15 78:6 90:16
**witnesses** 95:6 97:3
**won** 23:5
**wondering** 58:14
**word** 25:15
**wording** 55:16
**words** 52:7 78:14
**work** 13:16,21 20:2
  20:6,20 23:4,14
  28:9 53:15 87:3
**worked** 14:2 18:21
  20:5,7,16 21:2
  22:11,12 28:23
  32:1 49:5 53:14
**workers** 81:5
**working** 76:18,22
  89:3
**workings** 39:2
**wow** 16:17
**wright** 20:12 21:2,3
**write** 35:23,23
**written** 33:14
  99:22
**wrong** 101:4
**wrote** 57:4,7 88:17

| x |
|---|

**x** 5:1,6

| y |
|---|

**y** 29:22,23
**y'all** 63:14 66:15
  75:18 87:23 88:4
  93:17 96:3
**yachting** 11:3
**yeah** 8:11,11 11:18
  11:22 14:19 16:23
  17:23 18:2,7 21:13
  21:16 28:18,18,19

31:1,8,15 38:6 47:1
  47:7 50:6,6,13
  53:17 55:15,15,16
  57:20 58:1,19 59:7
  64:15,23 65:2
  68:10 74:10 75:14
  75:20,23 76:7 78:8
  83:3,10 89:5 90:8
  92:22 95:23 97:10
  97:15 102:8
**year** 14:21 15:2
  19:7 21:11,20
**years** 14:2,19 15:1
  15:4 16:14 18:2,17
  18:22 20:22 26:4
  76:18 79:20 96:14
  99:20,22 100:1,5
**young** 87:5,6

| z |
|---|

**z** 13:14,15
**zero** 39:6 52:8

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.