**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **SYLVIA RAY, AS PERSONAL** ) | |
| **REPRESENTATIVE OF THE** ) | |
| **ESTATE OF PAIGE MITCHELL,** ) | |
| **DECEASED, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No.: 19-0069-KD-MU** |
| **v.** ) | |
| ) | |
| **ESTATE OF BRADLEY ELLIOTT** ) | |
| **GRAY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**DEFENDANT KEN ROBERTSON'S MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW Defendant KEN ROBERTSON and, pursuant to Rule 56, Fed. R. Civ.

Proc., moves this Court for the entry of summary judgment in his favor on all claims asserted

against him in this action on the grounds that there is no genuine issue o f material fact and

Defendant is entitled to judgment as a matter of law.

This motion is based upon the brief filed in support of said motion and evidentiary

materials attached thereto and on all other pleadings and documents of record herein.

*/s/William W. Watts, III*
THOMAS O. GAILLARD III (GAILT9459)
WILLIAM W. WATTS, III (WATTW5095)
*Attorneys for Defendant Ken Robertson*

<u>**OF COUNSEL:**</u>
HELMSING, LEACH, HERLONG,
   NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, AL 36652
(251) 432-5521 Telephone
(251) 432-0633 Facsimile
E-Mail: <u>tog@helmsinglaw.com</u>
      <u>www@helmsinglaw.com</u>

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of November 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

John E. McCulley, Esquire (*johnemcculley@gmail.com*)
John E. McCulley, P.C.
601 Greensboro Avenue, Suite 200
Tuscaloosa, AL 35401

Michael S. Burrough (*Mike@MichaelBurroughs.com*)
Post Office Box 1908
Tuscaloosa, AL 35403

James W. Porter, Esquire (*jwporterii@pphlaw.net*)
R. Warren Kinney, Esquire (*wkinney@pphlaw.net*)
Porter, Porter & Hassinger, P.C.
880 Montclair Road, Suite 175
Birmingham, AL 35213

*/s/ Thomas O. Gaillard III*
OF COUNSEL

4825-1486-8178, v. 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

SYLVIA RAY, AS PERSONAL                    )
REPRESENTATIVE OF THE                      )
ESTATE OF PAIGE MITCHELL,                  )
DECEASED,  et al.,                         )
                                           )
      **Plaintiffs,**              )
                                           )    **Case No.: 19-0069-KD-MU**
**v.**                                     )
                                           )
ESTATE OF BRADLEY ELLIOTT                  )
GRAY, et al.,                              )
                                           )
      **Defendants.**              )

## BRIEF IN SUPPORT OF KEN ROBERTSON'S MOTION FOR SUMMARY JUDGMENT

Defendant KEN ROBERTSON files the following brief in support of his motion for summary judgment.

## INTRODUCTION

The Plaintiff Sylvia Ray, as Personal Representative of the Estates of Paige Mitchell and Kaci Mitchell, has brought this action against the City of Moundville and its former Police Chief Ken Robertson, alleging a federal claim under 42 U.S.C. §1983 for violation of her decedents' unspecified "constitutional rights" and state law claims for wrongful death arising out of the fatal shooting of her decedents by Brad Gray, a former boyfriend of Paige.  The Plaintiff seeks to impose liability upon Robertson for his return of a pistol to Brad  some 17 months before the shooting, after Robertson had determined that the pistol had been unlawfully seized from Brad's residence when the police responded to an altercation between Brad and Paige.  Contrary to the allegations of the Complaint, the pistol was returned *before* Brad's plea of guilty to a misdemeanor offense of domestic violence-harassment.   The federal and state statutes that

Plaintiff claims were violated by the return of the gun prohibit the delivery of a pistol to one who has been "convicted" of a misdemeanor crime/offense of domestic violence. In any event, these statutes would not have been violated even if the pistol had been returned *after* the conviction because Brad's guilty plea was not to a "misdemeanor crime [offense] of domestic violence," as defined under the federal and state statutes. No statutory duty was violated, and no other basis exists for the imposition of liability under §1983 or state tort law.

In particular, the only conceivable basis for a claim that the constitutional rights of Paige and her daughter were violated, by the return of the pistol to Brad, would be a substantive due process claim. The Due Process Clause would only have been violated by "conscience-shocking" conduct, which, at a minimum, would require a showing of "deliberate indifference to an extremely great risk of serious injury" to Paige or her daughter. This has not been alleged or shown by the evidence. Even if a constitutional violation could be shown, Robertson has qualified immunity because his conduct did not violate "clearly established law."

The state law wrongful death claims are not supported by the allegations or evidence for similar reasons. Under Alabama law, a person has no duty to protect another from criminal acts of a third person absent a special relationship or special circumstances. A "special relationship" requires that the victim be uniquely and completely dependent upon the defendant's protection. The "special circumstances" exception requires proof that particular criminal conduct was "foreseeable" and a "probability" at the time of the defendant's conduct. The evidence fails to establish either circumstance, as a matter of law. Further, Robertson has state-agent immunity for the exercise of his judgment and discretion in returning the gun to Brad, after investigating the circumstances and determining it was unlawfully seized.

**STATEMENT OF UNDISPUTED FACTS**

1.      On July 9, 2015, City of Moundville police responded to an altercation between the Plaintiff's decedent, Paige Mitchell ("Paige"), and Brad Gray at his residence at 619 Second Avenue, Moundville, Alabama.   (Certified Records, Hale County District Court, Case No. WR2015-000257, Doc. 4) (attached as Ex. A). One of the arresting officers, Lemarcus Mayes, described the incident as follows:

> "I, Officer Mayes, spoke with the complainant, Ms. Paige, who stated that she came to Mr. Gray's residence to get her vehicle and other belongings.  An altercation occurred and Mr. Gray stated to Ms. Paige 'I will blow you away too.'  Ms. Paige stated Brad was in possession of a pistol at the time, and had it in a holster.  Brad kept saying he was going to harm her.  Ms. Paige stated that after the altercation and Brad not letting her get her car, he cranked up his tractor and started to hook the car up with a chain.  Ms. Paige stated that he then snapped out of it and went back into the house and laid the pistol down.  Ms. Paige was threatened repeatedly and harassed numerous times.  Mr. Gray's weapon was recovered and confiscated.  Mr. Gray was arrested.  There were no injures." (Ex. A, Doc. 3)

2.      The pistol was not on Brad's person when he was arrested (Deposition of Ken Robertson at 60:3-4) (attached as Ex. B). It was taken from his residence without a search warrant (Id. at 52:3).  The pistol was not evidence in the misdemeanor case (Id. at 54:3-7).  It was never booked in as evidence.  (Id. at 58:19-59:8).

3.      On July 13, 2015, a complaint was filed in Hale County District Court, and a warrant issued, charging Brad with a violation of Ala. Code §13A-6-132, a Class A misdemeanor for domestic violence in the third degree (Ex. A, Docs. 1 and 2).  This statute is violated if a person commits one of several crimes identified in that statute and if the victim "is a current or former spouse, parent, child, any person with whom the defendant has a child in common, a present or former household member, or a person who has or had a dating or engagement relationship with the defendant."  *See* §13A-6-132(a)[version effective until January

1, 2016].  Brad was charged with the predicate offense of harassment under §13A-11-8(a).  In particular, he was charged with a violation of §13A-11-8(a)(2), which defines harassment to include "a threat, verbal or non-verbal, made with the intent to carry out the threat, that would cause a reasonable person who was the target of the threat to fear for his or her safety."  (Ex. A, Doc. 2).

4.  Moundville Police Chief, Defendant Ken Robertson, was not involved in the arrest.  (Robertson at 47:20-21).  He found out about the pending criminal proceedings about a month later, in early August, when Brad confronted him while he was getting coffee at a store.  (Id. at 48:2-17, 64:20-65:3).  Brad was very angry that the police had taken a pistol from his residence after he was arrested outside of the house.  He claimed the officers had no right to do that and threatened to sue. (Id. at 48:2-17).  Robertson had just returned from a police chief conference in Orange Beach that was held August 3rd through August 6th.  (Id. at 48:2-5).  See Declaration of Ken Robertson dated November 24, 2020 (attached as Ex. C).  Robertson remembers he went to the store to get coffee, within a day or two of returning from a conference, because the coffee at the conference had been terrible and he had missed it. (Id. at 48:20-49:10).  He remembers this happening upon his return from the conference because several memorable events coincided.  Brad was "raising Cain in front of a bunch of people in the store" and he was in the store to get coffee immediately after the conference.  (Id. at 80:19-81:9).  It was an "eventful situation," coinciding with his return from the conference (Id. at 81:9-17).  He tried to calm Brad down and told him he would check into it. (Id. at 48:13-15).

5.  In his subsequent investigation, Robertson reviewed the police department records concerning the incident and talked with others in the department. (Robertson at 50:9-51:5).  As a result, he had some "real concerns" about the way the pistol was taken.  (Id. at 51:23):

"The pistol was in the house. We went in the house. It is basic police stuff, no search warrant. You can't — you know, we already had situations going on prior to that with lawsuits, so I disagreed with the way they took the pistol. So, in other words, we didn't have any legal reason to keep the pistol. There was zero legal reason to keep it. It wasn't taken off of him. It wasn't used as evidence. It wasn't being confiscated. So they didn't have a legal reason to keep it." (Id. at 52:1-12)

6. After looking into the matter, Robertson made the determination, as Chief of Police, that they had no legal reason to keep the gun. (Robertson at 56:2-5) The officers may have felt they were justified in taking the gun, but, as Police Chief, he had to determine whether it was legal for his department to keep possession of it under the circumstances (Id. at 58:1-12). The pistol had never been booked on the audit list of evidence kept at the station (Id. at 58:22-59:8). Even if it had been, that did not change his mind about its use as evidence. (Id. at 59:9-16). The gun needed to be returned based on how the pistol had been retrieved from the house without a search warrant: "If we want to get evidence inside somewhere, if we want to get evidence, we get a search warrant. We don't walk in and get it. That's just not — we cannot do that. That draws a whole bunch of ire in the police department when you start doing things like that." (Id. at 59:9-22). In short, he believed Brad had a "valid point" that the officers had no reason to go in his house and get his pistol (Id. at 60:1-3):

"He didn't have it on him when they arrested him. And even though someone accuses you of something, it is not a conviction. So, I have to weigh in on all of that as well. Just because someone accuses you of doing something doesn't mean you can't. And it is not illegal for him to have a pistol in a holster on his side on his property. So I had to take all of that into question when I made my decision." (Id. at 60:3-12).

7. Robertson got the pistol back from Officer Landry Donaldson. (Id. at 51:14-19, 55:13-16). He then returned it to Brad, who picked it up at the police department sometime around the second week of August 2015. (Id. at 47:2-13, 97:2-19).

8.     Robertson had known Brad for some 8 years, since Brad had been a teenager.  (Id. at 87:1-8).  He recalls one other arrest of Brad, possibly for a DUI. (Id. at 88:5-19).  He knew Brad liked to drink but did not know if he had an alcohol problem.  (Id. at 88:20-23).  He had never known him to be violent or to have a reputation for violence.  (Id. at 88:13-20)

9.     At the time of Brad's arrest in July of 2015, Paige lived at a residence on County Road 44 where she and her former husband, Benjamin Mitchell, had lived since they were married in 2002 (Deposition of Sylvia Ray at 9:9-10:7) (attached as Exhibit D).  *See* Certified Court Records (Ex. A, Doc. 4) (showing address of Paige Mitchell on Alabama Uniform Incident/Offense Report related to 7/9/2015 incident).  Brad lived in a separate house at 619 Second Avenue, Moundville, Alabama.  (Ray Depo. at 76:15-77:23).  See Certified Court Records (Ex A, Doc. 4) (showing address of Brad Gray on Incident Report).  Paige described herself as the "ex-girlfriend" of Brad, as recorded on the Incident Report she signed.  (Ex. A, Doc. 4, Box 119).  The Plaintiff, Paige's mother, testified that although they had dated in the past, Paige was no longer seeing Brad at this time.  For some two years before Brad's fatal shooting of Paige on January 25, 2017, Paige had not been in a relationship with Brad.  (Ray Depo at 18:23-19:10).  She was not dating anybody during that time period.  (Id. at 60:15).  She would just run into him in town at different places, but they were not seeing each other during that time. (Id. at 19:11-16, 20:9-19).

10.    Brad and Paige had no children in common.  Paige lived with her two daughters, Kayla and Kaci, from her former marriage to Mr. Mitchell.  (Ray Depo at 10:17-11:10, 12:16-13:5).  Brad had his own children from former marriages.  (Ray Depo. at 86:14-88:21)

11.    On September 8, 2015, Brad entered into a plea agreement, pleading guilty to the charge brought against him of domestic violence in the third degree, based on harassment.  (Ex

A, Doc. 9). Pursuant to the plea agreement, the court entered an order of conviction that same day, with Brad to serve 30 days in jail, and placed on unsupervised probation for 1 year, and ordered to have no contact with the victim. (Ex A, Doc. 11). Robertson doesn't know that he ever learned of the conviction. (Id. at 61:12-18, 63:3-10). This was Officer Mayes' case and it was his responsibility to track it. (Id. at 63:11-64:19).

12. As part of his sentence, Brad attended and completed 12 sessions of an Anger Management Program by March 17, 2016. (Ray Depo. at 49:3-7, 51:5-8). See Certified Court Records (Ex. A, Doc. 12). On March 28, 2016, the District Court entered an Order reflecting completion of the requirements of the Court Referral Officer program. (Ex. A, Doc. 13)

13. Robertson left the Moundville police department in September of 2016 and joined the Hale County Sheriff's office. (Robertson at 19:8-14; Robertson Declaration).

14. On the evening of January 25, 2017, or the early morning of January 26, 2017, Brad fatally shot Paige and her daughter Kaci at her home located at 154 Market Street in Moundville, (Revised First Amended Complaint, ¶¶3-4 (Doc. 25)). She and her daughters had moved there, from the County Road 44 residence, approximately one year earlier. (Ray Depo. at 13:6-23, 14:1-3). He later shot himself at his home before he was arrested and passed away a few days later. (Ray Depo. at 101:4 – 102:7).

14. Sylvia Ray testified that neither she nor her husband had any kind of warning or indication that Brad was going to potentially do anything violent to Paige or her daughter prior to the date of the shooting. (Ray Depo. at 45:21-46:7). Although she alleges that Brad used the same pistol that had been returned to him by the City (Doc. 25, ¶16), she admits she has no information to support that allegation. (Id. at 63:9-22).

15.     On January 25, 2019, this action was filed in the Circuit Court of Hale County against Brad's Estate, the City of Moundville, the Moundville Police Department (the "Department") and various fictitious defendants (Doc. 1-1).  The Complaint alleged that the return of the pistol occurred after Brad's conviction on September 8, 2015, of a crime of "domestic violence," in violation of Ala. Code §13A-11-76 (Doc 1-1, ¶12,14,15).  It contained state law claims for the wrongful death of Paige and Kaci against all Defendants (Counts I and II) and a federal claim against the City and the Department for liability under 42 U.S.C. §1983, alleging that the return of the pistol to Brad was in violation of certain unspecified "constitutional rights" of Paige and Kaci and resulted in their deaths (Count III).  The Complaint included claims against fictitious Defendants nos. 6-10, who allegedly engaged in the conduct attributed to the Department and the City (Doc. 1-1, ¶40).

16.     The action was removed to this Court on February 20, 2019 (Doc. 1).  After the Court granted the Plaintiff leave to amend her Complaint, she ultimately filed her Revised First Amended Complaint, deleting the Department as a Defendant, substituting Ken Robertson for fictitious Defendant no. 6, and adding allegations that the gun was returned in violation of 18 U.S.C. §922 (Doc. 25). [1]

## STANDARD OF REVIEW

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In evaluating the argument of the moving party, the Court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the

---

[1] The revised First Amended Complaint alleges a claim against only the City under Count III (Doc. 25, p.5 of 7).  But given the allegations of conduct attributable to fictitious defendant no. 6, in the original complaint, and out of an abundance of caution, Robertson seeks summary judgment on this Count as well, in the event it is construed to allege a claim against him.

facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "The non-moving party 'may not rest on the mere allegations or denials of the [non-moving] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.*Mallini v. Alabama Dep't of Indus. Relations*, No. CIV.A. 10-0130-CG-C, 2011 WL 1897646, at *3 (S.D. Ala. May 18, 2011) (quoting Fed. R. Civ. P. 56(e)). "The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment." *Beard v. Langham*, 649 F. Supp. 2d 1332, 1336 (S.D. Ala. 2009). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

## LEGAL ARGUMENT

**I.    Police Chief Robertson Had No Right to Keep Brad's Gun, Either Before or After His Conviction:  That Conviction Did Not Qualify as a "Misdemeanor Crime [Offense] of Domestic Violence" Under 18 U.S.C. §922 or Ala. Code §13A-11-76**

All the Plaintiff's claims rest upon the critical allegation that Police Chief Robertson returned Brad's pistol to him *after* his conviction, in violation of Ala. Code §13A-11-76, and 18 U.S.C. §922. But the undisputed fact is that it was returned *before* the conviction, after Robertson discovered that the pistol had been taken from his residence without a search warrant and the City had no lawful basis to keep it. These statutes both require that the person to whom the pistol or firearm is delivered has been "convicted" of a misdemeanor crime/offense of domestic violence. *See* §13A-11-76(a)("no person shall deliver a pistol to any person whom he or she has reasonable cause to believe has been **convicted**…of committing or attempting to

9

commit… a misdemeanor offense of domestic violence") (emphasis added); 18 U.S.C. §922(d)(9) (making it unlawful for any person "to sell or otherwise dispose of" any firearm to any person knowing or having reasonable cause to believe that such person "has been **convicted** in any court of a misdemeanor crime of domestic violence.") (emphasis added). Indeed, a "misdemeanor offense of domestic violence" was not even part of §13A-11-76 at the time Robertson returned the gun to Brad in August of 2015. That amendment only became effective September 1, 2015. *See* Acts 2015, No. 15-341, §1, September 1, 2015.[2]

In the absence of any federal or state law that prohibited the return of the unlawfully seized gun to its owner, Robertson was under a duty to return it and cannot have violated anyone's constitutional rights in doing so. Such a duty to return the property also contradicts the existence of any tort duty *not* to return it, allegedly owed to those who might later be injured by it.

However, even if there were evidence that Robertson returned the gun to Brad *after* his conviction, that would change nothing. Brad was not charged with, did not plead guilty to, and was not convicted of, a "misdemeanor offense of domestic violence" for purposes of §13-A-11-76 or a "misdemeanor crime of domestic violence" for purposes of §922(d)(9).

### A. Ala. Code §13A-11-76(a)

Ala. Code §13A-11-76(a) provides:

"Except as provided in subsection (b), no person shall deliver a pistol to any person who he or she has reasonable cause to believe …has been convicted in this state or elsewhere of committing or attempting to commit a crime of violence, *misdemeanor offense of*

---

[2] Prior to the 2015 amendment, the statute read: "No person shall deliver a pistol to any person under the age of 18 or to one who he has reasonable cause to believe has been convicted of a crime of violence or is a drug addict, an habitual drunkard or of unsound mind." *See* Ala. Code §13A-11-76, Michie's Ala. Code (2015 Replacement) (quoting prior statute in discussing 2015 Amendment in notes to statute).

*domestic violence*, a violent offense as listed in Section 12-25-32(15)….” (emphasis added)

The Plaintiff alleges that this statute was violated by Chief Robertson because Brad was convicted of a crime of “domestic violence.” (Doc. 25, ¶12)[3]

A “misdemeanor offense of domestic violence,” for purposes of §13A-11-76, means “a misdemeanor offense that has, as its elements, the use or attempted use of physical force or the threatened use of a dangerous instrument or deadly weapon, and the victim is a current or former spouse, parent, child, person with whom the defendant has a child in common, or a present or former household member.” §13A-11-72(l).

As discussed above, Brad was charged with a violation of §13A-6-132(a), which requires, as one of its elements, proof of the commission of one of several other specified offenses. In Brad’s case, the alleged predicate offense was the crime of harassment under §13A-11-8(a)(2), which defines harassment as including “a threat, verbal or non-verbal, made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her own safety.” A violation of §13A-11-8(a)(2) does not include, as one of its necessary elements, “the use or attempted use of physical force or the threatened use of a dangerous instrument or deadly weapon.” *See, e.g., Fallin v. City of Huntsville*, 865 So. 2d Ala. 2003) (affirming conviction under §13A-11-8(a)(2) for defendant’s threats to cheerleading coach, pointing finger and taking steps toward her, that “This isn’t over”; “I’ll have my foot up

---

[3] This allegation can only relate to a “misdemeanor offense of domestic violence.” The other types of convictions listed in §13A-11-76(a) clearly have no application. “Crimes of violence” are identified in §13A-11-70(2) as “murder, manslaughter, . . . rape, mayhem, assault with intent to ravish, assault with intent to murder, robbery, burglary and kidnapping,” as well as certain designated Class A felonies and Class B felonies. A “violent offense as listed in §12-25-32(15)” does not include the crime of domestic violence in the third degree under §13A-6-132(a), nor a conviction for harassment under §13A-11-8(a), the offenses with which Brad was charged. The statute only lists “domestic violence III” pursuant to subsection *(d)* of §13A-6-132. *See* §12-25-32(15)a.46. Subdivision (d) of §13A-6-132 relates to a third or subsequent conviction under subsection (a) and is a Class C felony.

your butt"; and "I'll be on you like white on rice."); *B.B. v. State*, 863 So. 2d 132 (Ala. Crim. App. 2003) (affirming conviction of juvenile under §13A-11-8(a)(2) for verbally threatening to kill teacher, even though he made no attempt to strike or grab her, and had no means with which to act upon his threat).   Thus, the misdemeanor to which Brad pled guilty does not qualify as a "misdemeanor offense of domestic violence" as defined under §13A-11-72(l).   And thus, the return of the pistol to Mr. Gray even after his conviction would not have violated §13A-11-76.

Further, Paige, the victim of the harassment, was not a "current or former spouse, parent, [or] child" of Brad, was not a "person with whom [Brad had] a child in common," and was not "a present or former household member" of Brad's household, as required under §13A-11-72(l) to be a "misdemeanor offense of domestic violence."   The police incident report identified the separate residences of Brad and Paige.   They had had a dating relationship at one time, but had stopped seeing each other around January of 2015, some 6 months before the harassment incident.   This prior dating relationship may have been enough for purposes of showing a violation of §13A-6-132(a) (defining victim as including "a person who has or had a dating or engagement relationship" with the defendant), to which Brad pled guilty.   But it is not enough to prove a "misdemeanor offense of domestic violence" within the meaning of §13A-11-76.   That statute did not prohibit the return of Brad's gun to him even if it had occurred after his conviction.

**B.  18 U.S.C. §922(d)(9)**

For similar reasons, Brad's conviction did not qualify as a "misdemeanor crime of domestic violence" for purposes of 18 U.S.C. §922(d)(9).   This statute reads:

> "It shall be unlawful for any person to sell or otherwise dispose of a firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . .

(9) has been convicted in any court of a misdemeanor crime of domestic violence."

A "misdemeanor crime of domestic violence" is defined at §921(a)(33)(A)(ii) as an offense that is a misdemeanor under federal, state or tribal law and that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the person shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse, parent, or guardian, or by a spouse similarly situated to a spouse, parent, or guardian of the victim."

As discussed above, the section of the harassment statute that Brad was charged with violating, as a predicate offense to the alleged violation of §13A-6-132, did not have, as one of its elements, "the use or attempted use of physical force, or the threatened use of a deadly weapon, . . . ."

In *US v. Castleman,* 572 U.S. 157 (2014), the issue was whether a domestic assault conviction under a Tennessee statute constituted a "misdemeanor crime of domestic violence" for purposes of §921(a)(33)(A). The Tennessee statute made it a crime to "commi[t] an assault . . . against" a "family or household member;" in the defendant's case, the mother of his child. *Id.* at 168. (quoting Tenn. Code Ann. §39-13-111(b)). An "assault" was defined as one of three types: "(1) [i]ntentionally, knowingly or recklessly caus[ing] bodily injury to another; (2) [i]ntentionally, or knowingly caus[ing] another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or knowingly caus[ing] physical contact with another" in a manner that a "reasonable person would regard . . . as extremely offensive or provocative." *Id.* (quoting Tenn. Code Ann. §39-13-101(a)). The Supreme Court noted that "it does not appear that every type of assault defined by §39-13-101 necessarily involves 'the use or attempted use of

physical force, or the threatened use of a deadly weapon,' as required under the definition of a "misdemeanor crime of domestic violence" under §921(a)(33)(A). *Id.* at 169. In particular, a threat under §39-13-101(2) "may not necessarily involve a deadly weapon, . . . ." *Id; see also United States v. Daniels*, 316 F. Supp. 3d 949 (N.D. Tex. 2018) ("Use or attempted use of physical force, or threatened use of deadly weapon" was not a necessary element of Tennessee's assault statute, which prohibited knowingly causing another to fear imminent bodily injury; thus defendant's prior Tennessee "domestic assault" conviction did not necessarily include that element and did not qualify as a "misdemeanor crime of domestic violence" under 19 U.S.C. §922(g)(9), prohibiting possession of firearms by anyone convicted of such a crime).

In determining the nature of the conduct to which a criminal defendant confesses, by the entry of a guilty plea to a crime that is a predicate offense under a federal statute, such as a "misdemeanor crime of domestic violence" under §922(d)(9), the court is limited to examining "the statutory definition, the charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. U.S.* 544 U.S. 13, 16 (2005) (known as the "*Shepard* documents"); *see Castleman*, 572 U.S. at 169 (citing *Shepard*, and consulting indictment to determine whether defendant pled guilty to a "misdemeanor crime of domestic violence" under 19 U.S.C. U.S. §922(g)(9)). These documents are consulted to determine if the defendant "necessarily admitted" the elements that correspond to the requisite predicate offense under the federal statute. *Shepard*, 544 U.S. at 26; *see Castleman*, 572 U.S. at 169. Police reports and complaint applications may not be considered in making this determination. *Shepard*, 544 U.S. at 16.

In the present case, the charging document, the terms of the plea agreement, and the order of conviction all show the specific statutory basis for Brad's plea and conviction. He was charged with, pled guilty to, and was convicted of making a "threat, verbal or non-verbal, made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her own safety," under §13A-11-8(a)(2), where the victim qualified as having the requisite relationship with the defendant as set forth in §13A-6-132. This charge did not require him to admit to the use or attempted use of physical force or the threatened use of a deadly weapon, and no *Shephard* document shows that he did. His conviction was insufficient to establish the predicate offense of a "misdemeanor crime of domestic violence" for purposes of §922(d)(9).

Further, as with the state statute, Brad did not have the kind of relationship with Paige, the victim of his harassment, that would make the crime to which he pled guilty a "misdemeanor crime of domestic violence," for purposes of §922(d)(9). He was not a "current or former spouse, parent, guardian" of Paige, was not a person with whom Paige "share[d] a child in common," was not a "person who [was] cohabitating with or [had] cohabitated with" Paige "as a spouse, parent, or guardian," and was not a "person similarly situated to a spouse, parent, or guardian" of Paige.

In summary, the return of the pistol to Brad did not violate either state or federal law, whether that return occurred before or after the conviction. The City and Robertson had no right to maintain possession of that gun. In fact, the circumstances surrounding its seizure show that the gun was not lawfully seized and that Brad had a right to its return. No constitutional right was violated, and no tort duty breached, in the return of the gun. Summary judgment is due on all counts.

**II.     Summary Judgment Is Due on Count III Because Neither the Complaint nor the Evidence Shows the Violation of Any Constitutional Right**

The two essential elements to a claim under 42 U.S.C. §1983 are "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived the person of rights, privileges, or immunities secured by the constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

In her complaint, Plaintiff fails to identify what constitutional right of Paige or Kaci was violated as a result of the return of the gun to Brad and his subsequent fatal shooting of them some 17 months later.  The only conceivable basis for such a claim might be an alleged violation of their substantive due process rights under the Fourteenth Amendment.  However, as shown below, neither the allegations of the complaint nor the evidence supports such a claim.

The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.,* 489 U.S. 189, 195 (1989).  Its purpose "was to protect the people from the State, not to ensure that the State protected them from each other."  *Id.* at 196.  Thus, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id.* at 197.  An exception arises where there is a "special relationship" between the state and the victim in which the state imposes limits upon an individual's freedom to act on his or her own behalf.  *Id.* at 200.  The only relationships that qualify under this exception  are "custodial relationships, such as those which arise from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus of their ability to take care of themselves."  *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999) (citing *Collins v. City of Harker Heights,* 503 U.S. 115 (1992)).  In the

wake of the *Collins* decision, "government officials violate the substantive due process rights of a person not in custody only by conduct 'that can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense,' and that standard is to be narrowly interpreted and applied." *Id.* at 1258 (quoting *Collins,* 503 U.S. at 128); *see Jackson v. City of Selma*, No. CIV.A. 14-23-KD-N, 2015 WL 685776, at *4 (S.D. Ala. Feb. 18, 2015) (Dubose, J.) (quoting *Hilderbrand v. Sanders,* 495 Fed. Appx. 6, 7-8 (11th Cir. 2012), summarizing these principles). The *Collins* opinion "reminds us . . . that the Supreme Court has been 'reluctant to expand the concept of substantive due process' and that judicial self-restraint requires courts to exercise the utmost care in this area." *White*, 183 F.3d at 1258 (quoting *Collins*, 503 U.S. at 125).

"Conscience-shocking" conduct is more than negligence. *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). Even an intentional tort under state law does not necessarily rise to the level of shocking the conscience. *Id; see, e.g., Dacosta v. Nwachukwa*, 304 F.3d 1045 (11th Cir. 2002) (college instructor slammed door to classroom on student who was following him, which caused her arm to shatter the glass window of the door and become lodged in glass pane; instructor then unsuccessfully tried to knock student back from door by swinging it violently several times and then reached through cracked pane and shoved the student's face). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Waddell*, 329 F.3d at 1305 (quoting *Cty.of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1716 (1998)). What is egregious conduct is not to be determined "in the glow of hindsight" but must "shock the conscience" at the time of the government actor's decision. *Id.* "In [a] non-custodial setting, a substantive due process violation would, at the very least, require a showing of **deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position**." *Id.* at 1306 (emphasis added). "**To act with deliberate**

indifference, a state actor must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety." *Id.* (emphasis added). *See Jackson*, 2015 WL 685776, at *5–6 (quoting *Waddell*).

In *Waddell,* the issue was whether a sheriff's release of a convicted felon, to serve as a confidential informant, rose to the level of conscience-shocking conduct, where the convict later injured and killed others in a traffic accident while on release and intoxicated. In a §1983 action for violation of the substantive due process rights of those injured and killed, the court affirmed summary judgment in favor of the sheriff, finding the evidence insufficient to support a finding of such "deliberate indifference to an extremely great risk of serious injury" to someone in the plaintiff's position. The defendants had released a convicted felon from the Hendry County jail on "work release," despite his extensive criminal history, giving him improper good/gain time credit and disregarding the manner in which concurrent sentences in Hendry County and another county were to be served. *Id.* at 1306. While noting that the defendants might be faulted for such behavior, the court recognized that "no substantive due process right exists to be protected generally from the release from confinement of persons convicted of crimes — **even if the release violates state law**." *Id.* at 1306-1307 (emphasis added) (citing *Lovins v. Lee*, 53 F.3d 1208, 1209 (11th Cir. 1995)).[4] The record did not reflect that the defendants knew about and

---

[4] Other decisions of the Supreme Court and the Eleventh Circuit demonstrate that a government actor's violation of state law does not change the calculus for a substantive due process violation. *See Collins,* 503 U.S. at 127-130 (defendant's violation of state statute imposing duty on city to warn its sanitation employees about dangers of noxious gases in sewers and to provide safety training and protective equipment to minimize those dangers did not give rise to viable substantive due process claim); *Lovins*, 53 F.3d at 1209 (conduct of sheriff's department, which had permitted the release of plaintiff's attacker on a temporary pass in violation of state law, did not violate substantive due process); *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985) (defendants' violation of their duties under state law as employees of the Department of Youthful Services, in illegally releasing an individual from state custody, did not create substantive due process right in the woman later raped in her home by that individual); *Norris v. City of Montgomery, Ala.*, 29 F. Supp. 2d 1292 (M.D. Ala. 1998), *aff'd sub nom. Norris*

disregarded an extremely great risk that the convict would drive while intoxicated and cause a fatal car collision. The court could not say that the defendants, at the time of the convict's release, "were on notice that [the convict] would very, very probably cause an automobile collision with serious injuries due to his driving while intoxicated." *Id.* at 1307. The court noted that the pertinent collision "occurred several months after [the convict's] release," and that "[a]ffirmative conduct for purposes of §1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration." *Id.* (quoting approvingly *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002)).

In a case factually analogous to the present case, a federal district court in this Circuit held that a sheriff's return of a firearm, in violation of state law, to an allegedly dangerous individual who posed a particular threat to a person later killed by that individual, was not a due process violation. In *Hawkins v. Eslinger*, No. 6:07-cv-Orl-PCF-UAM, 2007 WL 2757375 (M.D. Fla. Sept. 20, 2007), a deputy sheriff had forced his way into his ex-wife's home, armed with his handgun, and fired at her. She reported this to the county sheriff, having already reported two previous incidents of disturbance during their marriage. City police and county deputy sheriffs responded but did not arrest the deputy. They did seize his handgun, but later returned it to him, without a court order. *Id.* at *1. This was in violation of a state law that required a court order before doing so. *Id.* at *5. Sometime later, the deputy returned to his ex-wife's home, shot and killed her with the handgun, and then committed suicide. *Id.* at *1. In a subsequent §1983 action against the city and county law enforcement officers, for violation of the decedent's due process rights, the court granted a motion to dismiss, finding the allegations

---

*v. City of Montgomery*, 194 F.3d 1323 (11th Cir. 1999) (officer's violation of state statute, in failing to impound vehicle driven by unlicensed driver, did not violate substantive due process rights of person later injured by that vehicle driven by that driver)

insufficient to show a custodial relationship between the victim and either the City, *id.* at *4, or the County Sheriff's office, *id.* at *5, and insufficient to show arbitrary or conscience-shocking behavior, either in the failure of the City police officers to arrest the deputy, *id.* at *4, or in the seizure and later return of the gun in violation of state law by the County sheriff and his deputies. *Id.* at *6. Plaintiff failed to allege behavior that was more egregious than a "fairly typical state-law tort claim[]." *Id.* at *6 (quoting *White*, 183 F.3d at 1259)

In the present case, neither Paige nor Kaci were in the custody of the City of Moundville or its police department. Thus, on a substantive due process claim, the Plaintiff must prove conscience-shocking conduct, which, at a minimum, requires a showing of "deliberate indifference to an extremely great risk of serious injury" to someone in Paige or Kaci's position. Neither sufficient allegations nor sufficient evidence of such conduct by Robertson exists. Indeed, at the time he returned the gun to Brad, Robertson had determined that the gun had been illegally seized from his house, without a search warrant, and that no legal basis existed for his police department to retain possession of the gun. Brad had a right to the return of his illegally seized property, which Robertson was obligated to honor. This would be true even if Brad had called on Robertson to return the gun *after* the conviction; no federal or state law would have prohibited such a post-conviction return, as discussed above in Part I. Even if Robertson had any duty or discretion to withhold returning the gun to Brad, he did not return it "know[ing] of and disregard[ing] an excessive – that is, an extremely great – risk to [Paige's or Kaci's] health or safety." *Waddell*, 329 F.3d at 1306. Finally, the fact that some 17 months elapsed between the return of the gun and the fatal shooting negates any inference of such a risk. Such conduct did not impose an "immediate threat of harm, which by its nature has a limited range and duration." *Id.* at 1307 (quoting approvingly *Ruiz v. McDonnell*, *supra*). In *Waddell*, the intermission of just

several months between the convict's release and his causing serious injuries in an automobile collision was enough of a delay to convince the Eleventh Circuit that the defendants were not on notice, at the time of the convict's release, that he would "very, very probably cause an automobile collision with serious injuries due to his driving while intoxicated." *Id*. at 1307.

In short, there is no allegation or evidence that, at the time he returned the pistol, Robertson could have foreseen, let alone been deliberately indifferent to, a murder Brad would commit almost a year and a half later. Robertson did not know Brad to be violent or to have a reputation for violence. Even Paige's parents did not foresee Brad would ever do something like this. And, even if the gun had been returned *after* Brad's conviction, the misdemeanor offense to which Brad pled guilty required only proof of harassment by a threat that caused Paige to have a reasonable fear of her safety at the time. As shown by the Alabama decisions construing this harassment statute, cited above, this harassment statute casts a wide net, reaching verbal threats that do not require any physical force or the means to carry out such threats. Such a conviction is not enough to show that, in delivering a pistol to a person so convicted, one would be deliberately indifferent to an extremely great risk of serious injury to others.

### III.    Police Chief Robertson has Qualified Immunity on Plaintiff's §1983 Claim

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity protects all officials except "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*

*v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* To do so, the plaintiff must first allege that the facts of the case, if proven to be true, would make out a constitutional violation. *Pearson v. Callaghan,* 555 U.S. 223, 232 (2009). Second, the plaintiff must show that the constitutional right was "clearly established" at the time of the alleged misconduct. *Id.* "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Because qualified immunity provides a complete defense from suit, "courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013).

To establish that the defendant was acting within the scope of his "discretionary authority," he must show that the actions were "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). In other words, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

In making the determination that Brad's pistol had been unlawfully taken from his home, and deciding to return it to him, Robertson was exercising his discretionary authority as Police Chief. Part of Robertson's responsibilities, as Police Chief, was to ensure that any property seized by the City's police officers under his supervision was not taken in violation of the law

and to exercise judgment and discretion in determining whether any seized property needed to be returned to is owner in light of any potential violations of law in its seizure. *See* Robinson Declaration ¶2 (Ex. C). Decisions regarding the seizure of property and return of seized property are within a police official's discretionary authority. *See Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (authorizing a raid to enforce immigration laws); *Hawkins*, 2007 WL 2757375, at *7 (sheriff's decision to return gun to deputy, after domestic violence episode with his wife, was within his discretionary authority). Such discretionary authority would exist even if the return of the gun had violated federal or state law. *See Hawkins*, *supra,* at *5 (officer allegedly returned firearm to deputy in violation of Florida statute, prohibiting return of firearm lawfully taken by any officer, except pursuant to order of trial court judge).

As argued above, Chief Robertson's return of the gun to Mr. Gray was not a violation of the substantive due process rights of the Plaintiff's decedents. *A fortiori,* the law was not so "clearly established," at the time the gun was returned to Brad, that any reasonable law enforcement official would have known that he was violating the substantive due process rights of Paige and Kaci, killed by Brad using that gun some 17 months later. Indeed, the law in this Circuit is decidedly uncertain as to the level of culpability that must be shown to establish a violation of substantive due process in the non-custodial context. *See Waddell*, 329 F.3d at 1306 n. 5 (in case involving unlawful early release of convicted felon, emphasizing the phrase "at the very least," in applying "deliberate indifference" standard, and recognizing that the correct legal threshold might be "actually far higher"). The Eleventh Circuit has recently noted that "[n]o case in the Supreme Court, or in this Circuit,…has held that recklessness or deliberate indifference is a sufficient level of culpability to state a claim of violation of substantive due process rights in a non-custodial context." *Waldron v. Spicher,* 954 F.3d 1297, 1310 (11th Cir.

2020) (requiring proof of "intent to harm" victim, who died as a result of officer's termination of CPR efforts by others, in assessing "clearly established law" for qualified immunity purposes). On the record before this Court, the standard of establishing conduct in violation of "clearly established law" cannot be met. Robertson is entitled to qualified immunity.

## IV. Under Alabama law, Robertson Owed No Duty to Protect Paige or Kaci from the Subsequent Criminal Acts of Brad Gray Committed some 17 Months Later

In Alabama, "[i]t is well settled that absent a special relationship or special circumstances, a person has no duty to protect another from criminal acts of a third person." *Baptist Memorial Hosp. v. Gosa,* 686 So. 2d 1147, 1149 (Ala. 1996).

The first exception, the existence of a special relationship, "'hinge[s] on dependence or mutual dependence among the parties,' *Young v. Huntsville Hosp.,* 595 So. 2d 1386, 1388-89 (Ala. 1992); i.e., where the plaintiff is 'uniquely,' *Saccuzzo v. Krystal Co.,* 646 So. 2d 595, 597 (Ala. 1994), and 'completely,' *Finley v. Patterson,* 705 So. 2d 826, 828 (Ala. 1997), dependent upon the defendants for protection." *Emery v. Talladega College,* 169 F. Supp. 3d 1271, 1286 (N.D. Ala. 2016), *ajf'd,* 688 Fed. Appx. 727 (11th Cir. 2017). This is a "very high bar" and the Alabama Supreme Court has only twice found that such a special relationship exists. *Id.* at 1286. In *Young v. Huntsville Hosp.,* 595 So. 2d 1386 (Ala. 1992), the Court held that the relationship between a hospital and a sedated patient gave rise to a right in the sedated patient to have the hospital protect her from a sexual assault. In *Thetford v. City of Clayton,* 605 So. 2d 835 (Ala. 1992), an innkeeper was held to have the duty to protect a guest in his motel, a battered wife, who had informed the innkeeper that she was fleeing from her husband. The innkeeper nevertheless allowed her husband unauthorized access to her locked room and he, in the innkeeper's presence, threatened to kill her, took her to another motel, and fatally beat her.

The second exception for "special circumstances" exists "only when the defendant 'knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.'" *Saccuzzo v. Krystal Co.,* 646 So. 2d 595, 596 (Ala. 1994) (quoting *Nail v. Jefferson Cty. Tuckers Assn., Inc.,* 542 So. 2d 1208, 1211 (Ala. 1988)). To establish such "special circumstances," a plaintiff must prove three elements: "First, the particular criminal conduct must have been foreseeable.  Second, the defendant must have possessed 'specialized knowledge' of the criminal activity. Third, the criminal conduct must have been a probability." *Tenn Tom Building v. Olen, Nicholas & Copeland, P.C.,* 908 So. 2d 230, 233 (Ala. 2005) (citation and quotation marks omitted).

Knowledge of prior assaults upon or threats against another does not make the murder of that person "foreseeable" and a "probability," for purposes of the "special circumstances" exception.  "It is well-settled in Alabama that a previous assault and battery is insufficient to make a subsequent murder foreseeable,…." *Emery*, 169 F. Supp. 3d at 1282-1283) (citing *New Addition Club, Inc. v. Vaughn,* 903 So. 2d 68, 76 (Ala. 2004)).  "The 'particular criminal activity, not just any criminal activity,' must be foreseeable." *Vaughn*, 903 So. 2d at 76 (quoting *Ex parte So. Baldwin Reg. Med. Ctr.*, 785 So.2d 368, 370 (Ala. 2000)).

In *Carroll v. Shoney's Inc.* 775 So. 2d 753, 756 (Ala. 2000), a wrongful death action was brought against the defendant restaurant owner, arising out of a husband's fatal shooting of his wife, which occurred during her shift at the restaurant premises. On the evening before the shooting, the wife had told the restaurant relief manager that her husband had beaten, choked, and threatened her, that she was afraid of him, and asked the relief manager to telephone the police if her husband appeared at the restaurant that evening. Later that evening, her husband did come in, pushed his way past the relief manager, confronted his wife and told her that he was

going to "get her." The relief manager and another employee repeatedly told him to leave but he continued yelling at his wife. The relief manager telephoned the police who responded and escorted the husband from the restaurant. Detaining him briefly, the police released the husband after learning that the restaurant was not going to press charges. The next day, the relief manager reported for work and told the restaurant manager about the incident the night before and that the wife had said she was afraid to return to work. Later, the wife telephoned the manager and asked to be excused from work that evening, saying that she and her husband had been fighting and that she was afraid of him. The manager told the wife to come into work and that if her husband showed up, she would telephone the police. The wife went to work that evening and, while working at the front counter, her husband walked into the restaurant, pulled out a pistol, and fatally shot his wife. 775 So. 2d at 754. Affirming summary judgment for the defendant, the Court held that this evidence was insufficient to show that any employee of the restaurant should have reasonably foreseen that the husband would enter the restaurant and murder his wife. *Id.* at 757; *see also New Addition Club, Inc. v. Vaughn,* 903 So. 2d 68 (2004) (shooting death of patron outside of nightclub by second nightclub patron was not reasonably foreseeable even though shooter was known to be a hot tempered and violent patron of the bar and had once punched his girlfriend in the club's parking lot and had brandished a shotgun in the parking lot).

In the present case, the evidence completely fails to show the existence of either a special relationship or special circumstances sufficient to impose a duty on Robertson to protect Paige or her child from a murder Brad would commit some 17 months later, allegedly with the pistol returned to him. Paige was not dependent on Robertson or the City for protection, as in *Young* or *Thetford.* She was not in their care or custody. Nor was this murder "foreseeable" and a "probability," at the time the pistol was returned to Brad, under the "special circumstances"

exception.  Whatever threats Brad may have made during the altercation with Paige on July 9, none of this put Robertson on notice that Brad would subsequently murder her and her daughter some 17 months later.  The very notion that a murder some 17 months later was "foreseeable" and a "probability" is self-defeating:  The temporal remoteness of the return of the gun from the subsequent crime, in and of itself,  refutes the foreseeability or probability of that crime, as a matter of law. Alabama law does not subject law enforcement officials to liability for crimes committed by persons with their own weapons, simply because those officials had, at some earlier time, seized the weapon in connection with an arrest and later determined to return the weapon to its owner.

**V**     **Robertson has State Agent Immunity in Exercising his Discretion to Return Brad's Gun to Him**

Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities."  *Hill v. Cundiff,* 797 F.3d 948, 980 (11th Cir. 2015) (quoting *Ex parte Hayles,* 852 So. 2d 117, 122 (Ala. 2002)). Ala. Code §6-5-338(a) provides a police officer with "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  The restatement of state-agent immunity, as set out in *Ex parte Cranman,* 792 So. 2d 392 (Ala. 2000), now governs the determination of whether a peace officer is entitled to immunity under 6-5-338(a).  *See Ex parte City of Tuskegee,* 932 So. 2d 895, 904 (Ala. 2005) (citing prior decisions).  Category 4 of the *Cranman* standard provides immunity to a state agent in "exercising judgment in the enforcement of the criminal laws of the State, . . . ." *Id.* (quoting *Ex parte Cranman*, 792 So. 2d at 405).

Category 2 of the *Cranman* standard provides immunity for a state agent's "exercising his or her judgment in the administration of a department or agency of government, . . . ."  792

So. 2d at 405. In this category falls the responsibilities of a police chief for the "day-to-day operations of the [police] department . . . ." *Howard,* 887 So. 2d at 209-210; *see also Ex parte Price,* 256 So. 3d 1184, 1189-90 (Ala. 2018) (responsibility of warden for security of prison, including safety of correctional officers, fell within *Cranman* Category 2 on claims against warden regarding allegedly defective locks and understaffing of prison).

The state agent initially bears the burden of demonstrating that he was acting in a discretionary function that would entitle him to immunity. *Ex parte Estate of Reynolds,* 946 So. 2d 450, 452 (Ala. 2006). If the state agent makes such a showing, the burden shifts to the plaintiff to show that the state agent "acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Cranman,* 792 So. 3d 392, 402, n.13 (Ala. 2000); *see Hill v. Cundiff,* 797 F.3d 948, 980-981 (11th Cir. 2015).

A state agent "acts beyond his authority" when he "fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Hill,* 797 F.3d at 981 (quoting *Ex parte Butts,* 775 So. 2d 173, 178 (Ala. 2000)). The rules and regulations must be so "detailed" as to "remove a State-agent's judgment in the performance of required acts." *Id.* (quoting *Ex parte Spivey,* 846 So. 2d 322, 333 (Ala. 2002)).

A "mistaken interpretation of the law" does not include every innocent misinterpretation of the law; otherwise such an exception "would 'swallow' the whole of the general rule of immunity itself" because "any misstep by any state employee or other state agent that wrongs another can be said to be beyond his or her authority and/or committed under a mistaken interpretation of the law." *Hill,* 797 F.3d at 981-982 (quoting *Segrest v. Lewis,* 907 So. 2d 452, 456 (Ala. Civ. App. 2005)). "For that reason, the misinterpretation of the law must be coupled

with willfulness, maliciousness, or bad faith to 'pull the agent out from under the umbrella of state-agent immunity.'" *Id.* (quoting *Segrest,* 907 So. 2d at 456).

Qualified immunity under federal law is essentially equivalent to state-agent immunity under Alabama state law:

> "'The Alabama Supreme Court has largely equated qualified immunity with [state-agent] immunity.' 'Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law.' That means the same facts that establish an officer is not entitled to qualified immunity 'also establish that [she] is not entitled to' state-agent immunity."

*Cantu v. City of Dothan, Ala.,* 974 F.3d 1217, 1236 (11th Cir. 2020) (internal citations omitted); *see also Sheth v. Webster,* 145 F.3d 1231, 1239-40 (11 Cir. 1998) ("Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law . . . .The same facts which establish Sgt. Williams' entitlement to qualified immunity establish that his acts were not willful, malicious or in bad faith.").

The facts that establish the qualified immunity of Police Chief Robertson on the federal §1983 claim also establish state-agent immunity on the state wrongful death claims. Part of Robertson's responsibilities, as Police Chief, was to ensure that any property seized by the City's police officers under his supervision was not taken in violation of the law and to exercise judgment and discretion in determining whether any seized property needed to be returned to is owner in light of any potential violations of law in its seizure. *See* Robertson Declaration ¶2 (Ex. C). In returning the gun to Brad, he was thus exercising his judgment, as Police Chief, in his administration of the City police department, a discretionary function entitled to immunity under Cranman category 2. He was also exercising his judgment in the enforcement of the laws of criminal procedure, in returning the unlawfully seized gun, immunizing his conduct under Cranman category 4. He did not act beyond his authority in returning the gun. If any mistake

were made in his interpretation of the law, in determining that the gun needed to be returned to Brad, he would not lose his immunity unless that misinterpretation were coupled with willfulness, maliciousness or bad faith, no evidence of which exists in this case. Robertson did not violate "clearly established law" in returning the gun to Brad in August of 2015, before his conviction, or even if the return had been after his conviction. *See* discussion *supra,* at Part III. Chief Robertson is entitled to state-agent immunity on the Plaintiff's claims for wrongful death.

## CONCLUSION

For all the above reasons summary judgment is due to be granted in favor of Defendant Robertson.

/s/William W. Watts, III
THOMAS O. GAILLARD III (GAILT9459)
WILLIAM W. WATTS, III (WATTW5095)
*Attorneys for Defendant Ken Robertson*

**OF COUNSEL:**
HELMSING, LEACH, HERLONG,
    NEWMAN & ROUSE, P.C.
Post Office Box 2767Mobile, AL 36652
(251) 432-5521 Telephone
(251) 432-0633 Facsimile
E-Mail: tog@helmsinglaw.com
        www@helmsinglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of November 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

John E. McCulley, Esquire (*johnemcculley@gmail.com*)
John E. McCulley, P.C.
601 Greensboro Avenue, Suite 200
Tuscaloosa, AL 35401

Michael S. Burrough (*Mike@MichaelBurroughs.com*)
Post Office Box 1908
Tuscaloosa, AL 35403

James W. Porter, Esquire (*jwporterii@pphlaw.net*)
R. Warren Kinney, Esquire (*wkinney@pphlaw.net*)
Porter, Porter & Hassinger, P.C.
880 Montclair Road, Suite 175
Birmingham, AL 35213

*/s/ Thomas O. Gaillard III*
OF COUNSEL

4814-7743-3298, v. 1

# EXHIBIT A

DC-15-00089

# W A R R A N T

STATE OF ALABAMA      HALE COUNTY      DISTRICT COURT

AGENCY NUMBER: 000150709052      WARRANT NUMBER: WR 2015 000257.00
OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST   BRADLEY ELLIOTT GRAY   AND BRING HIM/HER BEFORE THE DISTRICT COURT OF HALE COUNTY TO ANSWER THE STATE OF ALABAMA ON A CHARGE(S) OF:
     DOM VIO 3RD-HARASSME   CLASS: A   TYPE: M   COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
DAY OF _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 13 DAY OF JULY, 2015.

BOND SET AT: (1)      $6,000.00   BOND TYPE:
     (2)
     (3)

JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHARGES: DOM VIO 3RD-HARASSME   13A-006-132      M   MISDEMEANOR

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NAME: BRADLEY ELLIOTT GRAY      ALIAS:
ADDRESS: 619 SECOND AVENUE      ALIAS:
ADDRESS:
CITY: MOUNDVILLE      STATE: AL      ZIP: 35474 0000
     PHONE: 000 000 0000 EXT: 000

EMPLOYMENT:
DOB:      RACE: W   SEX: M   HAIR: BRO
EYE: GRN   HEIGHT: 5'08"   WEIGHT: 165
SID: 000000000   SSN:      DL NUM:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND
( ✓ )   PLACING DEFENDANT IN THE HALE COUNTY JAIL
(   )   RELEASING DEFENDANT ON APPEARANCE BOND

THIS   13th   DAY OF   July

     SHERIFF

     BY   L. Mays 165 M.P.D

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMPLAINANT:   LAMARCUS MAYES
     MOUNDVILLE PD OFFICER

     MOUNDVILLE   AL   35474

OPERATOR: SHJ      DATE: 07/13/2015

STATE OF ALABAMA
HALE COUNTY

I, Catrina Long Perry, Clerk of the Circuit Court and Clerk of the District Court of Hale County, Alabama, do hereby certify that the foregoing is a true, correct and full copy of the instrument herewith act out as appears of record in said Court.
Witness my hand and seal of said Court this the ___19th___ day of _____November_____, 20 20.

Catrina Long Perry, Clerk
Hale County, Alabama

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF HALE COUNTY * * *

AGENCY NUMBER: 000150709052

WARRANT NUMBER: WR 2015 000257.00
OTHER CASE NBR:

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HALE COUNTY, ALABAMA, PERSONALLY APPEARED LAMARCUS MAYES
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT BRADLEY ELLIOTT GRAY DEFENDANT,
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT, DID WITHIN THE ABOVE
NAMED COUNTY AND

ON OR ABOUT JULY 9, 2015 , COMMIT THE CRIME OF HARASSMENT (SECTION 13A-
011-008(A) CODE OF ALABAMA 1975) WITH INTENT TO HARASS, ANNOY OR ALARM
ANOTHER PERSON, TO-WIT: PAIGE MITCHELL :
( ) STRIKE, SHOVE, KICK OR OTHERWISE TOUCH ANOTHER PERSON, TO-WIT:
, OR SUBJECT THEM TO PHYSICAL
CONTACT, TO -WIT: , OR,

( ) DIRECT ABUSIVE OR OBSCENE LANGUAGE OR MAKE AN OBSCENE GESTURE,
TO-WIT: , OR,
TOWARD ANOTHER PERSON, TO-WIT:

( X ) DIRECT A THREAT, VERBAL OR NONVERBAL, TO-WIT: A VERVAL THREAT
WITH THE INTENT TO CARRY OUT THE THREAT,
TOWARD ANOTHER PERSON, TO-WIT: PAIGE MITCHELL
A REASONABLE PERSON AND TARGET OF THE THREAT, CAUSING HIM/HER TO
FEAR FOR THEIR SAFETY
WITH THE VICTIM BEING A CURRENT OR FORMER SPOUSE, PARENT, CHILD, A PERSON
WITH WHOM HE/SHE HAS A CHILD IN COMMON, A PRESENT OR FORMER HOUSEHOLD
MEMBER, OR A PERSON WHOM HE/SHE HAS OR HAD A DATING RELATIONSHIP,
IN VIOLATION OF 13A-006-132 OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 13 DAY OF JULY, 2015.

JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: DOM VIO 3RD-HARASSME 13A-006-132 M MISDEMEANOR

WITNESS FOR THE STATE

LAMARCUS MAYES/MOUNDVILLE PD OFFICER/MOUNDVILLE/35474
PAIGE MITCHELL/2410 COUNTY ROAD 44/MOUNDVILLE/35474

OPERATOR: SHJ DATE: 07/13/2015

JUL 13 2015

State of Alabama
Unified Judicial System
Form CR-57 (front) Rev.8/98

**DEPOSITION**

Warrant/Summons Number: WR15-35?

Case Number

IN THE __District__ (Circuit, District, or Municipal) COURT OF __Hale__ (Name of Municipality or County), ALABAMA

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. __Bradley Elliott Gray__ Defendant

**INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED**

Name of Accused (or Alias): Bradley Elliott Gray          Telephone Number

| Social Security Number | Driver's License Number | Date of Birth | Age 35 | Race W | Sex M |

| Height 5'8 | Weight 165 | Hair Brn | Eyes Hnz | Complexion Light |

Address of Accused (or Alias): 1019 Second Ave.    City Moundville    State AL    Zip Code 35474

Name of Employer: West Alabama Mechanical          Employer's Telephone Number

Address of Employer:    City Moundville    State AL    Zip Code 35474

**INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE**

Offense: Domestic Violence - Harassment

Date and Time of Offense: 07/09/18 11:40 p.m

Place of Occurrence: 1019 Second Ave. Moundville, AL.

Person Attacked or Property Damaged:

How Attacked:

Was accused under the influence of alcohol or a controlled substance? ☐ Yes ☑ No

Any law enforcement agency contacted? ☑ Yes ☐ No

If yes, which one? Moundville Police Dept.

Did Accused Possess or Use a Weapon? ☑ Yes ☐ No    Type: Pistol

Did you go to the hospital? ☐ Yes ☑ No

Damage Done or Injuries Received: N/A

Value of Property:

Details of Offense: I, officer Mayra spoke with the complainant, Ms. Paige, who stated "that she came to Mr. Gray residence to get her vehicle and other belongings. An altercation occurred and Mr. Gray stated to Ms. Paige "I will blow you away too." Ms. Paige stated Gray was in possession of a pistol at the time, and had it in a holster, and kept saying he was going to harm her. Mr. Paige stated that after the altercation and Brad that he left her get her car, he crawled up his tractor and started to hook the car up with a chain. Ms. Paige stated that he then snapped out of it and went back into the house and layed the pistol down. Ms. Paige was threatened repeatly and harassed numerous of times. Mr. Gray weapon was recovered and confiscated. Mr. Gray was arrested. Their was no injures.

☐ Check if additional pages are necessary.

STATE OF ALABAMA
HALE COUNTY

I, Catrina Long Perry, Clerk of the Circuit Court and Clerk of the District Court of Hale County, Alabama, do hereby certify that the foregoing is a true, correct and full copy of the instrument herewith _____ of record in said Court.

_____ and seal of said Court this the 19th day of November, 20__.

Catrina Long Perry, Clerk
Hale County, Alabama

**Form CR-57 (back)    Rev.8/98**

## DEPOSITION

Any Law Enforcement Agency Contacted? ☐ Yes ☐ No
If yes, which one? _____

I make this statement for the purpose of securing a WARRANT/SUMMONS against the named of accused. I understand that I am instituting a criminal proceeding and cannot dismiss this case. I further understand that if any of the foregoing facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in the proceeding.

Sworn to and Subscribed before me this

13TH day of

JULY 2015

_____
Judge/Clerk/Magistrate

_____
Complainant

_____
Social Security Number

_____
Address

## WITNESSES

| Name | Address | Telephone Number |
|------|---------|------------------|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## MAGISTRATE NOTES

Warrant or Summons issued? ☐ Yes ☐ No          Warrant Number: _____

STATE OF ALABAMA
DALE COUNTY

I, Catrina Long Perry, Clerk of the Circuit Court and Clerk of the Circuit Court of Hale County, Alabama, do hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears of record in said Court.

Witness my hand and seal of said Court this the 19TH day of
November, 2020.

_____
Catrina Long Perry, Clerk
Hale County, Alabama

JUL 13 2015

# ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| 1 ORI# AL0360200 | 2 Date of Report 07/10/15 | 3 Time of Report 23:46 ☑AM ☐PM ☐MIL | 4 Incident Type ☐Incident ☐Offense ☐Supplement | 5 Supplement Date | 6 Agency Case Number 00150709052 | 7 Suffix |
|---|---|---|---|---|---|---|

Agency Name: **Moundville P.D.**

9 Sector:

| 10 Type of Incident or Offense ☐Felony ☐Misdemeanor ☐Attempted ☑Completed **DV- Harassment** | 11 Degree (Circle) 1 2 3 | 13 State Code/Local Ordinance |
|---|---|---|
| 14 Type of Incident or Offense ☐Felony ☐Misdemeanor ☐Attempted ☐Completed | 16 Degree (Circle) 1 2 3 | 17 State Code/Local Ordinance |

**EVENT**

18 Place of Occurrence ☐Check here if event occurred at victim's residence
**619 2nd Ave**

If offense occurred at victim's residence, then only the approximate location should be listed in this section. (For example, a block number should be entered.) If the offense occurred elsewhere, then the specific address should be listed here.

Victim Demographics (Where victim is an individual)

| 19 Sex ☑M ☐F | 20 Race ☐W ☐B | 21 Ethnicity ☐Hispanic ☐Other | 22 ☐Multiple Victims | 23 Age 35 |
|---|---|---|---|---|

24 Offender Suspected of Using: ☐Alcohol ☑Drugs ☐Computer Equipment ☐N/A
26 ☐Juvenile Gang ☐Adult Gang ☑None/Unknown
26 Hate Bias ☐Yes ☑No
27 Bias Code

| 29 Point of Entry ☐Door ☐Roof ☐Window ☐Other | 30 Method of Entry ☐Forcible ☐No Force ☐Attempted Forcible | 31 Local Use | 32 Lighting 1 Natural ②Moon 3 Artificial Exterior 4 Artificial Interior 5 Unknown | 33 Weather ①Clear 2 Cloudy 3 Rain 4 Fog 5 Snow 6 Hail 7 Unknown | 34 Location Type (Circle) 01 Terminal 02 Bank 03 Bar 04 Church 05 Commercial 06 Construction 07 Conv Store 08 Dept Store 09 Drug Store 10 Field/Woods 11 Govt/Public Building 12 Supermarket 13 Highway/Street 14 Hotel/Motel 15 Jail/Prison 16 Lake/Waterway 17 Liquor Store 18 Parking Lot/Garage 19 Storage Facility ⑳Residence/Home 21 Restaurant 22 School/College 23 Service/Gas Station 24 Specialty Store 25 Other/Unknown |
|---|---|---|---|---|---|

| 35 Occurred from MM/DD/YY 07/10/15 | 36 Time of Event 11:40 ☑AM ☐PM ☐MIL | 37 Day of Week S M T W ☑T F S 1 2 3 4 5 6 7 |
|---|---|---|

| 38 Occurred to MM/DD/YY 07/10/15 | 39 Time of Event 12:15 ☑AM ☐PM ☐MIL | 40 Day of Week S M T W ☑T F S | 41 If Premises Entered (Burglary) |
|---|---|---|---|

43 Victim Type ☑Individual ☐Business F ☐Financial (Bank) G ☐Government R ☐Religious Org S ☐Society

42 Type Criminal Activity: B Buying/Receiving C Cultivating/Manu D Distributing/Selling E Exploiting Children O Operating/Promoting P Possessing/Concealing T Transporting/Importing U Using/Consuming

**PROPERTY**

| 44 Loss Code | 45 Property Code | 46 Qty | 47 Property Description Include Make, Model, Size Type, Serial #, Color, Drug Type, Drug Qty, Etc. | 48 Stolen | Damaged | 49 Recovered Date | Value |
|---|---|---|---|---|---|---|---|
| | | | N N K N O W | | | | |

☐Continued on Supplement

Loss Code (Enter letter in loss code column)
B Stolen
R Recovered
D Damaged/Destroyed
C Confiscated/Seized
B Burned
F Forged/Counterfeited
N None

Property Code (Enter # in property type column)
01 Aircraft
02 Alcohol
03 Autos
04 Bicycles
05 Boats
06 Clothes
07 Computer
08 Consumables
09 Credit Card
10 Drugs
11 Drug Equip
12 Farm Equip
13 Firearms
14 Gambling Equipment
15 Heavy Construction
16 Household Goods
17 Jewelry
18 Livestock
19 Merchandise
20 Money
21 Negotiable Instrument
22 Non-negotiable Instru
23 Office Equipment
24 Other Motor Vehicle
25 Purse/Wallet
26 Radios/TV/VCR
27 Recordings
28 RV's
29 Structure - Single Occupancy Dwelling
30 Structure - Other Dwelling
31 Structure - Other Commercial
32 Structure - Industrial/ Manufacturing
33 Structure - Public/Community
34 Structure - Storage
35 Structure - Other
36 Tools - Power/Hand
37 Trucks
3A Vehicle Parts/Accessories
3B Watercraft
77 Other

**VEHICLE**

| 50 Stolen Vehicle Only | Area Stolen ☐Business ☐Rural | ☐Residence ☐Rural | 51 Ownership verified by: ☐Tag Receipt ☐Bill of Sale | ☐Title ☐Other | 52 Veh. Categories ☐Recovered ☐Stolen | ☐Victim's Vehicle ☐Suspect's Vehicle | ☐Unauthorized Use | ☐Abandoned |
|---|---|---|---|---|---|---|---|---|

| 53 Vehicle Year | 54 Vehicle Make | 55 Vehicle Model | 56 Number Veh Stolen | 57 Vehicle Description |
|---|---|---|---|---|

| 58 Vehicle Style | 59 Vehicle Color Top / Bottom | 60 License | 61 LSY | 62 LIY | 63 Tag Color |
|---|---|---|---|---|---|

| 64 Vehicle VIN Number | 65 Warrant Signed ☐Yes ☐No | Warrant Number |
|---|---|---|

| Motor Vehicle Recovery Only Required For 24XX UCR Code | 66 Stolen in your jurisdiction? ☐Yes ☐No Where? | 67 Recovered in your jurisdiction? ☐Yes ☐No Where? |
|---|---|---|

**ADMINISTRATIVE**

| 68 Case # | 69 SFX | 70 Case # | 71 SFX | 72 Case # | 73 SFX |
|---|---|---|---|---|---|

| 74 Case Status ①Open ☑M 2 Inactive ③Closed | 76 Multiple Cases Closed Listed Above ☐ Multiple Cases Closed Listed On Supplement ☐ | | 79 Reporting Officer *L. Mays* | Officer ID Number 1165 |
|---|---|---|---|---|

77 Case Disposition
78 Exceptional Clearance (Circle One)

76 Entered NCIC/ACJIC ☐Yes ☐No

77 Case Disposition:
①Cleared by Arrest (Juvenile)
②Cleared by Arrest (Adult)
③Unfounded
4 Exceptional Clearance
5 Administratively Cleared

78 Exceptional Clearance:
A Suspect/Offender Dead
B Prosecution Declined
C Other Prosecution
D Extradition Denied
D Victim Refused to Cooperate
E Juvenile (No Custody)
F Death of Victim

80 Assisting Officer — Officer ID Number

81 Supervisor Approval — Officer ID Number

82 Watch Commander — Officer ID Number

Date (MM/DD/YY)

NCIC/AIN #:

DISCRETION OF THE CHIEF LAW ENFORCEMENT OFFICER

| Incident/Offense Report - Continued | 83 Date of Report (MM/DD/YY) 07 10 15 | 84 Time of Report 23:45 ☐AM ☑PM ☐MIL | 85 Agency Case Number 0 0 0 1 5 0 7 1 0 0 5 2 | 86 Suffix | 87 | ☐ Offender ☐ Suspect ☐ Missing Person | ☐ Check if Multiple |

| 88 Reported by (Last, First, Middle Name) | 80 Victim Or | 89 Suffix | 90 ☑Resident ☐Non-Resident | 91 Home Phone | 92 Work Phone |
| | | | | | 93 Other Phone |

**VICTIM INFORMATION**

| 94 Victim # ou | 95 Victim (Last, First, Middle Name) Mitchell, Paige | 96 Suffix | 97 Address (Street, City, State, Zip) 2440 Co. Rd 44 | 98 Home Phone (205) 799-4210 | 99 Work Phone |
| 101 Employer/School Unemployed | 102 Occupation | | 103 Address (Street, City, State, Zip) | 100 Other Phone |
| | | | | 104 Work Phone |
| | | | | 105 Other Phone |

| 106 Sex ☑M ☐F | 107 Race ☑W ☐B ☐A ☐I | 108 ☑English ☐Spanish ☐Other | 109 HGT 5'6 | 110 WGT 154 | 111 Date of Birth 04/19/79 | 112 Age 36 |
| 115 Multiple Victims ☐ | 116 Ethnicity ☐ Hispanic | 117 Injury ☑Yes ☐No | 118 Offender known to Victim? ☑Yes ☐No | 119 Victim was? (Explain Relationship.) Ex-Girlfriend |
| ☐ LC Officer ☐ Other | | | | |

| 121 Weapon Used ☑Firearm ☐Knife | ☐Hands, Fist, Feet, Voice, etc. ☐Other Dangerous | 122 Description of Weapons/Firearms/Tools Used in Offense Describe: | ☑Handgun ☐Rifle ☐Shotgun ☐Unknown |

| 123 Place of Occurrence 619 2nd Ave. Moundville, Al. 35474 | 124 Injury (Enter exact street address here.) Type ☑N None ☐B Broken Bones | I Internal Injury S Severe Laceration | M Minor Injury O Other Major Injury | T Loss of Teeth U Unconscious | 125 Sedan |

| 128 Assault ☐Simple ☐Aggravated | 129 Treatment for Assault? ☐Yes ☐No | 130 Verify for Rape Exam? ☐Yes ☐No | 131 Treatment for Rape? ☐Yes ☐No |

**OFFENDER INFORMATION**

| 132 Off # 001 | 133 Name (Last, First, Middle) Gray, Bradley Elliott | 134 SFX | 135 Alias Brad | 136 Social Security # | 137 Race ☑W ☐B ☐A ☐I | 138 Sex ☑M ☐F | 140 Age 45 |
| 141 Address (Street, City, State, Zip) 619 2nd Ave. Moundville, Al. 35474 | | | 142 HGT 5'8 | 143 WGT 165 | 144 Ethnicity ☐Other | ☐Hispanic | 145 Language ☑English ☐Spanish ☐Other |
| 148 Probable Destination | | 147 Eye Blu | 148 Hair Light | 149 Complexion | 160 Armed ☑Yes ☐No | Weapon Pistol |
| 151 Clothing | 152 | ☐Scars ☐Marks ☐Tattoos ☐Amputations | 153 ☑Arrested ☐Wanted | ☐Dual Arrest (Domestic Violence) |

| 154 Off # | 155 Name (Last, First, Middle) | 156 SFX | 157 Alias | 158 Social Security # | 159 Race ☐W ☐B ☐A ☐I | 160 Sex ☐M ☐F | 162 Age |
| 163 Address (Street, City, State, Zip) | | | 164 HGT | 165 WGT | 166 Ethnicity ☐Hispanic | 167 Language ☐English ☐Spanish ☐Other |
| 168 Probable Destination | | 169 Eye | 170 Hair | 171 Complexion | 172 Armed ☐Yes ☐No | Weapon |
| 173 Clothing | 174 | ☐Scars ☐Marks ☐Tattoos ☐Amputations | 175 ☐Arrested ☐Wanted | ☐Dual Arrest (Domestic Violence) |

| Name (Last, First, Middle) | Sex | Race | Date of Birth | Address | Contact Telephone Numbers |
| 176 | 177 ☐M ☐F | 178 ☐W ☐B ☐A ☐I | 179 | 180 | 181 Home | 182 Work |
| | | | | | | 183 Other |
| 184 | 185 ☐M ☐F | 186 ☐W ☐B ☐A ☐I | 187 | 188 | 189 Home | 190 Work |
| | | | | | | 191 Other |
| 192 | 193 ☐M ☐F | 194 ☐W ☐B ☐A ☐I | 195 | 196 | 197 Home | 198 Work |
| | | | | | | 199 Other |
| 200 Witness 1 SSN | | | 201 Witness 2 SSN | | 202 Witness 3 SSN |

203 I, officer Mayes spoke with the complainant, Ms. Paige, who stated that she came to Mr. Gray house to get her vehicle. Ms. Mitchell stated that Brad stated, "I will you out too" referring to shooting her." Ms. Mitchell said Brad had a pistol in a holster and kept saying he was going to harm her. She stated that after the altercation and not letting her get the car, he cranked up his tractor and started to hook the car up with a chain. Ms. Mitchell stated that he then snapped back and went into the house and layed the pistol down on a counter top. Ms. Mitchell was threatened repeatedly and harrassed numerous of times. Mr. Gray was arrested and weapon confiscated! No injured.

☐ Continued on Supplement

| 204 Continued on Supplement? ☐Yes ☐No | 205 Assisting Agency ORI | 206 Assisting Agency Case # | 207 RPX | 208 Warrant Signed ☐Yes ☐No | Warrant # | 209 Add. Cases Closed Narrative ☐Y ☐N |

I hereby affirm that I have read this report and that all the information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying agency if any stolen property or missing person herein reported is returned.

21 Paige Mitchell
Signature

JUL

| Unified Judicial System | BAIL BOND FEE TRANSMITTAL FORM (Pursuant to Act 2012-535) | Case/Warrant No. DC-15-100049 |

In the **DISTRICT** _____ Court of **HALE** _____, Alabama
(Circuit/District/Municipal)                    (County/Municipality)

☒ State of Alabama
☐ Municipality   v. BRADLEY GRAY _____, Defendant

Charge: DVIII/HARASSMENT _____

Date of Incident: 7/10/2015 _____

Type of Bond:
☒ Professional Bail/Surety
☐ Property
☐ Cash
☐ Judicial Public
☐ Signature/Personal Recognizance

Official Executing the Bond: ☒ Sheriff ☐ Chief of Police

Name: SHERIFF KENNETH ELLIS _____

Bond Amount: $6,000.00 _____

Name(s) of Surety: ALABAMA'S BEST BAIL BONDS _____

## TO BE COMPLETED BY LAW ENFORCEMENT

WAS THE $35 BAIL FEE PAID:

☒ The Bail Fee was paid and is attached hereto
☐ The Bail Fee has not been paid
   ☐ Recognizance/Signature Bond
   ☐ Multiple Charges/Same Incident (Fee paid on other charge)
   ☐ Release due to Documented Medical Reasons

_____  07/10/2015
Signature of Law Enforcement Office  Date

*Alesia Tubbs*
Printed Name

## TO BE COMPLETED BY THE CLERK'S OFFICE

Received by: _____

*Catherine Log Pig*
Signature of Circuit/District/Municipal clerk's office  Date
JUL 1 0 2015

_____
Printed Name

ALABAMA JUDICIAL DATA CENTER

COURT PAYMENT SYSTEM

HALE COUNTY.

*** RECEIPT ***

NO: 094393

DATE: 07/13/2015
TIME: 15:44:18

CASE: DC2015100049.00  DEFENDANT: GRAY, BRADLEY ELLIOTT

BATCH: 2015159

RECEIVED FROM: ALABAMA'S BEST BAIL BONDS

TYPE: CHECK

AMOUNT: THIRTY FIVE AND NO CENTS-------------------------------$*******35.00

FOR ACCOUNTS:  BAIL  BAIL FEE                    $35.00

*** BALANCE OWED ON THIS CASE BY THIS PAYOR IS: $0.00 ***

RECEIVED BY: SHJ

NO Contact With Victim

| State of Alabama Unified Judicial System | CONSOLIDATED APPEARANCE BOND (District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|
| Form CR-10  Rev. 8/96 | | DC-15-100049 |

IN THE **District** COURT OF **Hale** , ALABAMA
(Circuit or District)               (Name of County)

STATE OF ALABAMA V. **Bradley Gray**
Defendant

I, **Bradley Gray** (Defendant), as principal,
**Who Sign**
and I (we), _____ , as surety(ies), agree
(Please print)

to pay the State of Alabama the sum of $**6,000.00** and such costs as authorized by law unless the above-named defendant appears before the district court of the county on **August 3** (date) at **9:30 A.** M. (time) (if date and time are unknown, the words "the scheduled" may be placed in the date blank and a line may be placed in the space for time) and from time to time thereafter until discharged by law or at the next session of circuit court of the county; there to await the action by the grand jury and from session to session thereafter until discharged by law to answer to the charge of **DV III/Harassment** , or any other charge as authorized by law.

We hereby severally certify that we have property valued over and above all debts and liabilities that has a fair market value equal to or greater than the amount of the above bond, and we, and each of us, waive the benefit of all laws exempting property from levy and sale under execution or other process for the collection of debt by the constitution and laws of the State of Alabama, and we especially waive our rights to claim as exempt our wages or salary that we have under the laws of Alabama, and our rights to homestead exemption that we have under the Constitution of Alabama and the laws of the State of Alabama, as set out in a separate writing.

It is agreed and understood that this is a consolidated bond, eliminating the necessity for multiple bonds and that it shall continue in full force and effect, until the defendant appears before the district court or circuit court, whichever has jurisdiction, to answer the above charge, and from time to time thereafter until the defendant is discharged by law, or, until such time as the undersigned sureties are otherwise duly exonerated as provided by law.

Signed and sealed this date with notice that false statements are punishable as perjury.

| Signature of Defendant  **Brad Gray** | | | (L.S.) |
|---|---|---|---|
| Address (print)  **219  2nd AVE** | City  **Moundville** | State  **AL** | Zip  **35474** |
| Signature of Surety/Agent of Professional Surety or Bail Company  **Carolyn Glenn** (L.S.) | | Signature of Surety/Agent of Professional Surety or Bail Company  **Carolyn Glenn** (L.S.) | |
| Social Security Number | Telephone Number | Social Security Number | Telephone Number |
| Address (print)  ALABAMA'S BEST BAIL BONDS  State  Zip  P.O. BOX 1377 | | Address (print)  City  State  Zip | |
| Signature of Surety/Agent of Professional Surety or Bail Company  MOUNDVILLE  205-393-6082 (L.S.) | | Signature of Surety/Agent of Professional Surety or Bail Company  (L.S.) | |
| Social Security Number | Telephone Number | Social Security Number | Telephone Number |
| Address (print)  City  State  Zip | | Address (print)  City  State  Zip | |

**Kenneth Ellis AT**
Approved by Judge/Magistrate/Sheriff

**7-10-2015** _____
Date                                    By, Deputy Sheriff

| Defendant's Information | | | | |
|---|---|---|---|---|
| Date of Birth | Sex  **M** | Height  **5-8** | Weight  **165** | Employer |
| Social Security Number | Race  **W/** | Hair  **BRO** | Eyes  **HAZ** | Employer's Address  **JUL 13 2015** |
| Driver's License Number  **6578098**  State  **(AL)** | Telephone Number  **(205) 372-3760** | | | Employer's Telephone Number |

☐ Property Bond      ☒ Professional Surety/Bail Company Bond      ☐ Cash Bond

COURT RECORD: Original          DEFENDANT: Copy          SURETY: Copy

**POWER OF ATTORNEY**

THE NORTH RIVER INSURANCE COMPANY
16000 Richmond Ave., Suite 300 · Houston, TX 77042
P.O. Box 2807 · Houston, Texas 77252-2807
(713) 954-8100     (713) 954-8288 FAX

POWER NO.     **\*\*\*T10-50503308\*\*\***

POWER AMOUNT $     **\*\*\*10,000.00\*\*\***

This Power of Attorney is granted pursuant to Article V of the By-Laws of THE NORTH RIVER INSURANCE COMPANY as now in full force and effect. Article V, Execution of Instruments- Except as the Board of Directors may authorize by resolution, the Chairman of the Board, President, any Vice-President, any Assistant Vice-President, the Secretary, or any Assistant Secretary, or any Assistant Secretary shall have power on behalf of the Corporation: (a) to execute, affix the corporate seal manually or by facsimile, to acknowledge, verify and deliver any contracts, obligations, instruments and documents whatsoever in connection with its business, including, without limiting the foregoing, any bonds, guarantees, undertakings, recognizances, powers of attorney or revocations of any powers of attorney, stipulations, policies of insurance, deeds, leases, mortgages, releases, satisfactions and agency agreements; (b) to appoint, in writing, one or more persons for any or all of the purposes mentioned in the preceding paragraph (a), including affixing the seal of the Corporation. Authority of such Attorney-In-Fact is limited to appearance bonds and cannot be construed to guarantee defendant's future lawful conduct, adherence to travel limitation, fines, restitution, payments or penalties, or any other condition imposed by a court not specifically related to court appearance.

This Power of Attorney is for use with Bail Bonds only. Not valid if used in connection with Federal Bonds or Immigration Bonds. This power void if altered or erased, void if used with other powers of this Company or in combination with powers from any other surety company, void if used to furnish bail in excess of the stated face amount of this power, and can only be used once.     **\*\*\*Ten Thousand  Dollars and Zero Cents\*\*\***

**The obligation of the Company shall not exceed the sum of**

and provided this Power of Attorney is filed with the bond and retained as a part of the court records. The said Attorney-In-Fact is hereby authorized to insert in this Power of Attorney the name of the person on whose behalf this bond was given.

IN WITNESS WHEREOF, THE NORTH RIVER INSURANCE COMPANY has caused these presents to be signed by its duly authorized officer, proper for the purpose and its corporate seal to be hereunto affixed this **10** DAY of **7** MONTH **15** YEAR

Bond Amount $ _6000_

Defendant _Bradley Gray_

Charges _DUI III Harassment_

Court _Deserlet_

Case No. _Aug 3 2015   9:30_

City _Hele_     State _Al_

If rewrite, original No. _____

Executing agent _Carolyn Jenkins_
NAME



By _Robert Crawford_

Robert Crawford
Vice President

**08/31/2015**

VOID IF NOT ISSUED BY:

**FOR STATE USE ONLY**
NOT VALID IF USED IN FEDERAL COURT

COPY FOR COURT

S-0023NR A  REV. (05/10)



ELECTRONICALLY FILED
8/3/2015 10:07 AM
36-DC-2015-100049.00
CIRCUIT COURT OF
HALE COUNTY, ALABAMA
CATRINNA LONG PERRY, CLERK

## IN THE DISTRICT COURT OF HALE COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| V. | ) | Case No.:  DC-2015-100049.00 |
| | ) | |
| GRAY, BRADLEY ELLIOTT | ) | |
| Defendant. | ) | |

## ORDER

DEFENDANT APPEARS THIS DATE AND ENTERS PLEA OF NOT GUILTY.  REQUEST ATTORNEY.  AFFIDAVIT OF HARDSHIP PROVIDED TO DEFENDANT.  ADVISED CASE SET FOR TRIAL ON SEPTEMBER 8, 2015 AT 1:00 p.m.

**DONE this 3rd day of August, 2015.**

/s/ TIMOTHY A. EVANS
**DISTRICT JUDGE**



**AlaFile E-Notice**

36-DC-2015-100049.00

Judge: TIMOTHY A. EVANS

To: BOCKMAN CYNTHIA HELENE MO
cynthia.bockman@alabamada.gov

# NOTICE OF ELECTRONIC FILING

IN THE COURT OF HALE COUNTY, ALABAMA

CITY OF MOUNDVILLE V. GRAY, BRADLEY ELLIOTT
36-DC-2015-100049.00

The following matter was FILED on 8/3/2015 10:07:04 AM

Notice Date:     8/3/2015 10:07:04 AM

CATRINNA LONG PERRY
CIRCUIT COURT CLERK
HALE COUNTY, ALABAMA
1001 MAIN STREET, ROOM 13
GREENSBORO, AL 36744

334-624-4334
catrinna.perry@alacourt.gov

# IN THE DISTRICT COURT OF Hale COUNTY, ALABAMA

STATE OF ALABAMA

vs.

Bradley Elliott Gray

DEFENDANT.

Case No. DC 2015 — ~~100~~   100049

## PLEA AGREEMENT

After discussion and negotiation between the parties, after a full explanation of rights has been given to the defendant as evidenced by the attached Explanation of Rights form, and after such disclosure of information between the parties as each deems sufficient, it is hereby agreed in this case, pursuant to Rule 14.3, Ala.R.Crim.P., subject to acceptance by the Court, that:

1. The Defendant will enter a plea of guilty to the charge(s) of: DV 3rd Harassment as charged in the (indictment)(information) all other counts of indictment will be dismissed.

2. ☑ The State will recommend to the Court that the Defendant be given a sentence of 30 days Suspended

3. ☑ The State will recommend to the Court that the Defendant be placed on probation for a period of:
   ☐ _____ SUPERVISED / 12 mil UNSUPERVISED.

4. ☑ As a condition of probation the Defendant agrees to:
   ☑ Obey all laws and further orders of the Court and Probation Officer.
   ☐ Have no contact with alcohol or illegal drugs.
   ☐ Maintain full time employment.
   ☑ Trespassed away from Paige Mitchell Complete DV Classes Disclosure

5. ☐ Restitution has been determined in the amount of $ _____ to be paid to _____

6. ☑ Other matters agreed to: Ct costs, fines, Bail Bond fee, are remittal.

7. ☑ The parties are aware that any sentence recommendation by the State of Alabama is merely a recommendation and does not bind the Court and the Court may impose a more severe or less severe sentence than that recommended.

8. ☐ Defendant represents to the State and stipulates that he has _____ prior felony convictions.

Dated: This the 8th day of September, 2015.

_____
Defendant

_____
Attorney for Defendant

_____
ASSISTANT DISTRICT ATTORNEY

FILED

SEP 03 2015

CATRINNA LONG PERRY, CLERK
HALE COUNTY, ALABAMA

State of Alabama
Unified Judicial System

Form CR-2    Rev. 2/93

# WAIVER OF COUNSEL

Case Number

OC 15-1cw4

IN THE **District** COURT OF **Hale**, ALABAMA
(Circuit, District, or Municipal)    (Name of County or Municipality)

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. **Bradley Gray**, Defendant

I, **Bradley Gray**, defendant in the above
(please print or type name)

case, having been informed of my right to the assistance of counsel and of the fact that the Court will appoint counsel if I am financially unable to obtain counsel, and understanding these rights, do hereby voluntarily, of my own free will knowingly, and intelligently forego and waive the right to the assistance of counsel. I have been advised that I may withdraw this waiver upon due notice to the Court at any time and that if waiver of counsel is withdrawn, I have the right to appointed or retained counsel at any stage of the proceedings. I understand that I will not be entitled to repeat any proceeding held or waiver prior to that withdrawal solely on the ground of the subsequent appointment or retention of counsel.

Date: _____    _____
                            Defendant

☑ It appearing that the foregoing waiver of counsel is made by defendant knowingly, intelligently, and voluntarily, it is ORDERED that it be and the same is hereby accepted subject to further Orders of the Court.

☐ It appearing that the defendant has not made a knowing, intelligent and voluntary waiver of his/her right to counsel, it is ORDERED that:

☐ the case is continued to _____ to afford the defendant time to obtain counsel.

☐ the Order appointing counsel heretofore entered in this cause remains in full force and effect.

☐ an Order appointing counsel to represent the defendant will be entered by the Court.

☐ it appearing that the defendant has made an effective waiver of his/her right to counsel, but that there are compelling reasons for appointment of advisory counsel, it is ORDERED that _____ Attorney at law, is hereby appointed to advise the defendant at all stages of the proceedings. Notice of all matters of which the defendant is notified shall also be given to advisory counsel.

Date: **9-8-15**    _____
                     Judge

FILED

CATHERINE LONG PERRY, CLERK
HALE COUNTY, ALABAMA

# IN THE DISTRICT COURT OF HALE COUNTY, ALABAMA

STATE OF ALABAMA, Plaintiff

CASE NUMBER: DC-20_15_ _100049_

v. _Bradley Gray_, Defendant.

TR-20_____

## ORDER

| | |
|---|---|
| X | Defendant appears, in proper person and is advised of rights and waives counsel [defendant's initials _____] or with counsel Hon. _____ [Judge's initials _____] |
| | and Youthful offender status as requested by Defendant is _____ granted _____ denied, |
| | and State moves to amend charge to _____ and defendant consents to such amendment, |
| ✓ | and Defendant pleads guilty and is |
| | and defendant pleads not guilty, and after hearing evidence the defendant is |
| | adjudged not guilty. |
| | adjudged guilty and is sentenced to serve _30 days_ in jail, suspended except for _0_ days which shall be immediately served, and Defendant shall turn himself in to Hale County Jail by _____ .M. |
| | On motion of State, case nolle-prosse. All cost, fines, fees and attorney fees remitted. |
| | On motion of State, case dismissed on condition of: _____ Restitution, _____ cost, _____ fines, _____ fees, _____ atty fees |
| ✓ | and Defendant shall pay a fine of $_____ plus costs and a Bail Bond Fee of $_____ (Act 2012-535, §2(a)(1)(b) and $25.00 to the crime victims compensation commission in any non-traffic case, plus the costs of any appointed attorney, plus fees, plus any amounts due the District Attorney's Check Unit, if any, and restitution in the amount of $_____ to be paid to: _____ |
| | Payments made in this case shall be applied FIRST, to restitution owed, SECOND, to court costs, and finally to fines and other charges. |
| ✓ | [for convictions under Ala. Code § 13A-12-260 (Paraphernalia) or § 13A-12-214 (Marihuana II)] Defendant shall pay the required fees of $100.00 pursuant to Ala. Code § 36-18-7 and $49.00 pursuant to Ala. Code § 12-19-181. |
| | [for convictions of DUI, Possession of Marihuana, Paraphernalia, Public Intoxication or Domestic Violence, where alcohol or drugs is a factor]: Defendant is ORDERED to see Court Referral Officer and follow and complete all recommendations CRO makes. CRO telephone: (334) 877-1776. |
| ✓ | Defendant is placed on _✓_ UNSUPERVISED _____ SUPERVISED probation for a period of _1_ years conditioned on good behavior, on satisfaction of all mandates of this order, on no further violation of the law and on payment of the fine above, restitution, fees and costs, including all sums due the District Attorney's Check Unit, if any. |
| | Defendant shall have all fines, cost, fees and restitution (if any) paid by the _____ day of _____, 20_____. Failure to have the case paid will result in a warrant for your arrest and being held in jail until the case is paid or until you have served _____ days at the rate of $15.00 per day. There may also be a fee added of 30%, which may result in additional days in jail. Failure to pay the case may also result in your drivers license being suspended. |
| | If checked, partial payments to circuit clerk of $_____ are authorized, and are due by the _____ of each month, commencing on _____, and shall continue to be paid until restitution, cost, fees, and any amount due the District Attorney's Check Unit and fines are paid and clerk shall issue a warrant for arrest of Defendant if payments are not made as ordered. |
| | Defendant is ordered to complete _____ hours of community service with the following organization: _____ Upon completion of Community Service with an approved non-profit organization the following, if checked shall be remitted: _____ Court Cost, _____ fines, _____ fees, _____ atty fees. Defendant shall present to the Circuit Clerk documentation on the Organization's letter head indicating that all hours of Community Service have been completed. Such Community Service shall be completed by the _____ day of _____, 20 _____ |
| ✓ | Other order/agreement: If checked, following remitted: _✓_ cost, fines _✓_ fees _____ atty fee _No Contact with victim in Case_ _CM, fines & fees Remitted_ _____ DA |
| ✓ | Review this matter for compliance on the _____ day of _____, 20 _____ at 9:00 _____ A.M. If the record reflects that all requirements have been satisfied, Defendant need not appear. Failure to appear in a case where the record fails to reflect that all requirements have been satisfied will result in a warrant for defendant's arrest |
| ✓ | DONE AND ORDERED this _0_ day of _JAN_, 20_15_ |

TIMOTHY A. EVANS, District Judge

_____ If checked, please fax to     Jail     DA     All Attorneys of record _____



## COMPLETION CERTIFICATE

**Attention:** Hale County District Court, Ms. Kimberly Pernell/Judge Evans:

This is to certify that the defendant below has successfully completed all of the requirements of the Court Referral Officer on 03/18/2016

**Name:**                    BRAD GRAY

**Judge:**                   TIMOTHY A. EVANS

**Case number:**             3600DC201510004800 49

BRAD GRAY   completed Level  Other and 4 months of monitoring.

Notes:

Completion Certificate attached.

Kenyatta Phillips

CRO Phillips signature

CC: Hale Co ADA
Cynthia Bockman

CCP File

MAR 18 2016

# FAMILY COUNSELING SERVICE
## 2020 Bryant Drive
## Tuscaloosa, Alabama 35401
## (205) 752-2504

## AMP COMPLETION SUMMARY

Date: __03-17-16__

To: **Judge**
    Hale County Court

From: ~~Lauren Hodges~~ Group Leader

Re: **Brad Gray**
Case #: 3600DC201510004800
             49

This is to confirm that the above named client has attended all 12 sessions of the Anger Management Program and has completed the program in compliance with the Court.

Completion of the Anger Management Program is no guarantee of a change in the participant's behavior. The program seeks to offer education and insight to encourage change, but the actual change is at the discretion of each participant and remains beyond the ability of this program to control.

MAR 1 8 2016

BARBARA FOR... RANCH CLERK
HALE COUNTY, ALABAMA



ELECTRONICALLY FILED
3/28/2016 11:31 AM
36-DC-2015-100049.00
CIRCUIT COURT OF
HALE COUNTY, ALABAMA
CATRINNA LONG PERRY, CLERK

# IN THE DISTRICT COURT OF HALE COUNTY, ALABAMA

STATE OF ALABAMA         )
                             )
V.                         )  Case No.:     DC-2015-100049.00
                             )
GRAY, BRADLEY ELLIOTT   )
Defendant.               )

## ORDER

COURT BEING NOTIFIED BY COURT REFERRAL PROGRAM THAT DEFENDANT HAS COMPLETED THE REQUIREMENTS OF CRO PROGRAM, RECORD SHALL REFLECT SAME.

**DONE this 28th day of March, 2016.**

                                    **/s/ TIMOTHY A. EVANS**
                                    **DISTRICT JUDGE**



**AlaFile E-Notice**

36-DC-2015-100049.00

Judge: TIMOTHY A. EVANS

To: BOCKMAN CYNTHIA HELENE MO
cynthia.bockman@alabamada.gov

# NOTICE OF COURT ACTION

IN THE COURT OF HALE COUNTY, ALABAMA

CITY OF MOUNDVILLE V. GRAY, BRADLEY ELLIOTT
36-DC-2015-100049.00

A court action was entered in the above case on 3/28/2016 11:31:59 AM

ORDER

[Filer: ]

Disposition: GRANTED
Judge: TAE

Notice Date: 3/28/2016 11:31:59 AM

CATRINNA LONG PERRY
CIRCUIT COURT CLERK
HALE COUNTY, ALABAMA
1001 MAIN STREET, ROOM 13
GREENSBORO, AL 36744

334-624-4334
catrinna.perry@alacourt.gov



# AlaFile E-Notice

36-DC-2015-100049.00

Judge: TIMOTHY A. EVANS

To: GRAY, BRADLEY ELLIOTT
619 SECOND AVENUE
MOUNDVILLE, AL 35474-0000

---

# NOTICE OF COURT ACTION

IN THE COURT OF HALE COUNTY, ALABAMA

CITY OF MOUNDVILLE V. GRAY, BRADLEY ELLIOTT
36-DC-2015-100049.00

A court action was entered in the above case on 3/28/2016 11:31:59 AM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           TAE

Notice Date:     3/28/2016 11:31:59 AM

CATRINNA LONG PERRY
CIRCUIT COURT CLERK
HALE COUNTY, ALABAMA
1001 MAIN STREET, ROOM 13
GREENSBORO, AL 36744

334-624-4334
catrinna.perry@alacourt.gov

# EXHIBIT B



Deposition of:

## Ken Robertson

*July 2, 2020*

In the Matter of:

## Ray, Sylvia Vs. Gray, Bradley, The Estate Of, et al.

**Veritext Legal Solutions**

877.373.3660 | calendar-al@veritext.com  | 800.808.4958

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4    CIVIL ACTION: 2:19-00069-KD-MU

5

6    SYLVIA RAY, AS PERSONAL

7    REPRESENTATIVE OF THE

8    ESTATE OF PAIGE MITCHELL,

9    DECEASED, et al.,

10             Plaintiffs,

11   vs.

12   ESTATE OF BRADLEY ELLIOTT GRAY,

13   et al.,

14             Defendants.

15

16                   DEPOSITION

17                      OF

18                 KEN ROBERTSON

19                 JULY 2, 2020

20

21   TAKEN BY: Maya Rose

22             Registered Professional Reporter

23             and Notary Public

S T I P U L A T I O N S

1
2    IT IS STIPULATED AND AGREED, by and
3  between the parties, through their respective
4  counsel, that the deposition of KEN ROBERTSON
5  may be taken before MAYA ROSE, Commissioner,
6  Court Reporter and Notary Public, State at
7  Large;
8    That the signature to and the reading of
9  the deposition by the witness is waived, the
10  deposition to have the same force and effect
11  as if full compliance had been had with all
12  laws and rules of Court relating to the taking
13  of depositions;
14    That it shall not be necessary for any
15  objections to be made by counsel to any
16  questions, except as to form or leading
17  questions, and that counsel for the parties
18  may make objections and assign grounds at the
19  time of trial, or at the time said deposition
20  is offered in evidence, or prior thereto;
21    That the notice of filing of the
22  deposition by the Commissioner is waived.
23

1    A P P E A R A N C E S (continued)
2
3  FOR MOUNDVILLE:
4    Mr. Richard Warren Kinney, III
5    Attorney at Law
6    Porter Porter & Hassinger, P.C.
7    880 Montclair Road, Suite 175
8    Birmingham, Alabama  35213
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1    A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
4    Mr. John E. McCulley
5    Attorney at Law
6    John E. McCulley, P.C.
7    601 Greensboro Avenue, Suite 200
8    Tuscaloosa, Alabama  35401
9
10    Mr. Michael S. Burroughs
11    Attorney at Law
12    Michaels S. Burroughs Law Office
13    601 Greensboro Avenue, Suite 200
14    Tuscaloosa, Alabama  35401
15
16  FOR KEN ROBERTSON:
17    Mr. Tom Gaillard
18    Attorney at Law
19    Helmsing, Leach, Herlong, Newman
20       & Rouse, P.C.
21    150 Government Street, Suite 2000
22    Mobile, Alabama  36602
23

1    I N D E X
2
3                    PAGE
4  EXAMINATION BY MR. MCCULLEY:...............7
5
6    E X H I B I T S
7  PLAINTIFF'S NO.              PAGE
8  Exhibit 1 - documents (Ray v. Moundville -102
9       001 through 023)
10  Exhibit 2 - Rules and Regulations of the -102
11     Moundville Police Department
12
13
14
15
16
17
18
19
20
21
22
23

2 (Pages 2 - 5)

1    I, Maya Rose, a Registered
2 Professional Reporter of Birmingham, Alabama,
3 and a Notary Public for the State of Alabama
4 at Large, acting as Commissioner, certify that
5 on this date, pursuant to the Federal Rules of
6 Civil Procedure and the foregoing stipulations
7 of counsel, there came before me at 2005
8 University Boulevard, Tuscaloosa, Alabama, on
9 the 2nd day of July, 2020, commencing at 10:10
10 a.m. and concluding at 12:20 p.m., KEN
11 ROBERTSON, witness in the above cause, for
12 oral examination, whereupon the following
13 proceedings were had and done:
14
15        KEN ROBERTSON,
16 being first duly sworn, was examined and
17 testified as follows:
18
19     THE REPORTER:  Usual stipulations?
20     MR. MCCULLEY:  Yes.
21     MR. GAILLARD:  That's fine.
22     MR. KINNEY:  That's fine.
23

1 EXAMINATION BY MR. MCCULLEY:
2     Q.  Do you know who everybody is in
3 here?
4     A.  I don't.
5     Q.  Okay.  You know your lawyer.
6     A.  Yes, sir.
7     Q.  Okay.  Do you know Warren Kinney,
8 down on the end?
9     A.  I don't.  I know he represents
10 Moundville, but I'm not familiar with him.
11     Q.  Okay.  All right.  And this is
12 Mike Burroughs --
13     A.  Right.
14     Q.  -- along with me, we represent the
15 plaintiffs in this case --
16     A.  Yes, sir.
17     Q.  -- which is the personal
18 representative of the deceased folks.
19     A.  Yes, sir.
20     Q.  Okay.
21     A.  Yes, sir.
22     Q.  The court reporter is taking down
23 everything we say --

1     A.  Yes, sir.
2     Q.  -- and she cannot take down this
3 (indicating) or this (indicating).
4     A.  Oh, sure.  Yes.
5     Q.  Right.  So be sure to answer.
6     A.  Yes, sir.
7     Q.  Let me know if you need a break.
8     A.  Yes, sir.
9     Q.  It's probably going to be after
10 you answer the question.
11     A.  Oh, yeah.  Yeah.
12     Q.  All right.
13     A.  Understood.
14     Q.  And if you don't understand a
15 question, I'd like for you to let me know
16 before you answer it.
17     A.  Sure.
18     Q.  Okay.  If you need clarification,
19 or you're not sure exactly where I'm going,
20 then just let me know.  Have you ever given a
21 deposition?
22     A.  No, sir.
23     Q.  Okay.  You're aware that Brad

1 Gray's estate is a defendant in this case?
2     A.  Yes, sir.  I believe I read that,
3 yes, sir.
4     Q.  All right.  And you know we're
5 here to talk about the deaths of Paige
6 Mitchell and Kaci Mitchell this morning;
7 right?
8     A.  Yes, sir.
9     Q.  All right.  Let me start by
10 getting your full name.
11     A.  Kenneth Wade, W-a-d-e, Robertson,
12 R-o-b-e-r-t-s-o-n.
13     Q.  Are you known by any other name?
14     A.  Ken.
15     Q.  And what's your date of birth?
16     A.  1 -- well, January 5th, 1966.
17     Q.  And what's your current home
18 address right now?
19     A.  925 County Road 67, and that's
20 Moundville, 35474.
21     Q.  What sort of professional
22 organizations, if any, do you belong to like
23 FOP?

1   A.   None.
2   Q.   You don't belong to FOP?
3   A.   No, sir.
4   Q.   Are there any that you've ever
5 belonged to?
6   A.   No, sir.
7   Q.   Like International Association of
8 Chiefs of Police?
9   A.   Well, like I said, not the
10 International Association but I was a member
11 of the Alabama Chiefs of Police when I was --
12 when I was --
13   Q.   What's the name of that
14 organization?
15   A.   AACOP, Alabama Association of
16 Chiefs of Police.  It's -- AACOP is the
17 synonym [sic] for it.
18   Q.   All right.  I haven't heard of
19 that one.  Where do you go to church?
20   A.   We go to the Highlands.
21   Q.   Here in Tuscaloosa?
22   A.   Yes, sir.
23   Q.   What about any sort of fraternal

1 groups, clubs or anything like that?
2   A.   No, sir.
3   Q.   No yachting association, nothing
4 like that?
5   A.   No, sir.
6   Q.   Have you reviewed any documents to
7 prepare for this today?
8   A.   The only documents I looked at
9 were the Exhibit 1 through the -- just the
10 initial reports and then the regulations.
11 That's the only thing that I've looked at.
12       MR. GAILLARD:  The Bates labeled
13 documents.
14       MR. MCCULLEY:  Okay.  All right.
15 Can we get a copy of that, the rules and
16 regulations of the Moundville Police
17 Department?
18       MR. KINNEY:  Sure.  Yeah.  Has
19 that not been provided to you?
20       MR. BURROUGHS:  It's Bates stamped
21 but we've not seen this.
22       MR. KINNEY:  All right.  Yeah, of
23 course.

1   Q.   (BY MR. MCCULLEY:)  Okay.  Mr.
2 Robertson, you've just shown me that you
3 reviewed the rules and regulations of the
4 Moundville Police Department prior to your
5 deposition today?
6   A.   Yes, that document there, yes.
7   Q.   Right.  Were those in effect at
8 the time of the death of Paige Mitchell and
9 Kaci Roberts?
10   A.   Not all of them were.  There are
11 some in there that I wasn't aware of that
12 aren't -- that I didn't know anything about.
13   Q.   Fair enough.
14   A.   So it may be something that was
15 put in place after I left.
16   Q.   So what you looked at is what's
17 current today?
18   A.   I'm assuming, yes, sir.
19   Q.   Okay.
20   A.   Yes, sir.  I'm not sure when they
21 were put in place, but some of that wasn't
22 familiar to me when I was chief.
23   Q.   All right.  And the other document

1 you looked at, was that the court record --
2       MR. GAILLARD:  Yes.
3   Q.   -- from Bradley Gray's case file?
4   A.   I'm not sure what the title is.
5 It would just be these documents here, the
6 report, the arrest warrant for Brad Gray, the
7 deposition.  I think it's Ray versus
8 Moundville 001 to Ray versus Moundville 023.
9   Q.   Okay.  All right.  When did you
10 first become a police officer?
11   A.   1997.
12   Q.   And where was that?
13   A.   McKenzie, Alabama.
14   Q.   K-e-n-z-i-e?
15   A.   No.  M-c-K-e-n-z-i-e, yes.
16   Q.   Okay.  And how long did you work
17 there?
18   A.   I was there through the academy.
19 I was there probably six months.  I moved to
20 Moundville.
21   Q.   So you went to work in Moundville
22 in '97 or '98?
23   A.   Yes, sir, ninety -- I can't

1 remember exactly, but it was '97 or '98. I
2 worked there two years, and then I went to the
3 sheriff's office.
4     Q.   All right.  You mentioned the
5 academy.  McKenzie paid for you to go to it?
6     A.   They did.
7     Q.   Okay.
8     A.   Bay Minette.
9     Q.   So did you have any law
10 enforcement training at all before you went to
11 the academy?
12     A.   No, sir.
13     Q.   Okay.  And then after you got the
14 job at McKenzie and after you completed the
15 academy at Bay Minette, did you have any other
16 training?
17     A.   Oh, I've had -- I mean, that's
18 kind of -- I mean, I've had training, good
19 gracious, twenty-two years of it.  Yeah.  I
20 mean, we've had twelve hours of training per
21 year, as you know, but, you know, a lot.  I
22 could go over it and over it and over it, but
23 there's just files of it.  You know, over

1 twenty-two years -- you know, we're required
2 to have twelve CEUs a year, so -- and then I
3 was in the Chief of Police Conference, in
4 their classroom for ten years.  So I had
5 almost 480 hours of -- I mean, excuse me,
6 almost 260 hours of training.  I didn't
7 quite -- I think I was a few hours short of
8 that, but --
9     Q.   Do you have records of that?
10     A.   Sure.  Yes.  There are records of
11 that, yes, sir.
12     Q.   Do you have them?
13     A.   I -- I don't know.  I could
14 probably -- I don't know if I would have a
15 complete record of that, but maybe we could
16 get them.
17     Q.   Who would have them?
18     A.   Chief conference.  The Chief of
19 Police Conference, the leadership of them
20 should be able to --
21     Q.   What's that?
22     A.   It's the association for all the
23 chiefs of police in the state of Alabama.

1     Q.   Back to AACOP?
2     A.   Yes.
3     Q.   Okay.
4     A.   Yes.  And, you know, they -- of
5 course you're required to have different CEUs
6 when you're in management and leadership
7 called executive CEUs, so they provide those.
8 And they have a law enforcement executive
9 program that you're in when you're there.
10 Those classes are reaching you toward that,
11 so --
12     Q.   Well, while I'm not surprised, I
13 just have to tell you that when I was in law
14 enforcement a hundred years ago --
15     A.   Yes, sir.
16     Q.   -- there was no academy.
17     A.   Wow, that's been a long time ago.
18     Q.   I was grandfathered in.
19     A.   Yes, sir.  Yes, sir.
20     Q.   And so the last thing on their
21 mind is continuing education.  They just
22 wanted to get us some training.
23     A.   Yes.  Yeah, it's all CEU based

1 now.  Everything has got to have it.
2     Q.   During that period of time, can
3 you remember whether you ever got any training
4 on securing evidence pretrial?
5     A.   I'm sure at some point, I can't
6 remember exactly a date, but I'm sure at some
7 point we certainly would have covered that at
8 some point.  There should be a record of that.
9 But I can't -- I can't sit here and say, yes,
10 on this date I did.
11     Q.   I can't remember either.  During
12 that period of time, did you ever have any
13 training on the disposition of articles being
14 held for evidence at the conclusion of a
15 trial?
16     A.   I can't recall if I had anything
17 like that or not.
18     Q.   Okay.  Did you ever have any
19 training specific to firearms as evidence?
20     A.   I mean, that's kind of a broad
21 question.  I don't know.  Do you mean a
22 description of firearms or --
23     Q.   Yeah.

1    A.  I mean, throughout the
2  twenty-something years, yeah, we've had --
3  I've had some sort of training in firearms,
4  you know, either by description or, you
5  know --
6    Q.  Identification?
7    A.  Right.  Yeah, how to handle them
8  through the ATF and that kind of thing.
9    Q.  Okay.  Have you ever had any
10  training specific to returning handguns to the
11  owner after the case is concluded in some way
12  or another?
13    A.  I don't recall any training of
14  that nature that specifically said how to
15  return it.
16    Q.  Okay.  All right.  You said that
17  you went to Moundville for a couple of years
18  in --
19    A.  Yes, sir.
20    Q.  All right.
21    A.  I worked for Moundville for
22  approximately two years, and then I went to
23  Hale County Sheriff's Office.

1    Q.  And that would have been?
2    A.  What, '99, 2000.  I was there
3  until 2006 before I went back to Moundville as
4  the police chief.
5    Q.  And you're sure that's 2006?
6    A.  Yes, sir, because that was an
7  election year, 2006 to 2016.
8    Q.  All right.  And then you stayed
9  with Moundville until when?
10    A.  2016.
11    Q.  Were you not there in January of
12  2017?
13    A.  No, sir.  I left there in
14  September of 2016.
15    Q.  So you weren't there when the
16  Mitchells were killed?
17    A.  No, sir.
18    Q.  In 2016 did you go back to the
19  sheriff's office?
20    A.  Yes, sir, I did.  I think that was
21  October.
22    Q.  And you're still there?
23    A.  Yes, sir, I'm still employed by

1  the sheriff's office.
2    Q.  Before 1997 when you went to work
3  in law enforcement for the first time, what
4  did you do?
5    A.  I worked for a trucking company.
6  I did mechanic work, that kind of thing.  I
7  worked on a farm.  Actually the mayor that
8  hired me --
9    Q.  Right.
10    A.  -- he kind of got me in it, so --
11    Q.  What was the mayor's name?
12    A.  Calvin Wright.  He's deceased,
13  but --
14    Q.  And he was mayor where?
15    A.  McKenzie.  He was also the owner
16  of the trucking company that I worked for.
17    Q.  But you didn't drive for the
18  trucking company?
19    A.  Huh-uh.
20    Q.  How long did you work for him?
21    A.  Man, you're getting back there
22  now.  Two, three years.
23    Q.  Do you remember the name of the

1  company?
2    A.  Wright -- that I worked at?
3  Wright & Son Trucking.
4    Q.  And that was in McKenzie?
5    A.  No, that was in Tuscaloosa.
6    Q.  Oh.
7    A.  Uh-huh.
8    Q.  Okay.  And before that?
9    A.  Horton's Auto Parts, I believe.
10  Man, that's way back there.  I don't know what
11  year that was.
12    Q.  That's here in town, too?
13    A.  Yeah, it was out on 215 out there.
14  It's gone now, but -- it was a junkyard at one
15  time.
16    Q.  Yeah.  And before that?
17    A.  That's just too -- I don't -- I
18  don't remember.
19    Q.  How long were you at Horton's?
20    A.  Not very long.  Maybe a year,
21  something like that.
22    Q.  All right.
23    A.  Man, I can't remember.  I can't

1 remember.
2    Q.  All right.  Your employment at
3 Moundville ended twice; correct?
4    A.  Yes.
5    Q.  All right.  And when you went from
6 Moundville to the sheriff's office in 2000 --
7    A.  Uh-huh.
8    Q.  -- why?
9    A.  Just a change of job.  I mean, I
10 don't remember.  You know, I had some friends
11 that worked there, you know, and just kind of
12 be over the -- worked through the County
13 instead of through the City, you know, kind of
14 opened up and to be able to...
15    Q.  Who was the sheriff then?
16    A.  Larry Johnson.
17    Q.  All right.  And then you went back
18 to the City --
19    A.  Yes, sir.
20    Q.  -- in 2006?
21    A.  Yes.
22    Q.  Why?
23    A.  I ran for sheriff in '06

1 against -- it was myself and the chief that
2 was in Moundville is the sheriff now.  Him and
3 I ran against each other, the one -- the guy I
4 work for now.  And so when that -- when he
5 won, I just kind of went up there and applied
6 for his job and got -- you know, took his job.
7    Q.  All right.  He had been chief at
8 Moundville?
9    A.  He had.
10    Q.  What's his name?
11    A.  Kenneth Ellis.
12    Q.  He's still sheriff; right?
13    A.  Yes, sir, he is.
14    Q.  And then you went to work for him
15 in '16?
16    A.  Yes, sir, I think it was October
17 of '16, yes, sir.
18    Q.  All right.  Why?
19    A.  Because I was fired from
20 Moundville Police Department.
21    Q.  Why were you fired?
22    A.  Well, that's a good question.
23 There was many accusations, but I don't know

1 the exact reason.  I guess just they didn't
2 need me anymore.  They were headed in a
3 different direction.  I really -- they never
4 really offered me an explanation at the end.
5    Q.  Who was the mayor?
6    A.  Tony Lester.
7    Q.  Is he still there?
8    A.  Yes, sir.  Yes, sir, he is.
9    Q.  He never told you directly why?
10    A.  In the beginning -- in the
11 beginning he made some accusations of some
12 things.  And then he -- but at the end when we
13 actually had the due diligence for them to
14 have the two-thirds vote, there was nothing
15 offered.  It was just kind of, you know, my
16 attorney said -- had some things to say.  They
17 didn't have anything to say.  Then they took a
18 vote and that was it.
19        So I don't really -- in answer to
20 your question -- to fairly answer your
21 question, I have no -- I don't know why.  I
22 know there were some accusations, but I don't
23 know why in the end --

1    Q.  What have you heard?  And I
2 sympathize with what you're saying because
3 when a girl breaks up with you, you don't know
4 why.  You just know it's over.
5    A.  Yes, sir.
6    Q.  What did you hear?
7    A.  What I can offer you is originally
8 when I was called into the mayor's office, he
9 stated I had forged a document.  And when I
10 rebutted that, then I was sent home on leave.
11 And then, you know, all -- everything else
12 took place and they had a -- they had an audit
13 at the office by some sheriff out of Kentucky.
14 And I mean, you know, it was just a whole
15 big -- I want to use the proper word, but it
16 was just a whole messy thing.
17        And then, you know, they set the
18 due diligence here, what I call it, the
19 hearing to go before the mayor and the
20 Council.  And of course I was there and
21 present.  They didn't mention any -- any
22 reason.  They didn't say this is why or
23 anything like that.  We just had -- you know,

1  we had our say and I was basically there
2  anyway to clear my name because I knew my job
3  was futile.  It was futile at the first four
4  years.  I wasn't trying to do that.  I was
5  just trying to clear my name from things that
6  had been said, so -- but nothing was said and
7  they took a vote and they decided to go in
8  another direction, and so here I am.
9      Q.   What was the document?
10     A.   It was a -- it was a reserve -- a
11  test, so to speak, that the reserves took to
12  say they could be reserves.  It's -- I don't
13  even know how -- it's just like a two or three
14  little page test that they tested.  And the
15  document that he had, which I only looked at
16  it for this long, I mean, I was never afforded
17  the opportunity to look at it.  Well, you
18  forged it and, you know, blah, blah, blah.
19  But I do know that it was a -- it was a test
20  for the reserves, some kind of aptitude test
21  or -- you know, I didn't handle the reserves.
22  The assistant chief handled the reserves, so
23  it was an aptitude type, you know, test can

1  you do good as a reserve type thing.  That's
2  what that was.
3      Q.   What was the allegation, that --
4      A.   The allegation was --
5      Q.   -- you signed somebody's name --
6      A.   Yes, the --
7      Q.   -- or took the test.
8      A.   The allegation was that I had
9  forged the document.  And I know that sounds
10  crazy, but beyond that, I don't know.
11     Q.   Okay.
12     A.   I didn't see it again other than
13  that first day when I was suspended.  I didn't
14  get to see the document again.  They didn't
15  show it to me in the hearing or the due
16  diligence hearing or anything, so I don't
17  know.  I mean, I did get -- I did have it in
18  my hand in that office and looked at it but,
19  you know, I don't know what he was insinuating
20  I forged or whatever.  But that was the case.
21     Q.   Was it discussed in the hearing?
22     A.   No.
23     Q.   How many police officers were

1  there when you were chief?
2      A.   At maximum, we had -- at one time
3  we had eight, I had eight maximum.
4      Q.   You say you left in October of
5  '16.
6      A.   September.
7      Q.   Okay.  September of '16.
8      A.   Yes, sir.
9      Q.   And you went to work for the --
10     A.   Sheriff's office.
11     Q.   -- sheriff's office in October?
12     A.   That's correct.
13     Q.   After October, did you learn about
14  personnel changes at Moundville?
15     A.   Like the new chief and that kind
16  of thing?
17     Q.   Anything.
18     A.   Oh, yeah.  Yeah.  I mean, it's a
19  little, small county.  Yeah, of course we
20  knew.  They got a new chief, new assistant
21  chief, new officers.
22     Q.   All right.  Tell me, if you can,
23  who worked in the Moundville Police Department

1  in January of 2017 when the Mitchells were
2  killed.
3      A.   That I know for a fact --
4      Q.   Right.
5      A.   -- you know, I'm not going to
6  guess.  I know they hired a new Chief Banks.
7  No, scratch that because I don't -- I can't
8  remember if he was there yet or not.  Keith
9  Burch.
10     Q.   Spell that for me.
11     A.   B-u-r-c-h.  K-e-i-t-h, B-u-r-c-h.
12  He was the assistant chief.  He was the acting
13  chief, but I cannot remember when they hired
14  the chief so I don't want to say that without
15  being very sure.
16     Q.   Was he your assistant chief?
17     A.   He was, yes, sir.
18     Q.   Okay.
19     A.   Timothy Dillard.
20     Q.   All right.
21     A.   Lamarcus Mayes.
22     Q.   Is that M-a-y-s?
23     A.   M-a-y-e-s.  Daniel Pence.

1    Q.  P-e-n-c-e?
2    A.  Correct.  And Tommy Muckenfuss.
3    Q.  Help me out.
4    A.  M-u-c-k-e-n-f-u-s-s.
5    Q.  So you're sure of these five?
6    A.  I'm sure of those five, yes, sir.
7  But I'm not sure -- because, you know, I
8  didn't -- there's a lot of animosity there, so
9  I didn't really -- I wasn't on the inner
10 circle --
11   Q.  Sure.
12   A.  -- of what was going on.  It's
13 just everything I heard on the outside was --
14 but I'm sure they were there because they were
15 there when I was there and I know they were
16 still there, so -- now, they were employed
17 there.  I don't know if they had anything to
18 do with any part of what you asked me.  They
19 were employed with Moundville at the time.
20   Q.  Did any of these other four hold
21 any rank?
22       MR. GAILLARD:  Are you asking at
23 the time of January 2017 or --

1    A.  Yeah.
2    Q.  (BY MR. MCCULLEY:)  Yes.
3    A.  Other than Burch, I don't think
4  anybody held any rank other than Chief Burch.
5    Q.  Were these guys all there when you
6  were there?
7    A.  Yes.  Timothy Dillard was there a
8  very short time after I arrived.  Yeah, they
9  were all there when I was there.
10   Q.  Did they hold any rank while you
11 were there?
12   A.  No, other than Chief Burch.
13   Q.  Okay.  And you said the maximum
14 size while you were there was eight?
15   A.  Yeah.  I think at one point
16 between 2006 and '16, I had had eight
17 employees at some point but I can't remember
18 when and I don't -- you know, things were so
19 fluid and changed.
20   Q.  Were some of them part time?
21   A.  We cut out part time in probably
22 2011, so I don't think after that we ever had
23 any part time.  And I'm sure I'm forgetting

1  someone who worked there, but I can't -- my
2  mind is -- you know, it's so hard to --
3    Q.  Sure.  Who was the -- while you
4  were chief --
5    A.  Yes, sir.
6    Q.  -- who was the custodian of
7  evidence for your department?
8    A.  That would have been myself.  That
9  would have been the chief.
10   Q.  Okay.  Did you have a safe or a
11 lockbox or something?
12   A.  We had a -- at one time Moundville
13 had a jail.  And when that jail closed, we
14 took that jail.  So there was three
15 independent cells and we took that and used
16 that for evidence.
17   Q.  Sure.
18   A.  So it had a big metal door on it
19 and cell doors.  And then inside each one had
20 a little locker for each officer.  So that's
21 how that was -- and if they needed something,
22 you know, I had the key.  We got the evidence
23 out and --

1    Q.  You had the only key?
2    A.  I did have the only key, yes, sir.
3    Q.  Okay.  But they had separate areas
4  inside?
5    A.  They did.
6    Q.  Okay.
7    A.  They did.
8    Q.  But in order to preserve the chain
9  for evidentiary purposes, you kept the only
10 keys?
11   A.  Yes, sir.
12   Q.  Okay.  Describe for me the
13 physical facilities of the police department,
14 and the question I have written down to ask
15 you is, did you have an office?  But I'd
16 really like a little more than that.
17   A.  Okay.  We had the old library, so
18 the physical -- it was in the corner of the
19 city hall, attached to the city hall, a part
20 of the city hall.  When you came into our
21 department, to the right was my office.  Then
22 there was a small clerk's office, Ms. Sparks.
23   Q.  Is that a police clerk?

1    A.   That is a police clerk, yes, Ms.
2  Sparks.  There's a records room behind her or
3  a file room, let me say that.  And then to the
4  left were officers' little cubicles.  Then I
5  had an assistant chief's office and a
6  sergeant's office.
7    Q.   Okay.  Who was the sergeant?
8    A.   Well, I had a couple.  At one time
9  Landry Donaldson was a sergeant.  And before
10  that Jason Hughen I believe was the sergeant.
11    Q.   Spell his last name for me.
12    A.   H-u-g-h-e-n.
13    Q.   Okay.  This policy and procedure
14  manual that you read before you came today, is
15  that the only manual that you had at the
16  police department?
17    A.   Well, that -- like I said, some of
18  that, yes.  That is the basic layout and type
19  of manual that we had and we run off
20  directives, you know, where we may -- I may
21  put out a directive that would count as
22  overridden or -- you know, we -- that's how we
23  ran the department is by directive --

1    Q.   Okay.
2    A.   -- so --
3    Q.   Because they were more responsive?
4    A.   Well, sometimes things you have to
5  do now.  You know --
6    Q.   Right.
7    A.   -- sometimes -- or sometimes
8  things have to fluidly change because
9  something might not be -- something might have
10  changed legally or whatever, so you have --
11    Q.   Right.
12    A.   -- to make sure that's known.
13    Q.   Who drafted this?
14    A.   I'm not sure.  I don't know who
15  drafted that.  I'm not really sure.
16    Q.   Do you know if it was drafted by a
17  police department employee?
18    A.   I don't.
19    Q.   Do you know whether it was drafted
20  by a member of the city council?
21    A.   I don't.  I can't say.  I didn't
22  draft it so -- I mean, I didn't physically
23  write that -- write that manual for the police

1  department.
2    Q.   Who's responsible for changes to
3  it?
4    A.   Well, you know, at the time if
5  there was any changes in the police
6  department -- let me say this, if there was
7  any changes in the police department, it
8  should have been my responsibility to do that.
9    Q.   So if there were changes, you
10  would have made them?
11    A.   Not necessarily.
12    Q.   Who would have made them?
13    A.   Well, I mean, the mayor could have
14  made a change.  I mean, he has the authority
15  to make a change.
16    Q.   Right.
17    A.   I'm assuming attorneys could have
18  made changes in it, but --
19    Q.   But if they do that, you'd know,
20  as chief?
21    A.   I'm suppose to, yes, sir.
22    Q.   All right.
23    A.   That should be something that I'm

1  supposed to know.
2    Q.   Is there a police commissioner on
3  the city council?
4    A.   I don't think there's any -- I
5  don't know how they officially handled that.
6  At one time there was a police committee and
7  it had like a couple of council members on it.
8  They changed -- it changed from time to time,
9  but I don't know what the official -- I don't
10  know if they officially had a police
11  commissioner or a police just for that.
12        They had one for the fire
13  department and one for the street -- a couple
14  for the street department that handled, I
15  guess, you know, things that needed to be
16  handled if you had to go to somebody.
17    Q.   With whom on the council did you
18  have the most direct contact?
19    A.   I had contact -- at one time I
20  probably had contact with all of them.  I
21  don't think I directly had just one council
22  member that I went to.  You know, there were
23  several of them.  Just depending on the

1 problem or what the situation was may have
2 been the one I approached. I don't -- you
3 know, I --
4    Q. Did you interact more with Mayor
5 Lester?
6    A. Yeah. Yes. Yes, sir. Of course,
7 you know, I answered to him directly. He was
8 over day-to-day operations. You know, if
9 you're -- yes, I had -- I -- when I had
10 something going on or something was going to
11 be put to me or put to change or whatever,
12 yes, I would go through the mayor.
13    Q. Right. And was he mayor when you
14 left?
15    A. He was, yes, sir.
16    Q. Tell me again why you left.
17    A. I was fired in September of 2016.
18    Q. And who's chief there now?
19    A. Toby Banks.
20    Q. Does he use some version of this
21 manual now, to the best of your knowledge?
22    A. I assume he does, yes, sir.
23    Q. Okay.

1    A. I can't say that for sure because
2 I don't have any part of the inner workings,
3 but I'm sure he does.
4    Q. What do you know about the
5 investigation into the Mitchell's murders?
6    A. Zero. I've never had -- I don't
7 know any -- I've never had any kind of
8 dealings with the investigation whatsoever. I
9 didn't -- I don't -- you know, I don't have --
10 I don't know any of the official stuff. I've
11 never seen any of the official stuff other
12 than these documents that we're discussing
13 now. I don't know who did what other than
14 maybe seeing them on TV or just knowing that,
15 you know, he took the pictures or what because
16 I didn't know that, but --
17    Q. Did you go to the scene?
18    A. No, sir.
19    Q. Do you know who ran the
20 investigation?
21    A. I -- see, that's the -- I can't
22 remember if -- let me say this. If Chief
23 Banks was there at the time, then he would

1 have ran the investigation. But I cannot for
2 the life of me remember if he was there in --
3 I don't want to put him there if he wasn't
4 there and I can't remember when they hired
5 him. Because it was -- you know, a couple of
6 months they went through the process, so I
7 can't remember but I'm believing he was. I
8 believe he was there, Chief Banks.
9    Q. Okay. And I understand you don't
10 know who ran the investigation.
11    A. No, sir, I do not know who ran the
12 investigation for sure.
13    Q. But you believe that Moundville --
14    A. Well, I would believe that because
15 it was in their jurisdiction and, you know,
16 that would be --
17    Q. Okay. And if not Toby Banks, then
18 we would guess Keith Burch; right?
19    A. Yes, that would be -- yes, that
20 would be a good assumption because he was
21 acting chief or whatever. I don't know if
22 they actually officially made him acting
23 chief, but he was doing that capacity.

1    Q. So in Hale County, the sheriff
2 allows a city police department to
3 investigate?
4    A. Well, now with that being said,
5 the sheriff's department had some part in
6 that, but I don't know. You asked me
7 infinitive, definite, but I don't know. I
8 know that the sheriff's investigator was
9 there. I know that. But to what extent that
10 he had -- you know, and I can't say that the
11 sheriff's department led the investigation
12 because I don't know that.
13    Q. Sure.
14    A. I've never seen anything to do
15 with that.
16    Q. Well, I'm just going on my
17 experience.
18    A. Right. Right. You know, our
19 sheriff -- our sheriff allows -- he doesn't
20 step on toes. He offers his assistance as
21 help, whatever we can do. But he's never
22 going to go in and say, hey, that's mine.
23 He's not going to do that especially if those

1 people are capable. I mean, he's just not
2 going to do that, you know.
3    Q. Okay.
4    A. You know --
5    Q. That would have been Sheriff
6 Ellis?
7    A. Yes, sir.
8    Q. And who was the investigator, if
9 you know?
10    A. Lieutenant Jeames.
11    Q. Spell that.
12    A. Or at the time -- it may have been
13 Sergeant Jeames at the time. I don't
14 remember. Jeames, J-e-a-m-e-s.
15    Q. Is he still with the sheriff's
16 department?
17    A. He is. He's a lieutenant with the
18 sheriff's office, yes.
19    Q. Based on what you've told me --
20    A. Yes, sir.
21    Q. -- some of my next questions
22 aren't going to make any logical sense.
23    A. Yes, sir.

1    Q. But I'm going to ask them
2 anyway --
3    A. Sure.
4    Q. -- because we're taking testimony.
5    A. Yes, sir.
6    Q. Do you agree that Brad Gray shot
7 and killed Paige and Kaci Mitchell?
8      MR. GAILLARD: Object to the form
9 of the question. You can answer.
10    A. Yes.
11    Q. (BY MR. MCCULLEY:) Do you agree
12 that Gray killed Paige and Kaci Mitchell using
13 a pistol that the Moundville Police Department
14 had confiscated and later returned to him?
15      MR. GAILLARD: Same objection.
16    A. No, sir, I don't agree, they
17 didn't confiscate it. But I do agree that the
18 pistol was used, to my knowledge. I don't
19 know that for a fact, but I don't -- I don't
20 believe it was ever confiscated. That term --
21 I'm not saying --
22    Q. Okay.
23    A. -- we -- I'm not saying they

1 didn't have it in their possession. But it
2 wasn't confiscated. That's kind of an
3 official term, whereas we filled -- I mean --
4    Q. Tell me about that distinction
5 that you're making in your mind.
6    A. The distinction I'm making in my
7 mind is that when -- if an arrest is made and
8 the weapon is not used as evidence, the weapon
9 is not being condemned or confiscated, it's
10 not on the person of the person being
11 arrested, you know, if it's taken from a house
12 or something like that via warrant, then we
13 can -- then that's what I consider to be
14 confiscated.
15    Q. All right.
16    A. The distinction is if we just take
17 the weapon for safekeeping because we arrested
18 someone, we either don't want the weapon to
19 get stolen or we don't want -- you know, we
20 don't want a rifle sitting outside if we
21 arrest somebody that's hunting. So that
22 weapon is taken into custody but it's not
23 necessarily confiscated or moved upon legally

1 in the court to keep it.
2    Q. Okay. All right. Do you know
3 whether the pistol that Gray used to kill
4 Paige and Kaci Mitchell was ever in the
5 custody of the Moundville Police Department?
6    A. That's an -- let me say this. How
7 can I put this? I'm not sure -- yes, there
8 was a pistol taken from Brad Gray that was in
9 custody of the Moundville Police Department at
10 one time, but I'm not sure if we're talking
11 about the same pistol, so it's hard for me to
12 distinguish whether the pistol you're
13 referring to killed her was the same pistol
14 that we had in custody.
15      Yes, we did have a -- there was a
16 pistol of some kind that was in custody from
17 an arrest they made with Brad, yes. That -- I
18 agree with that, but I don't know if it's the
19 same pistol. I want to clarify that because I
20 never -- nobody has ever showed -- I don't
21 know. I wasn't privy to the investigation.
22 All I have is just what I've read and what
23 someone said, you know, what, you know,

1 someone said about it.

2 Q. Okay. Then you would agree that
3 at some point in time a pistol was taken from
4 Brad Gray into custody?

5 A. I would -- I would agree that a
6 pistol was taken from Brad Gray's property and
7 placed in custody of the Moundville Police
8 Department, yes, sir.

9 Q. And you would agree that it was
10 returned to him?

11 A. I would agree with that, yes,
12 sir --

13 Q. Okay.

14 A. -- it was.

15 Q. All right. Do you know when it
16 was taken from him?

17 A. It was taken -- to the best of my
18 knowledge, the time of arrest --

19 Q. Is it in there (pointing)?

20 A. -- would have been I believe July
21 of 2015.

22 Q. All right.

23 A. Let me make sure. (Reviewing

1 document.) Yeah, it looks like July of 2015.

2 Q. Okay. And can you tell from any
3 of these documents or do you know when it was
4 returned to him?

5 A. I do. It was returned probably
6 the second week of August of 2015. That's a
7 rough guesstimate, but, yeah, it's right in
8 there within a few days.

9 Q. So it's your testimony that it was
10 returned to him prior to his conviction?

11 A. Yes, sir.

12 Q. Who returned it to him?

13 A. That was me. I did.

14 Q. Who arrested him?

15 A. It looks like Lamarcus Mayes,
16 Officer Mayes. He got the warrant. He did
17 the deposition, so it looks like he arrested
18 him. He also did the initial incident/offense
19 report, it appears.

20 Q. You didn't arrest him?

21 A. No, sir.

22 Q. Okay. When did you learn that he
23 had been arrested?

1 A. I don't remember an exact date,
2 but what -- as far as the arrest. But I was
3 in the store when I came back from conference,
4 a day or two after I had come back from
5 conference and he was in there and he was very
6 boisterous and loud. He was very angry that
7 they had taken a pistol from him out of his
8 house. He was arrested outside. They went in
9 his house and got the pistol. He was very
10 angry that they done that, said they didn't
11 have the right to do that and, you know, I'm
12 going to sue you and blah, blah, blah. And,
13 you know, I had to calm him down, told him,
14 look, let me check into it, let me see what's
15 going on and we will rectify the situation,
16 whatever that may be. So that's how it
17 started. That's how...

18 Q. And how long was that after his
19 arrest?

20 A. That date was -- the reason I
21 remember is because I had just come back from
22 conference in August, and I had come into the
23 store to get -- this is going to sound stupid,

1 but I missed the coffee. The coffee down on
2 the beach is all terrible. So that's how I
3 remember that. He came in -- I can even tell
4 you, it was probably around nine o'clock in
5 the morning because he worked for a company
6 that came in that store every morning. All
7 those guys come in about 9:00 in the morning
8 on break. And so there was a line of those
9 guys there and that's when he went to, you
10 know, raising Cain with me.

11 So that's when I kind of started
12 looking at what happened because I wasn't
13 aware of every arrest that was made.

14 Q. Sure.

15 A. But that's when I kind of started
16 looking into what it was and what happened and
17 how -- you know, how it went down.

18 Q. Can you tell me about how long
19 after the arrest that was?

20 A. After the arrest?

21 Q. Right.

22 A. He was arrested in July and this
23 was August. I don't know, a month?

1    Q.  Okay.
2    A.  Maybe.  You know, something close,
3 but I can't give you an exact date.
4    Q.  So he was still hot about it a
5 month later?
6    A.  Oh, yeah.  Yeah.  And, you know,
7 he was hot before that.  He just didn't get to
8 me, you know.
9    Q.  In that investigation Paige
10 Mitchell made a statement.  Did you go through
11 that file at some point?
12    A.  I'm sure I did.  I can't sit here
13 and say, yeah, I remember, but I'm sure I did.
14 When I was looking into, you know, what the
15 situation was, this would have been the way I
16 would have found out.
17    Q.  And you wouldn't have had the
18 court records, but you would have had the
19 police department --
20    A.  Right.
21    Q.  -- records --
22    A.  Right.
23    Q.  -- right?

1    A.  Just the police report and, you
2 know, talked to the assistant chief or talked
3 to whoever it was that I might have talked to
4 and just kind of get the story, find out
5 what's going on.
6    Q.  And that would have been in
7 August, early August?
8    A.  Yes.  Well, middle of August.
9 Yes, sir.  Yes, sir, that would have been.
10    Q.  To the best of your knowledge, was
11 Lamarcus Mayes there by himself?
12    A.  To the best of my knowledge, Mayes
13 was there by himself, according to the
14 paperwork.  Now, Landry Donaldson ended up
15 with the pistol because I actually got it back
16 from him.  Now, how that --
17    Q.  You got it back from Landry
18 Donaldson?
19    A.  He -- I went to him, yes.  Let me
20 tell you how -- let me explain this.
21    Q.  Okay.  Do, please.
22    A.  When I looked at this, I had some
23 real concerns about the way we took the

1 pistol.  All right.  The pistol was in the
2 house.  We went in the house.  It's basic
3 police stuff, no search warrant.  You can't --
4 you know, we already had situations going on
5 prior to that with lawsuits, so I disagreed
6 with the way they took the pistol.  So, in
7 other words, we didn't have any legal reason
8 to keep the pistol.  There was zero legal
9 reason to keep it.  It wasn't taken off of
10 him.  It wasn't used as evidence.  It wasn't
11 being confiscated.  So they didn't have a
12 legal reason to keep it.
13        So that's -- when I say I got it
14 back from Landry, that's how it was returned.
15 It had to come from him.  And he was --
16    Q.  Where did he have it?
17    A.  I don't know.  He just -- he just
18 brought it and gave it back to me.
19    Q.  To your knowledge, it wasn't in
20 the lockup?
21    A.  No.  To my knowledge, it was not
22 in the lockup.
23    Q.  At that point in time, was your

1 department permitting officers to patrol solo?
2    A.  I'm sorry.  Do what?
3    Q.  Were they permitted to patrol solo
4 or their shift solo without another officer?
5    A.  Yes.  Yes.
6    Q.  Okay.
7    A.  Yes.
8    Q.  But was it also common for two to
9 be on duty at the same time?
10    A.  It was.  It was sometimes more
11 than that.  You know --
12    Q.  Sure.
13    A.  -- it's a small place and
14 sometimes guys just worked over just so they
15 could work over, you know.
16    Q.  Sure.
17    A.  Yeah, it's common.  They're -- you
18 know, and I don't -- you know, I would sit
19 here and tell you, but I don't know for a fact
20 if Donaldson was on the scene or not at the
21 time of the arrest.  I don't know that.
22    Q.  Do you know who went in the house?
23    A.  According to this report right

1 here, it was Mayes.

2    Q.  I want to make sure I get this

3 point. It's your testimony here today that

4 the pistol was not evidence in that

5 misdemeanor that --

6    A.  That's correct, that they never

7 used it as evidence. They never used it as --

8 they never tried to confiscate it at all. My

9 understanding was the pistol was taken because

10 it was laying there and they didn't want

11 nothing to happen to it.

12    Q.  And it's your testimony that it

13 wasn't in the City's lockup for evidence?

14    A.  No, that is not my testimony,

15 because I'm telling you, my testimony is I

16 don't know.

17    Q.  Well, if you had the only keys to

18 the evidence lockup, wouldn't you know if

19 that's where it came from?

20    A.  I would.

21    Q.  Okay. Fair enough.

22    A.  My assumption is that the weapon

23 came out of Landry's office if you're looking

1 for where it was brought from. I didn't see

2 him bring it from there, but I'm assuming

3 that's where it was.

4    Q.  Where does Landry Donaldson live?

5    A.  Where does he live?

6    Q.  Yes.

7    A.  In Moundville.

8    Q.  Okay. Is he still on the police

9 department?

10    A.  He is. He came back. He went to

11 the sheriff's office for a while and then he

12 came back or went back.

13    Q.  Did you ask him to bring you the

14 gun?

15    A.  Yeah. Yeah. I mean, I don't know

16 my exact wording, but, yeah, I'm sure I did.

17 Because at the point when I decided that we

18 had not -- we didn't have any legal reason to

19 keep it and we had -- and, you know, that was

20 really a gray area whether we even took it

21 legally or not to start with. That was really

22 a concern of mine because I -- you know, a

23 fellow that's trying to hold onto his job

1 anyway, I didn't need a lawsuit.

2    So after I looked at it, and as

3 the chief of police I made the determination,

4 hey, you know, we don't have any legal reason

5 to keep the gun, none. So we returned it.

6    Q.  Do you know where the -- I think

7 Brad Gray was charged with harassment, DV?

8    A.  Yes, sir, third.

9    Q.  Do you know where that happened?

10    A.  Other than just reading the

11 report, I don't. It looks like she was at Mr.

12 Gray's residence. It happened at his home.

13    Q.  Was that about a car?

14    A.  Yes, went to residence to get her

15 vehicle and other belongings, yes, sir.

16    Q.  Do you recall whether he used the

17 pistol in the commission of that offense?

18    A.  I don't.

19    Q.  Is there anything in that --

20    A.  There is. It states in here that

21 he was in possession of a pistol at the time

22 and had it in a holster and kept saying he was

23 going to harm her.

1    Q.  Okay. And that's her statement;

2 right?

3    A.  That's her -- well, Officer Mayes

4 wrote it in the deposition. So is it her

5 statement? I think there's one -- see if that

6 says the same -- yes, she signed it, but

7 Officer Mayes wrote it.

8    Q.  So there was a pistol used?

9    A.  No, there was -- he was in

10 possession of a pistol.

11    Q.  Right.

12    A.  It doesn't say anything about him

13 using it to do anything.

14    Q.  It sounds like what happened was

15 that he was able to put it in the house before

16 the police got there.

17    A.  I'm not sure.

18    Q.  I mean, that would explain that,

19 wouldn't it?

20    A.  It's possible, yeah. I mean, he

21 could have put his pistol in the house.

22    Q.  And Donaldson or Mayes may have

23 felt justified in going in and getting it?

1    A.   Yeah.  And I'm not saying that
2  they -- you know, I'm certainly not saying
3  that they didn't feel justified.  I'm saying
4  what's legal and what's not.
5    Q.   Right.
6    A.   And as a chief, you know, that's
7  all I can determine.  I don't have the luxury
8  of saying I don't think he ought to have it or
9  I think he ought to have it.
10    Q.   I'm right there with you.
11    A.   Once I find out about it, I have
12  to handle it.
13    Q.   I'm right there with you.  I'm
14  just wondering in my mind whether there may
15  have been -- and I don't know there's a
16  question here.  I'm just -- do you think it
17  could have been evidence?
18      MR. GAILLARD:  Object to the form.
19    Q.   (BY MR. MCCULLEY:)  Yeah.  Let me
20  just restate that.  Do you think the pistol
21  could possibly have been used as evidence?
22    A.   It was never --
23      MR. GAILLARD:  Same objection.  Go

1  ahead.  I'm sorry.
2    A.   It was never booked in though.
3    Q.   (BY MR. MCCULLEY:)  Okay.
4    A.   So my assumption would be no.
5    Q.   Did you have a list of evidence
6  that's booked in?
7    A.   Yeah.  They have a audit list they
8  kept per -- per officer.
9    Q.   If they had put it on the list and
10  put it in the lockup, would that have changed
11  your mind about whether it was evidence?
12    A.   Not necessarily, no, sir.  I mean,
13  based on the -- based on the information that
14  I had at the time and based on -- because the
15  whole situation was based on the way that they
16  got the pistol.  If we want to get evidence
17  inside somewhere, if we want to get evidence,
18  we get a search warrant.  We don't walk in and
19  get it.  That's just not -- we cannot do that.
20  And that draws a whole bunch of ire in the
21  police department when you start doing things
22  like that.
23      So, you know, that was my main

1  concern was with Brad fussing like he was, he
2  had a valid point that they had no reason to
3  go in his house and get his pistol.  He didn't
4  have it on him when they arrested him.  And
5  even though someone accuses you of something,
6  it's not a conviction.  So I have to weigh in
7  on all of that as well.  Just because someone
8  accuses you of doing something doesn't mean
9  you can't.  And it's not illegal for him to
10  have a pistol in a holster on his side on his
11  property.  So I had to take all of that into
12  question when I made my decision.
13    Q.   Now, I may have asked you this
14  before.
15    A.   Yes, sir.
16    Q.   I did.  You said that you're in
17  charge of evidence.
18    A.   Yes, sir.
19    Q.   Or were.
20    A.   Were.
21    Q.   If you'll look one more time --
22    A.   Sure.
23    Q.   -- at that court record --

1    A.   Sure.
2    Q.   -- when was he convicted of
3  domestic violence?
4    A.   Let me look.  Is that in here?
5  (Reviewing document.)  Is that what I'm
6  looking for?  8 September; is that right?
7      MR. GAILLARD:  2015.
8    A.   2015.
9    Q.   (BY MR. MCCULLEY:)  Were you in
10  court then?
11    A.   I was not.
12    Q.   When did you learn about this, his
13  conviction?
14    A.   I don't know that -- I don't know
15  that I did.  I don't know that I did learn of
16  his conviction.  You know, it happens a lot.
17  We don't -- I mean, I don't necessarily track
18  every case especially if it's not eventful.
19    Q.   Who would have been the police
20  officer that appeared to testify?  Would that
21  have been Mayes?
22    A.   Yes, it would have been.  He did
23  the affidavit -- I mean, the deposition.  He

1 did the --
2    Q. Do you know whether he was in
3 court when Gray pled guilty?
4    A. I don't know that for sure. And
5 I'll tell you something, he was probably
6 there.
7    Q. Why do you say that?
8    A. Well, because I mean, we get a
9 subpoena if something is going on, so I'm just
10 saying he's probably there.
11    Q. But you don't get --
12    A. But he doesn't -- we don't
13 necessarily -- to be honest with you, we don't
14 necessarily have to agree with these plea
15 agreements. You know, sometimes they're done.
16    Q. Do Moundville police officers go
17 for every defendant's appearance whether it's
18 a trial or a first appearance or whatever?
19    A. At the time that I was chief, we
20 only -- we only went to court when we were
21 subpoenaed or called by the ADA and said, hey,
22 you need to be there tomorrow.
23    Q. Okay.

1    A. Whether that happened in this
2 case, I can't say.
3    Q. Right. And you don't know whether
4 you found out about the conviction until you
5 got sued --
6    A. Right.
7    Q. -- right?
8    A. I can't honestly say that I knew
9 even -- that he was even convicted at all of
10 that.
11    Q. Do you know if the department,
12 when you were chief, had any policy or
13 procedure for tracking cases in the district
14 court after y'all made them?
15    A. No, it was -- no, sir, there was
16 no policy. It was -- it was understood by
17 meetings and that kind of thing that you
18 followed up on your cases. You need to know
19 what happened because if you don't, you know,
20 I would always explain to the officers that it
21 will be gone in the by and by, you know, if
22 you don't keep up with your cases.
23      Tracking of the case as far as

1 physically tracking the case through court, we
2 did not. It was each officer's responsibility
3 to follow up on their cases and know what
4 happened and what the disposition of the case
5 was.
6    Q. Each officer?
7    A. Yes, each officer that had a case
8 followed --
9    Q. You think this is Mayes' case?
10    A. Well, this particular -- this
11 particular incident as I'm looking at it here
12 is Mayes' case, absolutely. It's a -- it's a
13 DV 3 harassment arrest. That's kind of a
14 common thing nowadays, back then as well.
15 And, yeah, it appears to me that he made the
16 arrest, that he got the warrant and filled out
17 the deposition for the clerk. It appears like
18 he did the initial IO, so this would be his
19 case.
20    Q. But you knew in August of 2015
21 that Gray had been charged with domestic
22 violence?
23    A. Yeah, I found out when he --

1    Q. When you got back?
2    A. Yeah, when he was fussing at me
3 about that gun.
4    Q. And you knew at that time that the
5 case was pending?
6    A. From that point on, yes --
7    Q. Right.
8    A. -- of course I did.
9    Q. But you didn't follow up to see
10 whether he was convicted or turned loose or
11 whatever?
12    A. I didn't because there was other
13 things that happened in between that time in
14 there, you know, just -- I just didn't follow
15 up with it.
16    Q. What things?
17    A. Just -- just, you know, police
18 life, things that went on and I just didn't
19 follow up on the case.
20    Q. Unrelated to this?
21    A. Unrelated to that.
22    Q. Okay.
23    A. Plus it was another officer's case

1 to follow up on. So if there would have been
2 any question, I would have just went to that
3 officer.
4     Q. Is that in this manual, that it's
5 his job to follow up with it, this police
6 procedure manual?
7     A. I don't know if it's in that
8 manual or not. But we didn't have anything to
9 my knowledge at the time, unless it was in
10 place before I came. And, you know, I just
11 have to be honest. There was nothing in there
12 that said we followed up on cases. It was by
13 directive or via meeting, you know, just, hey,
14 this is the way we need to do things.
15     Q. I guess y'all had your fair share
16 of domestic violence cases?
17     A. Yes, sir.
18     Q. Was anybody else involved in the
19 discussion about the return of the gun other
20 than you and Landry Johnson?
21     A. Donaldson.
22     Q. Donaldson.
23     A. Say that again. Was there anybody

1 else involved in the returning of it or --
2     Q. In the discussion about the
3 returning of the gun. I know that you were
4 involved and Landry Donaldson --
5     A. Well, I'm sure I discussed it with
6 probably the assistant chief. And I'm not
7 sure if I discussed it with Mayes or not
8 because it was not in his possession, but I'm
9 sure I did.
10     Q. What about the mayor?
11     A. No.
12     Q. No?
13     A. No. He wouldn't have had anything
14 to do -- I mean, you know, he wouldn't have
15 had anything to do with it.
16     Q. Did he ever talk to you about the
17 whole domestic violence arrest or any of that?
18     A. No.
19     Q. Okay. Did you ever consult him
20 about whether to return it?
21     A. No, sir.
22     Q. Have you ever asked anybody else
23 to return it?

1     A. No, sir.
2     Q. You know there are several state
3 statutes that apply to possession of handguns
4 by individuals convicted of domestic violence;
5 correct?
6     A. I'm aware of statutes, yes.
7     Q. Yes. Were you aware of them at
8 that time that you returned the handgun?
9     A. Specific statutes?
10     Q. Yeah.
11     A. At the time I returned the handgun
12 for that charge, there was no specific -- I
13 mean, there was no -- nothing in place that
14 said he couldn't get it back.
15     Q. There was no --
16     A. I mean, I don't know -- it's kind
17 of a broad question.
18     Q. Well, what we've agreed on
19 today --
20     A. Yes, sir.
21     Q. -- I think based on your --
22     A. Yes, sir.
23     Q. -- testimony is that you returned

1 it before he was convicted?
2     A. Yes, sir. Yes, sir.
3     Q. All right. And any state statute
4 would only apply to people who had
5 convictions; correct?
6     A. Yes, sir. I haven't refreshed
7 myself on that statute, but, yes, sir.
8     Q. Were you aware that there was a
9 scheme of state statutes that applied to
10 people who had been convicted of domestic
11 violence?
12     MR. GAILLARD: Object to the form.
13     A. At the time -- at the time that
14 we're discussing the pistol getting back, I
15 mean, of course from then on -- now I'm aware
16 of a lot now. But are we referring to the
17 time that the pistol was returned?
18     Q. Yes.
19     A. I was not aware of any statute
20 that would -- that would keep him from owning
21 a firearm. I don't -- I'm trying to answer it
22 right, but I don't --
23     Q. Okay. State or federal?

1    A.   State or federal.  If there was a
2  federal statute, I wasn't aware of it.
3    Q.   Okay.  And you didn't follow up on
4  the court case to see whether he was
5  convicted; correct?
6    A.   Correct.  Yes, sir.
7    Q.   And you don't know whether Mayes
8  or Donaldson followed up on the court case to
9  see whether he was convicted?
10    A.   I do not.
11    Q.   All right.  And the department --
12  I'm just trying to make sure I've got this
13  right.  The department has no policy itself to
14  follow up on the disposition of domestic
15  violence cases?
16    A.   At that time?
17    Q.   Yes.
18    A.   I wasn't aware of one.
19    Q.   Have you looked at the state
20  statutes since you got sued?
21    A.   I'm sure at some point I did.  I
22  can't recall the date, but I'm sure I did.
23  Well, I have to look at those statutes in the

1  course of my job all the time, so I'm sure I
2  have.
3    Q.   Right.  Do you contend that the
4  pistol that was returned to him is not covered
5  by the statute?
6        MR. GAILLARD:  Object to the form.
7    A.   Say that again.  I'm sorry.
8    Q.   (BY MR. MCCULLEY:)  The statute
9  talks about firearms.
10    A.   Right.
11    Q.   Do you contend that somehow the
12  pistol that was returned to him was outside
13  the statute?
14        MR. GAILLARD:  Object to the form
15  of the question.  If you understand it, you
16  can try to answer.
17    A.   At the time the pistol was given
18  back, that pistol nor Mr. Gray, the Moundville
19  Police Department nor myself had any legal
20  reason to keep it, if that's -- if that helps.
21  But there was no legal reason at the time the
22  pistol was returned to keep it.
23    Q.   Maybe I can narrow it down.  Do

1  you believe that pistol fits within the
2  definition of firearms contained in the
3  statute?
4        MR. GAILLARD:  Object to the form
5  of the question.  Which statute are we
6  referring to?
7        MR. MCCULLEY:  The state statutory
8  scheme.
9        MR. GAILLARD:  Okay.  And that's a
10  pretty broad statement.  Because even just the
11  criminal codes are full of a lot of statutes
12  or schemes.
13    Q.   (BY MR. MCCULLEY:)  Go ahead.
14        MR. GAILLARD:  So in fairness to
15  the witness, if we're asking --
16        MR. MCCULLEY:  Sure.
17        MR. GAILLARD:  -- about a specific
18  statute and how to define something --
19        MR. MCCULLEY:  Sure.
20        MR. GAILLARD:  -- you know, you
21  might want to let him look at it.
22    Q.   (BY MR. MCCULLEY:)  The state
23  statutory scheme that applies to individuals

1  that have been convicted of domestic violence
2  describes firearms and says they can't have
3  them.  Is there some reason you contend that
4  this pistol doesn't fit within that
5  definition?
6        MR. GAILLARD:  Object to the form
7  of the question.  Answer it if you can.
8    A.   I'm not sure that I understand the
9  question.  But I think what you're asking me
10  is that a firearm under the law -- under
11  that -- is that what you're asking me?
12    Q.   Exactly.
13    A.   Is that considered a firearm under
14  that domestic violence --
15    Q.   Yes.
16    A.   -- statute of a firearm?
17    Q.   Yes.
18    A.   Yes, that's a firearm, yes, sir.
19    Q.   All right.  Have you ever returned
20  any sort of weapon to someone who was arrested
21  and convicted?
22    A.   Have I ever -- have I ever
23  returned a weapon?

19 (Pages 70 - 73)

1    Q.   To someone who's been both
2 arrested and convicted?
3        MR. GAILLARD:  Object to the form
4 of the question.
5    A.   I mean, that's -- I can't answer
6 that.  I don't know what the -- have I ever
7 given a weapon back to someone that was a
8 convicted felon, convicted child molester?  I
9 mean, that's -- you know --
10    Q.   (BY MR. MCCULLEY:)  Yeah.
11    A.   -- any kind of conviction?
12    Q.   Yes, sir.
13    A.   Have I ever given a weapon back to
14 anybody --
15    Q.   Yes, sir.
16    A.   -- that had any kind of
17 conviction?  To my knowledge, no.  I mean, I
18 would have to say that because I don't recall
19 everybody that I've ever given --
20    Q.   All right.
21    A.   -- something back to.
22        MR. MCCULLEY:  Off the record.)
23        (Whereupon, a short break was

1        taken.)
2    Q.   (BY MR. MCCULLEY:)  Mr.
3 Robertson --
4    A.   Yes, sir.
5    Q.   -- we're curious whether the
6 change in the type font in this rules and
7 regulations manual from the police department,
8 page 1 through 45, are in some kind of Times
9 Font, Times New Roman --
10    A.   Uh-huh.
11    Q.   -- or something.
12    A.   Uh-huh.
13    Q.   And then this one is different.
14    A.   Yeah, I don't know what this is.
15    Q.   Do you think this was added?
16    A.   I -- yes.
17    Q.   Okay.
18        MR. GAILLARD:  When y'all say
19 "this", just for the record --
20        THE DEPONENT:  Yeah.
21        MR. GAILLARD:  -- we're referring
22 to the --
23        THE DEPONENT:  Yeah, we're

1 referring to the Moundville Police Department
2 Procedural General Order.
3    Q.   Page 46?
4    A.   Page 69, Ray versus Moundville 069
5 was the --
6    Q.   It's Bates stamped page 69.
7    A.   Yeah, Bates stamped.
8    Q.   Right.
9    A.   But from then on, it -- yes, it
10 does.
11    Q.   But you think the pages before
12 that were there when you were there?
13    A.   It's really hard to say just
14 without sitting down -- what this appears to
15 be is a -- is a copy -- this -- a lot of this
16 appears to be something that was never
17 enacted.  This appears to be something that
18 was -- we were working on over the years and
19 it was never -- the reason I say that is
20 because of the way it's laid out.  This was a
21 policy manual that we were -- that we were
22 working on.  I don't think it's ever been
23 voted on by the -- it may have been since I

1 left.  But at the time, I don't think so, but
2 that's what I'm going to say it was.
3    Q.   So you're saying you didn't use
4 this when you were chief?
5    A.   Right.  I mean, there may be some
6 things in here that are very similar to the
7 things that we used, but I can't say that I
8 used this (pointing).
9    Q.   But you still had policies --
10    A.   Yes, sir.
11    Q.   -- in your department?
12    A.   Yes, sir.
13    Q.   And you required your officers
14 to --
15    A.   Yes, sir.
16    Q.   -- follow them?
17    A.   There were policies, yes.
18    Q.   Okay.
19    A.   Pertaining to lots of different
20 things.
21    Q.   All right.  Well, the one I want
22 to ask you about is where you said that it was
23 each officer's job to follow up on their

1 cases.
2    A.  Right.
3    Q.  All right.  Did you follow up on
4 whether your officers were getting
5 convictions?
6    A.  (Witness shaking head negatively.)
7    Q.  Is that a no?
8    A.  That's a no.  Yeah, I'm sorry.
9 No.
10    Q.  Well, the reason I ask that again
11 it's based on my experience that supervisors
12 in law enforcement want to know if the patrol
13 officer's activity is productive.  In other
14 words, if you have an officer that's making a
15 hundred speeding arrests every week, you want
16 to know if he's getting convictions; right?
17        MR. GAILLARD:  Object to the form.
18    A.  Not necessarily.
19    Q.  (BY MR. MCCULLEY:)  No?
20    A.  Not -- not necessarily.
21    Q.  Okay.  Before you returned the
22 weapon that had been taken from Brad Gray, did
23 you talk to the City attorney?

1    A.  Before --
2    Q.  Before you --
3    A.  I did not.
4    Q.  Okay.  Did you talk to the
5 district attorney?
6    A.  I did not.
7    Q.  But you did read the arrest report
8 before you returned it to him?
9    A.  I'm sure I did, yes, sir.
10    Q.  Okay.  In the course of your
11 investigation, did you ask Mr. Donaldson why
12 he went in the house and took it?
13    A.  I'm not sure if I asked Mr.
14 Donaldson.  That question was asked and it was
15 told to me that -- just for safekeeping, just
16 so nothing would happen to it.
17    Q.  Who said that?
18    A.  It would -- it was either
19 Donaldson or maybe Assistant Chief Burch told
20 me that.  It's been five years.  I don't --
21    Q.  Maybe Mayes?
22    A.  Could have been, yes, sir.
23    Q.  Okay.

1    A.  That's fair, yes, sir.
2    Q.  But you asked the question?
3    A.  Yes, sir.
4    Q.  Okay.
5    A.  I mean --
6    Q.  Did you also ask, why do you have
7 it and not have it logged in as evidence?
8    A.  Well, at the time that I found out
9 what was going on, that's when I started
10 asking those questions.
11    Q.  Sure.
12    A.  So, of course, you know, why do we
13 have the gun?  Well, it's for safekeeping.  So
14 that would explain to me why you didn't put it
15 into evidence.  That would, you know --
16    Q.  So you didn't ask him that
17 particular --
18    A.  I didn't.
19    Q.  Okay.  Tell me why you remember so
20 well that you returned it to him in August
21 while that case was pending.
22    A.  Because of the eventful situation
23 that happened at that store.  You know, and I

1 knew -- like I said, there was just several
2 things that happened at that particular time
3 is why I remember that, you know, because he
4 was raising Cain in front of a bunch of people
5 in the store, you know, workers and stuff.
6 And I had to call him off to the side.  And I
7 know what time -- I mean, when it was because
8 I know when I got back from conference and I
9 know why I was in the store.  I mean, it was
10 just an eventful situation.  You know, can I
11 remember before that?  Probably not.  Or after
12 that, I don't know.  But that particular time
13 that's why, if you're asking me, that's the
14 reasoning why I remember that.
15    Q.  Okay.
16    A.  Because it was just an eventful
17 deal.
18    Q.  Okay.  Back to the policy that the
19 arresting officers are supposed to follow up
20 on their own cases, how did they go about
21 doing that?
22    A.  Well, they just follow through the
23 courts.  Once they get -- you know, it begins

1  with the initial report, the investigation,
2  either they're arrested or not, getting the
3  warrant, producing themselves in court when
4  they're subpoenaed and then deposition in the
5  case.
6      Q.  All right.  And I guess I'm
7  struggling with why this follow-up is not
8  important to you as a chief.
9          MR. GAILLARD:  Object to the form.
10     Q.  (BY MR. MCCULLEY:)  That's not
11 really a question, is it?  When you gave the
12 gun back to Brad Gray, you know that he's got
13 a pending case for domestic violence; correct?
14     A.  When I gave him the gun back I
15 knew he had been arrested, yes.
16     Q.  All right.  Well, you checked to
17 see that it was still pending, that he hadn't
18 been convicted; right?
19     A.  Right.
20     Q.  Okay.  Isn't it true that if he's
21 convicted, he's unlawfully in possession of a
22 weapon?
23         MR. GAILLARD:  Object to the form.

1  Answer it if you can.
2      A.  Say it one more time.
3      Q.  (BY MR. MCCULLEY:)  Yeah.  If he's
4  convicted of domestic violence, he is
5  unlawfully in possession of a weapon; correct?
6          MR. GAILLARD:  Object to the form
7  of the question.
8      A.  If he has a weapon.
9      Q.  (BY MR. MCCULLEY:)  Right.
10     A.  Right.  Yeah, if he has one, yes,
11 sir.  He was caught with --
12     Q.  Well, you had given him one.
13     A.  No.  He -- no, sir.  When -- the
14 time that I gave him the weapon, there was no
15 legal reason to keep it.  He could legally own
16 a firearm.  He had no -- there was no legal
17 reason for the Moundville Police Department to
18 keep that weapon.
19     Q.  Well, I understand that part of
20 your testimony.  But if he's later convicted,
21 then he can't have one; right?
22         MR. GAILLARD:  Object to the form
23 of the question.

1          MR. KINNEY:  Same objection.
2      A.  I would agree with that, but I
3  can't say that he had a weapon at a later
4  date.  We don't have the authority to go and
5  start checking everybody that's been
6  convicted.  You know, we don't have that --
7  you know, that's something in the courts.
8      Q.  (BY MR. MCCULLEY:)  Okay.  Did you
9  ever discuss the Mitchell's deaths with
10 anybody at the sheriff's office?
11     A.  I mean, other than just telling
12 the sheriff that I had this deposition or
13 something like that, because I don't know
14 anything about the Mitchells deaths other than
15 it happened.
16     Q.  After the Mitchells died, did
17 Sheriff Ellis discuss that with you?
18     A.  No.
19     Q.  Okay.  Were you ever asked to stay
20 out of the investigation?
21     A.  I mean, I wasn't -- I mean, I
22 wasn't there to be in the investigation.
23     Q.  Okay.  So --

1      A.  No, no one ever asked me to stay
2  out of the investigation but I wasn't there to
3  be in it.
4      Q.  And who was the sheriff's
5  investigator at the time?
6      A.  Lieutenant Jeames.
7      Q.  All right.  And he didn't ask you
8  to stay out of it?
9      A.  I wasn't -- I wasn't there.  I
10 wasn't employed there.  I wasn't --
11     Q.  Well, you were at the sheriff's
12 office then; right?
13     A.  Yes.
14     Q.  Okay.
15     A.  But -- but I never -- never -- he
16 never asked me to stay out of it, but I never
17 had anything to do with it.
18     Q.  Right.  He never discussed it with
19 you?
20     A.  No.
21     Q.  Okay.  Did you ever let anybody
22 know that you had returned the pistol to Gray?
23     A.  The clerk would have known because

22 (Pages 82 - 85)

1 I went in there and had to get a form, the
2 property form to fill out. Of course, she
3 would have known. Of course, the officer
4 getting it back for me would have known. I'm
5 sure Chief Burch would have known. You know,
6 I can't say that I told them, but I mean, just
7 from the assumption of them knowing what's
8 going on.
9     Q. Do you know if anyone told Paige
10 Mitchell or any her family members that the
11 gun had been returned?
12     A. No, sir, I do not know that.
13     Q. So you didn't let them know?
14     A. I didn't, no. No, sir.
15     Q. And you didn't discuss with the
16 City attorney or anybody else whether
17 returning the pistol to Gray might violate the
18 law?
19     A. I did not.
20     Q. Do you know whether federal
21 authorities were involved in the investigation
22 into the Mitchells deaths?
23     A. I -- no, I don't.

1     Q. How long have you known or had you
2 known Brad Gray?
3     A. Oh, I first went to work in
4 Moundville as a police officer in '97 or
5 whatever. He was a young kid then.
6     Q. How young?
7     A. Oh, I don't know how old he was.
8 Fifteen, maybe. I don't know.
9     Q. Did you know his dad?
10     A. I did not. I never did -- I never
11 did, his mom either. I don't really -- you
12 know, really the only person I know is him and
13 his brother. That's pretty much it. I knew
14 who his grandfather was.
15     Q. What's his brother's name?
16     A. Mike. Mike.
17     Q. So you never had any discussions
18 with his father about the gun?
19     A. Oh, no. No, sir.
20     Q. Okay.
21     A. I don't think I've ever had a
22 discussion with his father at all.
23     Q. All right. Had y'all arrested

1 Brad Gray a number of times before? And let
2 me finish that question. I really didn't
3 finish that. And he's going to say, object to
4 the form, and justifiably so. Had y'all
5 arrested Brad Gray a number of times before
6 this domestic violence arrest?
7     A. I think we arrested -- I know of
8 at least one other time.
9     Q. What was that for?
10     A. I -- geez, I don't remember. DUI,
11 maybe.
12     Q. Okay.
13     A. Or maybe a warrant. Maybe a
14 warrant that was outstanding. I just really
15 can't remember.
16     Q. All right.
17     A. I don't know if we wrote him a DUI
18 or it was an outstanding warrant. But I think
19 I made the arrest.
20     Q. Did he have an alcohol problem?
21         MR. GAILLARD: Object to the form.
22     A. He liked to drink, but I mean, I
23 don't know if he had an alcohol problem.

1     Q. Okay. You've run across him
2 several times?
3     A. Mostly during the day, working,
4 uh-huh.
5     Q. Yeah. Do you know if -- or did
6 you or do you know if any of your officers
7 took him home instead of to jail when they'd
8 catch him drinking?
9     A. Not to my knowledge, they didn't.
10     Q. Okay.
11     A. That would have been a no-no as
12 well.
13     Q. Do you know of him ever being
14 violent, you personally know of him ever being
15 violent?
16     A. No, sir.
17     Q. Did he have a reputation for it?
18     A. No, sir. I mean --
19     Q. Not that you know of?
20     A. No, not that I know of.
21     Q. Anybody besides Brad Gray ask for
22 that pistol to be returned to him?
23     A. No, sir.

1    Q.   Did you know Paige Mitchell?
2    A.   I did know Paige.  I didn't know
3  her as well as I did Brad, so to speak.  I
4  mean, I didn't talk to her much or anything.
5    Q.   Did you know her dad?
6    A.   I met her dad one time -- one
7  time.
8    Q.   Yeah.
9    A.   I went over and spoke with him.
10   Q.   Did you know he's deceased?
11   A.   I did, yes, sir.  I did.
12   Q.   Had you ever met Sylvia Ray?
13   A.   No.  No, sir.
14   Q.   Okay.  Did you ever discuss with
15  Danny Ray or Sylvia Ray Brad Gray?
16   A.   (Witness shaking head negatively.)
17       MR. GAILLARD:  You've got to
18  answer out loud.
19   A.   Oh, no, sir.  I'm sorry.  I'm
20  sorry.
21   Q.   (BY MR. MCCULLEY:)  Did you ever
22  hear them saying anything about Brad Gray?
23   A.   No, sir, I don't really know them.

1  If I did, I wouldn't know it was them saying
2  it.
3    Q.   Do you know anything about what
4  Paige Mitchell's and Brad Gray's relationship
5  was like at the time of all of this?
6    A.   Just a little, you know.
7    Q.   Tell me about that.
8    A.   Just on again, off again type
9  thing.  They -- you know, pretty much on
10  again, off again.  They'd see each other for a
11  little while and then they wouldn't see each
12  other for a little while, then they'd see each
13  other for a little while, you know, that kind
14  of thing.
15   Q.   Do you know why?
16   A.   I don't.
17   Q.   Okay.  Never heard --
18   A.   I mean, I just wasn't friends with
19  them.  I wasn't social friends with them, so I
20  don't -- I can't tell you.
21   Q.   Don't know why?
22   A.   Don't know why.
23   Q.   Have you ever had a conversation

1  with Kaci Mitchell?
2    A.   No, sir.
3    Q.   Kayla Mitchell?
4    A.   I've talked to Kayla before but
5  not about this case or anything.
6    Q.   Okay.  What was that conversation
7  about?
8    A.   Something in the hardware store.
9  I mean, honestly I -- if I remember, it would
10  have been nothing.  It was just casual
11  conversation.  That would have been it.
12   Q.   Do you know of any statements made
13  by Paige Mitchell about Brad Gray?
14   A.   No, sir.
15   Q.   What about -- same question for
16  Kaci.  Did Kaci ever say anything about Brad
17  Gray?
18   A.   No, sir, not to me.
19   Q.   You've said that Brad Gray
20  maintained the police had no right to go in
21  his house to get that gun.
22   A.   Yeah, I think that's what he
23  said --

1    Q.   Right.
2    A.   -- yes, sir.  Yes, sir.  That was
3  his --
4    Q.   And that he wanted it back?
5    A.   Right.  He said they didn't have a
6  right to take it and could he get it back.
7    Q.   What else did he say about that
8  incident, if you remember anything?
9    A.   I don't ever remember talking to
10  him about it.
11   Q.   Okay.  Never talked to him about
12  it after the return of the weapon either?  He
13  never --
14   A.   No, sir, I don't think I talked to
15  him again.  If I did, I don't remember after
16  that at all.
17   Q.   You said y'all got sued, the
18  department got sued in a -- for --
19   A.   Well, there was a litigation with
20  an improper arrest or, you know --
21   Q.   Tell me about that.
22   A.   It was -- Officer Donaldson
23  responded to a call where the female -- let me

1  get that right, where the female made the
2  call, initial call for assistance.  When he
3  got there, she tried to show him some
4  paperwork.  He arrested her anyway or arrested
5  him.  I -- geez, I'd have to go back and look.
6  But it's one or the other.  And then -- so
7  that person sued him saying -- sued the
8  department saying that he didn't do due
9  diligence and follow-up in his reading of
10  his -- he had paperwork saying he could be
11  there and arrested him on his own property and
12  that type of thing.  I'd have to read over the
13  lawsuit again.  But that was the gist of it.
14  He made an arrest and they stated he shouldn't
15  have or they claimed that he shouldn't have.
16      Q.  How did that come out?
17      A.  I think -- as far as I remember,
18  it was dismissed, as far as I remember.  As a
19  matter of fact, I know it was dismissed.  I
20  just don't remember the whole -- the --
21  without reading about it.
22      Q.  Do you know whether there was a
23  settlement?

1      A.  I don't.
2      Q.  Okay.
3      A.  I can't recall.  That's what I
4  mean by what I said.
5      Q.  You've told me that you're not
6  aware of any witnesses to the shooting;
7  correct?
8      A.  I am not.
9      Q.  Okay.  And you've told me that
10  Landry Donaldson and Lamarcus Mayes were there
11  when they took the pistol away from -- no,
12  you --
13      A.  I'm not sure --
14      Q.  -- didn't tell me that.
15      A.  I'm not sure if Landry was there.
16  I know Mayes had to be there because he made
17  the initial.
18      Q.  And that's what Brad Gray said;
19  right?
20      A.  Yes.
21      Q.  Did he say who --
22      A.  Yes.
23      Q.  -- went in?  Yeah.

1      A.  Yes.  He didn't -- no, to my
2  knowledge he didn't tell me who got it.  He
3  said they, y'all, you son of bitches or -- you
4  know, he was just really ranting and -- which
5  is why I remember.  He was really ranting
6  inside that store.  I had to call him out to
7  the side and say, hey, look, man, just give
8  me -- don't -- you know, don't raise Cain.
9  Let me figure out what's going on, so --
10      Q.  Do you know anybody else that was
11  there at the time?
12      A.  I probably knew everybody, but I
13  don't remember who.  I mean, it's been five
14  years ago.  I don't remember.  It would have
15  been employees.
16      Q.  No, I mean at the scene.
17      MR. GAILLARD:  Of the shooting?
18      Q.  (BY MR. MCCULLEY:)  No.  When the
19  pistol was taken away from him.
20      A.  Oh, no, I don't know if anybody
21  else was there or not.  I really --
22      Q.  Sorry.
23      A.  -- don't -- I really -- other than

1  just reading this (pointing), you know.
2      Q.  Okay.  Was anybody with you
3  when -- or there, any other witnesses to you
4  taking the pistol back to him?
5      A.  I mean, I would have been in my
6  office.  Nobody.  It was just me and him and
7  then, like I said, the clerk.
8      Q.  So he came to get it?  You didn't
9  take it?
10      A.  Yeah.  Right.  Right.
11      Q.  Okay.
12      A.  He came to get it.  He came to the
13  police department.  I mean, I can't -- I would
14  have never took it to him.  I mean, I'm not --
15  yeah, he had to come in and sign for it just
16  like any other property.  So the clerk, you
17  know, I would have went in there and got a
18  form and come in there.  He would have been at
19  my desk.
20      Q.  What does the form say?
21      A.  You're receiving -- I'd have to --
22  I don't know.  It would be something like --
23  it's just a general property return.  This is

1 the property, this is what it looked -- this
2 is the description. You know, you're
3 receiving it on this date and blah, blah,
4 blah. And he would sign it.
5    Q. So he didn't sign a waiver or
6 anything to get it back?
7    A. No.
8    Q. All right.
9    A. No. Right. Not unless there's
10 some kind of paperwork where you would legally
11 have to sign a waiver.
12    Q. And you can't think of anybody
13 else who was involved in any discussion --
14 other than who you've told me, that was
15 involved in discussions about returning the
16 pistol to him?
17    A. No, sir, nobody but who I've told
18 you.
19    Q. Okay. Have you ever been
20 arrested?
21    A. No, sir.
22    Q. Have you ever had a complaint
23 filed against you?

1    A. I had one in Moundville.
2    Q. What was that for?
3    A. Well, I -- I take that back. I
4 don't know if it was lodged or not.
5    Q. You don't know if there was --
6    A. It was a female that said that I
7 grabbed -- cuffed her too hard.
8    Q. But you don't know if --
9    A. I can't remember.
10    Q. -- there was a formal complaint?
11    A. I don't think she filed a formal
12 complaint. I think she just went to the
13 mayor.
14    Q. Okay.
15    A. He said, hey, if she files a
16 formal complaint, we're going to have to do
17 something about it or whatever, and I think
18 that was it. In my career, no, never had a --
19 never even -- never even had a -- never
20 been -- other than the last four years of my
21 employment after Mayor Lester, I've never been
22 written up in my life for twenty years.
23 Exemplary record.

1    Q. Other than the last four years of
2 your employment?
3    A. At Moundville.
4    Q. Okay. What happened during that
5 last four years?
6    A. Well, I think -- I mean, it would
7 merely be conjecture and opinion. But I think
8 that the mayor ran on a platform of reforming
9 the police department and he set out to do
10 that and I was not a part of that. So some of
11 his constituents were not favorable towards
12 me, didn't like me because of actions I had
13 taken. But, anyway, so that's how that -- you
14 know, how -- I mean, it's small town politics.
15 So --
16    Q. What were you doing that was
17 disfavored?
18    A. Well, I mean, in my opinion, I
19 wasn't doing anything. In their opinion, I
20 was doing -- you know, I wasn't following
21 their rules or whatever. I mean, I don't know
22 how to describe it. I mean, there was --
23 there was one time when, you know, I said

1 some -- I called this father a bad name on the
2 phone, you know, and that kind of thing, so
3 just things like that. Just --
4    Q. Were you arresting the wrong
5 people?
6    A. No.
7    Q. Okay.
8    A. No, it was never anything about an
9 arrest or anything, nothing like that. It was
10 about duties, internal, internal duty.
11    Q. Have you ever returned a weapon to
12 anyone after they've been convicted, that you
13 know of?
14    A. No, sir.
15    Q. You may have answered this already
16 for me but my memory is not good. After the
17 Mitchells were killed, did anybody with the
18 sheriff's office come talk to you about it?
19    A. Huh-uh.
20    Q. All right.
21       MR. MCCULLEY: I think we're about
22 done. Give us just a minute, guys.
23       (Whereupon, a short break was

1        taken.)
2        MR. MCCULLEY:  Unless I can think
3  of anything else while you're talking, I think
4  I'm done.
5        MR. GAILLARD:  Warren, do you have
6  anything?
7        MR. KINNEY:  I have no questions.
8        MR. GAILLARD:  Yeah, I don't think
9  I have any either.
10        MR. MCCULLEY:  Well, that didn't
11  give me much time.
12        MR. GAILLARD:  I know.  That's
13  what I was trying to accomplish.
14        MR. MCCULLEY:  I guess we're done.
15        (Whereupon, Plaintiff's
16        Exhibits 1 and 2 were marked
17         for identification.)
18     FURTHER THE DEPONENT SAITH NOT
19
20
21
22
23

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  COUNTY OF SHELBY)
5    I hereby certify that the above
6  proceedings were taken down by me and
7  transcribed by me using computer-aided
8  transcription and that the above is a true and
9  correct transcript of said proceedings taken
10  down by me and transcribed by me.
11    I further certify that I am neither of
12  kin nor of counsel to any of the parties nor
13  in anywise financially interested in the
14  outcome of this case.
15    I further certify that I am duly licensed
16  by the Alabama Board of Court Reporting as a
17  Certified Court Reporter as evidenced by the
18  ACCR number following my name found below.
19
20    Maya Rose, ACCR#242
21    Expires 9/30/20
22    State of Alabama at Large
23    Commission Expires 2/23/21

27 (Pages 102 - 103)

**&**

**&** 3:20 4:6 21:3

**0**

**001** 5:9 13:8
**023** 5:9 13:8
**06** 22:23
**069** 76:4

**1**

**1** 5:8 9:16 11:9 75:8
  102:16
**102** 5:8,10
**12:20** 6:10
**150** 3:21
**16** 23:15,17 28:5,7
  31:16
**175** 4:7
**18328** 103:19
**1966** 9:16
**1997** 13:11 20:2

**2**

**2** 1:19 5:10 102:16
**2/23/21** 103:23
**200** 3:7,13
**2000** 3:21 19:2 22:6
**2005** 6:7
**2006** 19:3,5,7 22:20
  31:16
**2011** 31:22
**2015** 46:21 47:1,6
  61:7,8 64:20
**2016** 19:7,10,14,18
  38:17
**2017** 19:12 29:1
  30:23
**2020** 1:19 6:9
**215** 21:13
**242** 103:20
**260** 15:6
**2:19-00069** 1:4

**2nd** 6:9

**3**

**3** 64:13
**35213** 4:8
**35401** 3:8,14
**35474** 9:20
**36602** 3:22

**4**

**45** 75:8
**46** 76:3
**480** 15:5

**5**

**5th** 9:16

**6**

**601** 3:7,13
**67** 9:19
**69** 76:4,6

**7**

**7** 5:4

**8**

**8** 61:6
**880** 4:7

**9**

**9/30/20** 103:21
**925** 9:19
**97** 13:22 14:1 87:4
**98** 13:22 14:1
**99** 19:2
**9:00** 49:7

**a**

**a.m.** 6:10
**aacop** 10:15,16
  16:1
**able** 15:20 22:14
  57:15
**absolutely** 64:12
**academy** 13:18
  14:5,11,15 16:16

**accomplish** 102:13
**accr** 103:18,20
**accusations** 23:23
  24:11,22
**accuses** 60:5,8
**acting** 6:4 29:12
  40:21,22
**action** 1:4
**actions** 100:12
**activity** 78:13
**ada** 62:21
**added** 75:15
**address** 9:18
**affidavit** 61:23
**afforded** 26:16
**ago** 16:14,17 96:14
**agree** 43:6,11,16,17
  45:18 46:2,5,9,11
  62:14 84:2
**agreed** 2:2 68:18
**agreements** 62:15
**ahead** 59:1 72:13
**aided** 103:7
**al** 1:9,13
**alabama** 1:2 3:8,14
  3:22 4:8 6:2,3,8
  10:11,15 13:13
  15:23 103:3,16,22
**alcohol** 88:20,23
**allegation** 27:3,4,8
**allows** 41:2,19
**angry** 48:6,10
**animosity** 30:8
**answer** 8:5,10,16
  24:19,20 43:9
  69:21 71:16 73:7
  74:5 83:1 90:18
**answered** 38:7
  101:15
**anybody** 31:4
  66:18,23 67:22

**74:14 84:10 85:21
  86:16 89:21 96:10
  96:20 97:2 98:12
  101:17**
**anymore** 24:2
**anyway** 26:2 43:2
  56:1 94:4 100:13
**anywise** 103:13
**appearance** 62:17
  62:18
**appeared** 61:20
**appears** 47:19
  64:15,17 76:14,16
  76:17
**applied** 23:5 69:9
**applies** 72:23
**apply** 68:3 69:4
**approached** 38:2
**approximately**
  18:22
**aptitude** 26:20,23
**area** 55:20
**areas** 33:3
**arrest** 13:6 44:7,21
  45:17 46:18 47:20
  48:2,19 49:13,19
  49:20 53:21 64:13
  64:16 67:17 79:7
  88:6,19 93:20
  94:14 101:9
**arrested** 44:11,17
  47:14,17,23 48:8
  49:22 60:4 73:20
  74:2 82:2,15 87:23
  88:5,7 94:4,4,11
  98:20
**arresting** 81:19
  101:4
**arrests** 78:15
**arrived** 31:8

**articles** 17:13
**asked** 30:18 41:6
  60:13 67:22 79:13
  79:14 80:2 84:19
  85:1,16
**asking** 30:22 72:15
  73:9,11 80:10
  81:13
**assign** 2:18
**assistance** 41:20
  94:2
**assistant** 26:22
  28:20 29:12,16
  34:5 51:2 67:6
  79:19
**association** 10:7,10
  10:15 11:3 15:22
**assume** 38:22
**assuming** 12:18
  36:17 55:2
**assumption** 40:20
  54:22 59:4 86:7
**atf** 18:8
**attached** 33:19
**attorney** 3:5,11,18
  4:5 24:16 78:23
  79:5 86:16
**attorneys** 36:17
**audit** 25:12 59:7
**august** 47:6 48:22
  49:23 51:7,7,8
  64:20 80:20
**authorities** 86:21
**authority** 36:14
  84:4
**auto** 21:9
**avenue** 3:7,13
**aware** 8:23 12:11
  49:13 68:6,7 69:8
  69:15,19 70:2,18
  95:6

**b**

**b** 5:6 9:12 29:11,11
**back** 16:1 19:3,18
  20:21 21:10 22:17
  48:3,4,21 51:15,17
  52:14,18 55:10,12
  55:12 64:14 65:1
  68:14 69:14 71:18
  74:7,13,21 81:8,18
  82:12,14 86:4 93:4
  93:6 94:5 97:4 98:6
  99:3
**bad** 101:1
**banks** 29:6 38:19
  39:23 40:8,17
**based** 16:23 42:19
  59:13,13,14,15
  68:21 78:11
**basic** 34:18 52:2
**basically** 26:1
**bates** 11:12,20 76:6
  76:7
**bay** 14:8,15
**beach** 49:2
**beginning** 24:10,11
**begins** 81:23
**believe** 9:2 21:9
  34:10 40:8,13,14
  43:20 46:20 72:1
**believing** 40:7
**belong** 9:22 10:2
**belonged** 10:5
**belongings** 56:15
**best** 38:21 46:17
  51:10,12
**beyond** 27:10
**big** 25:15 32:18
**birmingham** 4:8
  6:2
**birth** 9:15

**bitches** 96:3
**blah** 26:18,18,18
  48:12,12,12 98:3,3
  98:4
**board** 103:16
**boisterous** 48:6
**booked** 59:2,6
**boulevard** 6:8
**brad** 8:23 13:6 43:6
  45:8,17 46:4,6 56:7
  60:1 78:22 82:12
  87:2 88:1,5 89:21
  90:3,15,22 91:4
  92:13,16,19 95:18
**bradley** 1:12 13:3
**break** 8:7 49:8
  74:23 101:23
**breaks** 25:3
**bring** 55:2,13
**broad** 17:20 68:17
  72:10
**brother** 87:13
**brother's** 87:15
**brought** 52:18 55:1
**bunch** 59:20 81:4
**burch** 29:9 31:3,4
  31:12 40:18 79:19
  86:5
**burroughs** 3:10,12
  7:12 11:20

**c**

**c** 3:1 4:1 13:15
  29:11,11 30:1,4
  103:1,1
**cain** 49:10 81:4
  96:8
**call** 25:18 81:6
  93:23 94:2,2 96:6
**called** 16:7 25:8
  62:21 101:1

**calm** 48:13
**calvin** 20:12
**capable** 42:1
**capacity** 40:23
**car** 56:13
**career** 99:18
**case** 7:15 9:1 13:3
  18:11 27:20 61:18
  63:2,23 64:1,4,7,9
  64:12,19 65:5,19
  65:23 70:4,8 80:21
  82:5,13 92:5
  103:14
**cases** 63:13,18,22
  64:3 66:12,16
  70:15 78:1 81:20
**casual** 92:10
**catch** 89:8
**caught** 83:11
**cause** 6:11
**cell** 32:19
**cells** 32:15
**certainly** 17:7 58:2
**certified** 103:17
**certify** 6:4 103:5,11
  103:15
**ceu** 16:23
**ceus** 15:2 16:5,7
**chain** 33:8
**change** 22:9 35:8
  36:14,15 38:11
  75:6
**changed** 31:19
  35:10 37:8,8 59:10
**changes** 28:14 36:2
  36:5,7,9,18
**charge** 60:17 68:12
**charged** 56:7 64:21
**check** 48:14
**checked** 82:16

**checking** 84:5
**chief** 12:22 15:3,18
15:18 19:4 23:1,7
26:22 28:1,15,20
28:21 29:6,12,13
29:14,16 31:4,12
32:4,9 36:20 38:18
39:22 40:8,21,23
51:2 56:3 58:6
62:19 63:12 67:6
77:4 79:19 82:8
86:5
**chief's** 34:5
**chiefs** 10:8,11,16
15:23
**child** 74:8
**church** 10:19
**circle** 30:10
**city** 22:13,18 33:19
33:19,20 35:20
37:3 41:2 78:23
86:16
**city's** 54:13
**civil** 1:4 6:6
**claimed** 94:15
**clarification** 8:18
**clarify** 45:19
**classes** 16:10
**classroom** 15:4
**clear** 26:2,5
**clerk** 33:23 34:1
64:17 85:23 97:7
97:16
**clerk's** 33:22
**close** 50:2
**closed** 32:13
**clubs** 11:1
**codes** 72:11
**coffee** 49:1,1
**come** 48:4,21,22
49:7 52:15 94:16

**checking** 97:15,18 101:18
**commencing** 6:9
**commission** 56:17
103:23
**commissioner** 2:5
2:22 6:4 37:2,11
**committee** 37:6
**common** 53:8,17
64:14
**company** 20:5,16
20:18 21:1 49:5
**complaint** 98:22
99:10,12,16
**complete** 15:15
**completed** 14:14
**compliance** 2:11
**computer** 103:7
**concern** 55:22 60:1
**concerns** 51:23
**concluded** 18:11
**concluding** 6:10
**conclusion** 17:14
**condemned** 44:9
**conference** 15:3,18
15:19 48:3,5,22
81:8
**confiscate** 43:17
54:8
**confiscated** 43:14
43:20 44:2,9,14,23
52:11
**conjecture** 100:7
**consider** 44:13
**considered** 73:13
**constituents** 100:11
**consult** 67:19
**contact** 37:18,19,20
**contained** 72:2
**contend** 71:3,11
73:3

**continued** 4:1
**continuing** 16:21
**conversation** 91:23
92:6,11
**convicted** 61:2 63:9
65:10 68:4 69:1,10
70:5,9 73:1,21 74:2
74:8,8 82:18,21
83:4,20 84:6
101:12
**conviction** 47:10
60:6 61:13,16 63:4
74:11,17
**convictions** 69:5
78:5,16
**copy** 11:15 76:15
**corner** 33:18
**correct** 22:3 28:12
30:2 54:6 68:5 69:5
70:5,6 82:13 83:5
95:7 103:9
**council** 25:20 35:20
37:3,7,17,21
**counsel** 2:4,15,17
6:7 103:12
**count** 34:21
**county** 9:19 18:23
22:12 28:19 41:1
103:4
**couple** 18:17 34:8
37:7,13 40:5
**course** 11:23 16:5
25:20 28:19 38:6
65:8 69:15 71:1
79:10 80:12 86:2,3
**court** 1:1 2:6,12
7:22 13:1 45:1
50:18 60:23 61:10
62:3,20 63:14 64:1
70:4,8 82:3 103:16
103:17

**courts** 81:23 84:7
**covered** 17:7 71:4
**crazy** 27:10
**criminal** 72:11
**cubicles** 34:4
**cuffed** 99:7
**curious** 75:5
**current** 9:17 12:17
**custodian** 32:6
**custody** 44:22 45:5
45:9,14,16 46:4,7
**cut** 31:21

**d**

**d** 5:1 9:11
**dad** 87:9 90:5,6
**daniel** 29:23
**danny** 90:15
**date** 6:5 9:15 17:6
17:10 48:1,20 50:3
70:22 84:4 98:3
**day** 6:9 27:13 38:8
38:8 48:4 89:3
**days** 47:8
**deal** 81:17
**dealings** 39:8
**death** 12:8
**deaths** 9:5 84:9,14
86:22
**deceased** 1:9 7:18
20:12 90:10
**decided** 26:7 55:17
**decision** 60:12
**defendant** 9:1
**defendant's** 62:17
**defendants** 1:14
**define** 72:18
**definite** 41:7
**definition** 72:2
73:5
**department** 5:11
11:17 12:4 23:20

28:23 32:7 33:13
33:21 34:16,23
35:17 36:1,6,7
37:13,14 41:2,5,11
42:16 43:13 45:5,9
46:8 50:19 53:1
55:9 59:21 63:11
70:11,13 71:19
75:7 76:1 77:11
83:17 93:18 94:8
97:13 100:9
**depending** 37:23
**deponent** 75:20,23
102:18
**deposition** 1:16 2:4
2:9,10,19,22 8:21
12:5 13:7 47:17
57:4 61:23 64:17
82:4 84:12
**depositions** 2:13
**describe** 33:12
100:22
**describes** 73:2
**description** 17:22
18:4 98:2
**desk** 97:19
**determination** 56:3
**determine** 58:7
**died** 84:16
**different** 16:5 24:3
75:13 77:19
**diligence** 24:13
25:18 27:16 94:9
**dillard** 29:19 31:7
**direct** 37:18
**direction** 24:3 26:8
**directive** 34:21,23
66:13
**directives** 34:20
**directly** 24:9 37:21
38:7

**disagreed** 52:5
**discuss** 84:9,17
86:15 90:14
**discussed** 27:21
67:5,7 85:18
**discussing** 39:12
69:14
**discussion** 66:19
67:2 87:22 98:13
**discussions** 87:17
98:15
**disfavored** 100:17
**dismissed** 94:18,19
**disposition** 17:13
64:4 70:14
**distinction** 44:4,6
44:16
**distinguish** 45:12
**district** 1:1,2 63:13
79:5
**division** 1:3
**document** 12:6,23
25:9 26:9,15 27:9
27:14 47:1 61:5
**documents** 5:8 11:6
11:8,13 13:5 39:12
47:3
**doing** 40:23 59:21
60:8 81:21 100:16
100:19,20
**domestic** 61:3
64:21 66:16 67:17
68:4 69:10 70:14
73:1,14 82:13 83:4
88:6
**donaldson** 34:9
51:14,18 53:20
55:4 57:22 66:21
66:22 67:4 70:8
79:11,14,19 93:22
95:10

**door** 32:18
**doors** 32:19
**draft** 35:22
**drafted** 35:13,15
35:16,19
**draws** 59:20
**drink** 88:22
**drinking** 89:8
**drive** 20:17
**due** 24:13 25:18
27:15 94:8
**dui** 88:10,17
**duly** 6:16 103:15
**duties** 101:10
**duty** 53:9 101:10
**dv** 56:7 64:13

**e**

**e** 3:1,1,4,6 4:1,1 5:1
5:6 9:11,12 13:14
13:14,15,15 29:11
29:23 30:1,1,4
34:12 42:14,14
103:1,1
**early** 51:7
**education** 16:21
**effect** 2:10 12:7
**eight** 28:3,3 31:14
31:16
**either** 17:11 18:4
44:18 79:18 82:2
87:11 93:12 102:9
**election** 19:7
**elliott** 1:12
**ellis** 23:11 42:6
84:17
**employed** 19:23
30:16,19 85:10
**employee** 35:17
**employees** 31:17
96:15

**employment** 22:2
99:21 100:2
**enacted** 76:17
**ended** 22:3 51:14
**enforcement** 14:10
16:8,14 20:3 78:12
**especially** 41:23
61:18
**estate** 1:8,12 9:1
**et** 1:9,13
**eventful** 61:18
80:22 81:10,16
**everybody** 7:2
74:19 84:5 96:12
**evidence** 2:20 17:4
17:14,19 32:7,16
32:22 44:8 52:10
54:4,7,13,18 58:17
58:21 59:5,11,16
59:17 60:17 80:7
80:15
**evidenced** 103:17
**evidentiary** 33:9
**exact** 24:1 48:1
50:3 55:16
**exactly** 8:19 14:1
17:6 73:12
**examination** 5:4
6:12 7:1
**examined** 6:16
**excuse** 15:5
**executive** 16:7,8
**exemplary** 99:23
**exhibit** 5:8,10 11:9
**exhibits** 102:16
**experience** 41:17
78:11
**expires** 103:21,23
**explain** 51:20
57:18 63:20 80:14

**explanation** 24:4
**extent** 41:9

**f**

**f** 30:4 103:1
**facilities** 33:13
**fact** 29:3 43:19
　53:19 94:19
**fair** 12:13 54:21
　66:15 80:1
**fairly** 24:20
**fairness** 72:14
**familiar** 7:10 12:22
**family** 86:10
**far** 48:2 63:23
　94:17,18
**farm** 20:7
**father** 87:18,22
　101:1
**favorable** 100:11
**federal** 6:5 69:23
　70:1,2 86:20
**feel** 58:3
**fellow** 55:23
**felon** 74:8
**felt** 57:23
**female** 93:23 94:1
　99:6
**fifteen** 87:8
**figure** 96:9
**file** 13:3 34:3 50:11
**filed** 98:23 99:11
**files** 14:23 99:15
**filing** 2:21
**fill** 86:2
**filled** 44:3 64:16
**financially** 103:13
**find** 51:4 58:11
**fine** 6:21,22
**finish** 88:2,3
**fire** 37:12

**firearm** 69:21
　73:10,13,16,18
　83:16
**firearms** 17:19,22
　18:3 71:9 72:2 73:2
**fired** 23:19,21
　38:17
**first** 6:16 13:10
　20:3 26:3 27:13
　62:18 87:3
**fit** 73:4
**fits** 72:1
**five** 30:5,6 79:20
　96:13
**fluid** 31:19
**fluidly** 35:8
**folks** 7:18
**follow** 64:3 65:9,14
　65:19 66:1,5 70:3
　70:14 77:16,23
　78:3 81:19,22 82:7
　94:9
**followed** 63:18
　64:8 66:12 70:8
**following** 6:12
　100:20 103:18
**follows** 6:17
**font** 75:6,9
**fop** 9:23 10:2
**force** 2:10
**foregoing** 6:6
**forged** 25:9 26:18
　27:9,20
**forgetting** 31:23
**form** 2:16 43:8
　58:18 69:12 71:6
　71:14 72:4 73:6
　74:3 78:17 82:9,23
　83:6,22 86:1,2 88:4
　88:21 97:18,20

**formal** 99:10,11,16
**found** 50:16 63:4
　64:23 80:8 103:18
**four** 26:3 30:20
　99:20 100:1,5
**fraternal** 10:23
**friends** 22:10 91:18
　91:19
**front** 81:4
**full** 2:11 9:10 72:11
**further** 102:18
　103:11,15
**fussing** 60:1 65:2
**futile** 26:3,3

**g**

**g** 34:12
**gaillard** 3:17 6:21
　11:12 13:2 30:22
　43:8,15 58:18,23
　61:7 69:12 71:6,14
　72:4,9,14,17,20
　73:6 74:3 75:18,21
　78:17 82:9,23 83:6
　83:22 88:21 90:17
　96:17 102:5,8,12
**geez** 88:10 94:5
**general** 76:2 97:23
**getting** 9:10 20:21
　57:23 69:14 78:4
　78:16 82:2 86:4
**girl** 25:3
**gist** 94:13
**give** 50:3 96:7
　101:22 102:11
**given** 8:20 71:17
　74:7,13,19 83:12
**go** 10:19,20 14:5,22
　19:18 25:19 26:7
　37:16 38:12 39:17
　41:22 50:10 58:23
　60:3 62:16 72:13

81:20 84:4 92:20
　94:5
**going** 8:9,19 29:5
　30:12 38:10,10
　41:16,22,23 42:2
　42:22 43:1 48:12
　48:15,23 51:5 52:4
　56:23 57:23 62:9
　77:2 80:9 86:8 88:3
　96:9 99:16
**good** 14:18 23:22
　27:1 40:20 101:16
**government** 3:21
**grabbed** 99:7
**gracious** 14:19
**grandfather** 87:14
**grandfathered**
　16:18
**gray** 1:12 13:6 43:6
　43:12 45:3,8 46:4
　55:20 56:7 62:3
　64:21 71:18 78:22
　82:12 85:22 86:17
　87:2 88:1,5 89:21
　90:15,22 92:13,17
　92:19 95:18
**gray's** 9:1 13:3
　46:6 56:12 91:4
**greensboro** 3:7,13
**grounds** 2:18
**groups** 11:1
**guess** 24:1 29:6
　37:15 40:18 66:15
　82:6 102:14
**guesstimate** 47:7
**guilty** 62:3
**gun** 55:14 56:5
　65:3 66:19 67:3
　80:13 82:12,14
　86:11 87:18 92:21

**guy** 23:3
**guys** 31:5 49:7,9
53:14 101:22

**h**

**h** 5:6 29:11,11,11
34:12,12
**hale** 18:23 41:1
**hall** 33:19,19,20
**hand** 27:18
**handgun** 68:8,11
**handguns** 18:10
68:3
**handle** 18:7 26:21
58:12
**handled** 26:22 37:5
37:14,16
**happen** 54:11
79:16
**happened** 49:12,16
56:9,12 57:14 63:1
63:19 64:4 65:13
80:23 81:2 84:15
100:4
**happens** 61:16
**harassment** 56:7
64:13
**hard** 32:2 45:11
76:13 99:7
**hardware** 92:8
**harm** 56:23
**hassinger** 4:6
**head** 78:6 90:16
**headed** 24:2
**hear** 25:6 90:22
**heard** 10:18 25:1
30:13 91:17
**hearing** 25:19
27:15,16,21
**held** 17:14 31:4
**helmsing** 3:19

**help** 30:3 41:21
**helps** 71:20
**herlong** 3:19
**hey** 41:22 56:4
62:21 66:13 96:7
99:15
**highlands** 10:20
**hired** 20:8 29:6,13
40:4
**hold** 30:20 31:10
55:23
**holster** 56:22 60:10
**home** 9:17 25:10
56:12 89:7
**honest** 62:13 66:11
**honestly** 63:8 92:9
**horton's** 21:9,19
**hot** 50:4,7
**hours** 14:20 15:5,6
15:7
**house** 44:11 48:8,9
52:2,2 53:22 57:15
57:21 60:3 79:12
92:21
**hughen** 34:10
**huh** 20:19 21:7
22:7 75:10,12 89:4
101:19
**hundred** 16:14
78:15
**hunting** 44:21

**i**

**identification** 18:6
102:17
**iii** 4:4
**illegal** 60:9
**important** 82:8
**improper** 93:20
**incident** 47:18
64:11 93:8

**independent** 32:15
**indicating** 8:3,3
**individuals** 68:4
72:23
**infinitive** 41:7
**information** 59:13
**initial** 11:10 47:18
64:18 82:1 94:2
95:17
**inner** 30:9 39:2
**inside** 32:19 33:4
59:17 96:6
**insinuating** 27:19
**interact** 38:4
**interested** 103:13
**internal** 101:10,10
**international** 10:7
10:10
**investigate** 41:3
**investigation** 39:5
39:8,20 40:1,10,12
41:11 45:21 50:9
79:11 82:1 84:20
84:22 85:2 86:21
**investigator** 41:8
42:8 85:5
**involved** 66:18
67:1,4 86:21 98:13
98:15
**io** 64:18
**ire** 59:20

**j**

**j** 42:14
**jail** 32:13,13,14
89:7
**january** 9:16 19:11
29:1 30:23
**jason** 34:10
**jeames** 42:10,13,14
85:6

**job** 14:14 22:9 23:6
23:6 26:2 55:23
66:5 71:1 77:23
**john** 3:4,6
**johnson** 22:16
66:20
**july** 1:19 6:9 46:20
47:1 49:22
**junkyard** 21:14
**jurisdiction** 40:15
**justifiably** 88:4
**justified** 57:23 58:3

**k**

**k** 13:14,15 29:11
30:4
**kaci** 9:6 12:9 43:7
43:12 45:4 92:1,16
92:16
**kayla** 92:3,4
**kd** 1:4
**keep** 45:1 52:8,9,12
55:19 56:5 63:22
69:20 71:20,22
83:15,18
**keith** 29:8 40:18
**ken** 1:18 2:4 3:16
6:10,15 9:14
**kenneth** 9:11 23:11
**kentucky** 25:13
**kept** 33:9 56:22
59:8
**key** 32:22 33:1,2
**keys** 33:10 54:17
**kid** 87:5
**kill** 45:3
**killed** 19:16 29:2
43:7,12 45:13
101:17
**kin** 103:12
**kind** 14:18 17:20
18:8 20:6,10 22:11

22:13 23:5 24:15
26:20 28:15 39:7
44:2 45:16 49:11
49:15 51:4 63:17
64:13 68:16 74:11
74:16 75:8 91:13
98:10 101:2
**kinney** 4:4 6:22 7:7
11:18,22 84:1
102:7
**knew** 26:2 28:20
63:8 64:20 65:4
81:1 82:15 87:13
96:12
**know** 7:2,5,7,9 8:7
8:15,20 9:4 12:12
14:21,21,23 15:1
15:13,14 16:4
17:21 18:4,5 21:10
22:10,11,13 23:6
23:23 24:15,21,22
24:23 25:3,4,11,14
25:17,23 26:13,18
26:19,21,23 27:9
27:10,17,19,19
29:3,5,6 30:7,15,17
31:18 32:2,22
34:20,22 35:5,14
35:16,19 36:4,19
37:1,5,9,10,15,22
38:3,7,8 39:4,7,9
39:10,13,15,16,19
40:5,10,11,15,21
41:6,7,8,9,10,12,18
42:2,4,9 43:19
44:11,19 45:2,18
45:21,23,23 46:15
47:3 48:11,13
49:10,17,23 50:2,6
50:8,14 51:2 52:4
52:17 53:11,15,18

53:18,19,21,22
54:16,18 55:15,19
55:22 56:4,6,9 58:2
58:6,15 59:23
61:14,14,15,16
62:2,4,15 63:3,11
63:18,19,21 64:3
65:14,17 66:7,10
66:13 67:3,14 68:2
68:16 70:7 72:20
74:6,9 75:14 78:12
78:16 80:12,15,23
81:3,5,7,8,9,10,12
81:23 82:12 84:6,7
84:13 85:22 86:5,9
86:12,13,20 87:7,8
87:9,12,12 88:7,17
88:23 89:5,6,13,14
89:19,20 90:1,2,2,5
90:10,23 91:1,3,6,9
91:13,15,21,22
92:12 93:20 94:19
94:22 95:16 96:4,8
96:10,20 97:1,17
97:22 98:2 99:4,5,8
100:14,20,21,23
101:2,13 102:12
**knowing** 39:14
86:7
**knowledge** 38:21
43:18 46:18 51:10
51:12 52:19,21
66:9 74:17 89:9
96:2
**known** 9:13 35:12
85:23 86:3,4,5 87:1
87:2

| l |
| --- |

**l** 2:1
**labeled** 11:12

**laid** 76:20
**lamarcus** 29:21
47:15 51:11 95:10
**landry** 34:9 51:14
51:17 52:14 55:4
66:20 67:4 95:10
95:15
**landry's** 54:23
**large** 2:7 6:4
103:22
**larry** 22:16
**law** 3:5,11,12,18
4:5 14:9 16:8,13
20:3 73:10 78:12
86:18
**laws** 2:12
**lawsuit** 56:1 94:13
**lawsuits** 52:5
**lawyer** 7:5
**laying** 54:10
**layout** 34:18
**leach** 3:19
**leadership** 15:19
16:6
**leading** 2:16
**learn** 28:13 47:22
61:12,15
**leave** 25:10
**led** 41:11
**left** 12:15 19:13
28:4 34:4 38:14,16
77:1
**legal** 52:7,8,12
55:18 56:4 58:4
71:19,21 83:15,16
**legally** 35:10 44:23
55:21 83:15 98:10
**lester** 24:6 38:5
99:21
**library** 33:17

**licensed** 103:15
**lieutenant** 42:10,17
85:6
**life** 40:2 65:18
99:22
**liked** 88:22
**line** 49:8
**list** 59:5,7,9
**litigation** 93:19
**little** 26:14 28:19
32:20 33:16 34:4
91:6,11,12,13
**live** 55:4,5
**lockbox** 32:11
**locker** 32:20
**lockup** 52:20,22
54:13,18 59:10
**lodged** 99:4
**logged** 80:7
**logical** 42:22
**long** 13:16 16:17
20:20 21:19,20
26:16 48:18 49:18
87:1
**look** 26:17 48:14
60:21 61:4 70:23
72:21 94:5 96:7
**looked** 11:8,11
12:16 13:1 26:15
27:18 51:22 56:2
70:19 98:1
**looking** 49:12,16
50:14 54:23 61:6
64:11
**looks** 47:1,15,17
56:11
**loose** 65:10
**lot** 14:21 30:8
61:16 69:16 72:11
76:15

**lots** 77:19
**loud** 48:6 90:18
**luxury** 58:7

**m**

**m** 13:15 29:22,23
30:4 42:14
**main** 59:23
**maintained** 92:20
**making** 44:5,6
78:14
**man** 20:21 21:10
21:23 96:7
**management** 16:6
**manual** 34:14,15
34:19 35:23 38:21
66:4,6,8 75:7 76:21
**marked** 102:16
**matter** 94:19
**maximum** 28:2,3
31:13
**maya** 1:21 2:5 6:1
103:20
**mayes** 29:21 47:15
47:16 51:11,12
54:1 57:3,7,22
61:21 64:9,12 67:7
70:7 79:21 95:10
95:16
**mayor** 20:7,14 24:5
25:19 36:13 38:4
38:12,13 67:10
99:13,21 100:8
**mayor's** 20:11 25:8
**mcculley** 3:4,6 5:4
6:20 7:1 11:14 12:1
31:2 43:11 58:19
59:3 61:9 71:8 72:7
72:13,16,19,22
74:10,22 75:2
78:19 82:10 83:3,9
84:8 90:21 96:18

101:21 102:2,10,14
**mckenzie** 13:13
14:5,14 20:15 21:4
**mean** 14:17,18,20
15:5 17:20,21 18:1
22:9 25:14 26:16
27:17 28:18 35:22
36:13,14 42:1 44:3
55:15 57:18,20
59:12 60:8 61:17
61:23 62:8 67:14
68:13,16 69:15
74:5,9,17 77:5 80:5
81:7,9 84:11,21,21
86:6 88:22 89:18
90:4 91:18 92:9
95:4 96:13,16 97:5
97:13,14 100:6,14
100:18,21,22
**mechanic** 20:6
**meeting** 66:13
**meetings** 63:17
**member** 10:10
35:20 37:22
**members** 37:7
86:10
**memory** 101:16
**mention** 25:21
**mentioned** 14:4
**merely** 100:7
**messy** 25:16
**met** 90:6,12
**metal** 32:18
**michael** 3:10
**michaels** 3:12
**middle** 51:8
**mike** 7:12 87:16,16
**mind** 16:21 32:2
44:5,7 58:14 59:11
**mine** 41:22 55:22

**minette** 14:8,15
**minute** 101:22
**misdemeanor** 54:5
**missed** 49:1
**mitchell** 1:8 9:6,6
12:8 43:7,12 45:4
50:10 86:10 90:1
92:1,3,13
**mitchell's** 39:5 84:9
91:4
**mitchells** 19:16
29:1 84:14,16
86:22 101:17
**mobile** 3:22
**molester** 74:8
**mom** 87:11
**montclair** 4:7
**month** 49:23 50:5
**months** 13:19 40:6
**morning** 9:6 49:5,6
49:7
**moundville** 4:3 5:8
5:11 7:10 9:20
11:16 12:4 13:8,8
13:20,21 18:17,21
19:3,9 22:3,6 23:2
23:8,20 28:14,23
30:19 32:12 40:13
43:13 45:5,9 46:7
55:7 62:16 71:18
76:1,4 83:17 87:4
99:1 100:3
**moved** 13:19 44:23
**mu** 1:4
**muckenfuss** 30:2
**murders** 39:5

**n**

**n** 2:1 3:1 4:1 5:1
9:12 13:14,15 30:1
30:4 34:12

**name** 9:10,13 10:13
20:11,23 23:10
26:2,5 27:5 34:11
87:15 101:1 103:18
**narrow** 71:23
**nature** 18:14
**necessarily** 36:11
44:23 59:12 61:17
62:13,14 78:18,20
**necessary** 2:14
**need** 8:7,18 24:2
56:1 62:22 63:18
66:14
**needed** 32:21 37:15
**negatively** 78:6
90:16
**neither** 103:11
**never** 24:3,9 26:16
39:6,7,11 41:14,21
45:20 54:6,7,8
58:22 59:2 76:16
76:19 85:15,15,16
85:16,18 87:10,10
87:17 91:17 93:11
93:13 97:14 99:18
99:19,19,19,21
101:8
**new** 28:15,20,20,21
29:6 75:9
**newman** 3:19
**nine** 49:4
**ninety** 13:23
**northern** 1:2,3
**notary** 1:23 2:6 6:3
**notice** 2:21
**nowadays** 64:14
**number** 88:1,5
103:18

**o**

**o** 2:1 9:12,12
**o'clock** 49:4
**object** 43:8 58:18
69:12 71:6,14 72:4
73:6 74:3 78:17
82:9,23 83:6,22
88:3,21
**objection** 43:15
58:23 84:1
**objections** 2:15,18
**october** 19:21
23:16 28:4,11,13
**offense** 47:18 56:17
**offer** 25:7
**offered** 2:20 24:4
24:15
**offers** 41:20
**office** 3:12 14:3
18:23 19:19 20:1
22:6 25:8,13 27:18
28:10,11 33:15,21
33:22 34:5,6 42:18
54:23 55:11 84:10
85:12 97:6 101:18
**officer** 13:10 32:20
47:16 53:4 57:3,7
59:8 61:20 64:6,7
66:3 78:14 86:3
87:4 93:22
**officer's** 64:2 65:23
77:23 78:13
**officers** 27:23
28:21 34:4 53:1
62:16 63:20 77:13
78:4 81:19 89:6
**official** 37:9 39:10
39:11 44:3
**officially** 37:5,10
40:22

**oh** 8:4,11 14:17
21:6 28:18 50:6
87:3,7,19 90:19
96:20
**okay** 7:5,7,11,20
8:18,23 11:14 12:1
12:19 13:9,16 14:7
14:13 16:3 17:18
18:9,16 21:8 27:11
28:7 29:18 31:13
32:10 33:3,6,12,17
34:7,13 35:1 38:23
40:9,17 42:3 43:22
45:2 46:2,13 47:2
47:22 50:1 51:21
53:6 54:21 55:8
57:1 59:3 62:23
65:22 67:19 69:23
70:3 72:9 75:17
77:18 78:21 79:4
79:10,23 80:4,19
81:15,18 82:20
84:8,19,23 85:14
85:21 87:20 88:12
89:1,10 90:14
91:17 92:6 93:11
95:2,9 97:2,11
98:19 99:14 100:4
101:7
**old** 33:17 87:7
**once** 58:11 81:23
**opened** 22:14
**operations** 38:8
**opinion** 100:7,18
100:19
**opportunity** 26:17
**oral** 6:12
**order** 33:8 76:2
**organization** 10:14
**organizations** 9:22

**originally** 25:7
**ought** 58:8,9
**outcome** 103:14
**outside** 30:13 44:20
48:8 71:12
**outstanding** 88:14
88:18
**overridden** 34:22
**owner** 18:11 20:15
**owning** 69:20

**p**

**p** 2:1 3:1,1 4:1,1
30:1
**p.c.** 3:6,20 4:6
**p.m.** 6:10
**page** 5:3,7 26:14
75:8 76:3,4,6
**pages** 76:11
**paid** 14:5
**paige** 1:8 9:5 12:8
43:7,12 45:4 50:9
86:9 90:1,2 91:4
92:13
**paperwork** 51:14
94:4,10 98:10
**part** 30:18 31:20,21
31:23 33:19 39:2
41:5 83:19 100:10
**particular** 64:10,11
80:17 81:2,12
**parties** 2:3,17
103:12
**parts** 21:9
**patrol** 53:1,3 78:12
**pence** 29:23
**pending** 65:5 80:21
82:13,17
**people** 42:1 69:4,10
81:4 101:5
**period** 17:2,12

**permitted** 53:3
**permitting** 53:1
**person** 44:10,10
87:12 94:7
**personal** 1:6 7:17
**personally** 89:14
**personnel** 28:14
**pertaining** 77:19
**phone** 101:2
**physical** 33:13,18
**physically** 35:22
64:1
**pictures** 39:15
**pistol** 43:13,18 45:3
45:8,11,12,13,16
45:19 46:3,6 48:7,9
51:15 52:1,1,6,8
54:4,9 56:17,21
57:8,10,21 58:20
59:16 60:3,10
69:14,17 71:4,12
71:17,18,22 72:1
73:4 85:22 86:17
89:22 95:11 96:19
97:4 98:16
**place** 12:15,21
25:12 53:13 66:10
68:13
**placed** 46:7
**plaintiff's** 5:7
102:15
**plaintiffs** 1:10 3:3
7:15
**platform** 100:8
**plea** 62:14
**please** 51:21
**pled** 62:3
**plus** 65:23
**point** 17:5,7,8
31:15,17 46:3
50:11 52:23 54:3

55:17 60:2 65:6 70:21
**pointing** 46:19 77:8 97:1
**police** 5:11 10:8,11 10:16 11:16 12:4 13:10 15:3,19,23 19:4 23:20 27:23 28:23 33:13,23 34:1,16 35:17,23 36:5,7 37:2,6,10,11 41:2 43:13 45:5,9 46:7 50:19 51:1 52:3 55:8 56:3 57:16 59:21 61:19 62:16 65:17 66:5 71:19 75:7 76:1 83:17 87:4 92:20 97:13 100:9
**policies** 77:9,17
**policy** 34:13 63:12 63:16 70:13 76:21 81:18
**politics** 100:14
**porter** 4:6,6
**possession** 44:1 56:21 57:10 67:8 68:3 82:21 83:5
**possible** 57:20
**possibly** 58:21
**prepare** 11:7
**present** 25:21
**preserve** 33:8
**pretrial** 17:4
**pretty** 72:10 87:13 91:9
**prior** 2:20 12:4 47:10 52:5
**privy** 45:21
**probably** 8:9 13:19 15:14 31:21 37:20

47:5 49:4 62:5,10 67:6 81:11 96:12
**problem** 38:1 88:20 88:23
**procedural** 76:2
**procedure** 6:6 34:13 63:13 66:6
**proceedings** 6:13 103:6,9
**process** 40:6
**producing** 82:3
**productive** 78:13
**professional** 1:22 6:2 9:21
**program** 16:9
**proper** 25:15
**property** 46:6 60:11 86:2 94:11 97:16,23 98:1
**provide** 16:7
**provided** 11:19
**public** 1:23 2:6 6:3
**purposes** 33:9
**pursuant** 6:5
**put** 12:15,21 34:21 38:11,11 40:3 45:7 57:15,21 59:9,10 80:14

### q

**question** 8:10,15 17:21 23:22 24:20 24:21 33:14 43:9 58:16 60:12 66:2 68:17 71:15 72:5 73:7,9 74:4 79:14 80:2 82:11 83:7,23 88:2 92:15
**questions** 2:16,17 42:21 80:10 102:7
**quite** 15:7

### r

**r** 3:1 4:1 9:12,12 29:11,11 103:1
**raise** 96:8
**raising** 49:10 81:4
**ran** 22:23 23:3 34:23 39:19 40:1 40:10,11 100:8
**rank** 30:21 31:4,10
**ranting** 96:4,5
**ray** 1:6 5:8 13:7,8 76:4 90:12,15,15
**reaching** 16:10
**read** 9:2 34:14 45:22 79:7 94:12
**reading** 2:8 56:10 94:9,21 97:1
**real** 51:23
**really** 24:3,4,19 30:9 33:16 35:15 55:20,21 76:13 82:11 87:11,12 88:2,14 90:23 96:4 96:5,21,23
**reason** 24:1 25:22 48:20 52:7,9,12 55:18 56:4 60:2 71:20,21 73:3 76:19 78:10 83:15 83:17
**reasoning** 81:14
**rebutted** 25:10
**recall** 17:16 18:13 56:16 70:22 74:18 95:3
**receiving** 97:21 98:3
**record** 13:1 15:15 17:8 60:23 74:22 75:19 99:23

**records** 15:9,10 34:2 50:18,21
**rectify** 48:15
**referring** 45:13 69:16 72:6 75:21 76:1
**reforming** 100:8
**refreshed** 69:6
**registered** 1:22 6:1
**regulations** 5:10 11:10,16 12:3 75:7
**relating** 2:12
**relationship** 91:4
**remember** 14:1 17:3,6,11 20:23 21:18,23 22:1,10 29:8,13 31:17 39:22 40:2,4,7 42:14 48:1,21 49:3 50:13 80:19 81:3 81:11,14 88:10,15 92:9 93:8,9,15 94:17,18,20 96:5 96:13,14 99:9
**report** 13:6 47:19 51:1 53:23 56:11 79:7 82:1
**reporter** 1:22 2:6 6:2,19 7:22 103:17
**reporting** 103:16
**reports** 11:10
**represent** 7:14
**representative** 1:7 7:18
**represents** 7:9
**reputation** 89:17
**required** 15:1 16:5 77:13
**reserve** 26:10 27:1
**reserves** 26:11,12 26:20,21,22

**residence** 56:12,14
**respective** 2:3
**responded** 93:23
**responsibility** 36:8
 64:2
**responsible** 36:2
**responsive** 35:3
**restate** 58:20
**return** 18:15 66:19
 67:20,23 93:12
 97:23
**returned** 43:14
 46:10 47:4,5,10,12
 52:14 56:5 68:8,11
 68:23 69:17 71:4
 71:12,22 73:19,23
 78:21 79:8 80:20
 85:22 86:11 89:22
 101:11
**returning** 18:10
 67:1,3 86:17 98:15
**reviewed** 11:6 12:3
**reviewing** 46:23
 61:5
**richard** 4:4
**rifle** 44:20
**right** 7:11,13 8:5
 8:12 9:4,7,9,18
 10:18 11:14,22
 12:7,23 13:9 14:4
 18:7,16,20 19:8
 20:9 21:22 22:2,5
 22:17 23:7,12,18
 28:22 29:4,20
 33:21 35:6,11
 36:16,22 38:13
 40:18 41:18,18
 44:15 45:2 46:15
 46:22 47:7 48:11
 49:21 50:20,22,23
 52:1 53:23 57:2,11

58:5,10,13 61:6
 63:3,6,7 65:7 69:3
 69:22 70:11,13
 71:3,10 73:19
 74:20 76:8 77:5,21
 78:2,3,16 82:6,16
 82:18,19 83:9,10
 83:21 85:7,12,18
 87:23 88:16 92:20
 93:1,5,6 94:1 95:19
 97:10,10 98:8,9
 101:20
**road** 4:7 9:19
**roberts** 12:9
**robertson** 1:18 2:4
 3:16 6:11,15 9:11
 12:2 75:3
**roman** 75:9
**room** 34:2,3
**rose** 1:21 2:5 6:1
 103:20
**rough** 47:7
**rouse** 3:20
**rules** 2:12 5:10 6:5
 11:15 12:3 75:6
 100:21
**run** 34:19 89:1

**s**

**s** 2:1,1 3:1,10,12
 4:1 5:6 9:12 29:22
 29:23 30:4,4 42:14
**safe** 32:10
**safekeeping** 44:17
 79:15 80:13
**saith** 102:18
**saying** 25:2 43:21
 43:23 56:22 58:1,2
 58:3,8 62:10 77:3
 90:22 91:1 94:7,8
 94:10

**says** 57:6 73:2
**scene** 39:17 53:20
 96:16
**scheme** 69:9 72:8
 72:23
**schemes** 72:12
**scratch** 29:7
**search** 52:3 59:18
**second** 47:6
**securing** 17:4
**see** 27:12,14 39:21
 48:14 55:1 57:5
 65:9 70:4,9 82:17
 91:10,11,12
**seeing** 39:14
**seen** 11:21 39:11
 41:14
**sense** 42:22
**sent** 25:10
**separate** 33:3
**september** 19:14
 28:6,7 38:17 61:6
**sergeant** 34:7,9,10
 42:13
**sergeant's** 34:6
**set** 25:17 100:9
**settlement** 94:23
**shaking** 78:6 90:16
**share** 66:15
**shelby** 103:4
**sheriff** 22:15,23
 23:2,12 25:13 41:1
 41:19,19 42:5
 84:12,17
**sheriff's** 14:3 18:23
 19:19 20:1 22:6
 28:10,11 41:5,8,11
 42:15,18 55:11
 84:10 85:4,11
 101:18

**shift** 53:4
**shooting** 95:6
 96:17
**short** 15:7 31:8
 74:23 101:23
**shot** 43:6
**show** 27:15 94:3
**showed** 45:20
**shown** 12:2
**sic** 10:17
**side** 60:10 81:6
 96:7
**sign** 97:15 98:4,5
 98:11
**signature** 2:8
 103:19
**signed** 27:5 57:6
**similar** 77:6
**sir** 7:6,16,19,21 8:1
 8:6,8,22 9:2,3,8
 10:3,6,22 11:2,5
 12:18,20 13:23
 14:12 15:11 16:15
 16:19,19 18:19
 19:6,13,17,20,23
 22:19 23:13,16,17
 24:8,8 25:5 28:8
 29:17 30:6 32:5
 33:2,11 36:21 38:6
 38:15,22 39:18
 40:11 42:7,20,23
 43:5,16 46:8,12
 47:11,21 51:9,9
 56:8,15 59:12
 60:15,18 63:15
 66:17 67:21 68:1
 68:20,22 69:2,2,6,7
 70:6 73:18 74:12
 74:15 75:4 77:10
 77:12,15 79:9,22
 80:1,3 83:11,13

86:12,14 87:19
89:16,18,23 90:11
90:13,19,23 92:2
92:14,18 93:2,2,14
98:17,21 101:14
**sit** 17:9 50:12 53:18
**sitting** 44:20 76:14
**situation** 38:1
48:15 50:15 59:15
80:22 81:10
**situations** 52:4
**six** 13:19
**size** 31:14
**small** 28:19 33:22
53:13 100:14
**social** 91:19
**solo** 53:1,3,4
**somebody** 37:16
44:21
**somebody's** 27:5
**son** 21:3 96:3
**sorry** 53:2 59:1
71:7 78:8 90:19,20
96:22
**sort** 9:21 10:23
18:3 73:20
**sound** 48:23
**sounds** 27:9 57:14
**sparks** 33:22 34:2
**speak** 26:11 90:3
**specific** 17:19
18:10 68:9,12
72:17
**specifically** 18:14
**speeding** 78:15
**spell** 29:10 34:11
42:11
**spoke** 90:9
**stamped** 11:20 76:6
76:7

**start** 9:9 55:21
59:21 84:5
**started** 48:17 49:11
49:15 80:9
**state** 2:6 6:3 15:23
68:2 69:3,9,23 70:1
70:19 72:7,22
103:3,22
**stated** 25:9 94:14
**statement** 50:10
57:1,5 72:10
**statements** 92:12
**states** 1:1 56:20
**statute** 69:3,7,19
70:2 71:5,8,13 73:2
72:5,18 73:16
**statutes** 68:3,6,9
69:9 70:20,23
72:11
**statutory** 72:7,23
**stay** 84:19 85:1,8
85:16
**stayed** 19:8
**step** 41:20
**stipulated** 2:2
**stipulations** 6:6,19
**stolen** 44:19
**store** 48:3,23 49:6
80:23 81:5,9 92:8
96:6
**story** 51:4
**street** 3:21 37:13
37:14
**struggling** 82:7
**stuff** 39:10,11 52:3
81:5
**stupid** 48:23
**subpoena** 62:9
**subpoenaed** 62:21
82:4

**sue** 48:12
**sued** 63:5 70:20
93:17,18 94:7,7
**suite** 3:7,13,21 4:7
**supervisors** 78:11
**suppose** 36:21
**supposed** 37:1
81:19
**sure** 8:4,5,17,19
11:18 12:20 13:4
15:10 17:5,6 19:5
29:15 30:5,6,7,11
30:14 31:23 32:3
32:17 35:12,14,15
39:1,3 40:12 41:13
43:3 45:7,10 46:23
49:14 50:12,13
53:12,16 54:2
55:16 57:17 60:22
61:1 62:4 67:5,7,9
70:12,21,22 71:1
72:16,19 73:8 79:9
79:13 80:11 86:5
95:13,15
**surprised** 16:12
**suspended** 27:13
**sworn** 6:16
**sylvia** 1:6 90:12,15
**sympathize** 25:2
**synonym** 10:17

**t**

**t** 2:1,1 5:6 9:12
29:11 103:1,1
**take** 8:2 44:16
60:11 93:6 97:9
99:3
**taken** 1:21 2:5
44:11,22 45:8 46:3
46:6,16,17 48:7
52:9 54:9 75:1
78:22 96:19 100:13

102:1 103:6,9
**talk** 9:5 67:16
78:23 79:4 90:4
101:18
**talked** 51:2,2,3
92:4 93:11,14
**talking** 45:10 93:9
102:3
**talks** 71:9
**tell** 16:13 28:22
38:16 44:4 47:2
49:3,18 51:20
53:19 62:5 80:19
91:7,20 93:21
95:14 96:2
**telling** 54:15 84:11
**ten** 15:4
**term** 43:20 44:3
**terrible** 49:2
**test** 26:11,14,19,20
26:23 27:7
**tested** 26:14
**testified** 6:17
**testify** 61:20
**testimony** 43:4
47:9 54:3,12,14,15
68:23 83:20
**thereto** 2:20
**thing** 11:11 16:20
18:8 20:6 25:16
27:1 28:16 63:17
64:14 91:9,14
94:12 101:2
**things** 24:12,16
26:5 31:18 35:4,8
37:15 59:21 65:13
65:16,18 66:14
77:6,7,20 81:2
101:3
**think** 13:7 15:7
19:20 23:16 31:3

31:15,22 37:4,21
56:6 57:5 58:8,9,16
58:20 64:9 68:21
73:9 75:15 76:11
76:22 77:1 87:21
88:7,18 92:22
93:14 94:17 98:12
99:11,12,17 100:6
100:7 101:21 102:2
102:3,8
**third** 56:8
**thirds** 24:14
**three** 20:22 26:13
32:14
**time** 2:19,19 12:8
16:17 17:2,12 20:3
21:15 28:2 30:19
30:23 31:8,20,21
31:23 32:12 34:8
36:4 37:6,8,8,19
39:23 42:12,13
45:10 46:3,18
52:23 53:9,21
56:21 59:14 60:21
62:19 65:4,13 66:9
68:8,11 69:13,13
69:17 70:16 71:1
71:17,21 77:1 80:8
81:2,7,12 83:2,14
85:5 88:8 90:6,7
91:5 96:11 100:23
102:11
**times** 75:8,9 88:1,5
89:2
**timothy** 29:19 31:7
**title** 13:4
**toby** 38:19 40:17
**today** 11:7 12:5,17
34:14 54:3 68:19
**toes** 41:20

**told** 24:9 42:19
48:13 79:15,19
86:6,9 95:5,9 98:14
98:17
**tom** 3:17
**tommy** 30:2
**tomorrow** 62:22
**tony** 24:6
**town** 21:12 100:14
**track** 61:17
**tracking** 63:13,23
64:1
**training** 14:10,16
14:18,20 15:6
16:22 17:3,13,19
18:3,10,13
**transcribed** 103:7
103:10
**transcript** 103:9
**transcription** 103:8
**trial** 2:19 17:15
62:18
**tried** 54:8 94:3
**trucking** 20:5,16
20:18 21:3
**true** 82:20 103:8
**try** 71:16
**trying** 26:4,5 55:23
69:21 70:12 102:13
**turned** 65:10
**tuscaloosa** 3:8,14
6:8 10:21 21:5
**tv** 39:14
**twelve** 14:20 15:2
**twenty** 14:19 15:1
18:2 99:22
**twice** 22:3
**two** 14:2,19 15:1
18:22 20:22 24:14
26:13 48:4 53:8

**type** 26:23 27:1
34:18 75:6 91:8
94:12

**u** 2:1 29:11,11 30:4
30:4 34:12
**uh** 20:19 21:7 22:7
75:10,12 89:4
101:19
**understand** 8:14
40:9 71:15 73:8
83:19
**understanding**
54:9
**understood** 8:13
63:16
**united** 1:1
**university** 6:8
**unlawfully** 82:21
83:5
**unrelated** 65:20,21
**use** 25:15 38:20
77:3
**usual** 6:19

**v** 5:8
**valid** 60:2
**vehicle** 56:15
**version** 38:20
**versus** 13:7,8 76:4
**violate** 86:17
**violence** 61:3 64:22
66:16 67:17 68:4
69:11 70:15 73:1
73:14 82:13 83:4
88:6
**violent** 89:14,15
**vote** 24:14,18 26:7
**voted** 76:23

**vs** 1:11

**w** 9:11
**wade** 9:11
**waived** 2:9,22
**waiver** 98:5,11
**walk** 59:18
**want** 25:15 29:14
40:3 44:18,19,20
45:19 54:2,10
59:16,17 72:21
77:21 78:12,15
**wanted** 16:22 93:4
**warrant** 13:6 44:12
47:16 52:3 59:18
64:16 82:3 88:13
88:14,18
**warren** 4:4 7:7
102:5
**way** 18:11 21:10
50:15 51:23 52:6
59:15 66:14 76:20
**we've** 11:21 14:20
18:2 68:18
**weapon** 44:8,8,17
44:18,22 54:22
73:20,23 74:7,13
78:22 82:22 83:5,8
83:14,18 84:3
93:12 101:11
**week** 47:6 78:15
**weigh** 60:6
**went** 13:21 14:2,10
18:17,22 19:3 20:2
22:5,17 23:5,14
28:9 37:22 40:6
48:8 49:9,17 51:19
52:2 53:22 55:10
55:12 56:14 62:20
65:18 66:2 79:12
86:1 87:3 90:9

95:23 97:17 99:12
**whatsoever** 39:8
**witness** 2:9 6:11
72:15 78:6 90:16
**witnesses** 95:6 97:3
**won** 23:5
**wondering** 58:14
**word** 25:15
**wording** 55:16
**words** 52:7 78:14
**work** 13:16,21 20:2
20:6,20 23:4,14
28:9 53:15 87:3
**worked** 14:2 18:21
20:5,7,16 21:2
22:11,12 28:23
32:1 49:5 53:14
**workers** 81:5
**working** 76:18,22
89:3
**workings** 39:2
**wow** 16:17
**wright** 20:12 21:2,3
**write** 35:23,23
**written** 33:14
99:22
**wrong** 101:4
**wrote** 57:4,7 88:17

---
**x**
---

**x** 5:1,6

---
**y**
---

**y** 29:22,23
**y'all** 63:14 66:15
75:18 87:23 88:4
93:17 96:3
**yachting** 11:3
**yeah** 8:11,11 11:18
11:22 14:19 16:23
17:23 18:2,7 21:13
21:16 28:18,18,19

31:1,8,15 38:6 47:1
47:7 50:6,6,13
53:17 55:15,15,16
57:20 58:1,19 59:7
64:15,23 65:2
68:10 74:10 75:14
75:20,23 76:7 78:8
83:3,10 89:5 90:8
92:22 95:23 97:10
97:15 102:8
**year** 14:21 15:2
19:7 21:11,20
**years** 14:2,19 15:1
15:4 16:14 18:2,17
18:22 20:22 26:4
76:18 79:20 96:14
99:20,22 100:1,5
**young** 87:5,6

---
**z**
---

**z** 13:14,15
**zero** 39:6 52:8

# EXHIBIT C

EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **SYLVIA RAY, AS PERSONAL** | ) | |
| **REPRESENTATIVE OF THE** | ) | |
| **ESTATE OF PAIGE MITCHELL,** | ) | |
| **DECEASED,  et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.: 19-0069-KD-MU** |
| **v.** | ) | |
| | ) | |
| **ESTATE OF BRADLEY ELLIOTT** | ) | |
| **GRAY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF KEN ROBERTSON

My name is Ken Robertson, and I make this Declaration in the above-styled action under the provisions 28 U.S.C. § 1746. The statements made herein are true and correct and I sign this Declaration below under penalty of perjury.

1.      My name is Ken Robertson, the former police chief for the City of Moundville, and one of the Defendants herein.  I am currently employed with the Hale County Sheriff's Department.  I make this declaration based upon my own personal knowledge and in support of a motion for summary judgment filed on my behalf in this action.

2.      Attached hereto as Exhibit A is a true and correct copy of a list of the continuing legal education courses which I have taken over the years, including a "Summer Chief Conference" in Orange Beach, Alabama from August 3 through August 6, 2015.  This is the conference that I referenced at my deposition, after which, within a few days, Bradley Elliott Gray confronted me, demanding his pistol back, at a store in Moundville while I was getting coffee.  I returned it to him later that week, after my subsequent investigation into the

circumstances of his arrest in July and the seizure of the pistol from his residence without a search warrant.

2. Part of my administrative responsibilities as Police Chief for the City of Moundville was to ensure that any property that was seized by the City's police officers under my supervision in connection with any law enforcement conduct was not taken in violation of the law and to exercise judgment in whether any seized property needed to be returned to the owner in light of any potential violations of law in the seizing of that property. I was exercising this judgment and discretion in determining that the pistol that had been taken from Brad Gray's residence needed to be returned to him.

Dated this _24_ day of November, 2020.

_Ken Robertson_
Ken Robertson



## ALABAMA PEACE OFFICERS
STANDARDS & TRAINING COMMISSION

APOSTC  AELECTS  Applicants

HOME ◊ AGENCIES ◊ CONTINUING EDUCATION ◊ Courses

## Officers Continuing Education | View and Add Officer's Continuing Education Units.

**AGENCIES**

Alerts(0)
Home
Agencies
  Officer Select
  Continuing Education
    Courses
    Firearms
  Officer's CEU Detail Reports
  Delinquent Hours Reports
  Officer Employment
  Officer Info
  Applications
  Fingerprint Card Req.
Agency Chief
  Applicants Milestones
  Schedule Recruit
LogOut

Name: Kenneth Wade Robertson   DOB: 01/05/1966   SSN: 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   Notes(0)   Locked: ☐

New Course

### Continuing Education Courses with Hours

| Date | Course | Location | Hours | Exec. | Media | Changed By | Notes |
|---|---|---|---|---|---|---|---|
| 2/27/2020 | REACT Autism | Greensboro PD | 4 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 12/17/2019 | Alabama Fusion Center: Missing person/Human Traffi | Greensboro, Al | 3 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 9/19/2019 | 2019 Alabama Attorney General's Law Enforcement Su - Morning Session | Montgomery, AL | 3 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 9/19/2019 | AL ATTY GENERAL SUMMIT 2019 | MONTGOMERY AL | 6 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 2/7/2019 | Firearms Instructor Recertification | Jefferson Co. AL | 16 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 12/10/2018 | Utility Crimes Investigation | Birmingham AL Revenue Protection | 16 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 5/22/2018 | RX-PATROL | Birmingham Police Dept. | 7 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 2/22/2017 | Violent Crimes Investigations | UA | 12 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 10/25/2016 | Response to terrorist bombing | Greensboro Al | 8 | ☐ | ☐ | Ellis, Kenneth Wayne | Notes (0) |
| 8/4/2016 | 2016 AACOP Summer Conference - Business Meeting | Orange Beach, AL | 2 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 8/3/2016 | 2016 AACOP Summer Conference - Ferguson: Before, During and After | Orange Beach, AL | 4 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 8/2/2016 | 2016 AACOP Summer Conference - Know the Community You Police Session 2 | Orange Beach, AL | 4 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 8/1/2016 | 2016 AACOP Summer Conference - Know the Community You Police | Orange Beach, AL | 4 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 3/3/2016 | 2016 Winter Chief's Conference - Business Meeting | Montgomery, AL | 2 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 3/2/2016 | Mobile Field Force Command Training - Session 2 | Montgomery, AL | 4 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 3/2/2016 | Mobile Field Force Command Training - Session 3 | Montgomery, AL | 4 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 3/1/2016 | Mobile Field Force Command Training - Session 1 | Montgomery, AL | 4 | ☑ | ☐ | Echols, Eric | Notes (0) |
| 2/10/2016 | Civilian Response to Active Shooter Events | Bessemer, AL | 4 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 8/6/2015 | 2015 Summer Chief Conference - Business Meeting | Orange Beach, AL | 2 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 8/5/2015 | 2015 Summer Chief Conference - Challenging the Law | Orange Beach, AL | 4 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 8/4/2015 | 2015 Summer Chief Conference - Challenging the Law | Orange Beach, AL | 4 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 8/3/2015 | 2015 Summer Chief Conference - Challenging the Law | Orange Beach, AL | 4 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 1/29/2015 | 2015 Winter Chief Conference - Business Meeting | Montgomery, AL | 2 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 1/28/2015 | 2015 Winter Chiefs Conference - Session 1 - Civil | Montgomery, AL | 4 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 1/28/2015 | 2015 Winters Chief Conference - Session 2 - Civil | Montgomery, AL | 4 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 1/27/2015 | 2015 Winter Chiefs Conference - Domestic Extremist | Montgomery, AL | 4 | ☑ | ☐ | Chrisman, Sabrina Westmoreland | Notes (0) |
| 7/31/2014 | | Orange Beach, AL | 2 | | | | |

# EXHIBIT D



Deposition of:

**Sylvia Ray**

*July 23, 2020*

In the Matter of:

**Ray, Sylvia, et al. Vs. Gray, Bradley Elliott, Estate Of, et al.**

Veritext Legal Solutions

877.373.3660 | calendar-al@veritext.com | 800.808.4958

1      IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    SYLVIA RAY, AS PERSONAL )

6    REPRESENTATIVE OF THE   )

7    ESTATE OF PAIGE         )

8    MITCHELL, DECEASED,     )

9    et al.,                 )

10           Plaintiffs,    ) CIVIL ACTION NO:

11                          ) 19-0069-KD-MU

12   VS.                     )

13   ESTATE OF BRADLEY       ) DEPOSITION OF:

14   ELLIOTT GRAY, et al.,   ) SYLVIA RAY

15           Defendants.    )

16

17       S T I P U L A T I O N S

18       IT IS STIPULATED AND AGREED, by and

19   between the parties through their

20   respective counsel, that the deposition of:

21              SYLVIA RAY,

22   may be taken before Karen Hinch, Licensed

23   Court Reporter and Notary Public, State at

1 Large, at the Law Offices of Phelps,
2 Jenkins, Gibson & Fowler, 1201 Greensboro
3 Avenue, Tuscaloosa, Alabama 35401, on the
4 23rd day of July, 2020, commencing at
5 approximately 10:00 a.m.
6
7     IT IS FURTHER STIPULATED AND AGREED
8 that the signature to and reading of the
9 deposition by the witness is waived, the
10 deposition to have the same force and
11 effect as if full compliance had been had
12 with all laws and rules of Court relating
13 to the taking of depositions.
14
15     IT IS FURTHER STIPULATED AND AGREED
16 that it shall not be necessary for any
17 objections to be made by counsel to any
18 questions, except as to form or leading
19 questions, and that counsel for the parties
20 may make objections and assign grounds at
21 the time of the trial, or at the time said
22 deposition is offered in evidence, or prior
23 thereto.

1         A P P E A R A N C E S
2
3 ON BEHALF OF THE PLAINTIFFS:
4     John E. McCulley
5     Attorney at Law
6     John E. McCulley, P.C.
7     601 Greensboro Avenue, Suite 200
8     Tuscaloosa, AL 35401
9 ON BEHALF OF THE DEFENDANTS:
10     Thomas O. Gaillard, III
11     Attorney at Law
12     Helmsing, Leach, Herlong,
13         Newman & Rouse, P.C.
14     Post Office Box 2726
15     Mobile, AL 36652
16
17     R. Warren Kinney
18     Attorney at Law
19     Porter, Porter & Hassinger, P.C.
20     880 Montclair Road, Suite 175
21     Birmingham, AL 35213
22
23

1            I N D E X
2                      Page
3 Direct Examination by Mr. Gaillard    5
4 Cross-Examination by Mr. Kinney       81
5 Redirect Examination by Mr. Gaillard  101
6
7
         EXHIBIT INDEX
8
                      Marked
9 Defendant's
10 Exhibit 1   Statement of Claim    34
11 Exhibit 2   Court order           47
12 Exhibit 3   Plea agreement        47
13 Exhibit 4   Court document        48
14 Exhibit 5   Court document        50
15 Exhibit 6   Court document        51
16 Exhibit 7   Court document        51
17 Exhibit 8   Aerial map            75
18 Exhibit 9   Aerial map            75
19 Exhibit 10  Photos                75
20 Exhibit 11  Aerial photo          76
21 Exhibit 12  Photo                 76
22 Exhibit 13  Aerial photo          77
23 Exhibit 14  Deposition notice     80

1     I, Karen Hinch, Licensed Court
2 Reporter, and a Notary Public for the State
3 of Alabama at Large, acting as
4 Commissioner, certify that on this date, as
5 provided by the Federal Rules of Civil
6 Procedure and the foregoing stipulation of
7 counsel, there came before me on the 23rd
8 day of July, 2020, at the law offices of
9 Phelps, Jenkins, Gibson & Fowler, 1201
10 Greensboro Avenue, Tuscaloosa, Alabama
11 35401, commencing at approximately
12 10:00 a.m., SYLVIA RAY, witness in the
13 above cause, for oral examination,
14 whereupon the following proceedings were
15 had:
16         SYLVIA ANN RAY,
17 being first duly sworn, was examined and
18 testified as follows:
19     DIRECT EXAMINATION
20 BY MR. GAILLARD:
21 Q     Tell us your full name, please.
22 A     Sylvia Ann Casey Ray.
23 Q     Ms. Ray, my name is Tom

1  Gaillard. I represent Ken Robertson who's a
2  defendant in this case.  We're here to take
3  your deposition today.  Have you ever given
4  a deposition before?
5  A       No.
6  Q       Okay.  Let me just go through a
7  few sort of ground rules to help us get
8  started this morning.
9          I'll be asking questions, and
10 you'll be giving the answers, and the court
11 reporter will be taking down everything we
12 say.  So if you can remember, instead of
13 nodding your head or saying uh-huh or
14 huh-uh, if you can give a verbal response
15 that she can take down.  We'll all have to
16 go back and read it later, and it will be
17 better --
18 A       Yes.
19 Q       -- if we do that, and it makes it
20 clear.  And I'll try to do the same, and
21 I'll try not to talk over you if you're
22 giving an answer.  And if you'll make sure
23 to let me try to get my question out before

1  you answer too, that helps us keep it
2  clearer on paper later.
3          I don't know how long we'll be.
4  I don't think we'll be here all day with
5  this, but you never know when you get
6  started in these things how long they'll go.
7  So it's not an endurance contest.  If you
8  need to take a break at any point for any
9  reason, you just let me know and we'll be
10 glad to do that.  Okay?
11 A       That's fine.
12 Q       I want to, I guess, start just
13 getting a little bit of background
14 information, because there's some things we
15 know about this case, and there's other
16 things we don't, or about you and your
17 family and all that.  So I want to ask a
18 little bit about that.
19          I understand that you're living
20 in Gadsden, Alabama; is that right?
21 A       That's correct.
22 Q       How long have you lived there?
23 A       Sixty-six years.

1  Q       Have you ever lived in
2  Moundville?
3  A       No.
4  Q       Okay.  And as I understand it
5  from some of the documents, you are the
6  mother of Paige Mitchell?
7  A       That's correct.
8  Q       Okay.  And also, as I understand
9  it from some of the paperwork, your husband
10 was Danny Ray?
11 A       That's correct.
12 Q       And that was Paige's father?
13 A       Yes.
14 Q       And he was initially the personal
15 representative of her estate?
16 A       That's right.
17 Q       But he has since passed?
18 A       Yes.
19 Q       Okay.  Was Paige born in Gadsden?
20 A       Yes.
21 Q       And grew up there?
22 A       Well, no.  I'm sorry.  She lived
23 there all of her life, but she was actually

1  born in Plant City, Florida, is what her
2  original birth certificate says.
3  Q       Okay.  But you-all lived in
4  Gadsden all your life pretty much?
5  A       Yes.
6  Q       And most of her growing-up life
7  was in Gadsden?
8  A       Yes.
9  Q       And then, as I understand it, she
10 got married at some point.  And who did she
11 marry?
12 A       Benjamin Mitchell.
13 Q       Okay.  Do you remember when they
14 got married?
15 A       I do because it was her birthday.
16 Q       Okay.
17 A       April the 19th.  The year was
18 2002.
19 Q       You mentioned that that was her
20 birthday, April 19th.  I think I saw
21 something that said she was born April 19 of
22 1979; is that right?
23 A       Yes.

1 Q    Okay.  And when she married
2 Benjamin Mitchell, where did they live?
3 A    When they got married, they lived
4 on Powers Loop Road -- well, no, they
5 didn't.  I'm sorry.  It was County Road 44.
6 Q    In the Moundville area?
7 A    Yes.
8 Q    How did she end up in Moundville?
9 A    They met at the beach at Panama
10 City, Florida, and -- she was down there
11 with a friend.  And then they communicated
12 back and forth and just hit it off.  And she
13 moved down here actually before they got
14 married, because she talked to me about it.
15 And she was a hairdresser, so she had to get
16 a job and things like that.
17 Q    Was her husband Benjamin
18 originally from the Moundville area?
19 A    Yes.
20 Q    Okay.  And so she moved down here
21 just before they got married, and then got
22 married and stayed here?
23 A    Yes.

1 Q    I say "here."  We're in
2 Tuscaloosa right now.  But in the Moundville
3 area once she got married to him?
4 A    Yes.
5 Q    All right.  And how many children
6 did they have?
7 A    Two.
8 Q    And those were Kaci and Kayla
9 Mitchell; is that right?
10 A    Yes.
11 Q    Okay.  And I saw somewhere or
12 heard that Benjamin passed away at some
13 point, maybe from a motor vehicle accident?
14 A    Yes.
15 Q    Tell me about that.
16 A    The kids were two and six.  He
17 worked for Mercedes.  And he was off that
18 weekend, and he was to go in to work the
19 next day.  And he was at home, and a friend
20 came by that lived down the street with his
21 brother's motorcycle.  And the friend's
22 brother was in the service and he was
23 visiting.  And Ben loved stuff like that and

1 knew how to drive them, and so he drove it.
2 And something happened on County Road 44.
3 Q    And so he was operating the
4 motorcycle when some kind of accident
5 happened?
6 A    Yes.  He was on the street that
7 they live on, and he went down the road and
8 didn't come back.
9 Q    Do you remember what year that
10 was?
11 A    2000 -- let's see.  Wait a
12 minute.
13       Well --
14       MR. MCCULLEY:  If you're not
15 sure, it's okay to say so.
16 A    Well, I could count it up.  But
17 Kayla was born in 2006, and Kaci was born in
18 2002.  No, wait a minute.  2002, yeah, and
19 2006.  And Kayla was two years old.  So that
20 would be 2008.
21 Q    Okay.  After he passed away, what
22 did Paige do?  She and the girls, did they
23 stay in the Moundville area?

1 A    They stayed right where they
2 were.  They were on the Mitchell property.
3 And she didn't want to disrupt their life
4 and stayed there.  She thought it was best
5 for them.
6 Q    As I understand it, when this
7 incident happened -- when I say "this
8 incident," when Brad Gray killed Paige and
9 Kaci -- she was living in kind of downtown
10 Moundville?
11 A    Yes.  She had been there -- she
12 moved from the place that they had lived.
13 She sold it and bought a house on Market
14 Street.
15 Q    How long had she had that house
16 on Market Street?
17 A    I helped her move, so -- it was a
18 little over a year.
19 Q    Okay.  Before the incident we're
20 talking about or was it longer?
21 A    Well, wait a minute.  I don't
22 know.  I think she'd been in the house a
23 little over a year.

1 Q      And what was her reason for
2 moving from the County Road 44 location to
3 the 154 Market Street location?
4 A      She had a really large yard
5 there, and it was just a lot of upkeep.  And
6 I think she wanted -- it was a double-wide
7 trailer, but they had it fixed really nice
8 and it was -- but it was a lot for her in
9 upkeep.  So she wanted a smaller yard, and
10 she had decided that that was a good safe
11 area she thought.
12 Q      I guess at some point after her
13 husband Ben passed away, she started dating
14 Brad Gray; is that correct?
15 A      I don't know the time line, but I
16 had met him when I went down there when they
17 lived on County Road 44.  And their common
18 bond was -- and it's an ironic thing, but
19 they both had lost spouses in accidents on
20 that road.
21 Q      On the same road?
22 A      On the same road.
23 Q      Do you know how they met?

1 A      I don't.
2 Q      Tell me just generally what you
3 know about their relationship.  That's maybe
4 too broad of a question, but --
5 A      Yeah.  She was down there with no
6 family.  And we wanted her to move back, but
7 she did not want to leave that area for
8 several reasons.  And she enjoyed it.  But
9 she had a lot of fond memories, and he was
10 buried there and his -- a lot of his family
11 lived there and the other grandparents.
12      So she had two times tried to get
13 another house close to me, but this was when
14 Kaci was probably 11, and it just didn't
15 work out.  But then Kaci was older, and when
16 she mentioned moving back to Gadsden, Kaci
17 didn't want to move because she was about to
18 be in junior high school.  So Paige decided
19 to stay there.  She said it was not meant to
20 be because she had tried two times.  And the
21 first time the woman decided not to sell her
22 house, and Paige was ready to buy it.  And
23 then the second time, there was a big to-do

1 with Wachovia.  They had messed up her
2 paperwork.  And it actually had been
3 inspected and -- the house that she was
4 looking at.  But she just couldn't get the
5 paperwork straightened out.  And she really
6 had -- and you can talk to the real estate
7 agent about it.  Wachovia had -- I don't
8 know exactly what they did, but some people
9 didn't do their job, and it affected her
10 getting the house.  So it fell through, and
11 she said it just wasn't meant to be.
12      So she waited for a while and
13 then looked for a house there.  She wanted
14 to invest in a house because she thought it
15 was safer and a better investment.
16 Q      I guess I'm just right now
17 looking for more of what your knowledge is
18 of what relationship she had with Brad Gray.
19 Let me try to ask a better question maybe.
20      Do you remember when they first
21 started seeing each other?
22 A      I do but I don't remember the
23 date.  I really don't.  And --

1 Q      Do you remember a year?
2 A      I don't remember a year, because
3 I -- I mean, we went back and forth a lot.
4 The kids were small, and so we went back and
5 forth a lot.
6 Q      I guess I'm just wondering if she
7 had been --
8 A      The only way I would remember is
9 if I tried to think about how old the kids
10 were.  And I have no idea really.
11 Q      Well, you mentioned that her
12 husband Ben passed away in I think 2008, and
13 this incident we're talking about today was
14 in 2017.  And so I didn't know if she and
15 Brad were seeing each other for ten years,
16 for two years.  I'm trying to --
17 A      It was a long time, I'll put it
18 that way.  I really -- I don't have an idea.
19 I really don't.  But I will say this:  He
20 went to rehab for the drinking --
21 Q      Brad?
22 A      -- at some time.  And she was his
23 sponsor because his family had given up on

1 trying to help him. Or I don't know all the
2 background. She told me a lot of stuff.
3 But she did come to my house when
4 she visited him, and I don't know when that
5 was. I would have to -- if somebody's life
6 depended on it, I could maybe go back and
7 look, but I have no idea what year that was.
8 There's nothing in my mind that would make
9 me remember.
10 Q Would it be --
11 A But they were friends off and on
12 for a long time.
13 Q Okay. And would it be fair to
14 say for more than five years?
15 A Yeah. Well, let me think. Yeah.
16 It would be -- but I don't know how much
17 over that.
18 Q But you can't give an exact?
19 A Huh-uh.
20 Q That's fair.
21 Let me ask this. Did Paige ever
22 remarry at any point?
23 A No. She never -- she dated Brad,

1 and like I said, it was an off-and-on
2 relationship because she -- because of his
3 behavior. There were times when she didn't
4 talk to him. But she told me that --
5 because we asked her, and there were
6 times -- a long time when she did not see
7 him. And that was probably two years before
8 this happened. I know two -- like about two
9 years before this happened, she was not
10 seeing him.
11 But she said she kept running
12 into him and seeing him at different places
13 because he lived about a mile down the road.
14 And she said that it was kind of odd that
15 they would just run into each other, but
16 it's a small town. And I said, well, maybe
17 you just need to be his friend and that's
18 all. You know, because she was a
19 hairdresser, and he was a smart guy. I
20 mean, he really had some issues, but he was
21 kind of a jack-of-all-trades I guess you
22 would say.
23 Q When you would come down to

1 visit, would you spend time around her and
2 also see him from time to time?
3 A Yeah. He -- Brad helped her
4 move. We all helped her move into the
5 house.
6 Q Into the Market Street house?
7 A Uh-huh. And there were other
8 people that helped her move.
9 Q Do you know if, in that two-year
10 time frame before this incident happened
11 that they maybe weren't seeing each other as
12 regular, were they still seeing each other
13 some off and on during that time?
14 A No.
15 Q So she would just -- she wasn't
16 dating him, but she would see him around
17 town is your understanding?
18 A At that point.
19 Q Yes.
20 A But then I think -- you know,
21 after that, I'm not going to say because I
22 really don't know, but -- I don't know.
23 Because I didn't see him.

1 But I will say this. One day I
2 was coming, and she knew I was coming but I
3 was late. And she was working, and she
4 called Brad to go and make sure the kids
5 were at home. And so he lived down the
6 road. He also -- he lived down the road,
7 and he worked down the road. So she was
8 afraid the kids would be at the house on
9 Market Street by their self, so she called
10 Brad to go by there. And we were all -- we
11 all ended up there at the same time. But
12 that was probably a year -- probably that
13 summer at some point. So I know she talked
14 to him, but I don't remember how much.
15 Q So you're thinking that would
16 have been the summer of 2016 maybe?
17 A Yeah.
18 Q Okay. How often would you come
19 down here to visit with her?
20 A She came to my house more often
21 than I came down here, but we had -- my
22 husband and I came here for Kaci's birthday
23 December the 17th. And then she was killed

1 the next -- well, no, we saw each other --
2 then she came to my house at New Year's.
3 And she spent Christmas here in Moundville.
4 And so the last time I saw her was the 1st
5 of January.
6 Q        Of 2017?
7 A        Uh-huh.  And we were supposed to
8 see each other like the first of February,
9 sometime in that area, but it didn't work
10 out.  So my niece was supposed to come the
11 weekend before she got killed.
12 Q        And who is your niece?
13 A        Tiffany Parnell.
14 Q        Does she live in Gadsden?
15 A        She did.  She lives in Fort Payne
16 now.
17 Q        Okay.  When Paige would come up
18 to visit y'all in Gadsden, would she ever
19 bring Brad with her?
20 A        He came one time.
21 Q        Just once?
22 A        Uh-huh.
23 Q        Is that a yes?

1 A        Yes.
2 Q        I'll remind you every now and
3 then.
4 A        He came one time.
5 Q        On the times that you did see
6 Brad Gray and you were around him, did you
7 ever see him do anything to Kaci, make any
8 threats to her or harm her?
9 A        No.  No.  I never saw anything
10 like that, but I was told some things by
11 Paige.
12 Q        When did she tell you some of
13 those things?
14 A        Well, it's on record with the
15 police department that before she moved, he
16 had hit her.  And she had to go to the
17 dentist, and she was afraid she was going to
18 lose a tooth.
19 Q        Do you remember when that was?
20 A        No, I don't.
21 Q        Approximately?
22 A        But it should be -- she was
23 supposed to go and testify, but she never

1 went.  The police know about it because they
2 talked to me about it.  But I don't remember
3 the dates.
4 Q        And you said that was because
5 Brad hit her?
6 A        He didn't hit her with his hand,
7 but he hit her with something.  I don't
8 remember now what it was.
9 Q        And do you think there was some
10 sort of police report or complaint --
11 A        I know there was.
12 Q        -- that Paige --
13 A        I know there was.
14 Q        -- made against him?
15 A        Uh-huh.
16 Q        Have you never seen that report?
17 A        No.  Well, in some of her things
18 when we were cleaning the house out, I did
19 see where there was a piece of paper about
20 it.  But the police I think said that she
21 never -- and she talked to me about it, but
22 like I said, I don't remember the dates.
23 But she never followed through with it.

1 Q        There was an incident that
2 occurred on July 9th, 2015, I believe, where
3 Paige went over to Brad's house to get her
4 car.
5 A        Well, that was a different thing.
6 Q        Well, what I was going to ask is,
7 this thing where he hit her with something
8 and she had to go to the dentist, was that
9 incident before the July 9, 2015 situation?
10 A        I don't know.  I really -- I
11 think it was after.
12 Q        Which one was when?
13 A        The incident at her house I think
14 was after the thing at his house.  But I'm
15 not sure.
16 Q        When you say the incident at her
17 house, that would have been where she ended
18 up having to go to the dentist?
19 A        Yeah.
20 Q        But you can't say for sure right
21 here?
22 A        No.
23 Q        And the piece of paper you said

7 (Pages 22 - 25)

1 you found at her house, do you remember what
2 that was?
3 A    I think it was the piece of paper
4 telling her when the court date was, but --
5 and it may be even in some of her stuff that
6 I have.
7 Q    And based on what you said, it
8 sounds like that Paige didn't follow up on
9 that incident with the -- when he hit her at
10 her house so that maybe it got dismissed or
11 something?
12 A    Uh-huh.
13 Q    Is that right?
14 A    That's what I think.  Because he
15 had been in trouble, and she really was
16 afraid he would lose his job or something.
17 He had had his -- from what I understand, he
18 had had his license pulled or -- he had had
19 a lot of problems, and she was trying to
20 weigh out what to do.  And so she did not
21 follow through because of -- you know, she
22 just didn't.  I don't know.
23 Q    And when you say he had a lot of

1 problems, was it an alcohol problem he
2 apparently had?
3 A    Anger, alcohol, driving without a
4 license.  That's all I know of.
5 Q    Do you know if his substance
6 issues were just alcohol or if he had some
7 kind of drug issue as well?
8 A    I don't.  But I -- I was told he
9 took Adderall, but I really don't know.  I
10 think it's a possibility.  And I can't even
11 tell you who told me that.
12 Q    But other than that, you didn't
13 have any --
14 A    I don't know of any other drugs.
15 And I really have no idea, and I haven't
16 heard anybody say.
17 Q    Other than the incident where
18 Paige ended up having to go to the dentist
19 with the deal with Brad, and the one we
20 talked about where she went to get her car
21 in July of 2015, do you know of any other
22 incidents where Brad either hurt her or
23 threatened to hurt her?

1 A    Yeah.
2 Q    Tell me about that.
3 A    This is what Marjean said.
4 Q    Who is Marjean?
5 A    The other grandmother.
6 Q    What's her last name?
7 A    Childree.  She asked me if I knew
8 about it and I said no.  And so Paige had
9 called me several times before she got
10 killed, like three times over a few days,
11 but I was busy painting to get ready for
12 them to come to our house, and I just kept
13 missing her.  And she talked to her dad.
14    And looking back on it now, I
15 think she wanted to talk to me, but she
16 really did not want to bother me.  And
17 that's how she was.  She didn't -- like she
18 would -- I don't know why, but she didn't
19 ask to speak to me.  And I wish she had.
20    But anyway, she talked to her dad
21 and -- but dad -- Danny didn't like Brad and
22 she knew it.  So if she had a problem with
23 him, she would not have mentioned it to

1 Danny.  And so that lines up with what
2 Marjean was saying, that he had come by
3 their house on -- she said Saturday night.
4 And she asked me if I knew about it, and I
5 said no.  And she said that he picked up
6 like an exercise, muscle -- some kind of
7 working-out thing, and hit her in the head,
8 and she filed a report.
9 Q    Do you remember when that would
10 have been?
11 A    It was the Saturday before she
12 got killed on Thursday.
13 Q    And you think there was some sort
14 of report filed with the police department?
15 A    Yes.  I was told there was.
16 Q    Have you seen any documentation
17 of that?
18 A    No.  No.  But like I said, my
19 husband talked to the police really more
20 than I did.  I was working.  My husband was
21 retired, and so he took care of a lot of
22 that.  And he had almost a degree in
23 criminal justice.  So he took care of all

1  that.
2  Q      Your husband did?
3  A      Uh-huh.
4  Q      Is that a yes?
5  A      Yes.
6  Q      Any other incidents that you know
7  of where Brad threatened her or harmed --
8  A      I was not told, but --
9  Q      -- Paige?
10 A      No.  That I know of.  But I've
11 been told there was.  But she would not tell
12 me because she did not want to worry me.
13 Q      Who else would have told you
14 about anything like that?
15 A      Her friends.
16 Q      Do you remember who may have --
17 which friends may have said anything?
18 A      She had two friends that she --
19 from Gadsden that knew about it.
20 Q      And who were they?
21 A      Crystal Honeycutt was one, and
22 Elisa -- and I can't think of her married
23 name, but it's on my -- it's probably on

1  this phone that he has locked up.  That's
2  Paige's phone.
3  Q      But these were friends that lived
4  still in Gadsden?
5  A      Uh-huh.
6  Q      Is that a yes?
7  A      Yes.
8  Q      But these were people she would
9  still talk to?
10 A      Yes.
11 Q      Okay.  Did these friends from
12 Gadsden ever come down here to Moundville
13 and witness anything like that?
14 A      With Brad?
15 Q      Right.
16 A      To my knowledge -- they have not
17 mentioned it to me if they did.
18 Q      Okay.  And as we sit here today,
19 whether you've heard it from somebody else
20 or witnessed it yourself, any other events
21 you can think of leading up to, you know,
22 January 25th, 2017, where Brad --
23 A      No.

1  Q      -- had some incident with Paige?
2  A      No.
3  Q      Did Brad ever do anything to harm
4  or threaten the children, Kayla or Kaci?
5  A      No.  Because I asked.
6  Q      All right.  I looked this up
7  earlier just so we could establish the date
8  of birth.  Also we've talked about Paige's,
9  but Kaci's date of birth looked like was
10 December 17 of 2002.  Does that sound right?
11 A      Yes.
12 Q      And then Kayla was the younger
13 sister.
14 A      Yes.
15 Q      And you said she was born in
16 2006?
17 A      December the 1st.
18 Q      Where is Kayla now?
19 A      With Marjean and Keenan Childree
20 on Powers Loop Road.  Which Paige and Ben
21 had lived there for a few years before
22 they -- let's see, after -- she -- they
23 lived in his grandfather's house when they

1  first got married, and then they bought a
2  trailer and lived in Marjean's yard for a
3  few years.  And Kayla was brought home to
4  that trailer.  So that would be in 2002 that
5  they lived there.  And for how long, I
6  really don't remember.
7  Q      So Marjean Childree --
8  A      Probably --
9  Q      -- and Keenan Childree, were
10 those Ben's parents?
11 A      It was Ben's mother and
12 stepfather.
13 Q      Okay.  I was going to ask because
14 the name was different.  I was wondering.
15 A      Uh-huh.
16 Q      But both of them are still alive?
17 A      Yes.
18 Q      Okay.  And they live here still
19 in that same location?
20 A      Yes.  The same house, which is
21 the Perry home place.  It's been there for a
22 long time.  It's on their farm, the Perry
23 farm.

1 Q    And did Keenan and Marjean
2 Childree tell you anything else that they
3 observed about Brad Gray leading up to all
4 this?
5 A    Yes, but I really -- you'd have
6 to talk to them, because it's a lot of
7 stuff.
8 Q    They were living here, so they
9 may have seen more than you?
10 A    Keenan was called to help Paige
11 sometimes with whatever.  And so yes, they
12 know.
13    (Defendant's Exhibit Number
14    1 was marked
15    for identification.)
16 Q    Let me show you what I've marked
17 as Exhibit 1, which is just a copy of the
18 statement of claim that was made.  Have you
19 seen that before?
20 A    I have not seen this before that
21 I can remember, this exact piece of paper.
22 I mean, I don't --
23 Q    That's fine if you hadn't.  I

1 think it was your husband who signed it.
2 A    He told me -- I mean, he talked
3 about this stuff.  So that's his signature.
4 Q    That's your husband's signature?
5 A    Uh-huh.
6 Q    Is that a yes?
7 A    Yes, it is.  So July 25th, 2017.
8 Q    Is that the date he signed it?
9 A    Uh-huh.
10 Q    Yes?
11 A    Yes.  Well -- yes.
12 Q    And you may not know this, but in
13 Alabama generally you have to -- before you
14 sue a municipality, you have to make a
15 statement of claim like this and submit it
16 to them.  But it sounds like you weren't
17 really involved in this part of it, that
18 your husband handled that.  Would that be
19 fair to say?
20 A    Ask me that again.
21 Q    Sure.  Did you have anything to
22 do with putting together this statement of
23 claim we've marked as Exhibit 1?

1 A    Let me read this again.  So this
2 is actually -- (witness reviewing document.)
3    He -- he told me -- we have a
4 very good communication.  I'm sure he told
5 me, but I don't remember that exactly.
6 But -- I mean, I don't know what to say.
7 Q    You mentioned that it's got his
8 signature on there.
9 A    Yes.
10 Q    And it shows it was signed on
11 July 25, 2017.  Do you know when this
12 document, Exhibit 1, was actually sent to
13 the City of Moundville?
14 A    No.  I knew you were going to ask
15 that.
16 Q    And that's fine.  If you don't
17 know, you can just tell me you don't know.
18 A    I don't know.
19 Q    Okay.  And some of the things I'm
20 asking you about are just so we can kind of
21 get the dates that some of these things
22 happened.
23 A    Uh-huh.

1 Q    In looking at the estate, it
2 looks like your husband was initially the
3 personal representative of the estate
4 appointed by the Hale County probate court;
5 is that correct?
6 A    Yes.
7 Q    And it looks like -- let's see.
8 It looks like the will was submitted to that
9 probate court in Hale County on April 11,
10 2017.  I don't see exactly when your husband
11 was appointed as personal representative,
12 but I assume it was right around that time
13 frame.  Does that sound about right?
14 A    Yes.
15 Q    Okay.  And then he passed away --
16 was it in March of 2017 or 2018?
17 A    2018.
18 Q    Oh, wait.  Here it is.
19 March 27, 2018.  That's right.
20 A    Yes.
21 Q    And so then you were appointed as
22 the successor personal representative.  And
23 is that for the estates of Paige Mitchell

1 and Kaci Mitchell?

2 A    Yes.

3 Q    And it looks like, based on the

4 date of that document, that that was -- and

5 I can show it to you if you want to see it,

6 but it was around January 25 of 2019.

7 A    That I was appointed --

8 Q    That you were appointed.

9 A    Yes.

10 Q    Okay.  I just wanted to get those

11 dates down so we had that as a reference.

12      I know this is probably not

13 something you necessarily want to talk about

14 or not easy to talk about, but we do have to

15 talk about this whole situation.  And so I

16 do want to get into the incident that

17 occurred January 25th of 2017.

18      But before that I guess, I want

19 to talk a little bit about that incident

20 that I was aware of in July of 2015 where

21 Paige went over to I guess get her car.  And

22 the date I got from the documents that that

23 happened was July 9, 2015.

1      Tell me what you know about that

2 incident.

3 A    She called us and talked to her

4 daddy.  And she was upset.  And he told her

5 some things that she should do and not do.

6 And I overheard the conversation.  It was in

7 the afternoon.  And her daddy just told her

8 that she needed to call the police.

9 Q    Do you know if that conversation

10 she had with your husband was before or

11 after the incident with Brad on July 9th?

12 A    I have no idea.  The July 9th

13 incident is which incident?

14 Q    Well, my understanding from what

15 I've seen on that is that she went over to

16 his house to get her car.

17 A    That's right.

18 Q    And --

19 A    And it was parked there.  And

20 that I know.

21 Q    What -- and I guess that's what

22 I'm trying to learn is what else you know

23 about what happened that night when she went

1 to get her car.

2 A    It was during the afternoon, from

3 what I understand.

4 Q    Okay.

5 A    I really don't remember the time,

6 but I'm thinking it was the afternoon.  And

7 he wasn't going to let her have it.

8 Q    The police report indicates it

9 was 11:40 at night.  It says P.M.

10 A    Oh, was it?  Okay.  Well, she

11 called.  I don't remember.

12 Q    So --

13 A    It was at night?  Okay.

14 Q    That's what the police report

15 indicated.

16 A    I was thinking it was the

17 afternoon.

18 Q    So I didn't know if maybe she had

19 called the next day and was talking to y'all

20 about it.

21 A    She was really upset, and I just

22 know that she called.  And like I said, I

23 had to work, so a lot of times she would

1 talk to her daddy because he was just really

2 better at giving advice legally than me.

3 Because I have no clue what would be

4 sometimes the best thing in those

5 circumstances.

6 Q    Do you know why her car was over

7 at Brad's and why she was having to go get

8 it that night?

9 A    I don't.

10 Q    And do you know what actually

11 occurred in that incident?

12 A    No.

13 Q    Okay.  But something occurred, at

14 least you know that, that she talked to your

15 husband about and she was upset about it?

16 A    Yes.

17 Q    Did you know she filed a police

18 report or a complaint against him related to

19 that July 9th incident?

20 A    Yes.

21 Q    Okay.  Did you talk to her after

22 that about anything related to that

23 incident, whether she got her car back or

1 about going to court or anything like that?
2 A No. Her daddy took care of all
3 that.
4 Q Did he relay anything to you that
5 she told him?
6 A I'm sure he did, but I don't
7 remember any specific thing.
8 Q That's fair.
9 A Yes. We would discuss that.
10 That would be a big thing because -- because
11 of she's down here by herself, you know, and
12 she's got two kids, and that was her car.
13 So yes, that would be a very big thing to
14 discuss. But like I said, Danny didn't like
15 him, and so he told her what to do.
16 Q Were you aware that on that
17 July 9, 2015 incident the police in
18 Moundville who had responded out there took
19 a gun at some point from Brad or from his
20 house that night?
21 A I don't know when they got the
22 gun. I just know that they -- my husband
23 talked to several people with the police

1 department after her death, and one of them
2 called our house to tell us about the
3 incident that the gun had been returned to
4 Brad. Now, when they took it, I did not
5 know. I don't remember that. But they
6 called us to let us know that that was the
7 gun that they were killed with. And the
8 reason they called was that they were afraid
9 that it was going to come out in the
10 newspaper, and they wanted to tell us first.
11 Q Do you remember who called to
12 tell you?
13 A No, I don't. My husband took
14 notes, and he has like those yellow pads,
15 lots of notes. And he wrote it down and
16 they're stored away.
17 Q But you still have those?
18 A I have those. But I don't have
19 them memorized, and anything I need to know,
20 I can go back and look at those note pads.
21 Q When was the last time you looked
22 at them?
23 A About maybe two years ago.

1 Q Did you personally talk to
2 anybody from Moundville at that point about
3 the gun or the incident or anything, or was
4 it just your husband?
5 A My husband. But he wrote
6 everything down. This was just his hobby.
7 He liked it. He was retired where he was
8 the secretary-treasury of the union hall,
9 and that's how he kept up with things. And
10 I have them from years ago.
11 Q What did he do for a living
12 before he retired?
13 A He was the secretary-treasurer of
14 the Local 2176 union, steel worker union in
15 Gadsden.
16 Q That was before he retired?
17 A Well, before the steel plant
18 closed down. He actually was one of the
19 last people left in that office. He closed
20 the office down when the steel plant closed.
21 And that was in 2002.
22 Q As we sit --
23 A I mean the year 2000.

1 Q Okay. As we sit here today, have
2 you personally had any conversations with
3 anybody from the City of Moundville --
4 A No.
5 Q -- or its police department?
6 A No.
7 Q About any of this?
8 A If you're saying not ever, I have
9 called about something, and they never
10 called me back. I don't remember now what
11 it was. But about that incident or a
12 specific incident, no. I needed some --
13 some kind of documentation, and they never
14 called me back. So I have not spoke to any
15 of the -- the police department and
16 detectives and stuff came to Marjean's house
17 the night after or that -- let's see. I
18 think that Thursday night after Paige had
19 died, they came to Marjean's house and told
20 us a lot of information.
21 Q Before the night that this
22 happened in January where Brad went to -- I
23 guess Brad went to Paige's house, and he

1  shot page and Kaci --
2  A       Uh-huh.
3  Q       Before that night, had you or
4  your husband gotten any kind of warning or
5  indication that Brad was going to
6  potentially do something like that?
7  A       No.
8  Q       Do you know if anybody had any
9  clue he was going to do something like that?
10 A       Not like that.  No.  There were
11 some people that were not surprised and --
12 but no.
13 Q       Let me just go through a couple
14 of these documents too.  Again, part of this
15 is just getting some dates.
16       Going back to that July 9, 2015
17 incident, you understand that Brad was
18 arrested because of that confrontation he
19 had with Paige, correct?  Is that right?
20 A       Yes.
21 Q       And he ended up having to go to
22 court.  Were you aware of the outcome of
23 that?

1  A       No.  I'm sure Danny knew, but I
2  don't remember.
3  Q       I'm going to mark as Exhibit 2 --
4  this is an order from the court related to
5  that case, and it shows that Brad initially
6  pled not guilty, and then it set a trial
7  date for September 8, 2015.  Do you see
8  that?
9        (Defendant's Exhibit Number
10             2 was marked
11        for identification.)
12 A       Yes.
13 Q       Were you involved at all in that
14 court date or --
15 A       No.
16 Q       Do you know if Paige showed up
17 the day of that court date in court?
18 A       I don't know.
19       (Defendant's Exhibit Number
20             3 was marked
21        for identification.)
22 Q       Okay.  Let me show you Exhibit 3.
23 This is another one of those court

1  documents.  That's the plea agreement that
2  Brad Gray entered into, looks like on
3  September 8, 2015, where he actually pled
4  guilty.  Do you see that?
5  A       I see it.
6  Q       Were you aware that he had pled
7  guilty to that charge?
8  A       No.
9  Q       When I say "that charge," he was
10 charged with domestic violence third,
11 harassment, from that July 9 incident.  Were
12 you aware of that?
13 A       No.  I was not aware of that.
14       (Defendant's Exhibit Number
15             4 was marked
16        for identification.)
17 Q       And then Exhibit 4 is just
18 another part of that same plea situation.  I
19 don't know -- if you haven't seen it, you
20 can tell me you haven't seen that before.
21 A       I haven't.  I haven't seen it.
22 Q       And that I think is just another
23 document from the court setting out some of

1  the terms after he pled guilty to that.
2  A       Uh-huh.
3  Q       Were you aware that Brad, as a
4  result of that July 2015 incident, had to,
5  as part of his sentencing, attend some anger
6  management classes?
7  A       Yes.  I did know that.
8  Q       You did know that?
9        There's three documents here I
10 think that relate to that.  Do you know if
11 he had ever been to some kind of anger
12 management before this?
13 A       I have no idea.
14 Q       I just knew you had mentioned
15 something earlier about him having to go to
16 anger management, so I didn't know if there
17 was another situation where you were aware
18 of.
19 A       I don't know.
20 Q       So it could be this one that you
21 were referring to?
22 A       Uh-huh.
23 Q       Is that a yes?

1 A        That is a yes.
2 Q        I'm sorry.
3        (Defendant's Exhibit Number
4            5 was marked
5        for identification.)
6 Q        Okay. I'll show you these three
7 documents just kind of in order. Does that
8 appear to be, Exhibit 5, one of those
9 documents where the Court was referring him
10 to the court referral program for anger
11 management?
12 A        It doesn't say anger management,
13 does it?
14 Q        Let me see. Doesn't say anger
15 management. Just says, This is to certify
16 that the defendant below has successfully
17 completed all of the requirements of the
18 court referral officer on March 18, 2016.
19        Do you see that part at the top?
20 A        I do.
21 Q        Okay.
22 A        I saw that.
23 Q        Let me show you Exhibit 6 then.

1 That is a little more specific I think.
2        (Defendant's Exhibit Number
3            6 was marked
4        for identification.)
5 Q        Does Exhibit 6 actually set out
6 and confirm that he attended all 12 sessions
7 of the anger management program?
8 A        Yes.
9 Q        Okay.
10        (Defendant's Exhibit Number
11            7 was marked
12        for identification.)
13 Q        And then finally Exhibit 7, this
14 is another one of the court documents where
15 it looks like the Court is acknowledging
16 getting receipt of that information, about
17 the anger management completion; is that
18 correct?
19 A        Yes.
20 Q        Okay. Thank you.
21        All right. At the time Paige and
22 Kaci were killed, do you know what time of
23 day or night that occurred?

1 A        No one knows.
2 Q        And you and your husband were
3 called by some detectives or somebody I
4 think you said? How did you find out?
5 A        Perry Childree called, which is
6 Marjean and Keenan's daughter.
7 Q        Okay.
8 A        She is the aunt to the kids.
9 Q        And she is the one who let y'all
10 know?
11 A        Yes.
12 Q        And again, I hate to have to ask
13 this, but if you can just tell me what you
14 know about what occurred that night, you
15 know, that you've learned what happened.
16 A        Let's see. Okay. I know that --
17 I'm just trying to back up.
18 Q        And let me say this, I guess to
19 preface that. I'm just wondering, I guess,
20 what information you have about what led up
21 to that, if there was any kind of
22 confrontation with Brad and Paige that day
23 that ended up with this occurring later --

1 A        No.
2 Q        -- or anything like that?
3 A        No. I will tell you what
4 happened. Two friends of hers that were
5 dating were fussing. And Rickey is the guy,
6 and the girl was her friend that lived
7 across the street from her when she lived on
8 County Road 44. And the girlfriend,
9 neighbor, called her over and over. They
10 talked several times. And Paige talked to
11 her, and they were talking about Rickey.
12 And so she was friends with both of them,
13 and she went -- after the kids were asleep,
14 she went to Rickey's house to talk to him.
15 Q        Paige did?
16 A        Paige went to his house. And for
17 some reason, Brad was there. And she did
18 not know he was going to be there, and she
19 didn't like the fact that he was there. And
20 she felt like that it was a setup or -- she
21 was not sure. But she had a conversation
22 with her girlfriend -- and I can't think of
23 her name. That she told her that -- and I

1 think it was on a text, that she had a lot
2 to say to Brad whenever she was going to
3 talk to him, but she did not know she was
4 going to talk to him that night. But he was
5 there. And on the text, they apparently had
6 left on good terms, but he was drinking,
7 Rickey was drinking, and that was -- she
8 wasn't real crazy about that.
9 Q        Was Michelle Kramer the name of
10 the --
11 A        Michelle. Uh-huh.
12 Q        Okay. And so Michelle had been
13 talking to Paige because Michelle was having
14 issues with Rickey --
15 A        Rickey.
16 Q        -- Dalton --
17 A        Yes.
18 Q        -- that night or that day.
19 And --
20 A        Yes.
21 Q        And then at some point, sounds
22 like that evening when the girls had gone to
23 bed, Paige went over to Rickey's house to

1 try and help the situation.
2 A        Yes.
3 Q        And Brad was there.
4 A        Yes.
5 Q        And Paige, it sounds like,
6 thought maybe they had kind of set it up so
7 that she would come over knowing Brad was
8 there?
9 A        I don't think she thought
10 Michelle did. I think she thought Rickey --
11 but Rickey might have. But like I said,
12 there was -- Rickey and Brad had both been
13 drinking, so they -- we don't know how that
14 came about.
15 Q        But to your understanding, this
16 would have been the night of
17 January 25, 2017?
18 A        It would have been the 26th
19 because it was at 12:30 at night.
20 Q        Okay. So on into the next
21 morning?
22 A        It was the morning that she got
23 killed.

1 Q        Okay.
2 A        So what happened exactly after
3 that is speculation.
4 Q        Where did you get that
5 information?
6 A        From the phone.
7 Q        From Paige's phone?
8 A        Yes.
9 Q        Was that from text messages?
10 A        Yes. And what Michelle -- I've
11 talked to her friends. They tell -- you
12 know -- you know, it's -- it's information
13 that I know.
14 Q        What else did you learn from
15 Paige's phone about that day and night of
16 July -- I mean January 25, 26 of 2017?
17 A        That she was not happy with
18 Brad's behavior, period, and she -- from
19 what was -- let's see. She was ready -- I
20 won't say that I -- I don't know what to
21 say. She was not happy with some things
22 that Brad had told her friend. For sure,
23 she was not happy.

1 Q        Which friend was that?
2 A        I don't remember her name.
3 Q        But she wasn't happy because Brad
4 had said something to someone?
5 A        One of her best friends. Not
6 these two girls from Gadsden but from
7 somebody in Moundville.
8 Q        During this time, was Brad trying
9 to get back together with Paige? Do you
10 know?
11 A        I think he was obsessed with her,
12 because I have a recording on her porch on
13 the phone where she was talking to him about
14 stalking her.
15 Q        Is that recording on her phone?
16 A        Yes.
17 Q        And it was a recording she made
18 while she was talking to Brad?
19 A        Yes.
20 Q        Do you remember when that
21 recording was made?
22 A        No. I don't have that memorized,
23 but it's on the phone.

1 Q      Are there any other recordings
2 that you know of?
3 A      Not like that.
4 Q      But are there any other
5 recordings that you know of?
6 A      Not -- no.
7 Q      Do you remember the context of
8 the recording in terms of what was said
9 between Brad and Paige on that recording?
10 A      She said -- it was on her front
11 porch.  And like I said, I don't remember
12 the time, but it was at night.  And the
13 lights were on the porch, and she -- you can
14 see that she was talking to him.
15 Q      So this is a video recording?
16 A      A video recording.
17 Q      So she wasn't talking to him on
18 the phone?
19 A      No.
20 Q      She was standing on her porch
21 talking to him?
22 A      It is a video recording.  And she
23 said, I think I saw your car parked or --

1 something.  His vehicle.  I think it was a
2 truck.  And she said, What do you think
3 about that or what do you say about that.
4 She was just confronting him.  But it was
5 not -- they were just talking, and it was
6 not -- nobody was upset.  It was a
7 conversation.
8 Q      It wasn't a situation where
9 threats were being made --
10 A      No.
11 Q      -- or anything like that?  Okay.
12 A      But she knew that he was.  And
13 she told me that he was.
14 Q      He was stalking her?
15 A      Stalking her.  Because on several
16 occasions, she had mentioned that he would
17 just show up.
18 Q      At her house?
19 A      Wherever she was.
20 Q      You mentioned she was a
21 hairdresser.  Did she have a location in
22 Moundville where she worked?  Or did she do
23 that out of her house for friends, or how

1 did that work?
2 A      She had a friend in downtown
3 Moundville that she had worked in her shop
4 doing the colors and the dying and stuff.
5 And she could ride her bicycle there.  But
6 right before -- I don't know how long before
7 she died, but she had quit working there.
8 Q      At some point prior?
9 A      Sometime.  Uh-huh.
10 Q      In the two years you said that
11 she had kind of broken up with Brad but
12 would sill see him around town, do you know
13 if she was dating anyone else?
14 A      She didn't date anybody.  She had
15 started talking to someone.  They would
16 talk -- text, whatever, and she was -- she
17 told me about it, and she told me his name
18 and I don't remember.  But she was going --
19 they were going to meet, and we talked about
20 the safety of it.  And this was in -- at
21 Thanksgiving, and she had asked me to keep
22 the kids.  But she didn't do that at that
23 time.  But she had met him at some point and

1 they had dated.
2        And the Tuesday before she was
3 killed, Marjean said that she went out to
4 eat as a friend with Ben's work buddy that
5 they carpooled together.  And he was only a
6 friend, and they had gone somewhere to eat
7 and Brad showed up.
8 Q      And so is it your assumption that
9 Brad was jealous --
10 A      Yes.
11 Q      -- because of that?
12 A      I think so.  But this guy had --
13 I mean, she -- he is really a -- I mean, he
14 was tore up when Ben died.  And he was -- he
15 would take Paige, the girls, and his
16 girlfriend to the river just to spend time
17 with them.  So this was a friend.  And Paige
18 didn't -- she was already interested in this
19 other guy.  So this was only a friend.
20        But she was moving on.  She was
21 ready to start dating, because it had
22 been -- you know, Ben had been dead for a
23 long time.  So I think, yeah, he was very

1 jealous.
2 Q     Do you remember the name of the
3 guy that she had just?
4 A     No. I don't know. I've already
5 said that. I don't remember. I'm not good
6 with names.
7 Q     That's okay. Like I said, this
8 is --
9 A     It was something very common.
10 That's all I know. It was not a Donald
11 Duck. It was a Rickey or a -- something
12 very common. And he lived out of town and I
13 don't know.
14 Q     But it sounds like this was
15 something fairly new, and it hadn't really
16 progressed very far at that point?
17 A     No.
18 Q     Is that right?
19 A     That's right.
20 Q     Okay. There's an allegation in
21 this case in y'all's complaint that the gun
22 that Brad used to kill Paige and Kaci was
23 returned to him after his September 8, 2015

1 conviction. Are you aware of that claim?
2 A     I don't know anything about that.
3 Q     Would that have been something
4 your husband would have had more information
5 about?
6 A     He would know more about that.
7 And he talked with the police department
8 about the gun many times.
9 Q     And unfortunately, you know, I've
10 got to ask you these questions since he's
11 not here to just find out what you know
12 about that. And so I guess let me ask it
13 this way.
14     As we sit here today, do you have
15 any knowledge or information that would show
16 that that gun was given back to Brad after
17 his conviction in September of 2015?
18 A     No. I don't know. Like I said,
19 it's in those notes. I'm sure he knew, but
20 I don't, the dates and all that. I just
21 know that he felt like it should not have
22 been done and handled the way it was.
23 Q     When you say he, you mean your

1 husband?
2 A     My husband.
3 Q     All right. Okay. There's a
4 number of people that -- in lawsuits we send
5 out questions and get answers from both
6 sides. There's a number of people
7 identified in some of these responses y'all
8 gave, and I just want to ask you about a few
9 of them. We've already talked about a
10 number of them.
11     MR. MCCULLEY: Is this a good
12 spot for a break?
13     MR. GAILLARD: Sure. If y'all
14 want to take a break, that's fine.
15     (Short recess.)
16 Q     (By Mr. Gaillard) I think I was
17 mentioning I was going to ask you about some
18 of these folks that were identified in
19 y'all's discovery responses, and we've
20 already talked about some of them.
21     You mentioned Rick Dalton, and we
22 talked a little bit about him. Have you
23 talked with him at all about any of this?

1 A     No. I -- the last time I saw him
2 was at the funeral home when Paige and Kaci
3 died.
4 Q     But did you get any information
5 from him --
6 A     None.
7 Q     -- about what occurred --
8 A     No.
9 Q     -- that evening?
10 A     No.
11 Q     And Michelle Kramer, have you
12 talked with her about any of this and what
13 occurred that evening?
14 A     Yes.
15 Q     Tell me a little more about that.
16 A     For one thing, the phone shows
17 that she called. And I was told by someone,
18 and I can't remember who it was, that she
19 blew Paige phone -- Paige's phone up. And
20 that Paige would not answer the phone
21 because she didn't want to talk to her. And
22 it does show that she called many times,
23 Michelle. So finally she did answer or text

1  or something.  And I -- I don't know but I
2  think she said that she would talk to Rickey
3  or whatever.
4          So Michelle was just -- she told
5  me that Brad had come by her house.  She
6  didn't know what time.  She's a home health
7  nurse so she was in the bed.  And hollered
8  outside her door, and she didn't go to the
9  door.
10 Q       When was that?
11 A       The night that Paige was killed
12 is what she was talking about.
13 Q       I guess I didn't quite follow
14 that.  Who went to Brad's door and he
15 wouldn't answer?
16 A       Michelle said that she heard Brad
17 at Michelle's house.
18 Q       At Paige's house you mean?
19 A       Michelle's house.
20 Q       Okay.
21 A       Michelle was in the bed asleep,
22 because she's a home health nurse and she
23 had to work the next day.  So this was that

1  Thursday morning, January the 26th.  She
2  said she thought it was around 4:00 that
3  morning.  And that he was yelling or
4  hollering her name or something, and she did
5  not get up.  But she was not sure of the
6  time, and she had no idea about what
7  occurred.  And that's all I know.
8  Q       So this is something that
9  Michelle told you?
10 A       Yes.
11 Q       And it sounds like if -- what she
12 was describing was that Brad maybe came to
13 her house early on the morning of the 26th,
14 maybe after the shooting, or do you know?
15 A       Don't have any idea.  I wish I
16 knew, but it really doesn't matter.  It's
17 irrelevant.  It's just that we don't know.
18 Q       So it could have been before or
19 after I guess?
20 A       This is true.
21 Q       We don't know at this point?
22 A       We don't know.
23 Q       And Michelle didn't open the door

1  or talk to him?
2  A       No.
3  Q       And she didn't know where he went
4  after that I guess?
5  A       No.  So this would be on County
6  Road 44.
7  Q       Did she say anything else about
8  Rickey and whether he had any more
9  information about what happened that
10 night --
11 A       She didn't say.
12 Q       -- with Brad?  No?
13 A       Not to me.
14 Q       You mentioned in these responses
15 that Paige attended church at Moundville
16 Baptist Church here in Moundville?
17 A       Yes.
18 Q       Or in Moundville.
19 A       And went to the Wednesday night
20 service the night before with the girls.
21 Q       Yeah.
22 A       And that was per the preacher.
23 Q       And it says her cell phone -- her

1  cell telephone shows that she had contact
2  with Tiffany Parnell, Peggy Atchison, Jeremy
3  Johnson, Jeremy Stagg, and Casey
4  Roddenberry.  Do you know all those folks?
5  A       Name the names again.
6  Q       Tiffany Parnell?
7  A       That's my niece.
8  Q       Okay.  Peggy Atchison?
9  A       That was Ben's aunt.
10 Q       Jeremy Johnson?
11 A       Jeremy was -- I think he's the
12 one that was Ben's friend, Jeremy.  There
13 were several Jeremies.
14 Q       Yeah.  The next one is Jeremy
15 Stagg?
16 A       He, I think -- don't hold me to
17 it, but I think he was a friend -- she did
18 his -- she cut his hair.  But she was
19 friends with his wife, because they came to
20 the funeral home.  I think.
21 Q       And then the next name was Casey
22 Roddenberry.
23 A       I know the name Casey, but I

1 can't place her right now. I think she
2 might have been from the beauty salon. Or
3 it might have been a friend of the kids
4 mothers, something like that.
5 Q        And since this indicates that the
6 cell phone showed that she had contact with
7 those folks, would that either be the phone
8 showing a telephone call during that time
9 frame or a text message?
10 A        Yes. I think Casey was the one
11 that -- see, there's a bunch of Caseys in my
12 family, because my maiden name is Casey. So
13 it seems like there's lots of Caseys. And I
14 think that Casey, the girls would -- they
15 would swap up carpooling.
16 Q        Do you remember if there were
17 text messages with any of those folks
18 during --
19 A        There was.
20 Q        -- that time frame?
21 A        Sorry. There was. Yes.
22 Q        And I was going to -- the rest of
23 my question would be, do you remember what

1 they said?
2 A        Peggy wanted her hair done.
3 Casey wanted to talk to Paige about school
4 something. Tiffany was supposed to come to
5 Paige's house that weekend. And the other
6 Jeremies, I don't know. I don't remember.
7 Q        Do you remember if any of those
8 communications had anything to do with Brad
9 Gray?
10 A        No. They had -- to my knowledge,
11 none.
12 Q        As I understand it, there may
13 have been some life insurance that Paige
14 had?
15 A        Yes.
16 Q        Do you remember who that was
17 with, what company?
18 A        I know it's with MetLife.
19 Q        And was it more than one policy?
20 A        One policy on her life.
21 Q        And do you remember the amount?
22 A        One million dollars.
23 Q        Okay. What about Kaci? Was

1 there any kind of life insurance on her?
2 A        No.
3 Q        What is the status of the life
4 insurance policy that you had on -- or that
5 Paige had, in terms of has it paid out now
6 that she passed away?
7 A        Yes. It is paid out and
8 invested.
9 Q        And was the beneficiary her
10 children?
11 A        Yes.
12 Q        Okay. So that money's being held
13 now for Kayla?
14 A        Yes.
15 Q        Other than that, it looks like
16 there were a couple of small claims made
17 against her estate for like a small credit
18 card amount of a few thousand dollars and
19 another bill, looks like $300 or something.
20        Do you know of any other claims
21 made against the estate?
22 A        No.
23 Q        Do you know of any other assets

1 of the estate?
2 A        No.
3 Q        Okay. There was a request in
4 here to produce any documents or other
5 materials that you sent to the City of
6 Moundville or that you received from the
7 City of Moundville related to this
8 situation.
9        We talked about the statement of
10 claim, and I asked you about that. But do
11 you know of any other documents or
12 information that either you and your family
13 sent to the City related to this or that the
14 City sent to you?
15 A        Oh, my gosh.
16 Q        Because the answer says "we will
17 produce," but I don't know that we've gotten
18 anything that is really responsive to that,
19 so I'm not sure.
20 A        I don't remember really. Seems
21 like there was something, but I don't
22 remember what it would be. But it would be
23 in those notes.

19 (Pages 70 - 73)

1 Q    The notes that your husband would
2 have had?
3 A    Yes.
4 Q    With regard to my client, Ken
5 Robertson, have you ever had any
6 conversations or communications with him?
7 A    No.
8 Q    Do you know if your husband did?
9 A    No.
10 Q    No, you don't know or no, he
11 didn't?
12 A    He had no conversation with Ken.
13 Q    At any time that you know of?
14 A    At any time.
15 Q    I've got a few pictures and
16 exhibits I want to use just so I'm oriented
17 to some of what we talked about before in
18 terms of where Paige lived and things like
19 that.  So I just want to run through these
20 with you.
21      What I'm marking as Exhibit 8 is
22 a -- it's just a Google Map aerial
23 depiction.  It's got on here 2410 County

1 Road 44?
2      (Defendant's Exhibit Number
3          8 was marked
4       for identification.)
5 A    That's the home place -- the
6 Mitchell home place where they lived, which
7 was -- that she sold.
8 Q    Before she moved to the Market
9 Street location?
10 A    That's right.
11      (Defendant's Exhibit Number
12          9 was marked
13       for identification.)
14 Q    And then Exhibit 9 is another
15 aerial depiction.  And I believe that's the
16 154 Market Street address, if you can
17 confirm that for me.
18 A    That is it.
19      (Defendant's Exhibit Number
20          10 was marked
21       for identification.)
22 Q    Exhibit 10 is just a series of
23 photos, and if you can just flip through

1 them and confirm for me that that is the 154
2 Market Street house?
3 A    This is it.
4 Q    Were you familiar with where Brad
5 Gray lived?
6 A    I am.
7 Q    Had you ever been to his house?
8 A    Just to ride by.
9 Q    So you knew where it was
10 generally?
11 A    Yes.
12      (Defendant's Exhibit Number
13          11 was marked
14       for identification.)
15 Q    Okay.  Let me show you
16 Exhibit 11.  This is another one of those
17 aerial photos, and I believe it shows Brad's
18 house, which would have been I think 619
19 Second Avenue or Second Street in
20 Moundville?
21 A    That is it.
22      (Defendant's Exhibit Number
23          12 was marked

1       for identification.)
2 Q    And then Exhibit 12, is that a
3 picture of the actual house Brad lived in?
4 A    Yes.
5 Q    Okay.  And then finally, you had
6 mentioned earlier that they lived about a
7 mile apart?
8 A    Yes.
9 Q    Let me show you what I'll mark as
10 Exhibit 13.
11      (Defendant's Exhibit Number
12          13 was marked
13       for identification.)
14 Q    Again, this is just another one
15 of those aerial views.  And this one shows
16 the 154 Market Street location and Brad's
17 house down here at 619 Second Avenue.
18 A    Uh-huh.
19 Q    And it actually shows on there at
20 some point that it was about .8 miles
21 between the two.  Is that consistent with
22 your understanding?
23 A    Yes.

1 Q      Did Paige, other than Kaci and
2 Kayla, ever have anybody else living with
3 her at the Market Street house?
4 A      Yes, she did.
5 Q      Tell me what you know about that.
6 A      She was a foster mother to three
7 different children at different times. And
8 at the time of her death, a child was there
9 with Kayla in the back bedroom.
10 Q      What was that child's name if you
11 remember?
12 A      I don't remember. If you hadn't
13 have asked me, I could tell you.
14 Q      I know how that works.
15 A      I don't remember.
16 Q      Do you know how old that child
17 was?
18 A      She was ten I think.
19 Q      And how old was Kayla at the
20 time?
21 A      She might have been nine. She
22 was a little older than Kayla. So Kayla
23 was -- she's 13 now, so.

1 Q      Do you know if Kayla or that
2 other child actually witnessed any of this
3 or just --
4 A      I know that they found them the
5 next morning about -- sometime after 8:00,
6 and then they called Marjean. And I was
7 told that -- the detective interviewed Kayla
8 and asked her some questions. And so she
9 did not walk over to them, but she knew --
10 the words I was told was she knew something
11 was wrong, and she knew the time, and she
12 called her grandmother.
13 Q      I guess I was just wondering if
14 gunshots were involved, if they had, you
15 know, waked up in the middle of the night or
16 something?
17 A      No.
18 Q      Okay. So this was just all after
19 the fact?
20 A      Yes.
21 Q      Okay. Did you know either of the
22 neighbors that lived on either side or
23 across the street from Paige at that time?

1 A      I knew there was a lady that
2 lived in the house, if you're looking at the
3 house, on the right side. And Paige knew
4 her and called her name, but I don't know --
5 I never met her, but I did see her on the
6 porch.
7 Q      And obviously I guess my other
8 question just to follow up on that was
9 whether you had learned anything from any of
10 the neighbors about what happened?
11 A      No. The house on the other side
12 was vacant, and I didn't know anybody else
13 across the street.
14 Q      And that's the same to this day.
15 You haven't learned anything from any of
16 those folks?
17 A      No.
18      (Defendant's Exhibit Number
19          14 was marked
20          for identification.)
21 Q      I meant to mark the notice for
22 this deposition as an exhibit. I just
23 marked it as Exhibit 14. I don't really

1 have a question for you about it, but I just
2 wanted to make that part of the record so we
3 had that.
4      I don't know if you've seen that,
5 but that was just the notice we sent out for
6 your deposition today.
7 A      Okay. I see it.
8 Q      I'm going to go ahead and let
9 Mr. Kinney ask you some questions at this
10 point.
11 A      Okay.
12          CROSS-EXAMINATION
13 BY MR. KINNEY:
14 Q      Ms. Ray, my name is Warren
15 Kinney, and I represent the City of
16 Moundville in the lawsuit. I don't have
17 really too-too many questions, but I've got
18 a couple to sort of supplement what
19 Mr. Gaillard has already asked you.
20      Before we get started, I -- and
21 before we went back on the record, we were
22 discussing briefly some notes that your
23 husband took?

1 A     Yes.
2 Q     And, you know, rather than make a
3 formal request --
4     MR. KINNEY:  Unless that's
5 necessary, John.
6 Q     -- I would just ask you, Ms. Ray,
7 to please try and provide those to your
8 attorney as soon as possible so he can give
9 that to us.  Can you do that?
10 A     I can.  Try.
11 Q     In addition to your -- to the
12 notes that your husband would take, you said
13 that he -- well, when your husband would
14 take notes, he would write them all down on
15 a yellow pad?
16 A     Yes.
17 Q     Are you aware of -- did you ever
18 take any notes in dealing --
19 A     No.
20 Q     Are you aware of any other notes,
21 other than what your husband took, that
22 related to this incident and murder of your
23 daughter or any of her dealings with Brad,

1 any --
2 A     I have a calendar that I write
3 some things down, but it's not in detail.
4 It was just -- I did write that -- like if
5 the police office called.  And I did talk to
6 a detective.  Don't remember his name.  And
7 I would have written that down.  But not --
8 like I said, I didn't really handle this.
9     My husband and I would talk about
10 it.  He talked to John one time for an hour.
11 I don't know what all they talked about.
12 But I just know he would take notes, and if
13 it was anything interesting, he would tell
14 me.  But I did not take notes other than my
15 calendar that I used for personal use.
16 Q     Do you still have that calendar?
17 A     I do.
18 Q     I'd also ask that you make a copy
19 and produce that through your attorney,
20 please.
21 A     Okay.  It will be an interesting
22 calendar.
23 Q     And, you know, the purpose is not

1 to make you undertake an arduous task or
2 anything like that, I can assure you.
3 A     I know.  I know.
4 Q     This is how we get information
5 about the claims.
6 A     Sure.  You can verify dates and
7 things.
8 Q     Yes, ma'am.
9     Do you know when Brad went to
10 rehab?
11 A     I don't but it might be on that
12 calendar, because I did write down when
13 Paige came and just a brief thing of what we
14 did, maybe some activity we did.
15 Q     Okay.  Do you know where he was
16 in rehab?
17 A     It was up close to Gadsden.  And
18 she told me but -- well, it might have been
19 close to Birmingham.  And then she would
20 come on up to our house, I guess would be --
21 it was -- she would head north and go by --
22 swing by and see him, and then come up to
23 our house.

1 Q     Do you know if it was in Warrior?
2 a     That might be it.  But it would
3 be on my calendar.
4 Q     And you mentioned that Paige was
5 his sponsor?
6 A     That's what she said.
7 Q     Okay.  Had Paige ever been to
8 rehab?
9 A     No.
10 Q     Okay.
11 A     She liked to help animals and
12 people and people that needed some help.
13 Q     Sure.  But she had never
14 participated then in a 12-step program?
15 A     She's never had that kind of
16 problem at all.
17 Q     Okay.  And really the reason that
18 I'm asking is because you said that she was
19 his sponsor, and generally that is -- it's
20 my understanding that's generally somebody
21 who has been through a rehabilitation
22 program and helps out others who are coming
23 through.

22 (Pages 82 - 85)

1  A       No, not that kind of a sponsor.
2  No, no, no, no.  You have to have a
3  responsible person, to some effect, and his
4  family was refusing.  And from what I
5  understand, he needed a person to -- I don't
6  know if it's legal reasons or what, but you
7  do have to have somebody -- I mean, she
8  was -- well, I'll say this.  She was okay to
9  come and visit him and that type of thing.
10 I really don't know what all that involved.
11 Q       Okay.
12 A       But she said a sponsor.
13 Q       Okay.  I follow.
14         Do you know -- did Brad have any
15 children?
16 A       He did.
17 Q       Did you ever meet his children?
18 A       I did.
19 Q       Do you know how old they were or
20 are?
21 A       The only child I met, and he has
22 come to my house also, was in between in
23 ages between Kayla and Kaci, is the best I

1  remember.  And I think his name is Bradley.
2  Q       Okay.  And did he visit your
3  house in Gadsden on that -- the one occasion
4  when Brad came as well?
5  A       I really don't think so.  Paige
6  would get him and -- she tried to help him
7  because his mother was dead.  So she was
8  friends with the grandparents that had
9  custody of him after his -- it was his dead
10 mother's parents.  She was friends with
11 them.  And she would even contact them even
12 when Brad and her were not seeing each
13 other, as far as I know.  She would get Brad
14 sometimes -- Bradley sometimes.
15         And the only reason I remember
16 his name is because it was so similar to
17 his.  It was Brad and Bradley.  And it's --
18 Q       I can see how that would be
19 helpful.
20 A       Yeah.  That's the only reason I
21 know.
22 Q       But did Bradley have another
23 brother or sister?

1  A       He had, from what I understand,
2  two stepsisters.
3  Q       Okay.  You don't -- were the
4  stepsisters -- so had Brad -- you said
5  earlier that Brad had also lost a spouse?
6  A       Yes.
7  Q       Did he remarry after he lost that
8  spouse?
9  A       Not that I know of.  I mean, he
10 may -- I know he had a girlfriend.  And I
11 think in between that time where she was not
12 seeing him, he had -- I think she said -- I
13 don't think he ever got married again, but
14 he did have a girlfriend.
15 Q       Okay.  Do you think that the
16 stepsisters were daughters of his deceased
17 spouse?
18 A       No.  I think they were -- may
19 have been from another marriage, but I don't
20 know.  She told me but I do not remember the
21 story.
22 Q       That's fine.
23 A       They were older and I couldn't

1  tell you.
2  Q       Okay.  Older than?
3  A       Bradley.
4  Q       Okay.  Did Paige -- did she buy
5  the house on Market Street?
6  A       Yes.
7  Q       You may have already answered
8  this.  Is that house still part of her
9  estate?
10 A       No.
11 Q       So y'all have been able to sell
12 the house?
13 A       We let it -- the bank repossess
14 it, because she had only been in there less
15 than a -- well, about a year, a little over
16 a year.  And considering all of the trouble,
17 my husband thought it would be best just to
18 let them repossess it.
19 Q       Okay.  But the bank that held the
20 mortgage hasn't filed a claim against the
21 estate?
22 A       No.
23 Q       Okay.

1  A      It was Wachovia I think that --
2  well, no, no, no. That was her house in --
3  on 44. It was -- I don't know who -- it's
4  in the records. I don't remember. She got
5  a special loan because it was in a rural
6  city and through the -- whatever that
7  agency -- government agency is. But I don't
8  know exactly all the details.
9  Q      Okay. Do you know if she had any
10 equity in the house?
11 A      She probably -- no. No. We just
12 let it -- because of all of the time and all
13 of the -- it being out of town, we just
14 considered what she had paid on it as rent
15 and let it rip.
16 Q      Did Paige ever work in any other
17 profession other than as a hairdresser?
18 A      I don't think so. No.
19 Q      You're not aware of any other
20 jobs she had while she lived in Moundville?
21 A      Not in Moundville. She didn't do
22 anything else.
23 Q      Okay. How about you, Ms. Ray?

1  Did you ever work outside the home?
2  A      I still do.
3  Q      Where?
4  A      I'm a nurse.
5  Q      Okay. In Gadsden?
6  A      Yes.
7  Q      What kind of nurse?
8  A      A nurse. RN, registered nurse.
9  Q      Okay. And what hospital in
10 Gadsden?
11 A      I had worked at the hospital and
12 then I retired. And right before I retired,
13 I started working at a rehab center in a
14 nursing home. So that's what I do now part-
15 time.
16 Q      Okay. What's the name of the
17 nursing home?
18 A      Gadsden Health & Rehab.
19 Q      Health & Rehab?
20 A      Uh-huh.
21 Q      You said your husband almost had
22 an associate's degree in criminal justice?
23 A      Uh-huh.

1  Q      Where was he pursuing that?
2  A      Gadsden State Jr. College in
3  Gadsden.
4  Q      Was he just taking classes after
5  he retired?
6  A      He took them -- he took some
7  classes when he was laid off from the steel
8  plant. But he -- he mainly took those
9  classes when -- as part of his benefits for
10 being in the Navy.
11 Q      Okay. How long was he in the
12 Navy?
13 A      Four years.
14 Q      So he was just interested in
15 criminal justice?
16 A      He was interested in getting the
17 money. I don't know what you can say. He
18 liked it or he wouldn't have done that, but
19 I -- he got a job and did not pursue it
20 anymore. I tried to get him to, but he
21 didn't want to.
22 Q      Where did he get a job?
23 A      At the steel plant in Gadsden.

1  He worked at Goodyear at one time.
2  Q      Okay.
3  A      But it changed names several
4  times.
5  Q      Okay. But after he sort of was
6  forced to retire in 2000, did he work
7  anywhere else after that?
8  A      No.
9  Q      You may have already been asked
10 this. Have you ever filed another lawsuit
11 against anyone?
12 A      No.
13 Q      And has any lawsuit ever been
14 filed against you?
15 A      No.
16 Q      Do you know anybody who works at
17 the City of Moundville?
18 A      Personally I have no -- no
19 contact with them. Well, I take that back.
20 I'm sorry.
21 Q      That's okay.
22 A      At one time the mayor. I don't
23 know who the mayor is. And he introduced

1 himself to me. And I can't remember if he
2 even came -- he may have come to Marjean's
3 house. I just don't remember now. But he
4 is a relative of Ben Mitchell.
5 Q        Does Tony Lester sound familiar?
6 A        Tony sounds right.
7 Q        Do you know how he's related to
8 them?
9 A    No. I don't know.
10 Q        That's okay. I'm just asking.
11 A        I just know it's through the
12 Mitchells, through Ronnie Mitchell. That's
13 all I know.
14 Q        And Ronnie is Ben's father?
15 A        Yes.
16 Q        And Ronnie's no longer married to
17 Marjean?
18 A        No.
19 Q        Is that correct?
20 A        That's correct.
21 Q        Okay. I'm just trying to get
22 everybody straight.
23 A        I got you.

1 Q        Other than speaking with -- it
2 sounded like that was maybe at the wake or a
3 visitation where Tony introduced himself to
4 you; is that right? Or maybe even a
5 reception afterwards?
6 A        I've talked to him. I don't
7 remember where. But he told me that at
8 Christmas that they would go by Ben's grave
9 and sing carols.
10 Q        Do you want to take a break?
11 A        I'm okay.
12 Q        Are you sure? And I --
13 A        I understand. It's okay.
14 Q        I'm sorry.
15 A        I'm good. Just go.
16 Q        Paige and Tony would go to Ben's
17 grave and sing?
18 A        No. His family.
19 Q        Ben's family would?
20 A        Tony's family.
21 Q        Tony's family. Okay.
22            Did Tony ever talk to you or
23 discuss the murder of Paige?

1 A        No.
2 Q        Are you familiar with any
3 policies and procedures of the City of
4 Moundville?
5 A        No.
6 Q        What about the police department?
7 Are you familiar with any of the Moundville
8 Police Department's policies or procedures?
9 A        No.
10 Q        Did you ever speak to any of the
11 police officers that work for the City of
12 Moundville?
13 A        Yes.
14 Q        Do you remember any of their
15 names?
16 A        No.
17 Q        Was this around the time or
18 shortly after Paige's murder?
19 A        Yes.
20 Q        And you mentioned earlier that
21 your husband on several occasions had spoken
22 to law enforcement officers.
23 A        Yes.

1 Q        Was that always with the City of
2 Moundville?
3 A        Yes.
4 Q        Okay. No -- never anybody from
5 the sheriff's department or another law
6 enforcement agency?
7 A        I think a sheriff deputy came
8 also to Marjean's. And -- let's see. There
9 were about four people there. I can't
10 remember all of them.
11 Q        That's okay. That's fine. I was
12 just curious to see what you do remember.
13            I think that may be all the
14 questions that I have, Ms. Ray. Let me just
15 double check.
16            I believe you testified earlier
17 that you had never had any warning that Brad
18 would do something like he did; is that
19 correct?
20 A        No. I had -- I was not told --
21 well, like I said, Keenan had talked to my
22 husband. And he did not like Brad, and Brad
23 and him -- and Keenan is the stepfather of

1 Marjean. And they had had some words, and
2 he did not like Brad. And he had talked to
3 my husband. Keenan came to our house to go
4 deer hunting, and I feel like it was to talk
5 to my husband about Brad, because he -- he
6 didn't like him. And I think he was
7 concerned with Brad's past behavior and just
8 wanted us to know. But I was at work, and I
9 don't know all of their conversations.
10 Q      Okay. Your husband -- you don't
11 recall your husband relaying to you what
12 Keenan had communicated to him?
13 A      Not that I can repeat. It was
14 not good things.
15 Q      Well, can you recharacterize the
16 sentiment of what was communicated?
17 A      He thought he was bad news, a bad
18 influence. Brad, in the -- let's see. How
19 I can say it. In the area had a bad
20 reputation. And everybody knows everybody
21 here, and Ronnie Mitchell's wife's mother
22 was Brad's neighbor. So they didn't like
23 each other.

1 Q      At that house that's in one of
2 these exhibits?
3 A      This was -- no. I don't know
4 where it was, but Ron -- let's see. I don't
5 know their -- Ronnie's wife's maiden name, I
6 don't remember, but her mother lived beside
7 Brad growing up. The families knew each
8 other. And I don't know where it was, but
9 it was somewhere here in Moundville. And
10 they knew Brad from years ago.
11 Q      Okay. And right after you
12 testified earlier that you didn't have any
13 warning that Brad would do something like he
14 did, you said that some were not surprised.
15 A      That was Perry. Perry is the
16 aunt of Kayla. That's what she said.
17 Q      Perry is a Mitchell?
18 A      She's a Childree.
19 Q      A Childree. Okay.
20 A      She's the only child that Keenan
21 and Marjean had. And then Ronnie and Jo had
22 two boys. And then Ben, which was Paige's
23 husband, was the middle, third spoke.

1 Q      Okay.
2 A      He was the only child Ronnie and
3 Marjean had.
4 Q      Okay. Do you know how old Perry
5 is in relation to --
6 A      Ben?
7 Q      Uh-huh.
8 A      Well, he would have been younger
9 than him, and I'm not sure the age.
10 Q      Okay. But Perry told you he was
11 not surprised?
12 A      She was not surprised.
13 Q      She. Okay. Did she say anything
14 more than that?
15 A      No.
16 Q      Did you ever ask more?
17 A      No.
18 Q      Anybody else other than Perry say
19 that they were not surprised by this?
20 A      Keenan.
21 Q      Keenan said it also?
22 A      (Witness nodding head.)
23 Q      Ms. Ray, I think that's all the

1 questions that I have.
2         REDIRECT EXAMINATION
3 BY MR. GAILLARD:
4 Q      There was something I meant to
5 ask you about just to see what, if anything,
6 you knew about it. And that is, my
7 understanding is that after Brad shot Paige
8 and Kaci, he went back to his house. And
9 the police came, and then he shot himself.
10 Is that your understanding?
11 A      Yes.
12 Q      Do you know anything more about
13 that, about what happened with Brad?
14 A      No.
15 Q      I understand he passed away maybe
16 a few days later.
17 A      Okay. He shot himself in the
18 head, and this is what the police said. And
19 they heard the gunshot when they were
20 standing on the porch after they had knocked
21 on the door. And so they went in, and he
22 was taken to the hospital and basically was
23 brain dead. And because of the situation, I

1 was told -- and I don't know who said it --
2 that he was kept alive until the funeral was
3 over with because of the town, the funeral
4 home, and all the politics.
5     And so after the funeral, within
6 a few hours, we got word that he was dead.
7 So that matched.
8     And there was a lot of upset
9 people. And some of my family members were
10 glad. And I have to say there were some
11 other -- and I know it happened a year --
12 the same thing. A lady was shot in front of
13 her kids in Moundville a year before that.
14 And I remember because it was on Christmas
15 day. And so this was a big shock.
16     So I know that there's still some
17 hard feelings even to the preacher, because
18 the preacher that did Paige and Kaci's
19 service did Brad's service. And so I don't
20 have any hard feelings, but there's still
21 some hard feelings in this town. And I
22 really -- you know, I mean, they know more
23 about this than I do really, as far as Brad.

1 I just know about Paige.
2     And so I don't get into that. I
3 really don't have time for it and don't want
4 to know. I don't even know all the details.
5 I mean, when I say I don't know the details,
6 of what happened exactly. And I don't want
7 to know.
8 Q     And I just -- I wanted to just
9 confirm if you had any other information
10 related to that.
11 A     I don't want to know.
12 Q     But that was my understanding
13 just about the sequence of how it happened.
14 A     All I wanted to know is what
15 Kayla saw. That's all I care about. And so
16 she didn't know a lot. And Jeremy, Perry's
17 husband, was in the room when the detective
18 talked to Kayla so that she could freely
19 talk, and that's what he said. That's all I
20 know.
21     MR. GAILLARD: John, I think
22 probably the best thing would be to suspend
23 the deposition right now until we follow up

1 on the phone and the notes and all that.
2     MR. MCCULLEY: Sure.
3     MR. GAILLARD: Hopefully we don't
4 have to reconvene, but just so we reserve
5 that right. But I think we're -- I'm good
6 with concluding for today.
7     MR. KINNEY: I was going to say
8 the same thing. We didn't want to not
9 have or somehow foreclose an opportunity,
10 unfortunately, to talk to you again,
11 Ms. Ray, depending on what we receive when
12 we get some of those notes, because it just
13 may be almost impossible to decipher some
14 stuff unless we talk to you again.
15     So I likewise would like to get
16 on the record that we just kind of
17 temporarily halt and reevaluate maybe after
18 we can get some of those things produced.
19     MR. MCCULLEY: At this point, we
20 don't have any objection to that.
21     MR. KINNEY: Thank you, Ms. Ray.
22     (Deposition concluded at 12:03 p.m.)
23

1     C E R T I F I C A T E
2
3 STATE OF ALABAMA )
4
5     I hereby certify that the above
6 and foregoing deposition was taken down
7 by me in stenotype, and the questions and
8 answers thereto were reduced to computer
9 print under my supervision, and that the
10 foregoing represents a true and correct
11 transcript of the deposition given by
12 said witness upon said hearing.
13
14     I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action, nor am I in
17 anywise interested in the result of said
18 cause.
19
20
Karen Hinch, Commissioner
21     ACCR #96
22
23

27 (Pages 102 - 105)

| & |
| --- |
| **&** 2:2 3:13,19 5:9 91:18,19 |

| 1 |
| --- |
| **1** 4:10 34:14,17 35:23 36:12 |
| **10** 4:19 75:20,22 |
| **101** 4:5 |
| **10:00** 2:5 5:12 |
| **11** 4:20 15:14 37:9 76:13,16 |
| **11:40** 40:9 |
| **12** 4:21 51:6 76:23 77:2 85:14 |
| **1201** 2:2 5:9 |
| **12:03** 104:22 |
| **12:30** 55:19 |
| **13** 4:22 77:10,12 78:23 |
| **14** 4:23 80:19,23 |
| **154** 14:3 75:16 76:1 77:16 |
| **17** 32:10 |
| **175** 3:20 |
| **17th** 21:23 |
| **18** 50:18 |
| **18431** 105:20 |
| **19** 9:21 |
| **19-0069** 1:11 |
| **1979** 9:22 |
| **19th** 9:17,20 |
| **1st** 22:4 32:17 |

| 2 |
| --- |
| **2** 4:11 47:3,10 |
| **200** 3:7 |
| **2000** 12:11 44:23 93:6 |
| **2002** 9:18 12:18,18 32:10 33:4 44:21 |
| **2006** 12:17,19 32:16 |
| **2008** 12:20 17:12 |
| **2015** 25:2,9 27:21 38:20,23 42:17 46:16 47:7 48:3 49:4 62:23 63:17 |
| **2016** 21:16 50:18 |
| **2017** 17:14 22:6 31:22 35:7 36:11 37:10,16 38:17 55:17 56:16 |
| **2018** 37:16,17,19 |
| **2019** 38:6 |
| **2020** 2:4 5:8 |
| **2176** 44:14 |
| **23rd** 2:4 5:7 |
| **2410** 74:23 |
| **25** 36:11 38:6 55:17 56:16 |
| **25th** 31:22 35:7 38:17 |
| **26** 56:16 |
| **26th** 55:18 67:1,13 |
| **27** 37:19 |
| **2726** 3:14 |

| 3 |
| --- |
| **3** 4:12 47:20,22 |
| **300** 72:19 |
| **34** 4:10 |
| **35213** 3:21 |
| **35401** 2:3 3:8 5:11 |
| **36652** 3:15 |

| 4 |
| --- |
| **4** 4:13 48:15,17 |
| **44** 10:5 12:2 14:2 14:17 53:8 68:6 75:1 90:3 |
| **47** 4:11,12 |

| 48 |
| --- |
| **48** 4:13 |
| **4:00** 67:2 |

| 5 |
| --- |
| **5** 4:3,14 50:4,8 |
| **50** 4:14 |
| **51** 4:15,16 |

| 6 |
| --- |
| **6** 4:15 50:23 51:3,5 |
| **601** 3:7 |
| **619** 76:18 77:17 |

| 7 |
| --- |
| **7** 4:16 51:11,13 |
| **75** 4:17,18,19 |
| **76** 4:20,21 |
| **77** 4:22 |

| 8 |
| --- |
| **8** 4:17 47:7 48:3 62:23 74:21 75:3 77:20 |
| **80** 4:23 |
| **81** 4:4 |
| **880** 3:20 |
| **8:00** 79:5 |

| 9 |
| --- |
| **9** 4:18 25:9 38:23 42:17 46:16 48:11 75:12,14 |
| **96** 105:21 |
| **9th** 25:2 39:11,12 41:19 |

| a |
| --- |
| **a.m.** 2:5 5:12 |
| **able** 89:11 |
| **accident** 11:13 12:4 |
| **accidents** 14:19 |
| **accr** 105:21 |
| **acknowledging** 51:15 |

| acting |
| --- |
| **acting** 5:3 |
| **action** 1:10 105:16 |
| **activity** 84:14 |
| **actual** 77:3 |
| **adderall** 27:9 |
| **addition** 82:11 |
| **address** 75:16 |
| **advice** 41:2 |
| **aerial** 4:17,18,20 4:22 74:22 75:15 76:17 77:15 |
| **afraid** 21:8 23:17 26:16 43:8 |
| **afternoon** 39:7 40:2,6,17 |
| **age** 100:9 |
| **agency** 90:7,7 97:6 |
| **agent** 16:7 |
| **ages** 86:23 |
| **ago** 43:23 44:10 99:10 |
| **agreed** 1:18 2:7,15 |
| **agreement** 4:12 48:1 |
| **ahead** 81:8 |
| **al** 1:9,14 3:8,15,21 |
| **alabama** 1:2 2:3 5:3,10 7:20 35:13 105:3 |
| **alcohol** 27:1,3,6 |
| **alive** 33:16 102:2 |
| **allegation** 62:20 |
| **amount** 71:21 72:18 |
| **anger** 27:3 49:5,11 49:16 50:10,12,14 51:7,17 |
| **animals** 85:11 |
| **ann** 5:16,22 |
| **answer** 6:22 7:1 65:20,23 66:15 |

73:16
**answered** 89:7
**answers** 6:10 64:5
  105:8
**anybody** 27:16
  44:2 45:3 46:8
  60:14 78:2 80:12
  93:16 97:4 100:18
**anymore** 92:20
**anyway** 28:20
**anywise** 105:17
**apart** 77:7
**apparently** 27:2
  54:5
**appear** 50:8
**appointed** 37:4,11
  37:21 38:7,8
**approximately** 2:5
  5:11 23:21
**april** 9:17,20,21
  37:9
**arduous** 84:1
**area** 10:6,18 11:3
  12:23 14:11 15:7
  22:9 98:19
**arrested** 46:18
**asked** 19:5 28:7
  29:4 32:5 60:21
  73:10 78:13 79:8
  81:19 93:9
**asking** 6:9 36:20
  85:18 94:10
**asleep** 53:13 66:21
**assets** 72:23
**assign** 2:20
**associate's** 91:22
**assume** 37:12
**assumption** 61:8
**assure** 84:2
**atchison** 69:2,8

**attend** 49:5
**attended** 51:6
  68:15
**attorney** 3:5,11,18
  82:8 83:19
**aunt** 52:8 69:9
  99:16
**avenue** 2:3 3:7 5:10
  76:19 77:17
**aware** 38:20 42:16
  46:22 48:6,12,13
  49:3,17 63:1 82:17
  82:20 90:19

**b**

**back** 6:16 10:12
  12:8 15:6,16 17:3,4
  18:6 28:14 41:23
  43:20 45:10,14
  46:16 52:17 57:9
  63:16 78:9 81:21
  93:19 101:8
**background** 7:13
  18:2
**bad** 98:17,17,19
**bank** 89:13,19
**baptist** 68:16
**based** 26:7 38:3
**basically** 101:22
**beach** 10:9
**beauty** 70:2
**bed** 54:23 66:7,21
**bedroom** 78:9
**behalf** 3:3,9
**behavior** 19:3
  56:18 98:7
**believe** 25:2 75:15
  76:17 97:16
**ben** 11:23 14:13
  17:12 32:20 61:14
  61:22 94:4 99:22
  100:6

**ben's** 33:10,11 61:4
  69:9,12 94:14 95:8
  95:16,19
**beneficiary** 72:9
**benefits** 92:9
**benjamin** 9:12 10:2
  10:17 11:12
**best** 13:4 41:4 57:5
  86:23 89:17 103:22
**better** 6:17 16:15
  16:19 41:2
**bicycle** 60:5
**big** 15:23 42:10,13
  102:15
**bill** 72:19
**birmingham** 3:21
  84:19
**birth** 9:2 32:8,9
**birthday** 9:15,20
  21:22
**bit** 7:13,18 38:19
  64:22
**blew** 65:19
**bond** 14:18
**born** 8:19 9:1,21
  12:17,17 32:15
**bother** 28:16
**bought** 13:13 33:1
**box** 3:14
**boys** 99:22
**brad** 13:8 14:14
  16:18 17:15,21
  18:23 20:3 21:4,10
  22:19 23:6 24:5
  27:19,22 28:21
  30:7 31:14,22 32:3
  34:3 39:11 42:19
  43:4 45:22,23 46:5
  46:17 47:5 48:2
  49:3 52:22 53:17
  54:2 55:3,7,12

56:22 57:3,8,18
  58:9 60:11 61:7,9
  62:22 63:16 66:5
  66:16 67:12 68:12
  71:8 76:4 77:3
  82:23 84:9 86:14
  87:4,12,13,17 88:4
  88:5 97:17,22,22
  98:2,5,18 99:7,10
  99:13 101:7,13
  102:23
**brad's** 25:3 41:7
  56:18 66:14 76:17
  77:16 98:7,22
  102:19
**bradley** 1:13 87:1
  87:14,17,22 89:3
**brain** 101:23
**break** 7:8 64:12,14
  95:10
**brief** 84:13
**briefly** 81:22
**bring** 22:19
**broad** 15:4
**broken** 60:11
**brother** 11:22
  87:23
**brother's** 11:21
**brought** 33:3
**buddy** 61:4
**bunch** 70:11
**buried** 15:10
**busy** 28:11
**buy** 15:22 89:4

**c**

**c** 3:1 105:1,1
**calendar** 83:2,15
  83:16,22 84:12
  85:3
**call** 39:8 70:8

**called** 21:4,9 28:9
  34:10 39:3 40:11
  40:19,22 43:2,6,8
  43:11 45:9,10,14
  52:3,5 53:9 65:17
  65:22 79:6,12 80:4
  83:5
**car** 25:4 27:20
  38:21 39:16 40:1
  41:6,23 42:12
  58:23
**card** 72:18
**care** 29:21,23 42:2
  103:15
**carols** 95:9
**carpooled** 61:5
**carpooling** 70:15
**case** 6:2 7:15 47:5
  62:21
**casey** 5:22 69:3,21
  69:23 70:10,12,14
  71:3
**caseys** 70:11,13
**cause** 5:13 105:18
**cell** 68:23 69:1 70:6
**center** 91:13
**certificate** 9:2
**certify** 5:4 50:15
  105:5,14
**changed** 93:3
**charge** 48:7,9
**charged** 48:10
**check** 97:15
**child** 78:8,16 79:2
  86:21 99:20 100:2
**child's** 78:10
**childree** 28:7 32:19
  33:7,9 34:2 52:5
  99:18,19
**children** 11:5 32:4
  72:10 78:7 86:15

**christmas** 22:3
  95:8 102:14
**church** 68:15,16
**circumstances** 41:5
**city** 9:1 10:10 36:13
  45:3 73:5,7,13,14
  81:15 90:6 93:17
  96:3,11 97:1
**civil** 1:10 5:5
**claim** 4:10 34:18
  35:15,23 63:1
  73:10 89:20
**claims** 72:16,20
  84:5
**classes** 49:6 92:4,7
  92:9
**cleaning** 24:18
**clear** 6:20
**clearer** 7:2
**client** 74:4
**close** 15:13 84:17
  84:19
**closed** 44:18,19,20
**clue** 41:3 46:9
**college** 92:2
**colors** 60:4
**come** 12:8 18:3
  19:23 21:18 22:10
  22:17 28:12 29:2
  31:12 43:9 55:7
  66:5 71:4 84:20,22
  86:9,22 94:2
**coming** 21:2,2
  85:22
**commencing** 2:4
  5:11
**commissioner** 5:4
  105:20
**common** 14:17
  62:9,12

**communicated**
  10:11 98:12,16
**communication**
  36:4
**communications**
  71:8 74:6
**company** 71:17
**complaint** 24:10
  41:18 62:21
**completed** 50:17
**completion** 51:17
**compliance** 2:11
**computer** 105:8
**concerned** 98:7
**concluded** 104:22
**concluding** 104:6
**confirm** 51:6 75:17
  76:1 103:9
**confrontation**
  46:18 52:22
**confronting** 59:4
**considered** 90:14
**considering** 89:16
**consistent** 77:21
**contact** 69:1 70:6
  87:11 93:19
**contest** 7:7
**context** 58:7
**conversation** 39:6
  39:9 53:21 59:7
  74:12
**conversations** 45:2
  74:6 98:9
**conviction** 63:1,17
**copy** 34:17 83:18
**correct** 7:21 8:7,11
  14:14 37:5 46:19
  51:18 94:19,20
  97:19 105:10
**counsel** 1:20 2:17
  2:19 5:7 105:15

**count** 12:16
**county** 10:5 12:2
  14:2,17 37:4,9 53:8
  68:5 74:23
**couple** 46:13 72:16
  81:18
**court** 1:1,23 2:12
  4:11,13,14,15,16
  5:1 6:10 26:4 37:4
  37:9 42:1 46:22
  47:4,14,17,17,23
  48:23 50:9,10,18
  51:14,15
**crazy** 54:8
**credit** 72:17
**criminal** 29:23
  91:22 92:15
**cross** 4:4 81:12
**crystal** 30:21
**curious** 97:12
**custody** 87:9
**cut** 69:18

### d

**d** 4:1
**dad** 28:13,20,21
**daddy** 39:4,7 41:1
  42:2
**dalton** 54:16 64:21
**danny** 8:10 28:21
  29:1 42:14 47:1
**date** 5:4 16:23 26:4
  32:7,9 35:8 38:4,22
  47:7,14,17 60:14
**dated** 18:23 61:1
**dates** 24:3,22 36:21
  38:11 46:15 63:20
  84:6
**dating** 14:13 20:16
  53:5 60:13 61:21
**daughter** 52:6
  82:23

**daughters** 88:16
**day** 2:4 5:8 7:4
  11:19 21:1 40:19
  47:17 51:23 52:22
  54:18 56:15 66:23
  80:14 102:15
**days** 28:10 101:16
**dead** 61:22 87:7,9
  101:23 102:6
**deal** 27:19
**dealing** 82:18
**dealings** 82:23
**death** 43:1 78:8
**deceased** 1:8 88:16
**december** 21:23
  32:10,17
**decided** 14:10
  15:18,21
**decipher** 104:13
**deer** 98:4
**defendant** 6:2
  50:16
**defendant's** 4:9
  34:13 47:9,19
  48:14 50:3 51:2,10
  75:2,11,19 76:12
  76:22 77:11 80:18
**defendants** 1:15
  3:9
**degree** 29:22 91:22
**dentist** 23:17 25:8
  25:18 27:18
**department** 23:15
  29:14 43:1 45:5,15
  63:7 96:6 97:5
**department's** 96:8
**depended** 18:6
**depending** 104:11
**depiction** 74:23
  75:15

**deposition** 1:13,20
  2:9,10,22 4:23 6:3
  6:4 80:22 81:6
  103:23 104:22
  105:6,11
**depositions** 2:13
**deputy** 97:7
**describing** 67:12
**detail** 83:3
**details** 90:8 103:4,5
**detective** 79:7 83:6
  103:17
**detectives** 45:16
  52:3
**died** 45:19 60:7
  61:14 65:3
**different** 19:12
  25:5 33:14 78:7,7
**direct** 4:3 5:19
**discovery** 64:19
**discuss** 42:9,14
  95:23
**discussing** 81:22
**dismissed** 26:10
**disrupt** 13:3
**district** 1:1,2
**division** 1:3
**document** 4:13,14
  4:15,16 36:2,12
  38:4 48:23
**documentation**
  29:16 45:13
**documents** 8:5
  38:22 46:14 48:1
  49:9 50:7,9 51:14
  73:4,11
**doing** 60:4
**dollars** 71:22 72:18
**domestic** 48:10
**donald** 62:10

**door** 66:8,9,14
  67:23 101:21
**double** 14:6 97:15
**downtown** 13:9
  60:2
**drinking** 17:20
  54:6,7 55:13
**drive** 12:1
**driving** 27:3
**drove** 12:1
**drug** 27:7
**drugs** 27:14
**duck** 62:11
**duly** 5:17
**dying** 60:4

**e**

**e** 3:1,1,4,6 4:1
  105:1,1
**earlier** 32:7 49:15
  77:6 88:5 96:20
  97:16 99:12
**early** 67:13
**easy** 38:14
**eat** 61:4,6
**effect** 2:11 86:3
**either** 27:22 70:7
  73:12 79:21,22
**elisa** 30:22
**elliott** 1:14
**ended** 21:11 25:17
  27:18 46:21 52:23
**endurance** 7:7
**enforcement** 96:22
  97:6
**enjoyed** 15:8
**entered** 48:2
**equity** 90:10
**establish** 32:7
**estate** 1:7,13 8:15
  16:6 37:1,3 72:17
  72:21 73:1 89:9,21

**estates** 37:23
**et** 1:9,14
**evening** 54:22 65:9
  65:13
**events** 31:20
**everybody** 94:22
  98:20,20
**evidence** 2:22
**exact** 18:18 34:21
**exactly** 16:8 36:5
  37:10 56:2 90:8
  103:6
**examination** 4:3,4
  4:5 5:13,19 81:12
  101:2
**examined** 5:17
**exercise** 29:6
**exhibit** 4:7,10,11
  4:12,13,14,15,16
  4:17,18,19,20,21
  4:22,23 34:13,17
  35:23 36:12 47:3,9
  47:19,22 48:14,17
  50:3,8,23 51:2,5,10
  51:13 74:21 75:2
  75:11,14,19,22
  76:12,16,22 77:2
  77:10,11 80:18,22
  80:23
**exhibits** 74:16 99:2

**f**

**f** 105:1
**fact** 53:19 79:19
**fair** 18:13,20 35:19
  42:8
**fairly** 62:15
**familiar** 76:4 94:5
  96:2,7
**families** 99:7
**family** 7:17 15:6,10
  17:23 70:12 73:12

86:4 95:18,19,20
95:21 102:9
**far** 62:16 87:13
102:23
**farm** 33:22,23
**father** 8:12 94:14
**february** 22:8
**federal** 5:5
**feel** 98:4
**feelings** 102:17,20
102:21
**fell** 16:10
**felt** 53:20 63:21
**filed** 29:8,14 41:17
89:20 93:10,14
**finally** 51:13 65:23
77:5
**find** 52:4 63:11
**fine** 7:11 34:23
36:16 64:14 88:22
97:11
**first** 5:17 15:21
16:20 22:8 33:1
43:10
**five** 18:14
**fixed** 14:7
**flip** 75:23
**florida** 9:1 10:10
**folks** 64:18 69:4
70:7,17 80:16
**follow** 26:8,21
66:13 80:8 86:13
103:23
**followed** 24:23
**following** 5:14
**follows** 5:18
**fond** 15:9
**force** 2:10
**forced** 93:6
**foreclose** 104:9

**foregoing** 5:6 105:6
105:10
**form** 2:18
**formal** 82:3
**fort** 22:15
**forth** 10:12 17:3,5
**foster** 78:6
**found** 26:1 79:4
**four** 92:13 97:9
**fowler** 2:2 5:9
**frame** 20:10 37:13
70:9,20
**freely** 103:18
**friend** 10:11 11:19
19:17 53:6 56:22
57:1 60:2 61:4,6,17
61:19 69:12,17
70:3
**friend's** 11:21
**friends** 18:11 30:15
30:17,18 31:3,11
53:4,12 56:11 57:5
59:23 69:19 87:8
87:10
**front** 58:10 102:12
**full** 2:11 5:21
**funeral** 65:2 69:20
102:2,3,5
**further** 2:7,15
105:14
**fussing** 53:5

**g**

**gadsden** 7:20 8:19
9:4,7 15:16 22:14
22:18 30:19 31:4
31:12 44:15 57:6
84:17 87:3 91:5,10
91:18 92:2,3,23
**gaillard** 3:10 4:3,5
5:20 6:1 64:13,16
81:19 101:3 103:21

104:3
**generally** 15:2
35:13 76:10 85:19
85:20
**getting** 7:13 16:10
46:15 51:16 92:16
**gibson** 2:2 5:9
**girl** 53:6
**girlfriend** 53:8,22
61:16 88:10,14
**girls** 12:22 54:22
57:6 61:15 68:20
70:14
**give** 6:14 18:18
82:8
**given** 6:3 17:23
63:16 105:11
**giving** 6:10,22 41:2
**glad** 7:10 102:10
**go** 6:6,16 7:6 11:18
18:6 21:4,10 23:16
23:23 25:8,18
27:18 41:7 43:20
46:13,21 49:15
66:8 81:8 84:21
95:8,15,16 98:3
**going** 20:21 23:17
25:6 33:13 36:14
40:7 42:1 43:9 46:5
46:9,16 47:3 53:18
54:2,4 60:18,19
64:17 70:22 81:8
104:7
**good** 14:10 36:4
54:6 62:5 64:11
95:15 98:14 104:5
**goodyear** 93:1
**google** 74:22
**gosh** 73:15
**gotten** 46:4 73:17

**government** 90:7
**grandfather's**
32:23
**grandmother** 28:5
79:12
**grandparents**
15:11 87:8
**grave** 95:8,17
**gray** 1:14 13:8
14:14 16:18 23:6
34:3 48:2 71:9 76:5
**greensboro** 2:2 3:7
5:10
**grew** 8:21
**ground** 6:7
**grounds** 2:20
**growing** 9:6 99:7
**guess** 7:12 14:12
16:16 17:6 19:21
38:18,21 39:21
45:23 52:18,19
63:12 66:13 67:19
68:4 79:13 80:7
84:20
**guilty** 47:6 48:4,7
49:1
**gun** 42:19,22 43:3
43:7 44:3 62:21
63:8,16
**gunshot** 101:19
**gunshots** 79:14
**guy** 19:19 53:5
61:12,19 62:3

**h**

**hair** 69:18 71:2
**hairdresser** 10:15
19:19 59:21 90:17
**hale** 37:4,9
**hall** 44:8
**halt** 104:17

**hand** 24:6
**handle** 83:8
**handled** 35:18 63:22
**happened** 12:2,5 13:7 19:8,9 20:10 36:22 38:23 39:23 45:22 52:15 53:4 56:2 68:9 80:10 101:13 102:11 103:6,13
**happy** 56:17,21,23 57:3
**harassment** 48:11
**hard** 102:17,20,21
**harm** 23:8 32:3
**harmed** 30:7
**hassinger** 3:19
**hate** 52:12
**head** 6:13 29:7 84:21 100:22 101:18
**health** 66:6,22 91:18,19
**heard** 11:12 27:16 31:19 66:16 101:19
**hearing** 105:12
**held** 72:12 89:19
**helmsing** 3:12
**help** 6:7 18:1 34:10 55:1 85:11,12 87:6
**helped** 13:17 20:3,4 20:8
**helpful** 87:19
**helps** 7:1 85:22
**herlong** 3:12
**high** 15:18
**hinch** 1:22 5:1 105:20
**hit** 10:12 23:16 24:5,6,7 25:7 26:9

29:7
**hobby** 44:6
**hold** 69:16
**hollered** 66:7
**hollering** 67:4
**home** 11:19 21:5 33:3,21 65:2 66:6 66:22 69:20 75:5,6 91:1,14,17 102:4
**honeycutt** 30:21
**hopefully** 104:3
**hospital** 91:9,11 101:22
**hour** 83:10
**hours** 102:6
**house** 13:13,15,22 15:13,22 16:3,10 16:13,14 18:3 20:5 20:6 21:8,20 22:2 24:18 25:3,13,14 25:17 26:1,10 28:12 29:3 32:23 33:20 39:16 42:20 43:2 45:16,19,23 53:14,16 54:23 59:18,23 66:5,17 66:18,19 67:13 71:5 76:2,7,18 77:3 77:17 78:3 80:2,3 80:11 84:20,23 86:22 87:3 89:5,8 89:12 90:2,10 94:3 98:3 99:1 101:8
**huh** 6:13,14 18:19 20:7 22:7,22 24:15 26:12 30:3 31:5 33:15 35:5,9 36:23 46:2 49:2,22 54:11 60:9 77:18 91:20 91:23 100:7

**hunting** 98:4
**hurt** 27:22,23
**husband** 8:9 10:17 14:13 17:12 21:22 29:19,20 30:2 35:1 35:18 37:2,10 39:10 41:15 42:22 43:13 44:4,5 46:4 52:2 63:4 64:1,2 74:1,8 81:23 82:12 82:13,21 83:9 89:17 91:21 96:21 97:22 98:3,5,10,11 99:23 103:17
**husband's** 35:4

**i**

**idea** 17:10,18 18:7 27:15 39:12 49:13 67:6,15
**identification** 34:15 47:11,21 48:16 50:5 51:4,12 75:4,13,21 76:14 77:1,13 80:20
**identified** 64:7,18
**iii** 3:10
**impossible** 104:13
**incident** 13:7,8,19 17:13 20:10 25:1,9 25:13,16 26:9 27:17 32:1 38:16 38:19 39:2,11,13 39:13 41:11,19,23 42:17 43:3 44:3 45:11,12 46:17 48:11 49:4 82:22
**incidents** 27:22 30:6
**index** 4:7
**indicated** 40:15

**indicates** 40:8 70:5
**indication** 46:5
**influence** 98:18
**information** 7:14 45:20 51:16 52:20 56:5,12 63:4,15 65:4 68:9 73:12 84:4 103:9
**initially** 8:14 37:2 47:5
**inspected** 16:3
**insurance** 71:13 72:1,4
**interested** 61:18 92:14,16 105:17
**interesting** 83:13 83:21
**interviewed** 79:7
**introduced** 93:23 95:3
**invest** 16:14
**invested** 72:8
**investment** 16:15
**involved** 35:17 47:13 79:14 86:10
**ironic** 14:18
**irrelevant** 67:17
**issue** 27:7
**issues** 19:20 27:6 54:14

**j**

**jack** 19:21
**january** 22:5 31:22 38:6,17 45:22 55:17 56:16 67:1
**jealous** 61:9 62:1
**jenkins** 2:2 5:9
**jeremies** 69:13 71:6
**jeremy** 69:2,3,10 69:11,12,14 103:16

**jo** 99:21
**job** 10:16 16:9
26:16 92:19,22
**jobs** 90:20
**john** 3:4,6 82:5
83:10 103:21
**johnson** 69:3,10
**jr** 92:2
**july** 2:4 5:8 25:2,9
27:21 35:7 36:11
38:20,23 39:11,12
41:19 42:17 46:16
48:11 49:4 56:16
**junior** 15:18
**justice** 29:23 91:22
92:15

**k**

**kaci** 11:8 12:17
13:9 15:14,15,16
23:7 32:4 38:1 46:1
51:22 62:22 65:2
71:23 78:1 86:23
101:8
**kaci's** 21:22 32:9
102:18
**karen** 1:22 5:1
105:20
**kayla** 11:8 12:17,19
32:4,12,18 33:3
72:13 78:2,9,19,22
78:22 79:1,7 86:23
99:16 103:15,18
**kd** 1:11
**keenan** 32:19 33:9
34:1,10 97:21,23
98:3,12 99:20
100:20,21
**keenan's** 52:6
**keep** 7:1 60:21
**ken** 6:1 74:4,12

**kept** 19:11 28:12
44:9 102:2
**kids** 11:16 17:4,9
21:4,8 42:12 52:8
53:13 60:22 70:3
102:13
**kill** 62:22
**killed** 13:8 21:23
22:11 28:10 29:12
43:7 51:22 55:23
61:3 66:11
**kin** 105:15
**kind** 12:4 13:9
19:14,21 27:7 29:6
36:20 45:13 46:4
49:11 50:7 52:21
55:6 60:11 72:1
85:15 86:1 91:7
104:16
**kinney** 3:17 4:4
81:9,13,15 82:4
104:7,21
**knew** 12:1 21:2
28:7,22 29:4 30:19
36:14 47:1 49:14
59:12 63:19 67:16
76:9 79:9,10,11
80:1,3 99:7,10
101:6
**knocked** 101:20
**know** 7:3,5,9,15
13:22 14:15,23
15:3 16:8 17:14
18:1,4,16 19:8,18
20:9,20,22,22
21:13 24:1,11,13
25:10 26:21,22
27:4,5,9,14,21
28:18 30:6,10
31:21 34:12 35:12
36:6,11,17,17,18

38:12 39:1,9,20,22
40:18,22 41:6,10
41:14,17 42:11,21
42:22 43:5,6,19
46:8 47:16,18
48:19 49:7,8,10,16
49:19 51:22 52:10
52:14,15,16 53:18
54:3 55:13 56:12
56:12,13,20 57:10
58:2,5 60:6,12
61:22 62:4,10,13
63:2,6,9,11,18,21
66:1,6 67:7,14,17
67:21,22 68:3 69:4
69:23 71:6,18
72:20,23 73:11,17
74:8,10,13 78:5,14
78:16 79:1,4,15,21
80:4,12 81:4 82:2
83:11,12,23 84:3,3
84:9,15 85:1 86:6
86:10,14,19 87:13
87:21 88:9,10,20
90:3,8,9 92:17
93:16,23 94:7,9,11
94:13 98:8,9 99:3,5
99:8 100:4 101:12
102:1,11,16,22,22
103:1,4,4,5,7,11,14
103:16,20
**knowing** 55:7
**knowledge** 16:17
31:16 63:15 71:10
**knows** 52:1 98:20
**kramer** 54:9 65:11

**l**

**l** 1:17
**lady** 80:1 102:12
**laid** 92:7

**large** 2:1 5:3 14:4
**late** 21:3
**law** 2:1 3:5,11,18
5:8 96:22 97:5
**laws** 2:12
**lawsuit** 81:16 93:10
93:13
**lawsuits** 64:4
**leach** 3:12
**leading** 2:18 31:21
34:3
**learn** 39:22 56:14
**learned** 52:15 80:9
80:15
**leave** 15:7
**led** 52:20
**left** 44:19 54:6
**legal** 86:6
**legally** 41:2
**lester** 94:5
**license** 26:18 27:4
**licensed** 1:22 5:1
**life** 8:23 9:4,6 13:3
18:5 71:13,20 72:1
72:3
**lights** 58:13
**liked** 44:7 85:11
92:18
**likewise** 104:15
**line** 14:15
**lines** 29:1
**little** 7:13,18 13:18
13:23 38:19 51:1
64:22 65:15 78:22
89:15
**live** 10:2 12:7 22:14
33:18
**lived** 7:22 8:1,22
9:3 10:3 11:20
13:12 14:17 15:11
19:13 21:5,6 31:3

32:21,23 33:2,5
53:6,7 62:12 74:18
75:6 76:5 77:3,6
79:22 80:2 90:20
99:6
**lives** 22:15
**living** 7:19 13:9
34:8 44:11 78:2
**loan** 90:5
**local** 44:14
**location** 14:2,3
33:19 59:21 75:9
77:16
**locked** 31:1
**long** 7:3,6,22 13:15
17:17 18:12 19:6
33:5,22 60:6 61:23
92:11
**longer** 13:20 94:16
**look** 18:7 43:20
**looked** 16:13 32:6,9
43:21
**looking** 16:4,17
28:14 37:1 80:2
**looks** 37:2,7,8 38:3
48:2 51:15 72:15
72:19
**loop** 10:4 32:20
**lose** 23:18 26:16
**lost** 14:19 88:5,7
**lot** 14:5,8 15:9,10
17:3,5 18:2 26:19
26:23 29:21 34:6
40:23 45:20 54:1
102:8 103:16
**lots** 43:15 70:13
**loved** 11:23

**m**

**ma'am** 84:8
**maiden** 70:12 99:5

**management** 49:6
49:12,16 50:11,12
50:15 51:7,17
**map** 4:17,18 74:22
**march** 37:16,19
50:18
**marjean** 28:3,4
29:2 32:19 33:7
34:1 52:6 61:3 79:6
94:17 98:1 99:21
100:3
**marjean's** 33:2
45:16,19 94:2 97:8
**mark** 47:3 77:9
80:21
**marked** 4:8 34:14
34:16 35:23 47:10
47:20 48:15 50:4
51:3,11 75:3,12,20
76:13,23 77:12
80:19,23
**market** 13:13,16
14:3 20:6 21:9 75:8
75:16 76:2 77:16
78:3 89:5
**marking** 74:21
**marriage** 88:19
**married** 9:10,14
10:1,3,14,21,22
11:3 30:22 33:1
88:13 94:16
**marry** 9:11
**matched** 102:7
**materials** 73:5
**matter** 67:16
**mayor** 93:22,23
**mcculley** 3:4,6
12:14 64:11 104:2
104:19
**mean** 17:3 19:20
34:22 35:2 36:6

44:23 56:16 61:13
61:13 63:23 66:18
86:7 88:9 102:22
103:5
**meant** 15:19 16:11
80:21 101:4
**meet** 60:19 86:17
**members** 102:9
**memories** 15:9
**memorized** 43:19
57:22
**mentioned** 9:19
15:16 17:11 28:23
31:17 36:7 49:14
59:16,20 64:21
68:14 77:6 85:4
96:20
**mentioning** 64:17
**mercedes** 11:17
**message** 70:9
**messages** 56:9
70:17
**messed** 16:1
**met** 10:9 14:16,23
60:23 80:5 86:21
**metlife** 71:18
**michelle** 54:9,11,12
54:13 55:10 56:10
65:11,23 66:4,16
66:21 67:9,23
**michelle's** 66:17,19
**middle** 79:15 99:23
**mile** 19:13 77:7
**miles** 77:20
**million** 71:22
**mind** 18:8
**minute** 12:12,18
13:21
**missing** 28:13
**mitchell** 1:8 8:6
9:12 10:2 11:9 13:2

37:23 38:1 75:6
94:4,12 99:17
**mitchell's** 98:21
**mitchells** 94:12
**mobile** 3:15
**money** 92:17
**money's** 72:12
**montclair** 3:20
**morning** 6:8 55:21
55:22 67:1,3,13
79:5
**mortgage** 89:20
**mother** 8:6 33:11
78:6 87:7 98:21
99:6
**mother's** 87:10
**mothers** 70:4
**motor** 11:13
**motorcycle** 11:21
12:4
**moundville** 8:2
10:6,8,18 11:2
12:23 13:10 22:3
31:12 36:13 42:18
44:2 45:3 57:7
59:22 60:3 68:15
68:16,18 73:6,7
76:20 81:16 90:20
90:21 93:17 96:4,7
96:12 97:2 99:9
102:13
**move** 13:17 15:6,17
20:4,4,8
**moved** 10:13,20
13:12 23:15 75:8
**moving** 14:2 15:16
61:20
**mu** 1:11
**municipality** 35:14
**murder** 82:22
95:23 96:18

**muscle** 29:6

**n**

**n** 1:17 3:1 4:1
**name** 5:21,23 28:6
  30:23 33:14 53:23
  54:9 57:2 60:17
  62:2 67:4 69:5,21
  69:23 70:12 78:10
  80:4 81:14 83:6
  87:1,16 91:16 99:5
**names** 62:6 69:5
  93:3 96:15
**navy** 92:10,12
**necessarily** 38:13
**necessary** 2:16
  82:5
**need** 7:8 19:17
  43:19
**needed** 39:8 45:12
  85:12 86:5
**neighbor** 53:9
  98:22
**neighbors** 79:22
  80:10
**neither** 105:15
**never** 7:5 18:23
  23:9,23 24:16,21
  24:23 45:9,13 80:5
  85:13,15 97:4,17
**new** 22:2 62:15
**newman** 3:13
**news** 98:17
**newspaper** 43:10
**nice** 14:7
**niece** 22:10,12 69:7
**night** 29:3 39:23
  40:9,13 41:8 42:20
  45:17,18,21 46:3
  51:23 52:14 54:4
  54:18 55:16,19
  56:15 58:12 66:11

68:10,19,20 79:15
**nine** 78:21
**nodding** 6:13
  100:22
**north** 84:21
**northern** 1:3
**notary** 1:23 5:2
**note** 43:20
**notes** 43:14,15
  63:19 73:23 74:1
  81:22 82:12,14,18
  82:20 83:12,14
  104:1,12
**notice** 4:23 80:21
  81:5
**number** 34:13 47:9
  47:19 48:14 50:3
  51:2,10 64:4,6,10
  75:2,11,19 76:12
  76:22 77:11 80:18
**nurse** 66:7,22 91:4
  91:7,8,8
**nursing** 91:14,17

**o**

**o** 1:17 3:10
**objection** 104:20
**objections** 2:17,20
**observed** 34:3
**obsessed** 57:11
**obviously** 80:7
**occasion** 87:3
**occasions** 59:16
  96:21
**occurred** 25:2
  38:17 41:11,13
  51:23 52:14 65:7
  65:13 67:7
**occurring** 52:23
**odd** 19:14
**offered** 2:22

**office** 3:14 44:19,20
  83:5
**officer** 50:18
**officers** 96:11,22
**offices** 2:1 5:8
**oh** 37:18 40:10
  73:15
**okay** 6:6 7:10 8:4,8
  8:19 9:3,13,16 10:1
  10:20 11:11 12:15
  12:21 13:19 18:13
  21:18 22:17 31:11
  31:18 33:13,18
  36:19 37:15 38:10
  40:4,10,13 41:13
  41:21 45:1 47:22
  50:6,21 51:9,20
  52:7,16 54:12
  55:20 56:1 59:11
  62:7,20 64:3 66:20
  69:8 71:23 72:12
  73:3 76:15 77:5
  79:18,21 81:7,11
  83:21 84:15 85:7
  85:10,17 86:8,11
  86:13 87:2 88:3,15
  89:2,4,19,23 90:9
  90:23 91:5,9,16
  92:11 93:2,5,21
  94:10,21 95:11,13
  95:21 97:4,11
  98:10 99:11,19
  100:1,4,10,13
  101:17
**old** 12:19 17:9
  78:16,19 86:19
  100:4
**older** 15:15 78:22
  88:23 89:2
**once** 11:3 22:21

**open** 67:23
**operating** 12:3
**opportunity** 104:9
**oral** 5:13
**order** 4:11 47:4
  50:7
**oriented** 74:16
**original** 9:2
**originally** 10:18
**outcome** 46:22
**outside** 66:8 91:1
**overheard** 39:6

**p**

**p** 1:17 3:1,1
**p.c.** 3:6,13,19
**p.m.** 40:9 104:22
**pad** 82:15
**pads** 43:14,20
**page** 4:2 46:1
**paid** 72:5,7 90:14
**paige** 1:7 8:6,19
  12:22 13:8 15:18
  15:22 18:21 22:17
  23:11 24:12 25:3
  26:8 27:18 28:8
  30:9 32:1,20 34:10
  37:23 38:21 45:18
  46:19 47:16 51:21
  52:22 53:10,15,16
  54:13,23 55:5 57:9
  58:9 61:15,17
  62:22 65:2,19,20
  66:11 68:15 71:3
  71:13 72:5 74:18
  78:1 79:23 80:3
  84:13 85:4,7 87:5
  89:4 90:16 95:16
  95:23 101:7 102:18
  103:1
**paige's** 8:12 31:2
  32:8 45:23 56:7,15

65:19 66:18 71:5
96:18 99:22
**painting** 28:11
**panama** 10:9
**paper** 7:2 24:19
25:23 26:3 34:21
**paperwork** 8:9
16:2,5
**parents** 33:10
87:10
**parked** 39:19 58:23
**parnell** 22:13 69:2
69:6
**part** 35:17 46:14
48:18 49:5 50:19
81:2 89:8 91:14
92:9
**participated** 85:14
**parties** 1:19 2:19
105:16
**passed** 8:17 11:12
12:21 14:13 17:12
37:15 72:6 101:15
**payne** 22:15
**peggy** 69:2,8 71:2
**people** 16:8 20:8
31:8 42:23 44:19
46:11 64:4,6 85:12
85:12 97:9 102:9
**period** 56:18
**perry** 33:21,22
52:5 99:15,15,17
100:4,10,18
**perry's** 103:16
**person** 86:3,5
**personal** 1:5 8:14
37:3,11,22 83:15
**personally** 44:1
45:2 93:18
**phelps** 2:1 5:9

**phone** 31:1,2 56:6
56:7,15 57:13,15
57:23 58:18 65:16
65:19,19,20 68:23
70:6,7 104:1
**photo** 4:20,21,22
**photos** 4:19 75:23
76:17
**picked** 29:5
**picture** 77:3
**pictures** 74:15
**piece** 24:19 25:23
26:3 34:21
**place** 13:12 33:21
70:1 75:5,6
**places** 19:12
**plaintiffs** 1:10 3:3
**plant** 9:1 44:17,20
92:8,23
**plea** 4:12 48:1,18
**please** 5:21 82:7
83:20
**pled** 47:6 48:3,6
49:1
**point** 7:8 9:10
11:13 14:12 18:22
20:18 21:13 42:19
44:2 54:21 60:8,23
62:16 67:21 77:20
81:10 104:19
**police** 23:15 24:1
24:10,20 29:14,19
39:8 40:8,14 41:17
42:17,23 45:5,15
63:7 83:5 96:6,8,11
101:9,18
**policies** 96:3,8
**policy** 71:19,20
72:4
**politics** 102:4

**porch** 57:12 58:11
58:13,20 80:6
101:20
**porter** 3:19,19
**possibility** 27:10
**possible** 82:8
**post** 3:14
**potentially** 46:6
**powers** 10:4 32:20
**preacher** 68:22
102:17,18
**preface** 52:19
**pretty** 9:4
**print** 105:9
**prior** 2:22 60:8
**probably** 15:14
19:7 21:12,12
30:23 33:8 38:12
90:11 103:22
**probate** 37:4,9
**problem** 27:1 28:22
85:16
**problems** 26:19
27:1
**procedure** 5:6
**procedures** 96:3,8
**proceedings** 5:14
**produce** 73:4,17
83:19
**produced** 104:18
**profession** 90:17
**program** 50:10
51:7 85:14,22
**progressed** 62:16
**property** 13:2
**provide** 82:7
**provided** 5:5
**public** 1:23 5:2
**pulled** 26:18
**purpose** 83:23

**pursue** 92:19
**pursuing** 92:1
**put** 17:17
**putting** 35:22

**q**

**question** 6:23 15:4
16:19 70:23 80:8
81:1
**questions** 2:18,19
6:9 63:10 64:5 79:8
81:9,17 97:14
101:1 105:7
**quit** 60:7
**quite** 66:13

**r**

**r** 3:1,17 105:1
**ray** 1:5,14,21 5:12
5:16,22,23 8:10
81:14 82:6 90:23
97:14 100:23
104:11,21
**read** 6:16 36:1
**reading** 2:8
**ready** 15:22 28:11
56:19 61:21
**real** 16:6 54:8
**really** 14:4,7 16:5
16:23 17:10,18,19
19:20 20:22 25:10
26:15 27:9,15
28:16 29:19 33:6
34:5 35:17 40:5,21
41:1 61:13 62:15
67:16 73:18,20
80:23 81:17 83:8
85:17 86:10 87:5
102:22,23 103:3
**reason** 7:9 14:1
43:8 53:17 85:17
87:15,20

**reasons** 15:8 86:6
**recall** 98:11
**receipt** 51:16
**receive** 104:11
**received** 73:6
**reception** 95:5
**recess** 64:15
**recharacterize** 98:15
**reconvene** 104:4
**record** 23:14 81:2 81:21 104:16
**recording** 57:12,15 57:17,21 58:8,9,15 58:16,22
**recordings** 58:1,5
**records** 90:4
**redirect** 4:5 101:2
**reduced** 105:8
**reevaluate** 104:17
**reference** 38:11
**referral** 50:10,18
**referring** 49:21 50:9
**refusing** 86:4
**regard** 74:4
**registered** 91:8
**regular** 20:12
**rehab** 17:20 84:10 84:16 85:8 91:13 91:18,19
**rehabilitation** 85:21
**relate** 49:10
**related** 41:18,22 47:4 73:7,13 82:22 94:7 103:10
**relating** 2:12
**relation** 100:5
**relationship** 15:3 16:18 19:2

**relative** 94:4
**relay** 42:4
**relaying** 98:11
**remarry** 18:22 88:7
**remember** 6:12 9:13 12:9 16:20,22 17:1,2,8 18:9 21:14 23:19 24:2,8,22 26:1 29:9 30:16 33:6 34:21 36:5 40:5,11 42:7 43:5 43:11 45:10 47:2 57:2,20 58:7,11 60:18 62:2,5 65:18 70:16,23 71:6,7,16 71:21 73:20,22 78:11,12,15 83:6 87:1,15 88:20 90:4 94:1,3 95:7 96:14 97:10,12 99:6 102:14
**remind** 23:2
**rent** 90:14
**repeat** 98:13
**report** 24:10,16 29:8,14 40:8,14 41:18
**reporter** 1:23 5:2 6:11
**repossess** 89:13,18
**represent** 6:1 81:15
**representative** 1:6 8:15 37:3,11,22
**represents** 105:10
**reputation** 98:20
**request** 73:3 82:3
**requirements** 50:17
**reserve** 104:4

**respective** 1:20
**responded** 42:18
**response** 6:14
**responses** 64:7,19 68:14
**responsible** 86:3
**responsive** 73:18
**rest** 70:22
**result** 49:4 105:17
**retire** 93:6
**retired** 29:21 44:7 44:12,16 91:12,12 92:5
**returned** 43:3 62:23
**reviewing** 36:2
**rick** 64:21
**rickey** 53:5,11 54:7 54:14,15 55:10,11 55:12 62:11 66:2 68:8
**rickey's** 53:14 54:23
**ride** 60:5 76:8
**right** 7:20 8:16 9:22 11:2,5,9 13:1 16:16 25:20 26:13 31:15 32:6,10 37:12,13,19 39:17 46:19 51:21 60:6 62:18,19 64:3 70:1 75:10 80:3 91:12 94:6 95:4 99:11 103:23 104:5
**rip** 90:15
**river** 61:16
**rn** 91:8
**road** 3:20 10:4,5 12:2,7 14:2,17,20 14:21,22 19:13 21:6,6,7 32:20 53:8

68:6 75:1
**robertson** 6:1 74:5
**roddenberry** 69:4 69:22
**ron** 99:4
**ronnie** 94:12,14 98:21 99:21 100:2
**ronnie's** 94:16 99:5
**room** 103:17
**rouse** 3:13
**rules** 2:12 5:5 6:7
**run** 19:15 74:19
**running** 19:11
**rural** 90:5

**s**

**s** 1:17,17 3:1
**safe** 14:10
**safer** 16:15
**safety** 60:20
**salon** 70:2
**saturday** 29:3,11
**saw** 9:20 11:11 22:1,4 23:9 50:22 58:23 65:1 103:15
**saying** 6:13 29:2 45:8
**says** 9:2 40:9 50:15 68:23 73:16
**school** 15:18 71:3
**second** 15:23 76:19 76:19 77:17
**secretary** 44:8,13
**see** 12:11 19:6 20:2 20:16,23 22:8 23:5 23:7 24:19 32:22 37:7,10 38:5 45:17 47:7 48:4,5 50:14 50:19 52:16 56:19 58:14 60:12 70:11 80:5 81:7 84:22 87:18 97:8,12

98:18 99:4 101:5
**seeing** 16:21 17:15
  19:10,12 20:11,12
  87:12 88:12
**seen** 24:16 29:16
  34:9,19,20 39:15
  48:19,20,21 81:4
**self** 21:9
**sell** 15:21 89:11
**send** 64:4
**sent** 36:12 73:5,13
  73:14 81:5
**sentencing** 49:5
**sentiment** 98:16
**september** 47:7
  48:3 62:23 63:17
**sequence** 103:13
**series** 75:22
**service** 11:22 68:20
  102:19,19
**sessions** 51:6
**set** 47:6 51:5 55:6
**setting** 48:23
**setup** 53:20
**she'd** 13:22
**sheriff** 97:7
**sheriff's** 97:5
**shock** 102:15
**shooting** 67:14
**shop** 60:3
**short** 64:15
**shortly** 96:18
**shot** 46:1 101:7,9
  101:17 102:12
**show** 34:16 38:5
  47:22 50:6,23
  59:17 63:15 65:22
  76:15 77:9
**showed** 47:16 61:7
  70:6

**showing** 70:8
**shows** 36:10 47:5
  65:16 69:1 76:17
  77:15,19
**side** 79:22 80:3,11
**sides** 64:6
**signature** 2:8 35:3
  35:4 36:8 105:20
**signed** 35:1,8 36:10
**sill** 60:12
**similar** 87:16
**sing** 95:9,17
**sister** 32:13 87:23
**sit** 31:18 44:22 45:1
  63:14
**situation** 25:9
  38:15 48:18 49:17
  55:1 59:8 73:8
  101:23
**six** 7:23 11:16
**sixty** 7:23
**small** 17:4 19:16
  72:16,17
**smaller** 14:9
**smart** 19:19
**sold** 13:13 75:7
**somebody** 31:19
  52:3 57:7 85:20
  86:7
**somebody's** 18:5
**soon** 82:8
**sorry** 8:22 10:5
  50:2 70:21 93:20
  95:14
**sort** 6:7 24:10
  29:13 81:18 93:5
**sound** 32:10 37:13
  94:5
**sounded** 95:2
**sounds** 26:8 35:16
  54:21 55:5 62:14

67:11 94:6
**southern** 1:2
**speak** 28:19 96:10
**speaking** 95:1
**special** 90:5
**specific** 42:7 45:12
  51:1
**speculation** 56:3
**spend** 20:1 61:16
**spent** 22:3
**spoke** 45:14 99:23
**spoken** 96:21
**sponsor** 17:23 85:5
  85:19 86:1,12
**spot** 64:12
**spouse** 88:5,8,17
**spouses** 14:19
**stagg** 69:3,15
**stalking** 57:14
  59:14,15
**standing** 58:20
  101:20
**start** 7:12 61:21
**started** 6:8 7:6
  14:13 16:21 60:15
  81:20 91:13
**state** 1:23 5:2 92:2
  105:3
**statement** 4:10
  34:18 35:15,22
  73:9
**states** 1:1
**status** 72:3
**stay** 12:23 15:19
**stayed** 10:22 13:1,4
**steel** 44:14,17,20
  92:7,23
**stenotype** 105:7
**step** 85:14
**stepfather** 33:12
  97:23

**stepsisters** 88:2,4
  88:16
**stipulated** 1:18 2:7
  2:15
**stipulation** 5:6
**stored** 43:16
**story** 88:21
**straight** 94:22
**straightened** 16:5
**street** 11:20 12:6
  13:14,16 14:3 20:6
  21:9 53:7 75:9,16
  76:2,19 77:16 78:3
  79:23 80:13 89:5
**stuff** 11:23 18:2
  26:5 34:7 35:3
  45:16 60:4 104:14
**submit** 35:15
**submitted** 37:8
**substance** 27:5
**successfully** 50:16
**successor** 37:22
**sue** 35:14
**suite** 3:7,20
**summer** 21:13,16
**supervision** 105:9
**supplement** 81:18
**supposed** 22:7,10
  23:23 71:4
**sure** 6:22 12:15
  21:4 25:15,20
  35:21 36:4 42:6
  47:1 53:21 56:22
  63:19 64:13 67:5
  73:19 84:6 85:13
  95:12 100:9 104:2
**surprised** 46:11
  99:14 100:11,12,19
**suspend** 103:22
**swap** 70:15

**swing** 84:22
**sworn** 5:17
**sylvia** 1:5,14,21
5:12,16,22

**t**

**t** 1:17,17 105:1,1
**take** 6:2,15 7:8
61:15 64:14 82:12
82:14,18 83:12,14
93:19 95:10
**taken** 1:22 101:22
105:6
**talk** 6:21 16:6 19:4
28:15 31:9 34:6
38:13,14,15,19
41:1,21 44:1 53:14
54:3,4 60:16 65:21
66:2 68:1 71:3 83:5
83:9 95:22 98:4
103:19 104:10,14
**talked** 10:14 21:13
24:2,21 27:20
28:13,20 29:19
32:8 35:2 39:3
41:14 42:23 53:10
53:10 56:11 60:19
63:7 64:9,20,22,23
65:12 73:9 74:17
83:10,11 95:6
97:21 98:2 103:18
**talking** 13:20 17:13
40:19 53:11 54:13
57:13,18 58:14,17
58:21 59:5 60:15
66:12
**task** 84:1
**telephone** 69:1
70:8
**tell** 5:21 11:15 15:2
23:12 27:11 28:2
30:11 34:2 36:17

39:1 43:2,10,12
48:20 52:13 53:3
56:11 65:15 78:5
78:13 83:13 89:1
**telling** 26:4
**temporarily** 104:17
**ten** 17:15 78:18
**terms** 49:1 54:6
58:8 72:5 74:18
**testified** 5:18 97:16
99:12
**testify** 23:23
**text** 54:1,5 56:9
60:16 65:23 70:9
70:17
**thank** 51:20 104:21
**thanksgiving** 60:21
**thereto** 2:23 105:8
**thing** 14:18 25:5,7
25:14 29:7 41:4
42:7,10,13 65:16
84:13 86:9 102:12
103:22 104:8
**things** 7:6,14,16
10:16 23:10,13
24:17 36:19,21
39:5 44:9 56:21
74:18 83:3 84:7
98:14 104:18
**think** 7:4 9:20
13:22 14:6 17:9,12
18:15 20:20 24:9
24:20 25:11,13
26:3,14 27:10
28:15 29:13 30:22
31:21 35:1 45:18
48:22 49:10 51:1
52:4 53:22 54:1
55:9,10 57:11
58:23 59:1,2 61:12
61:23 64:16 66:2

69:11,16,17,20
70:1,10,14 76:18
78:18 87:1,5 88:11
88:12,13,15,18
90:1,18 97:7,13
98:6 100:23 103:21
104:5
**thinking** 21:15
40:6,16
**third** 48:10 99:23
**thomas** 3:10
**thought** 13:4 14:11
16:14 55:6,9,10
67:2 89:17 98:17
**thousand** 72:18
**threaten** 32:4
**threatened** 27:23
30:7
**threats** 23:8 59:9
**three** 28:10 49:9
50:6 78:6
**thursday** 29:12
45:18 67:1
**tiffany** 22:13 69:2,6
71:4
**time** 2:21,21 14:15
15:21,23 17:17,22
18:12 19:6 20:1,2,2
20:10,13 21:11
22:4,20 23:4 33:22
37:12 40:5 43:21
51:21,22 57:8
58:12 60:23 61:16
61:23 65:1 66:6
67:6 70:8,20 74:13
74:14 78:8,20
79:11,23 83:10
88:11 90:12 91:15
93:1,22 96:17
103:3

**times** 15:12,20 19:3
19:6 23:5 28:9,10
40:23 53:10 63:8
65:22 78:7 93:4
**today** 6:3 17:13
31:18 45:1 63:14
81:6 104:6
**told** 18:2 19:4
23:10 27:8,11
29:15 30:8,11,13
35:2 36:3,4 39:4,7
42:5,15 45:19
53:23 56:22 59:13
60:17,17 65:17
66:4 67:9 79:7,10
84:18 88:20 95:7
97:20 100:10 102:1
**tom** 5:23
**tony** 94:5,6 95:3,16
95:22
**tony's** 95:20,21
**tooth** 23:18
**top** 50:19
**tore** 61:14
**town** 19:16 20:17
60:12 62:12 90:13
102:3,21
**trades** 19:21
**trailer** 14:7 33:2,4
**transcript** 105:11
**treasurer** 44:13
**treasury** 44:8
**trial** 2:21 47:6
**tried** 15:12,20 17:9
87:6 92:20
**trouble** 26:15
89:16
**truck** 59:2
**true** 67:20 105:10
**try** 6:20,21,23
16:19 55:1 82:7,10

**trying** 17:16 18:1
26:19 39:22 52:17
57:8 94:21
**tuesday** 61:2
**tuscaloosa** 2:3 3:8
5:10 11:2
**two** 11:7,16 12:19
15:12,20 17:16
19:7,8,8 20:9 30:18
42:12 43:23 53:4
57:6 60:10 77:21
88:2 99:22
**type** 86:9

**u**

**u** 1:17
**uh** 6:13,14 18:19
20:7 22:7,22 24:15
26:12 30:3 31:5
33:15 35:5,9 36:23
46:2 49:2,22 54:11
60:9 77:18 91:20
91:23 100:7
**understand** 7:19
8:4,8 9:9 13:6
26:17 40:3 46:17
71:12 86:5 88:1
95:13 101:15
**understanding**
20:17 39:14 55:15
77:22 85:20 101:7
101:10 103:12
**undertake** 84:1
**unfortunately** 63:9
104:10
**union** 44:8,14,14
**united** 1:1
**upkeep** 14:5,9
**upset** 39:4 40:21
41:15 59:6 102:8
**use** 74:16 83:15

**v**

**vacant** 80:12
**vehicle** 11:13 59:1
**verbal** 6:14
**verify** 84:6
**video** 58:15,16,22
**views** 77:15
**violence** 48:10
**visit** 20:1 21:19
22:18 86:9 87:2
**visitation** 95:3
**visited** 18:4
**visiting** 11:23
**vs** 1:12

**w**

**wachovia** 16:1,7
90:1
**wait** 12:11,18 13:21
37:18
**waited** 16:12
**waived** 2:9
**wake** 95:2
**waked** 79:15
**walk** 79:9
**want** 7:12,17 13:3
15:7,17 28:16
30:12 38:5,13,16
38:18 64:8,14
65:21 74:16,19
92:21 95:10 103:3
103:6,11 104:8
**wanted** 14:6,9 15:6
16:13 28:15 38:10
43:10 71:2,3 81:2
98:8 103:8,14
**warning** 46:4 97:17
99:13
**warren** 3:17 81:14
**warrior** 85:1

**way** 17:8,18 63:13
63:22
**we've** 32:8 35:23
64:9,19 73:17
**wednesday** 68:19
**weekend** 11:18
22:11 71:5
**weigh** 26:20
**went** 12:7 14:16
17:3,4,20 24:1 25:3
27:20 38:21 39:15
39:23 45:22,23
53:13,14,16 54:23
61:3 66:14 68:3,19
81:21 84:9 101:8
101:21
**wide** 14:6
**wife** 69:19
**wife's** 98:21 99:5
**wish** 28:19 67:15
**witness** 2:9 5:12
31:13 36:2 100:22
105:12
**witnessed** 31:20
79:2
**woman** 15:21
**wondering** 17:6
33:14 52:19 79:13
**word** 102:6
**words** 79:10 98:1
**work** 11:18 15:15
22:9 40:23 60:1
61:4 66:23 90:16
91:1 93:6 96:11
98:8
**worked** 11:17 21:7
59:22 60:3 91:11
93:1
**worker** 44:14
**working** 21:3 29:7
29:20 60:7 91:13

**works** 78:14 93:16
**worry** 30:12
**write** 82:14 83:2,4
84:12
**written** 83:7
**wrong** 79:11
**wrote** 43:15 44:5

**x**

**x** 4:1

**y**

**y'all** 22:18 40:19
52:9 64:7,13 89:11
**y'all's** 62:21 64:19
**yard** 14:4,9 33:2
**yeah** 12:18 15:5
18:15,15 20:3
21:17 25:19 28:1
61:23 68:21 69:14
87:20
**year** 9:17 12:9
13:18,23 17:1,2
18:7 20:9 21:12
44:23 89:15,16
102:11,13
**year's** 22:2
**years** 7:23 12:19
17:15,16 18:14
19:7,9 32:21 33:3
43:23 44:10 60:10
92:13 99:10
**yelling** 67:3
**yellow** 43:14 82:15
**younger** 32:12
100:8